# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

CITY OF LA CROSSE, individually and on behalf of all others similarly situated,

        Plaintiff,

v.

OSHKOSH CORPORATION, PIERCE MANUFACTURING, INC., REV GROUP, INC., ROSENBAUER AMERICA LLC, FIRE APPARATUS MANUFACTURERS' ASSOCIATION,

        Defendants.

Case No. 1:25-cv-01252

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................... 1

II. PARTIES ............................................................................................................... 3

    A.     Plaintiff City of La Crosse .......................................................................... 3

    B.     Defendants .................................................................................................. 6

        1.     REV Group, Inc. ............................................................................. 6

        2.     Oshkosh Corporation and Pierce Manufacturing, Inc.................. 7

        3.     Rosenbauer America LLC .............................................................. 8

        4.     The Fire Apparatus Manufacturers' Association ......................... 9

III. JURISDICTION AND VENUE ............................................................................ 10

IV. FACTUAL ALLEGATIONS ................................................................................. 11

    A.     The fire truck industry was diverse and comprised of many independent sellers until approximately 2008, when the Great Recession devastated the industry. ...................................................... 11

    B.     REV Group, Oshkosh, and Rosenbauer start rolling up fire truck manufacturers............................................................................... 12

        1.     AIP and REV Group ..................................................................... 12

        2.     Oshkosh........................................................................................ 16

        3.     Rosenbauer................................................................................... 18

    C.     Manufacturer Defendants seek to cooperate rather than compete with one another.......................................................................... 19

    D.     Manufacturer Defendants exchange confidential, competitively sensitive information through FAMA................................................. 20

        1.     FAMA Statistical Reports............................................................ 20

        2.     FAMA Meetings .......................................................................... 23

    E.     The conspiracy enabled Defendants to suppress supply and raise prices of fire trucks during the class period......................................... 27

1. Fire truck backlogs soared by 40% or more during the class period. ...................................................................... 27

2. In the face of increasing demand, Manufacturer Defendants have failed to increase capacity and in some cases have shuttered manufacturing facilities, worsening the fire truck shortage. ...................................................................... 31

3. The price of fire trucks doubled during the class period. ........................ 33

4. Manufacturer Defendants used "floating prices" during the class period to charge even more for fire trucks. ...................................... 34

F. Defendants' conspiracy had the intended effect of increasing manufacturers' margins and revenues. ................................................. 35

G. Market Power and Barriers to Entry ............................................................ 37

1. Relevant Markets ......................................................................... 37

   a. The product market encompasses all fire trucks. ......................... 38

   b. The geographic market is the United States. ............................... 41

2. Manufacturer Defendants have market power in the relevant markets. ...................................................................... 41

3. High barriers to entry in the fire truck manufacturing market protect Manufacturer Defendants' market shares ........................ 41

H. Plaintiff and other Class members have been harmed as a result of the conspiracy. ...................................................................... 43

1. Plaintiff and other Class members have overpaid for fire trucks as a result of Defendants' anticompetitive behavior. ..................... 43

2. Inflated prices and long backlogs have prevented Plaintiff and the other Class members from timely replacing old vehicles in their fire truck fleets, and their fleets have suffered as a consequence. ...................................................... 44

3. Reduced fire truck fleets are less able to respond to disasters. ...................................................................... 47

4. Plaintiff and Class members have also suffered harm because they have had to redirect funds toward purchasing fire trucks that they would have otherwise put toward other essential needs. ...................................................................... 50

I.      Defendants actively concealed the conspiracy and Plaintiff did not and could not have discovered Defendants' anticompetitive conduct. ............................................................................................... 50

V.      CLASS ACTION ALLEGATIONS ....................................................... 51

        A.      All requirements of Federal Rule of Civil Procedure 23(a) are met. .................... 52

        B.      All requirements of Federal Rule of Civil Procedure 23(b)(3) are met. ................................................................................................. 53

VI.     ANTITRUST INJURY ........................................................................ 54

VII.    CLAIMS FOR RELIEF ....................................................................... 55

        A.      First Claim for Relief: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for conspiracy to restrain production (on behalf of the Nationwide Class for injunctive and equitable relief) ..................... 55

        B.      Second Claim for Relief: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for conspiracy to exchange competitive information (on behalf of the Nationwide Class for injunctive and equitable relief) ....................................................................................... 56

        C.      Third Claim for Relief: Violation of Wisconsin State Antitrust Law, Wis. Stat. Ann. § 133.01, *et seq.* (on behalf of the Wisconsin Class) ........................................................................................................ 58

        D.      Fourth Claim for Relief: Unjust Enrichment (on behalf of the Wisconsin Class) ....................................................................................... 59

REQUEST FOR RELIEF ................................................................................. 60

DEMAND FOR JURY TRIAL ........................................................................ 61

Plaintiff brings this action under Section 1 of the Sherman Act, as well as under Wisconsin antitrust law and common law, against Defendants. Plaintiff seeks an injunction requiring Defendants to stop their anticompetitive practices, as well as restitution, disgorgement, and civil penalties to the full extent authorized by law. Plaintiff demands a trial by jury.

## I.     INTRODUCTION

1.     Fire truck prices have doubled in the last ten years. A fire truck that cost $500,000 in the mid-2010s now costs $1 million. More specialized trucks that used to cost $900,000 now cost more than $2 million. Inflation alone does not explain these price increases, which have squeezed municipal budgets and prevented communities from replacing their old rigs. At the same time, wait times for new fire trucks have ballooned from 18 months in the mid-2010s to more than four years today.

2.     As a result of high prices and long order backlogs, fire trucks that should have been retired after 15 or 20 years are now celebrating their 30th "birthdays" on the front lines. These older trucks break down more frequently and are more difficult to repair than new trucks, leaving gaps in communities' fire protection systems and putting the public in danger. These gaps can have deadly consequences when fires break out and no fire trucks are available to respond. And even communities that have been able to purchase new fire trucks have had to redirect funds from other priorities to cover the price increases.

3.     Three fire truck manufacturers—REV Group, Inc. ("REV Group"), Oshkosh Corporation ("Oshkosh"), and Rosenbauer America LLC ("Rosenbauer") (collectively "Manufacturer Defendants")—are responsible for increasing fire truck prices and perpetuating lengthy backlogs. Together, these three manufacturers control between 70 and 80 percent of the U.S. fire truck market, and they have unlawfully conspired to use their collective market power to suppress the fire truck supply and raise prices.

- 1 -

4.     The Manufacturer Defendants have perpetuated their conspiracy in part through the Fire Apparatus Manufacturers' Association ("FAMA"). The Manufacturer Defendants, along with most other fire truck manufacturers in the country, submit sensitive, non-public economic data to FAMA. FAMA sends the data to an outside consulting company, which compiles the data into reports that FAMA then distributes to its members. FAMA also provides a forum for Manufacturer Defendants to communicate with each other directly during yearly members-only meetings.

5.     The economic data manufacturers obtain from FAMA is not the type of information that competitors would provide each other in a normal, competitive market. The Manufacturer Defendants use the sensitive economic data FAMA shares with them to coordinate price increases and suppress production. They also use FAMA to monitor their co-conspirators to ensure continued adherence to the conspiracy.

6.     None of the FAMA reports are available to anyone other than the manufacturers themselves. As a result, buyers in the market, including Plaintiff and Class members, operate at a disadvantage. By limiting data access, FAMA reports create an information asymmetry that benefits the Manufacturer Defendants at buyers' expense. This information exchange is particularly likely to have anticompetitive effects because so few sellers control the fire truck market.

7.     Thanks to their conspiracy, Manufacturer Defendants have been able to increase their margins by several percentage points and boost total profits, all without concern that their competitors will try to steal market share. Nor are Manufacturer Defendants phased by potential new entrants, because high barriers to entry prevent new competitors from coming into the market.

8.      As a result of each Defendant's unlawful conduct, Plaintiff and Class members paid artificially inflated prices for fire trucks during the class period. Such prices exceeded the amount they would have paid if the price for fire trucks had been determined by a competitive market. Thus, Defendants' conduct injured Plaintiff and Class members.

9.      Plaintiff City of La Crosse, individually and on behalf of all others similarly situated, challenges Defendants' conspiracy. Plaintiff brings this Complaint, alleging violations under both a *per se* or, in the alternative, rule-of-reason standard, under federal and state antitrust laws.

## II.      PARTIES

### A.      Plaintiff City of La Crosse

10.      The City of La Crosse ("La Crosse") is a city of 52,680 people located on Wisconsin's western border.[1]

11.      La Crosse has purchased multiple fire trucks from Manufacturer Defendants for its fire department since 2016. Among these are two Pierce Arrow XT aerial trucks, a Pierce Saber pumper tanker, and a Spartan truck. La Crosse has also purchased a Rosenbauer Panther 4x4 for its airport.

---

[1] *Welcome to La Crosse!*, LA CROSSE WISCONSIN, https://www.cityoflacrosse.org/city-services/about-la-crosse-wisconsin (last visited Aug. 19, 2025).



*Image 1: La Crosse's 2016 Pierce Arrow XT aerial fire apparatus.*[2]



*Image 2: La Crosse's 2020 Pierce Saber pumper tanker.*[3]

---

[2] *Fire Wiki*, FANDOM.COM, https://fire.fandom.com/wiki/La_Crosse_Fire_Department_(Wisconsin)#Apparatus_Roster (last visited Aug. 15, 2025).

[3] *La Crosse Fire Department – Pumper*, PIERCEMFG.COM, https://www.piercemfg.com/customers/new-deliveries/la-crosse-fire-department-pumper-34319 (last visited Aug. 15, 2025).



*Image 3: La Crosse's 2021 Pierce Arrow XT aerial fire apparatus.[4]*



*Image 4: La Crosse's 2023 Rosenbauer Panther 4x4.[5]*

[4] *La Crosse Fire Department – Aerial*, PIERCEMFG.COM, https://www.piercemfg.com/customers/new-deliveries/la-crosse-fire-department-aerial-35222 (last visited Aug. 15, 2025).

[5] *La Crosse Regional Airport*, ROSENBAUERAMERICA.COM, https://rosenbaueramerica.com/whats-new/new-deliveries/la-crosse-regional-airport (last visited Aug. 15, 2025).

12.     La Crosse also has two Pierce Ultimate Configuration ("PUC") pumper trucks on order from Pierce.[6]

**B.     Defendants**

**1.     REV Group, Inc.**

13.     REV Group, Inc. ("REV Group") is incorporated in Delaware and is headquartered in Brookfield, Wisconsin.[7]

14.     REV Group manufactures fire trucks under multiple brand names, including: E-ONE, Inc. ("E-ONE"), Kovatch Mobile Equipment Corporation ("KME"), Ferrara Fire Apparatus ("Ferrara"), Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower").[8] 113 dealers nationwide sell fire trucks from these brands across all 50 states. Additionally, REV Group sells Spartan cabs and chassis to approximately 40 smaller builders.[9]

15.     REV Group currently operates manufacturing plants in Ocala, Florida (E-ONE apparatus), Hamburg, New York (stainless steel E-ONE products), Nesquehoning, Pennsylvania (KME apparatus), Ephrata, Pennsylvania (Ladder Tower, KME, and Ferrara apparatus),

---

[6] *Fire Wiki*, FANDOM.COM, https://fire.fandom.com/wiki/La_Crosse_Fire_Department_ (Wisconsin)#Apparatus_Roster (last visited Aug. 15, 2025).
[7] Rev Group, Inc. SEC Form 10K (Oct. 31, 2023), https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2023.pdf (last visited Aug. 15, 2025).
[8] *REV Group Invests in Its Ephrata Facility to Increase Aerial and TDA Apparatus Production*, FIREAPPARATUSMAGAZINE.COM (Feb. 28, 2023), https://www.fireapparatus magazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-its-ephrata-facility-to-increase-aerial-and-tda-apparatus-production (last visited Aug. 15, 2025).
[9] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands (last visited Aug. 15, 2025).

Brandon, South Dakota (Spartan pumpers), Charlotte, Michigan (Spartan cabs and chassis), Snyder, Nebraska (Smeal apparatus), and Holden, Louisiana (Ferrara apparatus).[10]

16.    Of the roughly $3 billion in annual fire truck sales in the United States, REV Group captures approximately $1 billion, or at least 33% of the total.[11] In 2024, REV Group's full year net income was $257.6 million.[12]

**2.    Oshkosh Corporation and Pierce Manufacturing, Inc.**

17.    Oshkosh Corporation ("Oshkosh") is incorporated in Wisconsin and is headquartered in Oshkosh, Wisconsin.[13]

18.    Oshkosh sells its products in more than 150 countries under a variety of brand names, including JLG Industries, Inc., JerrDan LLC, Hinowa S.p.A, AUSACORP S.L., Oshkosh AeroTech, McNeilus Companies, Inc., Oshkosh Commercial Products, LLC, Iowa Mold Tooling Co., Inc., Maxi-Metal, Inc., Kewaunee Fabrications, LLC, Oshkosh Defense, LLC, and Pratt & Miller Engineering & Fabrications, LLC.[14]

19.    Oshkosh's leading North American brand is Pierce Manufacturing, Inc. ("Pierce"). Pierce is incorporated in Delaware and is headquartered in Appleton, Wisconsin. It produces custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, and other fire apparatus in its manufacturing facilities in Appleton, Wisconsin and Brandenton,

---

[10] *Who We Are*, REVGROUP.COM, https://revgroup.com/who-we-are (last visited Aug. 15, 2025).

[11] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG BY MATT STOLLER (Jan. 25, 2025), https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll (last visited Aug. 15, 2025) (hereinafter "Musharbash").

[12] Julie Nuernberg, *REV Group, Inc. Reports Strong Fiscal 2024 Fourth Quarter and Full Year Results*, REVGROUP.COM (Dec. 11, 2024), https://revgroup.com/rev-group-inc-reports-strong-fiscal-2024-fourth-quarter-and-full-year-results (last visited Aug. 15, 2025).

[13] OSHKOSH CORP., FORM 10-K at 3, https://www.investors.oshkoshcorp.com/media/document/cdffc8d8-7620-48f8-9d1a-b5430d2b7d47/assets/2024_Oshkosh_Annual_Report_web.pdf (last visited Aug. 19, 2025).

[14] *Id.* at 6.

Florida.[15] Pierce has 26 dealers across California, Colorado, Florida, Kansas, Massachusetts, Minnesota, Mississippi, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin.[16] Together, this dealer network sells fire trucks to customers in all 50 states.

20. Oshkosh, including through Pierce, captures around $750 million in annual fire truck sales in the United States, or at least 25% of the total.[17] Oshkosh's reported 2024 fourth quarter net income was $153.1 million.[18] Pierce has an annual revenue of approximately $1 billion.

### 3. Rosenbauer America LLC

21. Rosenbauer America LLC ("Rosenbauer") is a wholly owned subsidiary of Rosenbauer International AG ("Rosenbauer International"), a publicly traded company based in Austria and listed on the Vienna Stock Exchange.[19] Rosenbauer is incorporated in Delaware and headquartered in Lyons, South Dakota.[20]

---

[15] *Pierce Manufacturing Joins Oshkosh Corporation to Showcase the Future of Electric Firefighting Technology at CES 2025*, FIREAPPARATUSMAGAZINE.com (Dec. 23, 2024), https://www.fireapparatusmagazine.com/industry-news/pierce-joins-oshkosh-to-showcase-the-future-of-electric-firefighting-technology-at-ces-2025/ (last visited Aug. 15, 2025); *Tour of Pierce Manufacturing,* Inc., R4.IEEE.ORG, https://r4.ieee.org/event/tour-of-pierce-manufacturing-inc/ (last visited Aug. 15, 2025).

[16] *Find a Dealer*, PIERCE.COM, https://www.piercemfg.com/find-a-dealer (last visited Aug. 15, 2025).

[17] Musharbash, *supra* note 11.

[18] *Oshkosh Corporation Reports 2024 Fourth Quarter and Full Year Results*, OSHKOSHCORP.COM (Jan. 30, 2025), https://investors.oshkoshcorp.com/news/oshkosh-corporation-reports-2024-fourth-quarter-and-full-year-results/f1490807-bbcf-44b4-be51-56294a3276e3 (last visited Aug. 15, 2025).

[19] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/en/12/rosenbauer-group/investor-relations/financial-news/financial-news-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (last visited Aug. 15, 2025).

[20] *A Single-Source Provider for the US Fire Services*, ROSENBAUER.COM, https://www.rosenbauer.com/en/de/rosenbauer-group/company/locations/sales-and-service-locations/rosenbauer-america-llc (last visited Aug. 15, 2025).

22.     Rosenbauer has production facilities in Lyons, South Dakota; Wyoming, Minnesota; and Fremont, Nebraska. Rosenbauer produces custom and commercial pumpers, heavy rescues, tenders, mini pumpers and light rescues, aerial ladders and platforms, and electric fire trucks.[21] Rosenbauer has 24 dealers across Alabama, Arizona, California, Colorado, Florida, Georgia, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, South Dakota, Texas, Utah, Washington, and West Virginia.[22] Together, these dealers sell fire trucks to customers in all 50 states.

23.     Rosenbauer captures approximately $307 million in United States fire apparatus sales annually,[23] or at least 10% of the market.[24]

### 4.     The Fire Apparatus Manufacturers' Association

24.     The Fire Apparatus Manufacturers' Association ("FAMA") is a not-for-profit trade association for fire apparatus manufacturers, located in Ocala, Florida.[25] As of May 2025, FAMA had 55 manufacturer members,[26] including REV Group subsidiaries E-One, Ferrara,

---

[21] FAMA.ORG, https://www.fama.org/members/company_profile/?id=99 (last visited Aug. 15, 2025).

[22] *Find a Dealer*, ROSENBAUERAMERICA.COM, https://rosenbaueramerica.com/find-a-dealer (last visited Aug. 15, 2025).

[23] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/en/12/rosenbauer-group/investor-relations/financial-news/financial-news-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (converted to U.S. dollars from 262.9 million euros) (last visited Aug. 15, 2025).

[24] Musharbash, *supra* note 11.

[25] *How to Join*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/how-to-join/ (last visited Aug. 15, 2025).

[26] *FAMA Releases Fire Apparatus Industry Update*, FIREENGINEERING.COM (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update/ (last visited Aug. 15, 2025).

KME, and Spartan; Oshkosh subsidiary Pierce; and Rosenbauer.[27] John Schultz, the Vice

President and General Manager of Pumper Products at Pierce,[28] is FAMA's vice-chair.[29]

25.     FAMA acted as a co-conspirator of the fire truck manufacturers by facilitating the

exchange of confidential, proprietary, and competitively sensitive data among the other

Defendants.

## III.    JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action under 28 U.S.C.

§§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. Plaintiff

brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief

against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).

27.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28

U.S.C. § 1367(a). Plaintiff's state law claims derive from the same common nucleus of operative

fact as their federal claims, i.e., their federal and state claims all arise from Defendants'

anticompetitive behavior in the fire truck market. Plaintiff brings state law class claims on behalf

of the Wisconsin Class to recover actual and/or compensatory damages, treble damages as

permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by

Defendants' conduct in restricting the supply and increasing the price of fire trucks. Plaintiff

seeks damages in excess of $5,000,000.

28.     This Court has personal jurisdiction over each Defendant because, inter alia, each

Defendant: (a) transacted business throughout the United States, including in this District;

---

[27] *Members List*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list (last visited Aug. 15, 2025).
[28] *John Schultz*, PIERCEMFG.COM, https://www.piercemfg.com/hubfs/FDIC%202025/Bios/Bio/John%20Schultz%20-%20Pierce%20Manufacturing.pdf (last visited Aug. 15, 2025).
[29] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).

(b) manufactured, sold, shipped, and/or delivered fire trucks to purchasing entities throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

29.     Defendants' activities were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

30.     Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because multiple Defendants resided or transacted business in this District, are licensed to do business or are doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

## IV.     FACTUAL ALLEGATIONS

**A.     The fire truck industry was diverse and comprised of many independent sellers until approximately 2008, when the Great Recession devastated the industry.**

31.     The modern fire truck manufacturing industry boomed in the post-war decades of the 1950s and 1960s.[30] Small and midsized fire truck manufacturers—typically family-owned operations—appeared in every region of the country to produce emergency vehicles tailored to the needs of local fire departments. The industry was competitively diversified across at least two dozen companies.[31] Competition among these smaller firms kept fire truck prices near costs,

---

[30] Musharbash, *supra* note 11.

[31] *Letter to FTC and DOJ re Firetrucks*, ECONOMICLIBERTIES.US (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

and the existence of a large number of manufacturers ensured redundant manufacturing capacity to meet demand.[32] By 2008, these companies sold over 5,000 new fire trucks in the United States every year.

32.     For decades, the fire truck industry enjoyed relatively stable (inflation-adjusted) prices and ample production capacity. With few exceptions, the annual cost increase for new trucks prior to 2008 was around 3%.[33]

33.     Starting in 2008, the Great Recession decimated municipal budgets, which in turn caused a drop-off in demand for new fire trucks. By 2011, the market for new fire truck sales had fallen more than 40% from its peak,[34] from 5,000 a year to around 3,000 a year.[35] Many independent fire truck manufacturers folded during this period. Demand for fire trucks did not fully rebound until the mid-2010s.

**B.      REV Group, Oshkosh, and Rosenbauer start rolling up fire truck manufacturers.**

**1.      AIP and REV Group**

34.     Capitalizing on the economic turbulence of the Great Recession, a midsize private-equity firm, American Industrial Partners ("AIP"), purchased the fire apparatus manufacturing company E-ONE in 2008. E-ONE builds a full line of fire fighting vehicles, from brush trucks and pumpers to aircraft rescue and firefighting vehicles.[36] E-ONE was the first fire truck manufacturer in AIP's portfolio.

---

[32] Musharbash, *supra* note 11.

[33] *Id.*

[34] Paul C. Darley, *The Fire Apparatus Market is Coming Back… Just Look at the Data*, FAMA.ORG (Dec. 5, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/ (last visited Aug. 15, 2025).

[35] Musharbash, *supra* note 11.

[36] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025).

35.     As demand for fire trucks returned in the mid-2010s, AIP turned its attention to rolling up the fire truck industry. AIP created REV Group (originally Allied Specialty Vehicles) in 2015 from the merger of several companies, including E-ONE.[37]

36.     In 2016, REV Group purchased Kovatch Mobile Equipment Corporation ("KME").[38] Headquartered in Nesquehoning, Pennsylvania, KME operates in Pennsylvania, Virginia, New York, and California. It produces a broad array of fire apparatus, including pumpers, aerials, and tankers.[39]

37.     In April 2017, REV Group purchased Ferrara Fire Apparatus, Inc. ("Ferrara"), based in Holden, Louisiana. The Ferrara product portfolio included custom chassis pumpers, aerials, and industrial apparatus. At the time, Ferrara had more than 450 employees and annual revenue of approximately $140 million.[40] Prior to the purchase, Ferrara had been E-ONE's direct competitor in the southern United States.[41]

---

[37] Mike Baker, Maureen Farrell & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. TIMES (Feb. 17, 2025), https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html (last visited Aug. 15, 2025) (hereinafter "Baker, Farrell & Kovaleski").

[38] *REV Group Acquires Kovatch Mobile Equipment*, REVGROUP.COM (Apr. 11, 2016), https://investors.revgroup.com/investor-releases/2016/11-04-2016 (last visited Aug. 15, 2025); Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025); *KME Fire Apparatus Sold REV Group*, FIREHOUSE.COM (Apr. 22, 2016), https://www.firehouse.com/apparatus/press-release/12193362/fire-apparatus-manufacturer-kme-kovtach-pumpers-aerials-heavy-rescue-fire-apparatus-builder-kme-fire-apparatus-sold-to-revgroup (last visited Aug. 15, 2025).

[39] Chris Mc Loone, *REV Group, Inc. Acquires KME*, FIREAPPARATUSMAGAZINE.COM (Apr. 11, 2016), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-inc-acquires-kme/ (last visited Aug. 15, 2025).

[40] *REV Group Acquires Ferrara Fire Apparatus, Inc*., FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-apparatus/ (last visited Aug. 15, 2025).

[41] Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025); *REV Group Acquires Ferrara Fire Apparatus, Inc*., REVGROUP.COM (Apr. 25,

38.     Dan Peters, President of the fire division within REV Group, noted that "the addition of Ferrara to the REV Fire Group enable[d] a number of new growth opportunities including expansion of our reach nationwide and adding new geographical regions and key accounts."[42] Timothy Sullivan, REV Group's CEO, confirmed that "Ferrara will immediately contribute strategic value by expanding the REV Fire Group national footprint, dealer sales network, service and after-market parts revenue as well as enhancing our robust line of custom chassis and aerial products for multiple market segments."[43] The Ferrara purchase cemented REV Group's position as a dominant fire truck manufacturer.

39.     Not satisfied with control over E-ONE, KME, and Ferrara—each a prominent fire apparatus brand in its own right—REV Group purchased Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower") in 2020.[44] These brands had a significant presence in the Midwest market. The acquisitions solidified REV Group's position as the top fire truck manufacturer in the United States.[45]

---

2017), https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523 (last visited Aug. 15, 2025).

[42] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/ (last visited Aug. 15, 2025).

[43] *Id.*

[44] Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025); *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, REVGROUP.COM (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03-2020-135942281 (last visited Aug. 15, 2025).

[45] *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, FIREAPPARATUSMAGAZINE.COM (Feb. 3, 2020), https://www.fireapparatusmagazine.com/the-fire-station/the-station-news/rev-group-inc-completes-acquisition-of-spartan-emergency-response/ (last visited Aug. 15, 2025).

40.     REV Group used its market power to tamp down competition in the industry. Although REV Group executives initially made a show of preserving the independence of the company's subsidiary manufacturers and their dealers, they simultaneously warned that aggressive or "negative" competition among subsidiaries would not be tolerated.[46]

41.     By 2021, REV Group stopped even pretending to support subsidiary independence. A REV Group investor presentation referred to REV Group as "an industry consolidator."[47] That same presentation highlighted a strategy that called for REV Group's subsidiaries to "[c]onverge on common designs that can be shared across brands," and to use Spartan's Metro Star chassis/cab as the "platform" for their offerings. REV Group also ensures its larger fire department customers deal directly with corporate-level staff rather than individual brand representatives.[48] The investor presentation further called for the elimination of geographic overlaps between the marketing of its different fire-truck brands and dealers. REV Group's fire apparatus operations are now "center-led," with REV Group dictating and managing the execution of "margin improvement actions" across its subsidiaries.[49]

42.     REV Group explained to shareholders that its goal was to double the fire apparatus companies' profitability. Timothy Sullivan, REV Group's CEO, told analysts that the companies REV Group had profit margins of 4 to 5 percent, and that REV Group was on a path

---

[46] Musharbash, *supra* note 11.

[47] *REV Group, Inc. Presentation*, REV GROUP at 5 (July 2021), https://investors.revgroup .com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf

[48] Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025).

[49] Musharbash, *supra* note 11.

"to get all of them above that 10 percent level." Sullivan further explained: "You bring them into the fold, you got to give them the religion, and they've got it now."[50]



*Image 5: Logos of fire apparatus brands consolidated by REV Group by 2020.[51]*

### 2. Oshkosh

43. Oshkosh responded to REV Group's roll-up by making acquisitions of its own. In 2021, Oshkosh's primary North American subsidiary, Pierce, announced that it had acquired Boise Mobile Equipment ("BME").[52] BME's product portfolio, which allowed Pierce to expand its reach and focus to West Coast markets, included fire apparatus like the Model 34, Tactical Tender, and Type 6 Xtreme.[53] In 2022, Oshkosh acquired Maxi-Metal, Inc.,[54] a leading designer and manufacturer of custom fire trucks. Subsequent to these expansions, Oshkosh controlled a full quarter of the U.S. fire truck market.

44. In addition to purchasing third-party manufacturers, Oshkosh also embarked on a strategy of consolidating the U.S. brands already within its purview, reducing geographic overlap

---

[50] Baker, Farrell & Kovaleski, *supra* note 37.

[51] *REV Group, Inc. Presentation July 2021*, REVGROUP.COM, https://investors.revgroup .com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Aug. 15, 2025).

[52] *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, OSHKOSHCORP.COM (Sept. 16, 2021), https://www.investors.oshkoshcorp.com/news/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment/16c54803-9007-4e9e-82f2-e6253396d4e0/ (last visited Aug. 15, 2025).

[53] *Pierce Completes Ownership Interest in BME*, FIREHOUSE.COM (Sept. 16, 2021), https://www.firehouse.com/apparatus/press-release/21238596/pierce-manufacturing-custom-fire-truck-builder-pumpers-ladders-quints-rescues-puc-enforcer-pierce-completes-ownership-interest-in-bme (last visited Aug. 15, 2025); *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, PIERCEMFG.COM (Sept. 16, 2021), https://www.piercemfg .com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment (last visited Aug. 15, 2025).

[54] *Oshkosh Corporation Acquires Maxi-Metal, Inc.*, OSHKOSHCORP.COM (Jun. 13, 2022), https://www.investors.oshkoshcorp.com/news/oshkosh-corporation-acquires-maxi-metal-inc/c5afbb77-38ec-4497-a391-f4f56b88d127/ (last visited Aug. 15, 2025).

between its dealers. In July 2018, Pierce subsidiary MacQueen Emergency Group ("MacQueen") acquired Schuhmacher Fire Equipment. The acquisition consolidated MacQueen's control over the upper Midwest, including Minnesota, Nebraska, South Dakota, North Dakota, and 109 Missouri counties. [55]

45.     In January 2019, Pierce dealer Siddons-Martin Emergency Group ("Siddons") acquired Superior Equipment, consolidating control over the American Southwest.[56] Siddons' territory now includes Texas, Louisiana, New Mexico, Utah, and Nevada.

46.     In November 2019, Pierce dealer Allegiance Fire and Rescue ("Allegiance") acquired Minuteman Fire and Rescue. The acquisition expanded Allegiance's territory to encompass most of New England, including Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.[57]

47.     In September 2023, Pierce dealer Firematic Supply Co. Inc. ("Firematic") acquired Churchville Fire Equipment. The acquisition consolidated Firematic's control over Connecticut and New York.[58]

48.     Most recently, on June 12, 2025, Pierce dealer Reliant Fire Apparatus brand ("Reliant") acquired Halt Fire, Inc., thereby consolidating Reliant's "exclusive Pierce territory"

---

[55] *MacQueen Emergency Group Territory Expanded to Include 109 Missouri Counties*, PIERCEMFG.COM (July 10, 2018), https://www.piercemfg.com/pierce/press-release/macqueen-emergency-group-territory-expanded-to-include-109-missouri-counties (last visited Aug. 15, 2025).

[56] *Siddons-Martin Emergency Group Expands Territory with Acquisition of Superior Equipment*, PIERCEMFG.COM (Jan. 21, 2020), https://www.piercemfg.com/pierce/press-release/siddons-martin-emergency-group-expands-territory-with-acquisition-of-superior-equipment (last visited Aug. 15, 2025).

[57] *Minuteman Fire and Rescue Acquire by Allegiance Fire and Rescue*, ALLEGIANCEFR.COM (Nov. 19, 2019), https://allegiancefr.com/minuteman-fire-and-rescue-acquired-by-allegiance-fire-and-rescue/ (last visited Aug. 15, 2025).

[58] *Pierce Dealer Firematic Supply Co. Grows Presence in Northeast with Acquisition of Churchville Fire Equipment*, PIERCEMFG.COM (Sept. 1, 20123), https://www.piercemfg.com/pierce/press-release/pierce-dealer-firematic-supply-co.-grows-presence-in-northeast-with-acquisition-of-churchville-fire-equipment (last visited Aug. 15, 2025).

to include Michigan, in addition to its existing territories in Wisconsin and Iowa.[59] Pierce noted that Reliant would "align Michigan operations with its existing territories" to "ensur[e] a consistent and reliable customer experience."[60]

49. These consolidations, which have largely eliminated geographic overlaps and given Pierce dealers exclusive control across vast territories, have reduced or eliminated competition among Pierce subsidiaries.

### 3. Rosenbauer

50. Rosenbauer International A.G., seeing REV Group's and Oshkosh's consolidation efforts, finalized its acquisition of the remaining 25 percent minority stake in Rosenbauer American from General Safety Equipment Corporation in June 2022.[61]

51. In March 2023, Rosenbauer announced that IKON Fire, LLC would join its dealer network for apparatus sales in Colorado and Wyoming.[62]

52. Rosenbauer's dealers are assigned non-overlapping territories, reducing inter-dealer competition.

---

[59] *Reliant Fire Apparatus Acquires Halt Fire, Inc. Expands Pierce Dealership Territory to Include the State of Michigan*, PIERCEMFG.COM (Jun 12, 2025), https://www.piercemfg.com/pierce/press-release/reliant-fire-apparatus-acquires-halt-fire-inc.-expands-pierce-dealership-territory-to-include-the-state-of-michigan (last visited Aug. 15, 2025).
[60] *Id.*
[61] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/pl/fr/group/presse/wirtschaftspresse/wirtschaftspresse-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (last visited Aug. 15, 2025).
[62] Rosenbauer America, *Rosenbauer Announces New Partnership with IKON Fire, LLC*, ROSENBAUERAMERICA.COM (Mar. 30, 2023), https://rosenbaueramerica.com/rosenbauer-announces-new-partnership-with-ikon-fire-llc/ (last visited Aug. 15, 2025).


*Image 6: Geographic territories of Rosenbauer dealers.*[63]

**C.    Manufacturer Defendants seek to cooperate rather than compete with one another.**

53.    While rolling up independent fire truck manufacturers and tamping down competition between their own brands, Manufacturer Defendants have also sought to cooperate, rather than compete, with one another.

54.    For example, REV Group's Vice President of Sales in the Fire Group, Mike Virnig, stated: "What I won't tolerate is negative selling. I won't tolerate it ***with our competitors***, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"[64]

---

[63] *Find a Dealer*, ROSENBAUERAMERICA.COM, https://rosenbaueramerica.com/find-a-dealer/ (last visited Aug. 15, 2025).

[64] Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025) (emphasis added).

55.     REV Group company executives have also told analysts that the company would substantially raise its profit margins and that ***other companies were doing the same***.[65]

56.     Industry insider Jerry Halpin, the co-owner and vice president of sales and marketing for C.E.T. Fire Pumps, noted in 2022 that "people in the fire service industry are talking amongst themselves" and are looking "to ***bolster opportunities through partnerships and other alliances***."[66] He also predicted "***cooperation between like businesses*** to gain an edge in the marketplace."[67]

**D.     Manufacturer Defendants exchange confidential, competitively sensitive information through FAMA.**

57.     E-One, Ferrara, KME, Spartan, Pierce, and Rosenbauer, which together represent all three Manufacturer Defendants, are members of FAMA.[68] FAMA colludes with the Manufacturer Defendants to enable an information exchange through statistical reports and by organizing twice-yearly in-person meetings.

**1.     FAMA Statistical Reports**

58.     FAMA describes access to competitors' data as "one of the most valuable reasons" for companies to join the organization. FAMA has an entire committee, the Data & Research Committee, dedicated to enabling this data exchange. FAMA describes the Data & Research Committee's mission as helping to "strengthen FAMA member companies by

---

[65] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Aug. 15, 2025) (emphasis added).

[66] *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIREAPPARATUS MAGAZINE.COM (Dec. 120, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (last visited Aug. 15, 2025) (emphasis added).

[67] *Id*. (emphasis added).

[68] *Members List*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list (last visited Aug. 15, 2025).

providing actionable data," including economic data, "for strategic business planning."[69] The Committee is tasked with "collect[ing] and distribut[ing] data regarding apparatus sales and orders" and distributing it on at least a quarterly basis.[70] FAMA describes this "detailed data"[71] as "invaluable" to members "for their internal business purposes."[72]

59.     The Data & Research Committee maintains a digital data portal through which apparatus manufacturers enter economic data. That data is sent to an accounting firm, which compiles the data and returns it to the Data & Research Committee. The Committee then uploads the data onto the FAMA website.

60.     Not just anyone can access this data, however. "FAMA does not release this information to the public."[73] Instead, the data is uploaded onto a secure portion of the FAMA website that FAMA describes as a "members-only section."[74] "Only those companies that participate in the statistical studies and members are privy to these reports."[75]

61.     FAMA imposes strict limits on who can become a member, and consequently, who has access to these reports. To join FAMA, an entity must (a) be "engaged in the manufacture of fire fighting or fire protection apparatus, including rescue vehicles," or (b) "manufacture components or products which are incorporated by the manufacturer as a

---

[69] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).

[70] *Id.*

[71] Paul C. Darley, *The Fire Apparatus Market is Coming Back… Just Look at the Data*, FIRE APPARATUS MFRS. ASS'N (Dec. 4, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data (last visited Aug. 15, 2025).

[72] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Aug. 15, 2025).

[73] *Id.*

[74] FIRE APPARATUS MFRS. ASS'N, WHY JOIN FAMA, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Aug. 15, 2025).

[75] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join; https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data (last visited Aug. 15, 2025).

permanent part of the completed fire apparatus . . . such as chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices, apparatus valves and other water control appliances."[76] Notably, fire departments, municipalities, and other buyers of fire apparatus are *not* eligible to join FAMA under this definition. Such entities—apparatus manufacturers' customers—are denied access to the data that manufacturers exchange among themselves.

62.    Even among its members, FAMA further restricts data access to those companies that provide their own data, in a give-data-to-get-data scheme. FAMA states data access "may be denied" to any company "that was given the opportunity to participate in the program but refused."[77] Data may also be denied to any company "that does not agree in advance of participation to keep the results confidential."[78]



**INDUSTRY STATISTICS**

FAMA is the ONLY source for accurate fire service statistics provided quarterly and summarized at year end. Only FAMA members are privy to these reports since they are not released to the public. Members find this research invaluable  for their internal business purposes regarding apparatus purchases by state, product category, pump type and more.

*Image 7: Section of a flyer titled "Why Join FAMA?"[79]*

[76] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Aug. 15, 2025).
[77] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).
[78] *Id.*
[79] FIRE APPARATUS MFRS. ASS'N, WHY JOIN FAMA, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Aug. 15, 2025).

### 2. FAMA Meetings

63.     In addition to providing economic data to their members, FAMA also organizes twice-yearly meetings, in the spring and the fall, to "provide a forum [for members] to share information."[80]

64.     At these meetings, attendees, including direct competitors, listen to presentations that include economic forecasts regarding the fire truck manufacturing market.



***Image 8: Anirban Basu, Chairman & CEO of the Sage Policy Group, presenting an economic forecast at a FAMA gathering.[81]***

65.     Attendees also engage in "purchasing roundtables" and FAMA members-only meetings and discussion groups.

---

[80] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Aug. 15, 2025).

[81] Fire Apparatus Mfrs. Ass'n, *FAMA Membership Meetings*, YOUTUBE.COM (Feb. 26, 2016), https://www.youtube.com/watch?v=dbdjUvqfFAw (last visited Aug. 15, 2025).



*Image 9: FAMA Purchasing Roundtable*[82]



*Image 10: Rosenbauer employees attending a FAMA meeting*[83]

---

[82] *Id.*
[83] *Id.*



*Image 11: FAMA members-only meeting*[84]



*Image 12: FAMA discussion group*[85]

---

[84] *Id.*
[85] *Id.*



*Image 13: FAMA discussion group*[86]

66.    Manufacturer Defendants had ample time and opportunity to exchange sensitive economic information and coordinate supply restrictions and price hikes at these meetings. FAMA advertises these "networking" events as one of the reasons to join FAMA.



**NETWORKING**

FAMA's spring and fall meetings provide a great opportunity to network with industry professionals. The meetings also keep members up-to-date with new information, allow for group formulations of organizational goals and provide a forum to share information.

*Image 14: Section of a flyer titled "Why Join FAMA?"*[87]

---

[86] *Id.*

[87] FIRE APPARATUS MFRS. ASS'N, WHY JOIN FAMA, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Aug. 15, 2025).

67.     In addition to the statistical reports and twice-yearly in-person meetings, FAMA "communicates with its members on a regular basis via emails, its website and an extensive FAMA newsletter."[88] These missives offered another avenue for communication and coordination among Manufacturer Defendants.

**E.      The conspiracy enabled Defendants to suppress supply and raise prices of fire trucks during the class period.**

**1.      Fire truck backlogs soared by 40% or more during the class period.**

68.     Demand for fire trucks picked up in the mid-2010s as the economy rebounded after the Great Recession, increasing steadily until approximately 2020. Between 2020 and 2022, the number of fire truck orders spiked as municipal coffers became flush with COVID relief funds. Since about 2022, order activity has hovered between 5,500 and 6,500 trucks per year.

69.     Manufacturer Defendants' production has not kept pace with this increased demand. Particularly within the last few years, order backlogs have ballooned. For example, REV Group reported a record $3.6 billion backlog in late 2023, a 41% increase over 2022.[89] REV Group's backlog increased again in 2024. As of last October, REV Group had a $4.4 billion backlog on fire and emergency vehicle orders in the United States.[90]

70.     Oshkosh and Rosenbauer have reported similarly mammoth backlogs. Oshkosh's backlog of fire truck orders quadrupled from 2019 to 2023; it recently reported some $4 billion

---

[88] *Id.*
[89] Reuters, *Fire Truck Boom Highlights Divide in US Manufacturing*, U.S. News (Jan. 19, 2024), https://money.usnews.com/investing/news/articles/2024-01-19/fire-truck-boom-highlights-divide-in-us-manufacturing (last visited Aug. 15, 2025).
[90] Rev Group, Inc. SEC Form 10K (Oct. 31, 2024), https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm (last visited Aug. 15, 2025).

in orders placed but not fulfilled.[91] And Rosenbauer announced an approximately $2.67 billion backlog at the end of 2024.[92]

71.     Increased backlogs have translated to substantial delays prior to delivery of new fire trucks. Wait times in some areas have more than quadrupled, from one year to 4.5 years.[93] An individual going by the username "Capttomo" complained in an online forum in January 2023 that "lead times for delivery from date the order is placed to final inspection has gone from 10-12 months to greater than 2 years in many cases and in some cases approaching 3 years."[94] Another user noted that a REV Group dealer "added 15 months to the delivery time" for a fire truck.[95] A third reported an estimated delivery time of 48 months from a Pierce dealer for "a very cookie cutter" truck "without any interior customization."[96] And yet another described a 435 day waiting period for a single component of a Rosenbauer truck, with full wait times up to 3 years.[97]

[91] Baker, Farrell & Kovaleski, *supra* note 37.

[92] Christian Sandherr, *Rosenbauer International AG: Solid Start Into the Year/ Record High Order Backlog*, NUWAYS (May 14, 2025), https://www.nuways-ag.com/company/rosenbauer-international-ag/research/solid-start-into-the-year-record-high-order-backlog ("Q1 sales grew by 16.8% yoy to € 264m (eNuW: € 265m) thanks to the company's strong order backlog of € 2.28bn at the end of FY24.") (last visited Aug. 15, 2025).

[93] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 2 (May 13, 2025), https://www.economic liberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

[94] *Skyrocketing Apparatus Costs and Outrageous Delivery Times*, NYCFIRE.NET, https://www.nycfire.net/forums/threads/skyrocketing-apparatus-costs-and-outrageous-delivery-times.75187 (last visited Aug. 15, 2025).

[95] *Id.*

[96] *Id.*

[97] *Id.*



**Image 15: Forum comment by Capttomo regarding state of the fire truck industry.[98]**



**Image 16: Forum comment by Sfdc111 regarding state of the fire truck industry.[99]**



**Image 17: Forum comment by CFDMarshal regarding state of the fire truck industry.[100]**

72.    As another example, Sue Finkam, the mayor of Carmel, Indiana, said her city was growing and needed to add more fire stations. But as matters stand now, the city expects to be able to acquire land, design a fire station, construct the building, hire firefighters and train them, while still waiting for the station's fire engines to be delivered.[101]

73.    The data bears out these anecdotes. While orders spiked to 45% above average levels, order fulfillment dropped nearly 10% below average levels in 2022, as illustrated in the graph below.

---

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Aug. 15, 2025).



*Image 18: North America Fire Apparatus Trend.*[102]

74.     While the rate of order fulfillment has ticked up again in recent years, that increase has not been nearly enough to dent the serious backlog.

75.     In addition to delays for new fire trucks, delays have also increased for replacement part orders. Gil Carpenter, a fire chief in Benton, Arkansas, explained that prior to REV Group rolling up Ferrara, he would call a contact named Charlie whenever he needed a Ferrara replacement part. Charlie would ship him the part the next day. But in 2024, when one of the department's vehicles needed new parts, delivery was delayed for more than 10 months. Mr. Carpenter's fire department was left without one of its eight trucks for nearly a year.[103]

---

[102] *FAMA Releases Fire Apparatus Industry Update*, Fire Engineering (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update (last visited Aug. 15, 2025).

[103] Baker, Farrell & Kovaleski, *supra* note 37; *see also* Fire Apparatus & Emergency Equipment Staff, *REV Group Fire Division Launches New E-Commerce Website for Fire Truck Aftermarket Parts Sales and Service*, Fire Apparatus & Emergency Equipment (July 29, 2019), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-fire-division-launches-new-ecommerce-website-for-fire-truck-aftermarket-parts-sales-and-se (last visited Aug. 15, 2025).

76.     These backlogs cannot be explained by supply chain disruptions in the wake of the COVID-19 pandemic or other geopolitical events of the early 2020s. Although supply chain issues plagued industries across the United States in 2021 and 2022, the Federal Reserve Bank of New York's Global Supply Chain Pressure Index returned to baseline by early 2023, hitting its lowest point on record in May 2023.[104]



*Image 19: Global Supply Chain Pressure Index from June 30, 2017 to June 30, 2025.[105]*

### 2.    In the face of increasing demand, Manufacturer Defendants have failed to increase capacity and in some cases have shuttered manufacturing facilities, worsening the fire truck shortage.

77.     Under typical market conditions, such a significant surge in demand would be met with a corresponding increase in manufacturing capacity. But no such manufacturing capacity increase has materialized. REV Group has recently spent only a small portion of its revenue— about 1 percent—on upgrading its buildings and equipment. Alexander Yaggy, a former investor in REV Group's stock, called this minimal investment in the face of significant industry

[104] Diccon Hyatt, *Supply Chains Have Healed From Pandemic Disruptions*, INVESTOPEDIA (June 7, 2023), https://www.investopedia.com/supply-chains-have-healed-from-pandemic-disruptions-7509263 (last visited Aug. 15, 2025).
[105] *Global Supply Chain Pressure Index (GSCPI)*, FED. RESERVE BANK OF N.Y. (July 2025), https://www.newyorkfed.org/research/policy/gscpi#/interactive (last visited Aug. 15, 2025).

backlogs "reflective of an uncompetitive market."[106] And neither Oshkosh nor Rosenbauer have attempted to meet this surge in demand or capture market share by ramping up their production.

78.     Not only have Manufacturer Defendants failed to add manufacturing capacity, in some cases they have in fact *shuttered* existing plants. In September of 2021, REV Group shut down two KME custom fire truck manufacturing facilities in Pennsylvania and Virginia.[107] The closure cut the company's manufacturing footprint by roughly one third.[108]

79.     In a press release, REV Group stated that orders currently in progress at the two KME facilities would be transferred to other REV Group manufacturing plants.[109] The process, unsurprisingly, resulted in additional, substantial delays. Matthew R. Timerman, a fire chief whose department had ordered a $1.2 million ladder truck from REV Group slated to be completed at the KME Pennsylvania plant, discovered the truck would instead be assembled at three different manufacturing sites, resulting in additional delays.[110] Eventually, Mr. Timerman received his truck more than four years after his department first placed the order.[111]

80.     Despite these record-setting backlogs, the Manufacturer Defendants appear unconcerned that their customers might cancel orders or that a competitor might steal their business.[112] Mark Skonieczny, REV Group's current chief executive, explained during a 2023 conference call that the company did not expect the delays to cause cancellations because once a

---

[106] Baker, Farrell & Kovaleski, *supra* note 37.

[107] Chris Reber, *KME Plant to Close in April 2022*, TIMES NEWS ONLINE, (Sept. 11, 2021), https://www.tnonline.com/20210911/kme-plant-to-close-in-april-2022 (last visited Aug. 15, 2025).

[108] Baker, Farrell & Kovaleski, *supra* note 37.

[109] Andrew Corselli, *REV Group Announces Plans to Shift KME Production to Other REV Fire Group Facilities*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 10, 2021), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-announces-plans-to-shift-kme-production-to-other-rev-fire-group-facilitie (last visited Aug. 15, 2025).

[110] Baker, Farrell & Kovaleski, *supra* note 37.

[111] *Id.*

[112] Musharbash, *supra* note 11.

city sets aside the money, it is "earmarked" and REV Group gets a deposit. "That money is allocated to those units, so we feel good about that."[113] Skonieczny further commented, "I don't think it's impacting our market share."[114] According to REV Group's SEC reports, the company considers its backlog to *enhance* its value to shareholders by giving the company "strong visibility into future net sales."[115]

### 3. The price of fire trucks doubled during the class period.

81. Unsurprisingly, given growing demand and flat or declining supply, the cost of fire trucks has soared. In the mid-2010s, a standard pumper truck cost approximately $300,000 to $500,000.[116] Within the last few years, prices have increased to an average of $1 million per pumper truck.[117] Similarly, ladder trucks that cost $750,000 to $900,000 in the mid-2010s cost upward of $2 million today.[118] An industry leader commented that the industry has "reached a

---

[113] Baker, Farrell & Kovaleski, *supra* note 37.

[114] Eman Abu-Khaled, *REV Group Takes Steps to Normalcy After Supply-Chain Setbacks*, TRAILER BODY BUILDERS (Mar. 22, 2023), https://www.trailer-bodybuilders.com/truck-bodies/article/21262503/rev-group-takes-steps-to-normalcy-after-supply-chain-setbacks (last visited Aug. 15, 2025).

[115] Musharbash, *supra* note 11.

[116] *Id.*; CHRIS GODFREY, AN EVALUATION OF FIRE APPARATUS USAGE AND OPERATING COST FOR GREEN TOWNSHIP FIRE & EMS at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188 (last visited Aug. 15, 2025); Patrick Varine, *Despite Grant, PA Dept. Says Rising Apparatus Costs a Challenge*, FIREHOUSE (Aug. 3, 2023), https://www.firehouse.com/apparatus/news/53068052/despite-fire-act-grant-export-pa-fire-department-says-rising-fire-apparatus-costs-a-challenge ("'In 1994, we brought a new KME front-line pumper truck in for $200,000,' Export fire Chief and Councilman David Silvis said. 'Today, we're probably between $800,000 and $900,000 to fund this new truck.'") (last visited Aug. 15, 2025).

[117] Musharbash, *supra* note 11.

[118] CHRIS GODFREY, AN EVALUATION OF FIRE APPARATUS USAGE AND OPERATING COST FOR GREEN TOWNSHIP FIRE & EMS at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188 (last visited Aug. 15, 2025); Baker, Farrell & Kovaleski, *supra* note 37; Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025); Musharbash, *supra* note 11.

new level of price psychology. Today, relationships start at a half million dollars, and 10 years ago that was a remote concept."[119]

82.     Nor is seeking out competition a viable option for customers looking to get a better deal on fire apparatus. As one industry executive has observed, "[t]here are now times when all vendors at a bid table, each with a 'different' product, are all owned and managed by the same parent company. How is that competitive for the purchaser?"[120] Fire departments across the country have little alternative than to pay the exorbitant prices Manufacturer Defendants are charging for their fire trucks.

### 4.     Manufacturer Defendants used "floating prices" during the class period to charge even more for fire trucks.

83.     On top of already high base prices for new fire trucks, REV Group, Oshkosh, and Rosenbauer have relied on the significant industry backlog to justify imposing "floating prices" on their customers. Using the purported difficulty of projecting material costs over a years-long lead time as an excuse, Manufacturer Defendants have added price clauses to their contracts that allow Manufacturer Defendants to increase the final price of a fire truck *after* it goes into production. Due to production delays, this means Manufacturer Defendants can increase their prices years after a fire department initially orders a truck.[121] Mark Fusco, the president of

---

[119] Chris Mc Loone, *Fire Industry Outlook: 10 Years After the Great Recession*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 1, 2018), https://www.fireapparatusmagazine .com/fire-apparatus/fire-industry-outlook-10-years-after-the-great-recession (last visited Aug. 15, 2025).

[120] Musharbash, *supra* note 11.

[121] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing (last visited Aug. 15, 2025).

Rosenbauer America, has conceded that his company imposes "surcharges that might occur during the build times" on Rosenbauer customers.[122]

84.     One fire department in Massachusetts ordered a fire truck in 2022 and then added two more trucks to their original order in 2023. After the second order, the fire truck manufacturer increased the price of the truck ordered in 2022 by $150,000 to match the price of the trucks ordered in 2023. The manufacturer threatened not to deliver the truck ordered in 2022 unless the fire department agreed to the price increase. The fire chief felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."[123]

85.     As another example, a fire department in Indiana was hit with a more than $100,000 price increase for the same pumper truck after a 7-month delay.[124] And in yet a third example, the Loveland Fire Rescue Authority in Colorado experienced a surcharge of $29,000 on a pending order.[125]

**F.     Defendants' conspiracy had the intended effect of increasing manufacturers' margins and revenues.**

86.     Defendants have reaped the profits of these price increases. In July 2021, REV Group announced that it had "[e]xceeded consensus earnings estimates for five consecutive

---

[122] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (last visited Aug. 15, 2025).

[123] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing (last visited Aug. 15, 2025).

[124] *Id.*

[125] *"Floating" Prices & Lengthy Delivery Times for Fire Apparatus CSFC Members' Perspective*, at 1 (Aug. 25, 2022), https://static1.squarespace.com/static/5ea64a6b9614427 b0ff93e6d/t/63080a517f782438bdd6f98e/1661471313934/Floating+Prices+Lenghty+Delivery+ Time+for+Fire+Apparatus+Aug+25+2022%5B42%5D.pdf (last visited Aug. 15, 2025).

quarters."[126] In 2024, REV Group's profit margins jumped to what the company described as an "exceptional 8.9 percent" for the division that includes fire trucks.[127]

87.     In June 2025, Oshkosh stated that its adjusted operating margins had grown from 4.8% to 10.5% from 2022 to 2024, delivering on "key 2022 Investor Day targets one year early."[128]



*Image 20: Oshkosh's financial performance, 2022 to 2024.[129]*

88.     Oshkosh anticipates its adjusted operating margins will grow to 12 or 14 percent by 2028, with revenue of $13-14 billion.[130] According to the company, that revenue growth will be "supported by strong backlog" and price increases.[131]

---

[126] *REV Group, Inc. Presentation*, REV GROUP at 4 (July 2021), https://investors.revgroup .com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Aug. 15, 2025).

[127] Baker, Farrell & Kovaleski, *supra* note 37.

[128] OSHKOSH, INVESTOR DAY at 83 (June 5, 2025), https://online.flippingbook.com/view/ 29819025/3 (last visited Aug. 15, 2025).

[129] *Id.*

[130] *Id.* at 86.

[131] *Id.* at 87.

Case 1:25-cv-01252-BBC     Filed 08/20/25     Page 40 of 66     Document 1

89.     With a few exceptions during the pandemic years, overall revenues for fire truck manufacturers in the U.S., including Manufacturer Defendants, have increased significantly since 2015.



***Image 21: Fire Truck Manufacturing Revenue in the United States.***[132]

**G.     Market Power and Barriers to Entry**

**1.     Relevant Markets**

90.     One tool that courts use to assess the competitive effects of concerted action is defining the relevant market. The relevant market is the zone of competition among agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). Here, the product market is all fire trucks, and the geographic market is the United States.

---

[132] Oliwier Samorajski, *Fire Truck Manufacturing in the US – Market Research Report (2015-2030)*, IBIS WORLD (Apr. 2025), https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645 (last visited Aug. 15, 2025).

a.    **The product market encompasses all fire trucks.**

91.    This case concerns fire trucks as recognized by the National Fire Protection
Association ("NFPA") Standard 1900 regarding automotive fire apparatus and the National
Wildfire Coordinating Group Standards for Wildland Fire Resource Typing (together, the
"Standards"). These standards classify fire trucks within the United States into seven types, all of
which are at issue in this case:[133]

- **Type 1** fire trucks are often referred to as an engine company, engine pumper, or
  structural firefighting truck. This is the most common type of fire truck in use today.
  Urban, suburban, and rural fire departments all rely on Type 1 fire trucks. Type 1 fire
  trucks carry all required NFPA firefighting equipment and support both structural
  firefighting and initial emergency medical services. Every Type 1 fire truck is required to
  have a pump with a minimum tank size of 300 gallons and to be equipped with 2.5- and
  1.5-inch hoses of varying lengths. These trucks must also include a full complement of
  ground ladders, nozzles, forcible entry equipment, rear access and egress, and some level
  of first aid equipment. They are designed to carry four firefighters.

- **Type 2** fire trucks carry all required NFPA firefighting equipment and support both
  structural firefighting and initial emergency medical services. They are most commonly
  used in urban and suburban settings. They typically carry three to four firefighters.

- **Type 3** fire trucks are often referred to as a wildland fire truck or a brush truck. They are
  typically used in rural and wildland settings. NFPA standards require a Type 3 engine to
  have a minimum of a 500-gallon water tank and a pump capable of a minimum of 150
  US gallons per minute at a pressure of 250 pounds per square inch. Many Type 3 fire

---

[133] *Types of Fire Trucks: An Overview and Comparison*, PIERCE (Nov. 14, 2023),
https://www.piercemfg.com/pierce/blog/types-of-fire-trucks (last visited Aug. 15, 2025).

engines also feature an auxiliary pump in addition to the main water pump. The auxiliary pump can be powered by a separate diesel engine that is connected to the pump. This pump-and-roll technique means that a truck operator can drive the truck while crew members man the pump and hoses, allowing firefighters to follow along as forest fires and brush fires move with the weather, and to create fire lines, wetting down areas ahead of an advancing wildfire. Type 3 Fire Engines must be equipped to carry at least three passengers.

- **Type 4** fire trucks, like Type 3 trucks, are often used in wildland firefighting. Compared to Type 3 trucks, Type 4 trucks have a larger water tank and reduced hose capacity requirements. Type 4 fire trucks must have a 750-gallon water tank that offers 50 gallons per minute of water transfer at a pressure of 100 pounds per square inch. Type 4 trucks must be equipped to carry at least two people.

- **Types 5, 6, and 7** fire trucks are often grouped together because they feature many of the same design qualities. These vehicles are typically pick-up truck-based with 4-wheel drive on a medium duty chassis. The main difference between Type 5, Type 6, and Type 7 fire trucks is the difference in their maximum gross vehicle weight rating ("GVWR"): Type 5 trucks have a maximum GVWR of 26,000 pounds; Type 6 trucks have a maximum GVWR of 19,500 pounds, and Type 7 trucks have a maximum GVWR of 14,000 pounds. Type 5, 6, and 7 trucks typically carry a 300-gallon water tank and a small booster pump with a minimum capacity of 50 gallons per minute. They must be equipped to carry two firefighters.



| SPECS | STRUCTURE | | WILDLAND BRUSH TRUCKS | | | | |
|---|---|---|---|---|---|---|---|
| | TYPE 1 | TYPE 2 | TYPE 3 | TYPE 4 | TYPE 5 | TYPE 6 | TYPE 7 |
| TANK MIN. CAPACITY (GAL) | 300 | 300 | 500 | 750 | 400 | 150 | 50 |
| PUMP MIN. FLOW (GPM) | 1000 | 500 | 150 | 50 | 50 | 50 | 10 |
| @ RATED PRESSURE (PSI) | 150 | 150 | 250 | 100 | 100 | 100 | 100 |
| HOSE 2½" (MIN. FT) | 1200 | 1000 | ✕ | ✕ | ✕ | ✕ | ✕ |
| HOSE 1½" (MIN. FT) | 500 | 500 | 1000 | 300 | 300 | 300 | ✕ |
| HOSE 1" (MIN. FT) | ✕ | ✕ | 500 | 300 | 300 | 300 | 200 |
| LADDERS | ✓ | ✓ | ✕ | ✕ | ✕ | ✕ | ✕ |
| PUMP AND ROLL | ✕ | ✕ | ✓ | ✓ | ✓ | ✓ | ✓ |
| MAX. GVWR (LBS) | ✕ | ✕ | ✕ | ✕ | 26,000 | 19,500 | 14,000 |
| PERSONNEL (MIN.) | 4 | 3 | 3 | 2 | 2 | 2 | 2 |
| TYPICAL USES | STRUCTURAL FIRE RESPONSE | STRUCTURAL FIRE RESPONSE | BRUSH FIRE RESPONSE | BRUSH FIRE RESPONSE | INITIAL ATTACK, BRUSH PATROL | INITIAL ATTACK, BRUSH PATROL | PATROL, MOP UP, INITIAL ATTACK |

✓ REQUIRED    ✕ NOT REQUIRED/OPTIONAL

*Image 22:  Firetruck types and specifications.*[134]

92.    Some trucks are specially equipped to conform to additional standards. For example, NFPA Chapter 5 describes the requirement for a truck to be considered a Pumper Fire Apparatus, NFPA Chapter 9 describes the requirements for a Quint Fire Apparatus, NFPA Chapter 11 describes the requirements for a Mobile Foam Fire Apparatus, and NFPA Chapter 19 describes the requirements for Aerial Fire Apparatus (which include trucks equipped with aerial ladders, elevating platforms or towers, and water tower devices).[135] These specialty trucks are also included in the relevant product market.

---

[134] BOISE MOBILE EQUIPMENT, *Types of Fire Trucks and Their Purpose* (Feb. 21, 2022), https://www.bmefire.com/types-of-fire-trucks (last visited Aug. 15, 2025).

[135] PIERCE, *Types of Aerial Fire Trucks: NFPA Classification Overview* (Nov. 8, 2022), https://www.piercemfg.com/pierce/blog/types-of-aerial-fire-truck (last visited Aug. 15, 2025).

### b. The geographic market is the United States.

93. As described above, all three Manufacturer Defendants sell fire trucks to fire departments across the 50 states. The relevant market is the United States.

### 2. Manufacturer Defendants have market power in the relevant markets.

94. As a result of industry roll-ups from the mid-2010s through today, the overwhelming majority of the fire truck industry's sales and capacity are now concentrated among three dominant manufacturers: REV Group, Oshkosh, and Rosenbauer. As described above, REV Group captures around $1 billion of annual fire truck sales made in the United States, Oshkosh captures around $750 million, and Rosenbauer captures around $307 million. In combination, these three companies capture between 70 and 80 percent of the national market.[136]

### 3. High barriers to entry in the fire truck manufacturing market protect Manufacturer Defendants' market shares

95. Fire trucks are expensive, made-to-order, specialty equipment. End-users can specify nearly every aspect of the apparatus they order, from the size of the motor, to the placement of emergency lights, to the location of equipment storage compartments.

96. This demand for customization stems from the diversity of the customer base. According to the U.S. Fire Administration, there are approximately 30,000 fire departments in the United States, ranging from large urban departments to small rural agencies.[137] Among these departments, 68 percent have a single fire station, 17 percent have two stations, and 15 percent have three or more stations.[138] In total, there are approximately 52,000 fire stations across the

---

[136] Baker, Farrell & Kovaleski, *supra* note 37.

[137] U.S. FIRE ADMIN., *National Fire Department Registry Quick Facts* (Aug. 11, 2025), https://apps.usfa.fema.gov/registry/summary (last visited Aug. 15, 2025). There are 27,098 fire departments listed with the National Fire Department Registry, which accounts for 91% of all U.S. fire departments.

[138] *Id.*

country.[139] Each fire department, and sometimes each fire station, has their own specific set of requirements.[140] As Kent Tyler, president of REV Group's Fire Group put it, "[t]hese are fully custom trucks, and they don't just happen overnight."[141] What's more, fire departments buy new trucks infrequently, on average every 10 to 15 years.[142] Only about 10,000 fire trucks are manufactured each year.[143]

97.     Given this backdrop, breaking into the fire truck industry is challenging. The cost of producing fire trucks, combined with the long lead times, mean that only well-funded, established corporations have much chance of sustaining themselves through the initial investment period. The large capital outlays required limit market entry, as it can be difficult for firms to raise the required funds.

98.     The specialized nature of the fire truck market is an additional barrier to entry. The niche engineering expertise needed to meet NFPA standards and fire departments' demands is largely confined to current manufacturers. The effort required to develop the necessary expertise is another deterrent to would-be competitors.

---

[139] *Id.*

[140] FULD & CO., *What a Competitive Strategy Analyst Thinks About the Fire Apparatus Industry*, https://www.fuld.com/what-a-competitive-strategy-analyst-thinks-about-the-fire-apparatus-industry (last visited Aug. 15, 2025).

[141] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIRE APPARATUS & EMERGENCY EQUIPMENT (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands (last visited Aug. 15, 2025).

[142] Baker, Farrell & Kovaleski, *supra* note 37.

[143] *Id.*

**H.**     **Plaintiff and other Class members have been harmed as a result of the conspiracy.**

   **1.**     **Plaintiff and other Class members have overpaid for fire trucks as a result of Defendants' anticompetitive behavior.**

99.     If the price of fire trucks had increased only at the rate of inflation between 2015 and 2025, pumper trucks would cost approximately $680,000 (rather than the current cost of $1 million), and ladder trucks would cost approximately $1.2 million (rather than $2 million).[144] Municipalities across the country are therefore paying approximately 47 percent (or $320,000) more for pumpers and 66 percent (or $800,000) more for ladder trucks in 2025 than would be expected based on inflationary costs alone.

100.     There are approximately 5,000 new fire trucks sold in the United States every year.[145] Of these, about 75% are pumpers.[146] That means that since 2016, Plaintiff and other = Class members have paid a combined total of approximately $56.25 billion for new fire trucks[147]—$19.8 billion more than expected based on increased inflation alone.[148]

101.     Even accounting for issues facing the fire truck market in terms of supply chain and labor shortage challenges, these increases are far beyond what would be expected in a competitive market.

---

[144] Calculated assuming a pumper cost $500,000 and a ladder truck cost $900,000 in 2015.

[145] Jeffrey Bonior, *Get to Know Sutphen, Which Has Been Making Fire Engines in the United States Since 1890*, SUTPHEN (Mar. 12, 2021), https://www.sutphen.com/get-to-know-sutphen-which-has-been-making-fire-engines-in-the-united-states-since-1890 (last visited Aug. 15, 2025).

[146] Alan M. Petrillo, *What's the Right Size Pump for Your Apparatus and How Does It Affect the Design?*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 27, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/pumpers/whats-the-right-size-pump-for-your-apparatus-and-how-does-it-affect-the-design (last visited Aug. 15, 2025).

[147] Calculated as ((3,750 pumper trucks per year * 9 years *$1 million) + (1,250 ladder trucks per year * 9 years * $2 million).

[148] Cost based on inflation alone ($36.45 billion) calculated as ((3,750 pumper trucks per year * 9 years *$680,000) + (1,250 ladder trucks per year * 9 years * $1.2 million)).

**2.** **Inflated prices and long backlogs have prevented Plaintiff and the other Class members from timely replacing old vehicles in their fire truck fleets, and their fleets have suffered as a consequence.**

102.     As fire vehicles age, they become prone to more frequent and serious breakdowns, leading to more costly repairs and prolonged downtime. The National Fire Protection Association recommends that apparatus should be moved from the frontlines to the reserve fleet after 15 years and removed from service completely at the 20- or 25-year mark.

103.     Skyrocketing prices and longer delivery times have made it difficult for municipalities to replace aging vehicles in their fire departments' fleets in a timely manner. In many cases, fire departments are operating using trucks that have exceeded their service life because buying new trucks is prohibitively expensive. According to the president of the International Association of Fire Fighters, Edward Kelly, cities and towns across the country are facing a crisis where demand for new fire trucks has outstripped availability and funding.[149]

104.     For example, Plaintiff La Crosse is currently operating a 2006 Pierce Enforcer (a quint fire apparatus),[150] a vehicle that is nearly 20 years old. Although La Crosse has ordered a replacement for the vehicle, long expected delivery times mean La Crosse will need to rely on this outdated fire truck for several more years.

105.     Price and availability concerns also spurred the La Crosse Fire Department to change its operating plan, which previously relied on three quint apparatus and two engines, to a plan based on the cheaper configuration of two quint apparatus and three engines. In some cases, La Crosse has been shut out of the market altogether: although it recently looked at purchasing a

---

[149] Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025).

[150] FIREFIGHTING WIKI, *La Crosse Fire Department (Wisconsin)*, https://fire.fandom.com/wiki/La_Crosse_Fire_Department_(Wisconsin)#Apparatus_Roster (last visited Aug. 15, 2025).

new fire truck for its airport, the $1 million price tag and the long wait time were too much for the City, which decided to make do with its current fleet. To try to adapt to ever-increasing prices and lengthening backlogs, the La Crosse Fire Department has already begun requesting funds for a replacement truck that it will not need until 2030.

106.    Other examples of aging fleets abound. In January 2025, the Chicago fire department threw a mock thirtieth birthday celebration for one of its trucks, which was older than many firefighters on the force.



***Image 23: Celebration of Chicago Fire Department Truck D545's 30th birthday***[151]

<hr />

[151] Katherine Laidlaw, *Why Does a Fire Truck Cost $2 Million?*, HUSTLE (July 18, 2025), https://thehustle.co/originals/why-does-a-fire-truck-cost-2-million (last visited Aug. 15, 2025).

107.    In Los Angeles, the city's fire department has long aimed to have 90 percent of its fleet ready for deployment at any given time, but it has averaged only 78 percent in recent years as older trucks are pulled for maintenance.[152] Union officials have said that rising prices for replacement vehicles have forced the department to order fewer new rigs than it had planned.[153]

108.    Auditors in Atlanta found that more than a third of the city's aging firefighting fleet was out of commission.[154] Houston and Seattle have reported similar struggles with their fleets.[155]

109.    Smaller municipalities, including towns in Connecticut, Illinois, Michigan, New York, New Jersey, Pennsylvania, Texas, Kansas, and West Virginia, have faced comparable difficulties.[156] For example, in 2024, the city of Evanston, Illinois had to persuade a dealer to sell a demonstration vehicle to accelerate delivery of a $2.3 million new truck to only "12 to 14 months" to replace an 18 year old reserve truck with "major defects… that would cost around

---

[152] Baker, Farrell & Kovaleski, *supra* note 37.

[153] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Aug. 15, 2025).

[154] Baker, Farrell & Kovaleski, *supra* note 37; Riley Bunch, *City Leaders Reveal Plans to Address Aging Fire Trucks*, ATLANTA JOURNAL-CONSTITUTION, (Aug. 19, 2024), https://www.ajc.com/news/atlanta-news/city-leaders-reveal-plans-to-address-aging-fire-trucks/YGFTTY7ZPRBPJP54Z2RYDMXLOA (last visited Aug. 15, 2025).

[155] Christy Grimes, *Houston Fire Department Navigating Supply Chain Hurdles with Fleet Replacements*, GOV'T FLEET (Sept. 11, 2023), https://www.government-fleet.com/10206016/houston-fire-department-to-replace-aging-vehicles (last visited Aug. 15, 2025); David Kroman, *Seattle Firetruck Fleet Deteriorating Faster than Repairs Can Keep Up*, SEATTLE TIMES (Apr. 1, 2024), https://www.seattletimes.com/seattle-news/politics/seattle-fire-truck-fleet-deteriorating-faster-than-repairs-can-keep-up (last visited Aug. 15, 2025).

[156] CBS NEWS, *North Texas Fire Department in Crisis Needs Financial Windfall To Overcome Equipment Challenges* (Jan. 23, 2025), https://www.cbsnews.com/texas/video/north-texas-fire-department-in-crisis-needs-financial-windfall-to-overcome-equipment-challenges (last visited Aug. 15, 2025); Allen Clayton, *City of Clarksburg Approves $3.1 Million to Purchase New Fire Trucks*, 12WBOY (Feb. 29, 2024), https://www.wboy.com/news/harrison/city-of-clarksburg-approves-3-1-million-to-purchase-new-fire-trucks (last visited Aug. 15, 2025); Musharbash, *supra* note 11; Baker, Farrell & Kovaleski, *supra* note 37.

$300,000 to fix."[157] The Chief of the Ann Arbor, Michigan fire department recently observed

that "[t]he price of fire trucks has become bonkers," revealing "almost a monopoly market," such

that their next truck will cost $2.4 million and take 4 years to deliver.[158] And the fire chief of

Watertown, New York, has said his department was so desperate for a new ladder truck to keep

operations running that it bought one used from another city, even though that truck was already

more than two decades old.[159]

### 3. Reduced fire truck fleets are less able to respond to disasters.

110.     High prices and long waits for fire apparatus are endangering public safety in

communities across the country, particularly those facing natural disasters.

111.     Los Angeles's experience in January 2025, when two large fires raged for days

and killed 29 people, is a particularly poignant example of the harm communities can suffer

when their fire truck fleets are reduced.[160] More than 100 of the Los Angeles Fire Department's

("LAFD") 183 fire trucks were out of service at the time the fires broke out.[161] Chuong Ho, a

firefighter and union leader who was among those who reported for work during the fires, said

the lack of fire apparatus meant many of the firefighters who were available to help that day

---

[157] Bill Smith, *Council OK's Fire Truck Buy*, EVANSTON NOW (Mar. 26, 2024), https://evanstonnow.com/council-oks-fire-truck-buy (last visited Aug. 15, 2025).

[158] Ryan Stanton, *Ann Arbor Is Getting a New Fire Truck, But It Will Take 4 Years and Cost $2.4 M*, MLIVE (Feb. 7, 2025), https://www.mlive.com/news/ann-arbor/2025/02/ann-arbor-is-getting-a-new-fire-truck-but-it-will-take-4-years-and-cost-24m.html (last visited Aug. 15, 2025).

[159] Baker, Farrell & Kovaleski, *supra* note 37.

[160] Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025).

[161] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

could not be sent to the front lines.[162] Kristin Crowley, the LAFD fire chief, confirmed that the lack of a fully staffed fire truck fleet impeded the department's ability to respond to the fires.[163] Had additional firefighters been able to combat the blazes, they might have been able to prevent the devastation that followed, including $350 million in damage to L.A. public facilities[164] and the loss of homes and lives.[165]



*Image 24: Out-of-service fire trucks sitting in the LAFD's Bureau of Supply and Maintenance lot while fires ravage the city.[166]*

---

[162] Baker, Farrell & Kovaleski, *supra* note 37.

[163] *Id.*

[164] David Zahniser, *Fires and Windstorms Caused at Least $350 Million in Damage to L.A. Public Facilities, Report Says*, L.A. TIMES (Jan. 22, 2025), https://www.latimes.com/california/story/2025-01-22/la-me-wildfire-costs-los-angeles-public-infrastructure (last visited Aug. 15, 2025).

[165] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

[166] Perkin Amalaraj, *Dozens of Fire Trucks Waiting for Repair while Fires Ravage LA*, DAILY MAIL (Jan. 14, 2025), https://www.msn.com/en-ae/news/other/dozens-of-fire-trucks-waiting-for-repair-while-fires-ravage-la/ar-BB1rr7vy (last visited Aug. 15, 2025).



***Image 25: Out-of-service fire trucks sitting in the LAFD's Bureau of Supply and Maintenance lot while fires ravage the city.***[167]

112.    Other communities have faced similar difficulties. Jesse M. Flax, the fire chief in Camden, New Jersey, said that fire truck manufacturing delays and rising prices were "creating greater risk for the public and firefighters."[168] During a 2024 house fire in Camden, crews were slowed in their response by mechanical trouble on a truck that caused its hose to go limp. A resident died in that blaze.[169] And in Castle Rock, Colorado, firefighters responded to incidents in Type 3 brush trucks, rather than in other preferred vehicles, due to a four-year delivery delay of new apparatus.[170]

---

[167] *Id.*

[168] Baker, Farrell & Kovaleski, *supra* note 37.

[169] *Id*.

[170] Isabelle Crow, *IAFF Spotlight Apparatus Crisis and Its Impact*, FIRE & SAFETY J. (June 20, 2025) https://fireandsafetyjournalamericas.com/iaff-spotlight-apparatus-crisis-and-its-impact (last visited Aug. 15, 2025).

> 4. **Plaintiff and Class members have also suffered harm because they have had to redirect funds toward purchasing fire trucks that they would have otherwise put toward other essential needs.**

113. In addition to problems adequately responding to disasters with diminished fleets, the rising cost of fire truck maintenance and replacement has squeezed fire departments' and municipalities' budgets, leaving them with fewer resources for other needs including recruiting and retaining firefighters.[171] For example, cities whose fire departments are facing budget challenges, including those in Spokane, Washington and Mills, Wyoming, have had to cancel essential training and even lay off firefighters.[172]

I. **Defendants actively concealed the conspiracy and Plaintiff did not and could not have discovered Defendants' anticompetitive conduct.**

114. Plaintiff had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the price of fire trucks. Throughout the class period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

115. Defendants concealed their conspiracy by communicating competitively sensitive information to one another through FAMA Statistical Reports that are unavailable to the public. They also attended members-only discussions during twice-annual FAMA meetings, allowing

---

[171] Musharbash, *supra* note 11.

[172] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

them to surreptitiously communicate and prevent the existence of written records. Because the public had no access to either the FAMA Reports or the FAMA members-only meetings, there was no reason for Plaintiff to suspect that Defendants were engaged in an unlawful anticompetitive scheme.

116. What's more, Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Fire trucks are not exempt from antitrust regulation. Prior to the investigative articles by Basel Musharbash[173] and journalists with the New York Times,[174] Plaintiff reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Manufacturer Defendants' fire truck prices before these recent events.

117. By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff has as a result of the unlawful conspiracy alleged in this Complaint.

## V.    CLASS ACTION ALLEGATIONS

118. Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking injunctive relief pursuant to federal law, and damages pursuant to various state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states listed below on behalf of the members of the following Classes:

---

[173] Musharbash, *supra* note 11.
[174] Baker, Farrell & Kovaleski, *supra* note 37.

- **Nationwide Class**: All local or municipal government entities with fire departments that purchased fire trucks from Manufacturer Defendants in the United States from January 1, 2016 through the present.

- **Wisconsin Class:** All local or municipal government entities with fire departments that purchased fire trucks from Manufacturer Defendants in Wisconsin from January 1, 2016 through the present.

119. Specifically excluded from these Classes are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from these Classes are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

**A.     All requirements of Federal Rule of Civil Procedure 23(a) are met.**

120. A class action is warranted in this case because the Class members are so numerous that joinder of all members is impracticable; there are questions of law or fact common to the Classes; the claims of the representative parties are typical of the claims of the Classes; and the Plaintiff named in this Complaint will fairly and adequately protect the interests of the Classes.

121. **Numerosity**: Class members are so numerous (including thousands of municipalities) that joinder of all Class members in a single proceeding would be impracticable. The disposition of the claims asserted through this class action will enhance efficiency and will benefit the parties and the Court.

122.    **Commonality**: Plaintiff's antitrust claims are common to all Class members, and individual complaints otherwise may result in inconsistent or varying adjudications.

123.    **Typicality**: Antitrust violations and resulting harms alleged by the named Plaintiff are typical of the legal violations and harms suffered by all Class members.

124.    **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class members in that Plaintiff has no interests adverse to, or that conflict with, the Classes which Plaintiff seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex class actions of this nature.

**B.      All requirements of Federal Rule of Civil Procedure 23(b)(3) are met.**

125.    In addition to satisfying the prerequisites of Fed. R. Civ. P. 23(a), this case qualifies for class action treatment because questions of law or fact common to the Classes predominate over any questions affecting only individual Class members, and because a class action suit is superior to other available methods for adjudicating the controversy.

126.    **Predominance**: Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, but are not limited to:

- Whether Defendants engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of fire trucks sold in interstate commerce in the United States;

- The duration of the conspiracy alleged herein and the acts performed by Defendants in furtherance of the conspiracy;

- Whether the alleged conspiracy violated the antitrust laws of Wisconsin;

- Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the Plaintiff and other Class members;

- The effect of Defendants' alleged conspiracy on the prices of fire trucks sold in the United States during the class period;

- Whether Plaintiff and other Class members are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

- The appropriate Class-wide measure of damages.

127. **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. It would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct, both for Class members themselves and for the court system. Individualized litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the courts. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI. ANTITRUST INJURY

128. Defendants' anticompetitive conduct had the following effects, among others:

- Price competition has been restrained or eliminated with respect to fire trucks;

- The prices of fire trucks have been fixed, raised, stabilized, or maintained at artificially inflated levels;

- Plaintiff and other Class members have been deprived of free and open competition; and

- Plaintiff and other Class members have paid artificially inflated prices for fire trucks, causing substantial harm to Plaintiff and other Class members.

129.    The purpose of Defendants' conspiratorial conduct was to raise, fix, or maintain the price of fire trucks. As a direct and foreseeable result, Plaintiff and other Class members paid supra-competitive prices for fire trucks during the class period.

130.    By reason of the alleged violations of the antitrust laws, Plaintiff and other Class members have been injured because they paid higher prices for fire trucks than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## VII.    CLAIMS FOR RELIEF

**A.    First Claim for Relief: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for conspiracy to restrain production (on behalf of the Nationwide Class for injunctive and equitable relief)**

131.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

132.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016 and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price of fire trucks in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

133.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants achieved the following conspiratorial outcomes:

- Fixing, raising, and stabilizing the price of fire trucks; and

- Allocating among themselves and collusively reducing the production of fire trucks.

134.     The combination and conspiracy alleged herein has had the following effects, among others:

- Price competition has been restrained or eliminated with respect to fire trucks;

- The production of fire trucks has been restrained at artificially low levels;

- The price of fire trucks has been fixed, raised, stabilized, or maintained at artificially inflated levels;

- Plaintiff and other Class members have been deprived of free and open competition; and

- Plaintiff and other Class members have paid artificially inflated prices for fire trucks, causing substantial harm to Plaintiff and other Class members.

135.     Plaintiff and other Class members have been injured and will continue to be injured by paying more for fire trucks from Manufacturer Defendants than they would have paid and will pay in the absence of the combination and conspiracy.

136.     Plaintiff and other Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**B.      Second Claim for Relief: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for conspiracy to exchange competitive information (on behalf of the Nationwide Class for injunctive and equitable relief)**

137.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

138.     Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016, and continuing through the present, Defendants entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about

their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

139.     The relevant product market is fire trucks as recognized by NFPA Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing. The relevant geographic market is the United States.

140.     Manufacturer Defendants possess market power in the relevant market. Manufacturer Defendants control between 70 and 80 percent of the relevant market. Manufacturer Defendants' collective market power includes the power to artificially deflate the number of fire trucks produced in the United States below competitive levels and to artificially inflate the price Plaintiff and other members of the Nationwide Class pay for fire trucks above competitive levels.

141.     An increase in the price of fire trucks could be imposed collectively by Manufacturer Defendants without losing customers. The fire truck market is a unique product market.

142.     The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public economic information. The information exchanges included the exchange through FAMA Statistical Reports and FAMA meetings.

143.     Manufacturer Defendants' regular information exchanges through FAMA reflected concerted action between competitors in the market for fire trucks.

144.     Each Manufacturer Defendant furnished competitively sensitive information to other Manufacturer Defendants through FAMA with the understanding that it would be

reciprocated. FAMA enforced this understanding by requiring Manufacturer Defendants to share data in order to receive comparable data.

145.    The agreement to regularly exchange detailed and non-public economic information about their companies suppressed competition between Manufacturer Defendants.

146.    When defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Manufacturer Defendants used the data obtained through FAMA to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the fire truck market. This strategic information was a material factor in Manufacturer Defendants' decisions to inflate the prices that Plaintiff and other members of the Nationwide Class paid for fire trucks during the class period.

147.    Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose.

148.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Manufacturer Defendants in the market for fire trucks in the United States, and (2) inflating the prices of fire trucks during the class period.

149.    As a result of the unlawful agreement alleged herein to exchange information, Plaintiff and the other Class members have been injured in their business or property by paying artificially inflated prices for fire trucks during the class period.

**C.    Third Claim for Relief: Violation of Wisconsin State Antitrust Law, Wis. Stat. Ann. § 133.01, *et seq*. (on behalf of the Wisconsin Class)**

150.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

151.    Wisconsin state antitrust law aims "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. Ann. § 133.01.

152.    Plaintiff purchased fire trucks within Wisconsin during the class period. But for Defendants' conduct set forth herein, the price of those fire trucks would have been lower, in an amount to be determined at trial.

153.    Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in the market for fire trucks, in violation of Wis. Stat. Ann. § 133.01, et seq.

154.    Plaintiff and members of the Wisconsin Class were injured with respect to purchases of fire trucks in Wisconsin and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**D.      Fourth Claim for Relief: Unjust Enrichment (on behalf of the Wisconsin Class)**

155.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

156.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from fire trucks.

157.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiff and members of the Wisconsin Class.

# REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Classes of all others so similarly situated, respectfully request judgment against Defendants as follows:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

B.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act and listed state antitrust and common law;

C.    Plaintiff and the Classes recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiff and the other Class members be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any

manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that is withheld from the public;

F.      Plaintiff and Class members be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.      Plaintiff and Class members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      Plaintiff and Class members have such other and further relief as the case may require and the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: August 20, 2025          Respectfully submitted,

                                CRUEGER DICKINSON LLC

                                By:  ___*/s/ Erin K. Dickinson*_____
                                Erin Dickinson (Bar #1036707)
                                Charles Crueger (Bar #1029825)
                                4532 North Oakland Avenue
                                Milwaukee, WI 53211
                                Telephone: (414) 210-3868
                                Email: ekd@cruegerdickinson.com
                                Email: cjc@cruegerdickinson.com

                                Steve W. Berman (*pro hac vice forthcoming*)
                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                1301 Second Avenue, Suite 2000
                                Seattle, WA 98101
                                Telephone: (206) 623-7292
                                Facsimile:  (206) 623-0594
                                Email: steve@hbsslaw.com

Abigail D. Pershing (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Email: abigailp@hbsslaw.com

*Counsel for Plaintiff and the Proposed Classes*