# EXHIBIT B

Case 1:25-cv-01252-WCG    Filed 12/02/25    Page 1 of 47    Document 41-2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

| | |
|---|---|
| THE NEWSTEAD FIRE CO., INC., individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>OSHKOSH CORPORATION, PIERCE MANUFACTURING, INC.; REV GROUP, INC.; ROSENBAUER AMERICA LLC; and FIRE APPARATUS MANUFACTURERS' ASSOCIATION,<br><br>      Defendants. | Civil No._____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>JURY DEMAND |

Plaintiff The Newstead Fire Company, Inc. ("Plaintiff") brings this class action on behalf of themselves, and all entities similarly situated, against Oshkosh Corporation and Pierce Manufacturing, Inc.; REV Group, Inc.; Rosenbauer America LLC, (together "Manufacturing Defendants") and Fire Apparatus Manufacturers' Association (together "Defendants"), and unnamed co-conspirators. Plaintiff seeks treble damages, injunctive relief, and other relief pursuant to the federal antitrust laws for the anticompetitive conduct alleged herein and demands a trial by jury on all triable matters. Based upon personal knowledge and investigation by counsel, Plaintiff alleges as follows:

## I. NATURE OF THIS ACTION

1. Plaintiff brings this action on behalf of themselves and on behalf of a proposed class consisting of all purchasers of Fire Trucks (the "Class")[1] that purchased those products from at least January 1, 2016 until the present (the "Class Period"). Plaintiff brings this action for injunctive and putative relief under Section 1 of the Sherman Act. Plaintiff alleges that Defendants conspired to fix the prices of Fire Trucks being sold throughout the United States. As a result of Defendants' unlawful conduct, Plaintiff and the other class members suffered antitrust injury for which Plaintiff seeks treble damages and injunctive relief. Plaintiff also demands a jury trial.

2. Defendants are Fire Truck manufacturers Oshkosh Corporation ("Oshkosh"); Pierce Manufacturing, Inc. ("Pierce"); REV Group, Inc. ("REV"); and Rosenbauer America LLC ("Rosenbauer"), as well as industry trade association Fire Apparatus Manufacturers' Association ("FAMA").

3. The Manufacturer Defendants manufacture and supply Fire Trucks that are sold throughout the United States. Together, these manufacturers control between 70 and 80 percent of the United States Fire Truck market. They have used that dominant market power to unlawfully suppress the Fire Truck supply and subsequently raise Fire Truck prices. Beginning in or about January 2016, Manufacturing Defendants entered into an agreement, combination, or conspiracy to limit the supply, and to fix, raise, maintain, or stabilize prices of Fire Trucks sold in the United States at supra-competitive levels. As a result of the unlawful conduct of Defendants, Plaintiff and Class members paid artificially inflated prices for Fire Trucks and as a result have suffered antitrust injury in violation of the federal antitrust laws.

---

[1] "Fire Trucks" defined below at ¶36.

4.      Over the past ten years, Fire Trucks prices have doubled. This rise cannot be explained by inflation alone and has negatively impacted municipal budgets and the safety of communities. Inflated prices along with longer wait times for new Fire Trucks have forced municipalities to keep older and less reliable Fire Trucks instead of replacing them with newer models. This can have deadly consequences for communities when a fire breaks out and a municipality's capacity to act is hindered by older and less reliable equipment. Even for communities that have been able to purchase new Fire Trucks, they have been forced to redirect funds from other priorities to cover the price increases.

5.      The Manufacturer Defendants have perpetuated their conspiracy in part through the Fire Apparatus Manufacturers' Association ("FAMA"). The Manufacturer Defendants, along with most other Fire Truck manufacturers in the country, submit sensitive, non-public economic data to FAMA. FAMA sends the data to an outside consulting company, which compiles the data into reports that FAMA then distributes to its members. FAMA also provides a forum for Manufacturer Defendants to communicate with each other directly during members-only meetings.

6.      The information exchanged through FAMA is not the type of information that competitors would provide each other in a normal, competitive market. The Manufacturer Defendants use the sensitive economic data FAMA shares with them to coordinate price increases and suppress production. They also use FAMA to monitor their co-conspirators to ensure continued adherence to the conspiracy. The FAMA reports are **_not_** available to anyone other than the manufacturers themselves. As a result, buyers in the market, including Plaintiff and Class members, operate at an information asymmetry that solely benefits the Manufacturer Defendants. This information exchange is particularly likely to have anticompetitive effects because so few sellers control the market, as noted above.

7. Thanks to their conspiracy, Manufacturer Defendants have been able to consistently increase their margins by several percentage points and boost overall profits, all without concern that their competitors will try to steal market share. Manufacturer Defendants are also not worried by potential new entrants, as high barriers to entry prevent new competitors from coming into the market.

8. As a result of this anti-competitive behavior and climate, congressional and FTC inquiries have commenced analyzing the Defendants' impact on the United States Fire Truck market.

9. Beginning no later than January 1, 2016, Defendants conspired, colluded, and entered into an agreement to artificially raise, fix, maintain, or stabilize prices of Fire Trucks. Defendants' actions resulted in Plaintiff and Class members paying supra-competitive prices for Fire Trucks in the United States. Defendants' anticompetitive conduct, described further herein, violates Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

## II.    JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, as this action arises out of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26). Plaintiff seeks damages in excess of $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

11. Venue is appropriate in this District pursuant to 15 U.S.C. §§ 15 and 22, as well as 28 U.S.C. § 1391(b) and (c), in that at least one or more of the Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this district.

12. This Court has personal jurisdiction over Defendants because they: (1) transacted business throughout the United States, including in this District; (2) have substantial contacts within the United States, including in this District; and/or (3) are engaged in an antitrust conspiracy that was and is directed at, and had and has the intended effect of causing injury to, persons residing in, located in, and/or doing business in the United States, including in this District.

13. The activities of the Defendants and all co-conspirators, as described herein, were intended to and did have a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District. Defendants sell their products and services in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

## III. PARTIES

### A. Plaintiff

#### 1. The Newstead Fire Company, Inc.

14. The Newstead Fire Company, Inc., is located in the village of Akron, New York, in western New York state. Plaintiff services the Town of Newstead, New York (population 8,689)[2] and surrounding areas.[3]

15. Plaintiff purchased an E-One Heavy Rescue Fire Truck directly from one of the Manufacturer Defendants during the Class Period.

---

[2] TOWN OF NEWSTEAD, https://www4.erie.gov/newstead/ (last visited Oct. 19, 2025).
[3] THE NEWSTEAD FIRE COMPANY, INC., https://newsteadfire.com/ (last visited Oct. 25, 2025).

### B.  Defendants

#### 1.  Oshkosh Corporation and Pierce Manufacturing, Inc.

16.  Oshkosh Corporation ("Oshkosh") is a Wisconsin Corporation with its primary place of business at 1917 Four Wheel Drive, Oshkosh, Wisconsin.[4]

17.  Oshkosh sells its products in more than 150 countries under a variety of brand names, including JLG Industries, Inc., JerrDan LLC, Hinowa S.p.A, AUSACORP S.L., Oshkosh AeroTech, McNeilus Companies, Inc., Oshkosh Commercial Products, LLC, Iowa Mold Tooling Co., Inc., Maxi-Metal, Inc., Kewaunee Fabrications, LLC, Oshkosh Defense, LLC, and Pratt & Miller Engineering & Fabrications, LLC.[5]

18.  Oshkosh's leading North American brand is Pierce Manufacturing, Inc. ("Pierce"). Pierce is incorporated in Delaware and is headquartered in Appleton, Wisconsin. It produces custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, and other fire apparatus in its manufacturing facilities in Appleton, Wisconsin and Brandenton, Florida.[6] Pierce has 26 dealers across California, Colorado, Florida, Kansas, Massachusetts, Minnesota, Mississippi, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin. Together, this dealer network sells fire trucks to customers in all 50 states.[7]

---

[4] OSHKOSH CORP., FORM 10-K at 3, https://www.investors.oshkoshcorp.com/media/document/cdffc8d8-7620-48f8-9d1a-b5430d2b7d47/assets/2024_Oshkosh_Annual_Report_web.pdf (last visited Oct. 14, 2025).

[5] *Id.* at 6.

[6] *Pierce Manufacturing Joins Oshkosh Corporation to Showcase the Future of Electric Firefighting Technology at CES 2025*, FIREAPPARATUSMAGAZINE.COM (Dec. 23, 2024), https://www.fireapparatusmagazine.com/industry-news/pierce-joins-oshkosh-to-showcase-the-future-of-electric-firefighting-technology-at-ces-2025/ (last visited Oct. 14, 2025); *Tour of Pierce Manufacturing, Inc.*, R4.IEEE.ORG, https://r4.ieee.org/event/tour-of-pierce-manufacturing-inc/ (last visited Oct. 14, 2025).

[7] *Find a Dealer*, PIERCE.COM, https://www.piercemfg.com/find-a-dealer (last visited Oct. 14, 2025).

Case Case 1:25-cv-12501-IT-JCG  Filed 10/30/25  Page 6 of 47  Document 141-2

19. Oshkosh, including through Pierce, captures around $750 million in annual fire truck sales in the United States, or at least 25% of the total.[8] Oshkosh's reported 2024 fourth quarter net income was $153.1 million.[9] Pierce has an annual revenue of approximately $1 billion

20. Throughout the Class Period, Oshkosh and Pierce sold Fire Trucks in interstate commerce in the United States. Pierce was a member of FAMA and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Fire Trucks in the United States.

### 2. REV Group, Inc.

21. REV Group, Inc. ("REV") is a Delaware Corporation with its primary place of business at 245 South Executive Drive, Suite 100, Brookfield, Wisconsin.[10]

22. REV manufactures fire trucks under multiple brand names, including: E-ONE, Inc. ("E-ONE"), Kovatch Mobile Equipment Corporation ("KME"), Ferrara Fire Apparatus ("Ferrara"), Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower"). 113 dealers nationwide sell fire trucks from these brands across all 50 states. Additionally, REV sells Spartan cabs and chassis to approximately 40 smaller builders.[11]

---

[8] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG BY MATT STOLLER (Jan. 25, 2025) (hereinafter "Musharbash").

[9] *Oshkosh Corporation Reports 2024 Fourth Quarter and Full Year Results*, OSHKOSHCORP.COM (Jan. 30, 2025), https://investors.oshkoshcorp.com/news/oshkosh-corporation-reports-2024-fourth-quarter-and-full-year-results/f1490807-bbcf-44b4-be51-56294a3276e3 (last visited Oct. 14, 2025).

[10] REV GROUP, INC. SEC FORM 10K (Oct. 31, 2023), https://investors.revgroup.com/%7E/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2023.pdf (last visited Oct. 14, 2025).

[11] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands (last visited Oct. 14, 2025).

23. REV currently operates manufacturing plants in Ocala, Florida (E-ONE apparatus), Hamburg, New York (stainless steel E-ONE products), Nesquehoning, Pennsylvania (KME apparatus), Ephrata, Pennsylvania (Ladder Tower, KME, and Ferrara apparatus), Brandon, South Dakota (Spartan pumpers), Charlotte, Michigan (Spartan cabs and chassis), Snyder, Nebraska (Smeal apparatus), and Holden, Louisiana (Ferrara apparatus).[12]

24. Of the roughly $3 billion in annual fire truck sales in the United States, REV captures approximately $1 billion, or at least 33% of the total.[13] In 2024, REV's full year net income was $257.6 million.[14]

25. Throughout the Class Period, REV sold Fire Trucks in interstate commerce in the United States. REV subsidiaries were members of FAMA and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Fire Trucks in the United States.

### 3. Rosenbauer America LLC

26. Rosenbauer America LLC ("Rosenbauer") is a wholly owned subsidiary of Rosenbauer International AG ("Rosenbauer International"), a publicly traded company based in Austria and listed on the Vienna Stock Exchange. Rosenbauer is a Delaware Corporation with its primary place of business at 100 3rd St., Lyons, South Dakota.[15]

27. Rosenbauer has production facilities in Lyons, South Dakota; Wyoming, Minnesota; and Fremont, Nebraska. Rosenbauer produces custom and commercial pumpers, heavy rescues, tenders, mini pumpers and light rescues, aerial ladders and platforms, and electric fire

---

[12] *Who We Are*, REVGROUP.COM, https://revgroup.com/who-we-are (last visited Oct. 14, 2025).
[13] Musharbash, *supra* note 7.
[14] Julie Nuernberg, *REV Group, Inc. Reports Strong Fiscal 2024 Fourth Quarter and Full Year Results*, REVGROUP.COM (Dec. 11, 2024), https://revgroup.com/rev-group-inc-reports-strong-fiscal-2024-fourth-quarter-and-full-year-results (last visited Oct. 14, 2025).
[15] *A Single-Source Provider for the US Fire Services*, ROSENBAUER.COM, https://www.rosenbauer.com/en-us (last visited Oct. 14, 2025).

trucks.[16] Rosenbauer has 24 dealers across Alabama, Arizona, California, Colorado, Florida, Georgia, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, South Dakota, Texas, Utah, Washington, and West Virginia.[17] Together, these dealers sell fire trucks to customers in all 50 states.

28.     Rosenbauer captures approximately $307 million in United States fire apparatus sales annually,[18] or at least 10% of the market.[19]

29.     Throughout the Class Period, Rosenbauer sold Fire Trucks in interstate commerce in the United States. Rosenbauer was a member of FAMA and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Fire Trucks in the United States.

### 4.     The Fire Apparatus Manufacturers' Association

30.     The Fire Apparatus Manufacturers' Association ("FAMA") is a not-for-profit trade association for fire apparatus manufacturers, located in Ocala, Florida.[20] Throughout the Class Period, FAMA was an active participant in the conspiracy to fix, raise, maintain, or stabilize the prices of Fire Trucks in the United States. As of May 2025, FAMA had 55 manufacturer members,[21] including REV Group subsidiaries E-One, Ferrara, KME, and Spartan; Oshkosh

---

[16] FAMA.ORG, https://www.fama.org/members/company_profile/?id=99 (last visited Oct. 14, 2025).

[17] *Find a Dealer*, ROSENBAUERAMERICA.COM, https://rosenbaueramerica.com/find-a-dealer (last visited Oct. 14, 2025).

[18] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/en/12/rosenbauer-group/investor-relations/financial-news/financial-news-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (converted to U.S. dollars from 262.9 million euros) (last visited Oct. 14, 2025).

[19] Musharbash, *supra* note 7.

[20] *How to Join*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/how-to-join/ (last visited Oct. 14, 2025).

[21] *FAMA Releases Fire Apparatus Industry Update*, FIREENGINEERING.COM (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update/ (last visited Oct. 14, 2025).

subsidiary Pierce; and Rosenbauer.[22] John Schultz, the Vice President and General Manager of Pumper Products at Pierce, has served as FAMA's vice-chair.[23]

### C. Co-Conspirators and Agents

31. Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions while they were actively engaged in the management, direction, control, or transaction of the corporations' business or affairs, and for whom they are liable.

32. Various persons and entities that are not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. Plaintiff reserves the right to name some or all of these entities as Defendants. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not they are named as defendants in this litigation.

## IV. FACTUAL ALLEGATIONS

### A. The Relevant Market

33. The principal relevant product market to these claims are the market for all Fire Trucks, as defined below. The relevant geographic market is the United States.

34. "Fire Trucks" as used in this case refers to those fire trucks as recognized by the National Fire Protection Association ("NFPA") Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing

---

[22] *Members List*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list (last visited Oct. 14, 2025).
[23] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Oct. 14, 2025).

(together, the "Standards"). These standards classify fire trucks within the United States into seven types, all of which are at issue in this case:[24]

- **Type 1**: Often referred to as an engine company, engine pumper, or structural firefighting truck, this is the most common type of fire truck in use today. Urban, suburban, and rural fire departments all rely on Type 1 fire trucks. Type 1 fire trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. Every Type 1 fire truck is required to have a pump with a minimum tank size of 300 gallons and to be equipped with 2.5- and 1.5-inch hoses of varying lengths. These trucks must also include a full complement of ground ladders, nozzles, forcible entry equipment, rear access and egress, and some level of first aid equipment. They typically carry four firefighters.

- **Type 2**: Fire Trucks that carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. They are most commonly used in urban and suburban settings. They typically carry three to four firefighters.

- **Type 3**: These Fire Trucks are often referred to as a wildland fire truck or a brush truck. They are typically used in rural and wildland settings. NFPA standards require a Type 3 engine to have a minimum of a 500-gallon water tank and a pump capable of a minimum of 150 US gallons per minute at a pressure of 250 pounds per square inch. Many Type 3 fire engines also feature an auxiliary pump in addition to the main water pump. The auxiliary pump can be powered by a separate

---

[24] *Types of Fire Trucks: An Overview and Comparison*, PIERCE (Nov. 14, 2023), https://www.piercemfg.com/pierce/blog/types-of-fire-trucks (last visited Oct. 14, 2025).

diesel engine that is connected to the pump. This pump-and-roll technique means that a truck operator can drive the truck while crew members man the pump and hoses, allowing firefighters to follow along as forest fires and brush fires move with the weather, and to create fire lines, wetting down areas ahead of an advancing wildfire. Type 3 Fire Engines must be equipped to carry at least three passengers.

- **Type 4**: Like Type 3 trucks, these are often used in wildland firefighting. Compared to Type 3 trucks, Type 4 trucks have a larger water tank and reduced hose capacity requirements. Type 4 fire trucks must have a 750-gallon water tank that offers 50 gallons per minute of water transfer at a pressure of 100 pounds per square inch. Type 4 trucks must be equipped to carry at least two people.

- **Type 5, 6, and 7**: Because these Fire Trucks feature many of the same design qualities, they are grouped together. These vehicles are typically pick-up truck-based with 4-wheel drive on a medium duty chassis. The main difference between Type 5, Type 6, and Type 7 fire trucks is the difference in their maximum gross vehicle weight rating ("GVWR"): Type 5 trucks have a maximum GVWR of 26,000 pounds; Type 6 trucks have a maximum GVWR of 19,500 pounds, and Type 7 trucks have a maximum GVWR of 14,000 pounds. Type 5, 6, and 7 trucks typically carry a 300-gallon water tank and a small booster pump with a minimum capacity of 50 gallons per minute. They must be equipped to carry two firefighters.

35. As described above, all three Manufacturer Defendants sell fire trucks to fire departments across the 50 states. The relevant market is the United States.

36. Defendants' conspiracy to raise Fire Truck prices impacted purchasers of Fire Trucks across the entire United States. Municipalities and other government entities purchase Fire

Trucks in every state and were impacted by Defendants' conspiracy. According to the U.S. Fire Administration, there are approximately 30,000 fire departments in the United States, ranging from large urban departments to small rural agencies.[25] In total, there are approximately 52,000 fire stations across the country.[26] Each fire department, and sometimes each fire station, has their own specific set of requirements.[27] Fire departments also buy new trucks infrequently, on average every 10 to 15 years.[28] Only approximately 10,000 fire trucks are manufactured each year.[29]

37. Defendants and their co-conspirators possessed market power at all relevant times in the Fire Truck manufacturing market in the United States. As a result of industry roll-ups from the mid-2010s through today, the overwhelming majority of the fire truck industry's sales and capacity are now concentrated among three dominant manufacturers: REV, Oshkosh, and Rosenbauer. This dominant market power made possible a scheme to significantly raise prices above competitive levels without risking losing a proportional number of sales.

38. High barriers to entry also entrench Manufacturer Defendants' market position. The cost of producing Fire Trucks, combined with the long lead times, mean that only well-funded, established corporations have much chance of sustaining themselves through the initial investment period. The required large capital outlays limit market entry, as it can be difficult for firms to raise the required funds. The specialized nature of the Fire Truck market is an additional barrier to entry.

---

[25] U.S. FIRE ADMIN., *National Fire Department Registry Quick Facts* (Aug. 11, 2025), https://apps.usfa.fema.gov/registry/summary (last visited Oct. 14, 2025). There are 27,098 fire departments listed with the National Fire Department Registry, which accounts for 91% of all U.S. fire departments.

[26] *Id.*

[27] FULD & CO., *What a Competitive Strategy Analyst Thinks About the Fire Apparatus Industry*, https://www.fuld.com/what-a-competitive-strategy-analyst-thinks-about-the-fire-apparatus-industry (last visited Oct. 14, 2025).

[28] Mike Baker, Maureen Farrell & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. TIMES (Feb. 17, 2025) (hereinafter "Baker, Farrell & Kovaleski").

[29] *Id.*

Case 2:25-12501-JBG Filed 10/30/25 Page 14 of 47 Document 141-2

The niche engineering expertise needed to meet NFPA standards and fire departments' demands is largely confined to current manufacturers. The effort required to develop the necessary expertise is another deterrent to would-be competitors.

### B. Consolidation in the Fire Truck Manufacturing Market

39. Prior to 2008, the Fire Truck manufacturing market was defined by small and midsized manufacturers across every region of the country producing emergency vehicles tailored to the specific needs of local fire departments. Competition in the market kept prices near costs, and the existence of a large number of manufacturers ensured redundant manufacturing capacity to meet demand.[30] As a result, the Fire Truck industry enjoyed relatively stable (inflation-adjusted) prices and ample production capacity. With few exceptions, the annual cost increase for new trucks prior to 2008 was around 3%.[31]

40. However, starting in 2008, the Great Recession damaged municipal budgets, which in turn caused a drop-off in demand for new Fire Trucks. By 2011, the market for new Fire Truck sales had fallen more than 40% from its peak, from 5,000 a year to around 3,000 a year.[32] Demand for Fire Trucks did not fully rebound until the mid-2010s.

### 1. REV Group and AIP

41. Capitalizing on the economic turbulence of the Great Recession, a midsize private-equity firm, American Industrial Partners ("AIP"), purchased the fire apparatus manufacturing company E-ONE in 2008. E-ONE builds a full line of fire fighting vehicles, from brush trucks and pumpers to aircraft rescue and firefighting vehicles.[33] E-ONE was the first Fire Truck manufacturer in AIP's portfolio.

---

[30] Musharbash, *supra* note 7.
[31] *Id.*
[32] *Id.*
[33] Chris McLoone, *REV Group Invests in the Strength of Fire Apparatus Brands*,

42. As demand for Fire Trucks returned in the mid-2010s, AIP turned its attention to rolling up the Fire Truck industry. AIP created REV Group (originally Allied Specialty Vehicles) in 2015 from the merger of several companies, including E-ONE.[34]

43. In 2016, REV purchased Kovatch Mobile Equipment Corporation ("KME"). Headquartered in Nesquehoning, Pennsylvania, KME operates in Pennsylvania, Virginia, New York, and California. It produces a broad array of fire apparatus, including pumpers, aerials, and tankers.[35]

44. In April 2017, REV purchased Ferrara Fire Apparatus, Inc. ("Ferrara"), based in Holden, Louisiana. The Ferrara product portfolio included custom chassis pumpers, aerials, and industrial apparatus. At the time, Ferrara had more than 450 employees and annual revenue of approximately $140 million.[36] Prior to the purchase, Ferrara had been E-ONE's direct competitor in the southern United States.[37]

45. Dan Peters, President of the fire division within REV, noted that "the addition of Ferrara to the REV Fire Group enable[d] a number of new growth opportunities including

---

FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Oct. 14, 2025).

[34] Baker, Farrell & Kovaleski, *supra* note 27.

[35] Chris Mc Loone, *REV Group, Inc. Acquires KME*, FIREAPPARATUSMAGAZINE.COM (Apr. 11, 2016), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-inc-acquires-kme/ (last visited Oct. 14, 2025).

[36] REV Group Acquires Ferrara Fire Apparatus, Inc., FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/ (last visited Oct. 14, 2025).

[37] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Oct. 14, 2025); REV Group Acquires Ferrara Fire Apparatus, Inc., REVGROUP.COM (Apr. 25, 2017), https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523 (last visited Oct. 14, 2025).

expansion of our reach nationwide and adding new geographical regions and key accounts."[38] Timothy Sullivan, REV's CEO, confirmed that "Ferrara will immediately contribute strategic value by expanding the REV Fire Group national footprint, dealer sales network, service and after-market parts revenue as well as enhancing our robust line of custom chassis and aerial products for multiple market segments."[39]

46.     In 2020, REV purchased Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower") in 2020.[40] These brands had a significant presence in the Midwest market. The acquisitions solidified REV's position as the top fire truck manufacturer in the United States.

47.     REV used its market power to tamp down competition. Although REV executives initially made a show of preserving the independence of the company's subsidiary manufacturers and their dealers, they simultaneously warned that aggressive or "negative" competition among subsidiaries would not be tolerated.[41]

48.     By 2021, REV stopped pretending to support subsidiary independence. A REV Group investor presentation referred to REV as "an industry consolidator."[42] That same

---

[38] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/ (last visited Oct. 14, 2025).
[39] *Id.*
[40] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Oct. 14, 2025); *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, REVGROUP.COM (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03-2020-135942281 (last visited Oct. 14, 2025).
[41] Musharbash, *supra* note 7.
[42] *REV Group, Inc. Presentation*, REV GROUP at 5 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf

presentation highlighted a strategy that called for REV's subsidiaries to "[c]onverge on common designs that can be shared across brands." REV also ensured its larger fire department customers dealt directly with corporate-level staff rather than individual brand representatives.[43] REV investor presentation further called for the elimination of geographic overlaps between the marketing of its different Fire Truck brands and dealers. REV's fire apparatus operations are now "center-led," with REV dictating and managing the execution of "margin improvement actions" across its subsidiaries.[44]

49.    REV explained to shareholders that its goal was to double the fire apparatus companies' profitability. Timothy Sullivan, REV's CEO, told analysts that REV companies had profit margins of 4 to 5 percent, and that REV was on a path "to get all of them above that 10 percent level." Sullivan further explained: "You bring them into the fold, you got to give them the religion, and they've got it now."[45]

### 2.    Oshkosh

50.    Motivated by REV's roll-ups, Oshkosh got into the game, making acquisitions of its own. In 2021, Oshkosh's primary North American subsidiary, Pierce, announced that it had acquired Boise Mobile Equipment ("BME").[46] BME's product portfolio, which allowed Pierce to expand its reach to West Coast markets, included fire apparatus like the Model 34, Tactical Tender,

---

[43] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Oct. 14, 2025).

[44] Musharbash, *supra* note 7.

[45] Baker, Farrell & Kovaleski, *supra* note 27.

[46] *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, OSHKOSHCORP.COM (Sept. 16, 2021), https://www.investors.oshkoshcorp.com/news/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment/16c54803-9007-4e9e-82f2-e6253396d4e0/ (last visited Oct. 14, 2025).

and Type 6 Xtreme. In 2022, Oshkosh acquired Maxi-Metal, Inc., a leading designer and manufacturer of custom fire trucks.[47]

51.     In addition to purchasing third-party manufacturers, Oshkosh also embarked to consolidate the brands already within its purview, reducing geographic overlap between dealers. In July 2018, Pierce subsidiary MacQueen Emergency Group ("MacQueen") acquired Schuhmacher Fire Equipment. The acquisition consolidated MacQueen's control over the upper Midwest, including Minnesota, Nebraska, South Dakota, North Dakota, and Missouri.[48]

52.     In January 2019, Pierce dealer Siddons-Martin Emergency Group ("Siddons") acquired Superior Equipment, consolidating control over the American Southwest including Texas, Louisiana, New Mexico, Utah, and Nevada.[49]

53.     In November 2019, Pierce dealer Allegiance Fire and Rescue ("Allegiance") acquired Minuteman Fire and Rescue. The acquisition expanded Allegiance's territory to encompass most of New England, including Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.[50]

---

[47] *Oshkosh Corporation Acquires Maxi-Metal, Inc.*, OSHKOSHCORP.COM (Jun. 13, 2022), https://www.investors.oshkoshcorp.com/news/oshkosh-corporation-acquires-maxi-metal-inc/c5afbb77-38ec-4497-a391-f4f56b88d127/ (last visited Oct. 14, 2025).

[48] *MacQueen Emergency Group Territory Expanded to Include 109 Missouri Counties*, PIERCEMFG.COM (July 10, 2018), https://www.piercemfg.com/pierce/press-release/macqueen-emergency-group-territory-expanded-to-include-109-missouri-counties (last visited Oct. 14, 2025).

[49] *Siddons-Martin Emergency Group Expands Territory with Acquisition of Superior Equipment*, PIERCEMFG.COM (Jan. 21, 2020), https://www.piercemfg.com/pierce/press-release/siddons-martin-emergency-group-expands-territory-with-acquisition-of-superior-equipment (last visited Oct. 14, 2025).

[50] *Minuteman Fire and Rescue Acquire by Allegiance Fire and Rescue*, ALLEGIANCEFR.COM (Nov. 19, 2019), https://allegiancefr.com/minuteman-fire-and-rescue-acquired-by-allegiance-fire-and-rescue/ (last visited Oct. 14, 2025).

Case 25-1251, Document 141-2, 10/30/2025, Page 19 of 447

54.     In September 2023, Pierce dealer Firematic Supply Co. Inc. ("Firematic") acquired Churchville Fire Equipment. The acquisition consolidated Firematic's control over Connecticut and New York.[51]

55.     Most recently, on June 12, 2025, Pierce's Reliant Fire Apparatus brand ("Reliant") acquired Halt Fire, Inc., consolidating Reliant's "exclusive Pierce territory" to include Michigan, in addition to its existing territories in Wisconsin and Iowa.[52] Pierce noted that Reliant would "align Michigan operations with its existing territories" to "ensur[e] a consistent and reliable customer experience."[53]

### 3.     Rosenbauer

56.     Similarly, in June 2022 Rosenbauer International A.G. finalized its acquisition of the remaining 25 percent minority stake in Rosenbauer American from General Safety Equipment Corporation in June 2022.[54]

57.     In March 2023, Rosenbauer announced that IKON Fire, LLC would join its dealer network for apparatus sales in Colorado and Wyoming.[55]

---

[51] *Pierce Dealer Firematic Supply Co. Grows Presence in Northeast with Acquisition of Churchville Fire Equipment*, PIERCEMFG.COM (Sept. 1, 20123), https://www.piercemfg.com/pierce/press-release/pierce-dealer-firematic-supply-co.-grows-presence-in-northeast-with-acquisition-of-churchville-fire-equipment (last visited Oct. 14, 2025).

[52] *Reliant Fire Apparatus Acquires Halt Fire, Inc. Expands Pierce Dealership Territory to Include the State of Michigan*, PIERCEMFG.COM (Jun 12, 2025), https://www.piercemfg.com/pierce/press-release/reliant-fire-apparatus-acquires-halt-fire-inc.-expands-pierce-dealership-territory-to-include-the-state-of-michigan (last visited Oct. 14, 2025).

[53] *Id.*

[54] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/pl/fr/group/presse/wirtschaftspresse/wirtschaftspresse-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (last visited Oct. 14, 2025).

[55] Rosenbauer America, *Rosenbauer Announces New Partnership with IKON Fire, LLC*, ROSENBAUERAMERICA.COM (Mar. 30, 2023), https://rosenbaueramerica.com/rosenbauer-announces-new-partnership-with-ikon-fire-llc/ (last visited Oct. 14, 2025).

### C. Manufacturer Defendants Seek to Cooperate Rather than Compete

58. While consolidating the market, Manufacturer Defendants also actively sought to cooperate, rather than compete, with one another.

59. For example, REV's Vice President of Sales in the Fire Group, Mike Virnig, stated: "What I won't tolerate is negative selling. I won't tolerate it with our competitors, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"[56]

60. REV Group company executives also told analysts that the company would substantially raise its profit margins and that other companies were doing the same.[57]

61. Industry insider Jerry Halpin, the co-owner and vice president of sales and marketing for C.E.T. Fire Pumps, noted in 2022 that "people in the fire service industry are talking amongst themselves" and are looking "to ***bolster opportunities through partnerships and other alliances***."[58] He also predicted "***cooperation between like businesses*** to gain an edge in the marketplace."[59]

62. However, the Defendants would use FAMA to more effectively and efficiently exchange information and coordinate their conspiracy

---

[56] Chris McLoone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Oct. 14, 2025) (emphasis added).

[57] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Oct. 14, 2025).

[58] *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIREAPPARATUSMAGAZINE.COM (Dec. 120, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (last visited Oct. 14, 2025) (emphasis added).

[59] *Id.* (emphasis added).

**D.      Manufacturer Defendants use FAMA to Exchange Confidential Information**

63.      E-One, Ferrara, KME, Spartan, Pierce, and Rosenbauer, which together represent all three Manufacturer Defendants, are active members of FAMA.[60] FAMA colludes with the Manufacturer Defendants to enable an information exchange through statistical reports and by organizing meetings.

**1.      FAMA Statistical Reports**

64.      FAMA describes access to competitors' data as "one of the most valuable reasons" for companies to join the organization. FAMA has an entire committee, the Data & Research Committee, dedicated to enabling this data exchange. FAMA describes the Data & Research Committee's mission as helping to "strengthen FAMA member companies by providing actionable data," including economic data, "for strategic business planning."[61] The Committee is tasked with "collect[ing] and distribut[ing] data regarding apparatus sales and orders" and distributing it on at least a quarterly basis.[62] FAMA describes this "detailed data" as "invaluable" to members "for their internal business purposes."[63]

65.      The Data & Research Committee maintains a digital data portal through which apparatus manufacturers enter economic data. That data is then sent to an accounting firm, which compiles the data and returns it to the Data & Research Committee. The Committee then uploads the data onto the FAMA website. Not anyone can access this data, however, as FAMA does not

---

[60] *Members List*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list (last visited Oct. 14, 2025).

[61] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Oct. 14, 2025).

[62] *Id.*

[63] Paul C. Darley, *The Fire Apparatus Market is Coming Back… Just Look at the Data*, FIRE APPARATUS MFRS. ASS'N (Dec. 4, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data (last visited Oct. 14, 2025).; *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Oct. 14, 2025).

release this information to the public. Instead, the data is uploaded onto a portion of the FAMA website that it describes as a "members-only section."[64] Only companies that participate in the statistical studies and are FAMA members are privy to these reports.

66. FAMA imposes strict limits on who can become a member, and consequently, who has access to these reports. To join FAMA, an entity must (a) be "engaged in the manufacture of firefighting or fire protection apparatus, including rescue vehicles," or (b) "manufacture components or products which are incorporated by the manufacturer as a permanent part of the completed fire apparatus . . . such as chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices, apparatus valves and other water control appliances."[65] Notably, fire departments, municipalities, and other buyers of fire apparatus are ***not*** eligible to join FAMA under this definition. Such entities—apparatus manufacturers' customers—are denied access to the data that manufacturers exchange among themselves.

67. Even among its members, FAMA further restricts data access to those companies that provide their own data. FAMA states data access "may be denied" to any company "that was given the opportunity to participate in the program but refused."[66] Data may also be denied to any company "that does not agree in advance of participation to keep the results confidential."[67]

68. This kind of information exchange is precisely the kind of conduct that the FTC has cautioned against. In their guidance titled "Spotlight on Trade Associations" the FTC wrote:

> [E]mployees should be careful when sharing information they could not otherwise share with competitors through intermediaries such as a financial analyst or even a supplier if the consultant were to share that specific information with the company's

---

[64] *Why Join Fama*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Oct. 14, 2025).
[65] *Why Join?*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/why-join (last visited Oct. 14, 2025).
[66] *Data & Research Committee*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/data-research-committee (last visited Oct. 14, 2025).
[67] *Id.*

competitors, resulting in a change in their pricing strategy, such indirect communications could be seen as facilitating an agreement if other evidence points to a coordinated strategy.[68]

69.    The "Guidelines for Collaborations Among Competitors" issued in 2000 by the United States Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") provide:

> Agreements that facilitate collusion sometimes involve the exchange or disclosure of information…. [I]n some cases, the sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables.[69]

70.    A decade later, in 2010, the United States submitted the following comments to the Organization for Economic Cooperation and Development on the legal approach to information sharing among competitors:

> [C]ertain information exchanges among competitors may violate Section 1 of the Sherman Act, which prohibits a "contract, combination … or conspiracy" that unreasonably restrains trade. The antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. Thus, for example, exchanges on price may lead to illegal price coordination.[70]

71.    In 2014, the FTC issued general guidance entitled "Information exchange: be reasonable," confirming that "when competing companies seek market intelligence by exchanging

---

[68] *Spotlight on Trade Associations*, FTC, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust- laws/dealings-competitors/spotlight-trade-associations (last visited Oct. 14, 2025).

[69] Roundtable on Joint Ventures, *Note by the US Federal Trade Commission and the US Department of Justice*, 15–16 (Oct. 9, 2000), https://www.ftc.gov/system/files/attachments/us-submissions-oecd-other-international- competition-fora-2000-2009/2000-rdtble_on_joint_ventures_ftc_doj.pdf.

[70] OECD, *Information Exchanges Between Competitors under Competition Law 294* (2010), https://www.academia.edu/79222152/Information_Exchanges_Between_Competitors_under_Competition_Law (last visited Oct. 14, 2024).

price or other commercially sensitive information, that may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws."[71]

### 2. FAMA Meetings

72. In addition to providing advanced economic data to their members, FAMA also organizes twice-yearly meetings, in the spring and the fall, in order to "provide a forum [for members] to share information."[72]

73. At these meetings, attendees, including direct competitors, listen to presentations that include economic forecasts regarding the fire truck manufacturing market.

74. Attendees also engage in members-only meetings and discussion groups tailored to specific aspects of the industry.

75. FAMA provided Manufacturer Defendants with ample time and opportunity to exchange sensitive economic information and coordinate supply restrictions and price hikes at these meetings. FAMA advertises these "networking" events as one of the reasons to join FAMA.[73]

76. In addition to the statistical reports and twice-yearly in-person meetings, FAMA "communicates with its members on a regular basis via emails, its website and an extensive FAMA newsletter."[74] These platforms offered another avenue for communication and coordination among Manufacturer Defendants.

---

[71] Micheal Bloom, *Information exchange: be reasonable*, FTC (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange- be-reasonable (last visited Oct. 14, 2025).
[72] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Oct. 14, 2025).
[73] *Why Join Fama*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Oct. 14, 2025).
[74] *Id.*

**E.** **The Conspiracy Resulted in Defendants Suppressing Supply and Raising Prices of Fire Trucks During the Class Period**

**1.** **Fire Truck Backlogs Soared by 40% or More During the Class Period**

77. Demand for fire trucks picked up in the mid-2010s as the economy rebounded following the Great Recession, increasing steadily until approximately 2020. Between 2020 and 2022, the number of fire truck orders spiked as municipal coffers became flush with COVID relief funds. Since about 2022, order activity has hovered between 5,500 and 6,500 trucks per year.

78. However, Manufacturer Defendants' production has failed to keep pace with this increased demand, with order backlogs ballooning. For example, REV reported a record $3.6 billion backlog in late 2023, a 41% increase over 2022.[75] REV's backlog has continued to increase. As of last October, REV Group had a $4.4 billion backlog on fire and emergency vehicle orders in the United States.[76]

79. Oshkosh and Rosenbauer have reported similar backlogs. Oshkosh's backlog of Fire Truck orders quadrupled from 2019 to 2023 and it recently reported around $4 billion in orders placed but not fulfilled.[77] Rosenbauer announced an approximately $2.67 billion backlog as of the end of 2024.[78]

---

[75] Reuters, *Fire Truck Boom Highlights Divide in US Manufacturing*, U.S. NEWS (Jan. 19, 2024), https://money.usnews.com/investing/news/articles/2024-01-19/fire-truck-boom-highlights-divide-in-us-manufacturing (last visited Oct. 14, 2025).

[76] REV GROUP, INC. SEC FORM 10K (Oct. 31, 2024), https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm (last visited Oct. 14, 2025).

[77] Baker, Farrell & Kovaleski, *supra* note 27.

[78] Christian Sandherr, *Rosenbauer International AG: Solid Start Into the Year/ Record High Order Backlog*, NUWAYS (May 14, 2025), https://www.nuways-ag.com/company/rosenbauer-international-ag/research/solid-start-into-the-year-record-high-order-backlog ("Q1 sales grew by 16.8% yoy to € 264m (eNuW: € 265m) thanks to the company's strong order backlog of € 2.28bn at the end of FY24.") (last visited Oct. 14, 2025).

80.     Increased backlogs have resulted in substantial delays prior to delivery of new Fire Trucks. Wait times in some areas have more than quadrupled, from one year to 4.5 years.[79] While orders spiked to 45% above average levels, order fulfillment dropped nearly 10% below average levels in 2022, as illustrated in the graph below:



*Image 1: North America Fire Apparatus Trend[80]*

81.     While the rate of order fulfillment has ticked up again in recent years, that increase has not been nearly enough to reduce the serious backlog.

82.     In addition to delays for new Fire Trucks, delays have also increased for replacement part orders. These backlogs cannot be explained by supply chain disruptions in the

---

[79] *Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson* at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Oct. 14, 2025).
[80] *FAMA Releases Fire Apparatus Industry Update*, FIRE ENGINEERING (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update (last visited Oct. 14, 2025).

wake of the COVID-19 pandemic or other geopolitical events of the early 2020s. Although supply chain issues plagued industries across the United States in 2021 and 2022, the Federal Reserve Bank of New York's Global Supply Chain Pressure Index returned to baseline by early 2023, hitting its lowest point on record in May 2023.[81]

### 2. Facing Increasing Demand, Manufacturer Defendants Failed to Increase Capacity and Have Shuttered Facilities, Worsening the Shortage

83. Under typical, competitive market conditions, such a significant surge in demand would be met with a corresponding increase in manufacturing capacity. But no such manufacturing capacity increase has materialized. REV has recently spent only a small portion of its revenue—about 1 percent—on upgrading its buildings and equipment.[82] Neither Oshkosh nor Rosenbauer have attempted to meet this surge in demand or capture market share by ramping up their production.

84. Not only have Manufacturer Defendants failed to add manufacturing capacity, in some cases they have in fact *shuttered* existing plants, reducing capacity further. In September of 2021, REV shut down two KME custom Fire Truck manufacturing facilities in Pennsylvania and Virginia.[83] The closure cut the company's manufacturing footprint by roughly one third.[84]

---

[81] Diccon Hyatt, *Supply Chains Have Healed From Pandemic Disruptions*, INVESTOPEDIA (June 7, 2023), https://www.investopedia.com/supply-chains-have-healed-from-pandemic-disruptions-7509263 (last visited Oct. 14, 2025).

[82] Baker, Farrell & Kovaleski, *supra* note 27.

[83] Chris Reber, *KME Plant to Close in April 2022*, TIMES NEWS ONLINE (Sept. 11, 2021), https://www.tnonline.com/20210911/kme-plant-to-close-in-april-2022 (last visited Oct. 14, 2025).

[84] Baker, Farrell & Kovaleski, *supra* note 27.

85.     In a press release, REV stated that orders currently in progress at the two KME facilities would be transferred to other REV manufacturing plants.[85] The process, unsurprisingly, resulted in additional, substantial delays.[86]

86.     Despite these substantial and record-breaking backlogs, the Manufacturer Defendants appear unconcerned that their customers might cancel orders or that a competitor might steal their business.[87] Mark Skonieczny, REV's current chief executive, explained during a 2023 conference call that the company did not expect the delays to cause cancellations because once a city sets aside the money, it is "earmarked" and REV gets a deposit. "That money is allocated to those units, so we feel good about that."[88] Skonieczny further commented, "I don't think it's impacting our market share."[89] According to REV's SEC reports, the company considers its backlog to enhance its value to shareholders by giving the company "strong visibility into future net sales."[90]

### 3.     The Price of Fire Trucks Doubled During the Class Period

87.     The growing demand and flat or declining supply created by Manufacturer Defendants naturally resulted in the cost of Fire Trucks soaring. In the mid-2010s, a standard pumper truck cost approximately $300,000 to $500,000.[91] Within the last few years, prices have

---

[85] Andrew Corselli, *REV Group Announces Plans to Shift KME Production to Other REV Fire Group Facilities*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 10, 2021), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-announces-plans-to-shift-kme-production-to-other-rev-fire-group-facilitie (last visited Oct. 14, 2025).

[86] Baker, Farrell & Kovaleski, *supra* note 27.

[87] Musharbash, *supra* note 7.

[88] Baker, Farrell & Kovaleski, *supra* note 27.

[89] Eman Abu-Khaled, *REV Group Takes Steps to Normalcy After Supply-Chain Setbacks*, TRAILER BODY BUILDERS (Mar. 22, 2023), https://www.trailer-bodybuilders.com/truck-bodies/article/21262503/rev-group-takes-steps-to-normalcy-after-supply-chain-setbacks (last visited Oct. 14, 2025).

[90] Musharbash, *supra* note 7.

[91] *Id*.; Chris Godfrey, *An Evaluation Of Fire Apparatus Usage And Operating Cost For Green Township Fire & Ems* at 9 (Aug. 2, 2013),

increased to an average of $1 million per pumper truck.[92] Similarly, ladder trucks that cost $750,000 to $900,000 in the mid-2010s cost upward of $2 million today.[93] An industry leader commented that the industry has "reached a new level of price psychology. Today, relationships start at a half million dollars, and 10 years ago that was a remote concept."[94]

88.     Seeking out competition is also not a viable option for customers looking to get a better deal. Fire departments across the country have little alternative than to pay the exorbitant prices Manufacturer Defendants are charging for their Fire Trucks.

### 4.     Manufacturer Defendants Used "Floating Prices" to Charge Even More

89.     On top of already high base prices for new fire trucks, Manufacturer Defendants have relied on the significant industry backlog to justify imposing "floating prices" on their customers. Using the purported difficulty of projecting material costs over a years-long lead time as an excuse, Manufacturer Defendants have added price clauses to their contracts that allow Manufacturer Defendants to increase the final price of a fire truck after it goes into production. Due to production delays, this means Manufacturer Defendants can increase their prices years after

---

http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188 (last visited Oct. 14, 2025); Patrick Varine, *Despite Grant, PA Dept. Says Rising Apparatus Costs a Challenge*, FIREHOUSE (Aug. 3, 2023), https://www.firehouse.com/apparatus/news/53068052/despite-fire-act-grant-export-pa-fire-department-says-rising-fire-apparatus-costs-a-challenge ("'In 1994, we brought a new KME front-line pumper truck in for $200,000,' Export fire Chief and Councilman David Silvis said. 'Today, we're probably between $800,000 and $900,000 to fund this new truck.'") (last visited Oct. 14, 2025).

[92] Musharbash, *supra* note 7.

[93] Chris Godfrey, *An Evaluation Of Fire Apparatus Usage And Operating Cost For Green Township Fire & Ems* at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188 (last visited Oct. 14, 2025); Baker, Farrell & Kovaleski, *supra* note 27; Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025); Musharbash, *supra* note 7.

[94] Chris Mc Loone, *Fire Industry Outlook: 10 Years After the Great Recession*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 1, 2018), https://www.fireapparatusmagazine.com/fire-apparatus/fire-industry-outlook-10-years-after-the-great-recession (last visited Oct. 14, 2025).

a fire department initially orders a truck. Mark Fusco, the president of Rosenbauer America, conceded that his company imposes "surcharges that might occur during the build times" on Rosenbauer customers.[95]

90.     One fire department in Massachusetts ordered a fire truck in 2022 and then added two more trucks to their original order in 2023. After the second order, the fire truck manufacturer increased the price of the truck ordered in 2022 by $150,000 to match the price of the trucks ordered in 2023. The manufacturer threatened not to deliver the truck ordered in 2022 unless the fire department agreed to the price increase. The fire chief felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."[96] For another example, a fire department in Indiana was hit with a more than $100,000 price increase for the same pumper truck after a 7-month delay.[97] Similarly, in Colorado, the Loveland Fire Rescue Authority experienced a surcharge of $29,000 on a pending order.[98]

### F.     Defendants' Conspiracy Had the Intended Effects

91.     Defendants' agreement to artificially raise, fix, maintain, or stabilize prices for Fire Trucks and to exchange competitively sensitive information regarding Fire Trucks has had the

---

[95] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (last visited Oct. 14, 2025).
[96] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing (last visited Oct. 14, 2025).
[97] *Id.*
[98] *"Floating" Prices & Lengthy Delivery Times for Fire Apparatus CSFC Members' Perspective* at 1 (Aug. 25, 2022),
https://static1.squarespace.com/static/5ea64a6b9614427b0ff93e6d/t/63080a517f782438bdd6f98e/1661471313934/Floating+Prices+Lenghty+Delivery+Time+for+Fire+Apparatus+Aug+25+2022%5B42%5D.pdf (last visited Oct. 14, 2025).

intended effect of artificially inflating the prices for those pieces of equipment. As a result, Defendants have obtained considerable profit increases.

92. In July 2021, REV announced that it had "[e]xceeded consensus earnings estimates for five consecutive quarters."[99] In 2024, REV's profit margins jumped to what the company described as an "exceptional 8.9 percent" for the division that includes fire trucks.[100]

93. For Oshkosh, in June 2025 they stated that its adjusted operating margins had grown from 4.8% to 10.5% from 2022 to 2024, delivering on "key 2022 Investor Day targets one year early."[101]

94. Oshkosh anticipates its adjusted operating margins will grow to 12 or 14 percent by 2028, with revenue of $13-14 billion.,[102] revenue growth that will be "supported by strong backlog" and price increases.[103]

95. These profit increases are present across the industry. With a few exceptions during the pandemic years, overall revenues for fire truck manufacturers in the U.S., including Manufacturer Defendants, have increased significantly since 2015.

**G. Plaintiff and Other Class Members Have Been Harmed as a Result of the Conspiracy**

**1. Plaintiff and Other Class Members Overpaid for Fire Trucks**

96. The Defendants' inflated profit margins came at the expense of the municipalities and other government entities, like the Plaintiff, that purchased Fire Trucks.

---

[99] REV Group, Inc. Presentation, REV GROUP at 4 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Oct. 14, 2025).
[100] Baker, Farrell & Kovaleski, *supra* note 27.
[101] OSHKOSH, INVESTOR DAY at 83 (June 5, 2025), https://online.flippingbook.com/view/29819025/3 (last visited Oct. 14, 2025).
[102] *Id.*
[103] *Id.*

97. If the price of fire trucks had increased only at the rate of inflation between 2015 and 2025, pumper trucks would cost approximately $680,000 (rather than the current cost of $1 million), and ladder trucks would cost approximately $1.2 million (rather than $2 million).[104] Municipalities across the country are therefore paying approximately 47 percent (or $320,000) more for pumpers and 66 percent (or $800,000) more for ladder trucks in 2025 than would be expected based on inflationary costs alone.

98. There are approximately 5,000 new fire trucks sold in the United States every year. Of these, about 75% are pumpers.[105] That means that since 2016, Plaintiff and other Class members have paid a combined total of approximately $56.25 billion for new fire trucks—$19.8 billion more than expected based on increased inflation alone.[106]

99. Even accounting for issues facing the Fire Truck market in terms of supply chain and labor shortage challenges, these increases are far beyond what would be expected in a competitive market.

### 2. Inflated Prices and Long Backlogs Delay Plaintiff and Class Members from Replacing Old Vehicles, Impacting Public Safety

100. As stated above, as fire vehicles age, they become prone to more frequent and serious breakdowns, leading to more costly repairs and prolonged downtime. The National Fire Protection Association recommends that apparatus should be moved from the frontlines to the reserve fleet after 15 years and removed from service completely at the 20 or 25-year mark.

---

[104] Calculated assuming a pumper cost $500,000 and a ladder truck cost $900,000 in 2015.

[105] Alan M. Petrillo, *What's the Right Size Pump for Your Apparatus and How Does It Affect the Design?*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 27, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/pumpers/whats-the-right-size-pump-for-your-apparatus-and-how-does-it-affect-the-design (last visited Oct. 14, 2025).

[106] Cost based on inflation alone ($36.45 billion) calculated as ((3,750 pumper trucks per year * 9 years *$680,000) + (1,250 ladder trucks per year * 9 years * $1.2 million)).

CaseCase 1:25-cv-12521-WGG Filed 10/2/25 Page 33 of 47 Document 141-2

101. Skyrocketing prices and longer delivery times have made it difficult for municipalities to replace aging vehicles in their fire departments' fleets in a timely manner. In many cases, fire departments are operating using trucks that have exceeded their service life because buying new trucks is prohibitively expensive.

102. This aging equipment can also endanger public safety in communities across the country, particularly those facing natural disasters.

103. For example, in January 2025 in Los Angeles, when two large fires raged for days and killed 29 people, more than 100 of the Los Angeles Fire Department's ("LAFD") 183 fire trucks were out of service at the time the fires broke out.[107] Kristin Crowley, the LAFD fire chief, confirmed that the lack of a fully staffed fire truck fleet impeded the department's ability to respond to the fires.[108] Had additional firefighters been able to combat the blazes, they might have been able to prevent the devastation that followed, including $350 million in damage to L.A. public facilities and the loss of livelihoods.[109]

104. Other communities have faced similar difficulties. Jesse M. Flax, the fire chief in Camden, New Jersey, said that fire truck manufacturing delays and rising prices were "creating greater risk for the public and firefighters."[110] During a 2024 house fire in Camden, crews were

---

[107] *Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson* at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Oct. 14, 2025).

[108] Baker, Farrell & Kovaleski, *supra* note 27.

[109] *Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson* at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Oct. 14, 2025).

[110] Baker, Farrell & Kovaleski, *supra* note 27.

slowed in their response by mechanical trouble on a truck. A resident died in that blaze.[111] And in

Castle Rock, Colorado, firefighters responded to incidents in Type 3 brush trucks, rather than in

other preferred vehicles, due to a four-year delivery delay of a new apparatus.[112]

### 3. Plaintiff and Class Members Have Also Suffered Harm Because They Have Had to Redirect Funds Toward Purchasing Fire Trucks That They Would Have Otherwise Put Toward Other Essential Needs

105. In addition to problems adequately responding to disasters with diminished fleets,

the rising cost of fire truck maintenance and replacement has squeezed fire departments' as well

as entire municipalities' budgets, leaving them with fewer resources for other needs including

recruiting and retaining firefighters.[113] For example, cities whose fire departments are facing

budget challenges, including those in Spokane, Washington and Mills, Wyoming, have had to

cancel essential training and even lay off firefighters.[114]

### H. Defendants Concealed the Conspiracy and Plaintiff Did Not and Could Not Have Discovered Defendants' Anticompetitive Conduct

106. Plaintiff had neither actual nor constructive knowledge of the facts constituting

their claim for relief. Plaintiff did not discover, and could not have discovered through the exercise

of reasonable diligence, the existence of the conspiracy until shortly before filing this Complaint.

Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff on

inquiry notice that there was a conspiracy to fix the price of fire trucks. Throughout the class

---

[111] *Id.*

[112] Isabelle Crow, *IAFF Spotlight Apparatus Crisis and Its Impact*, FIRE & SAFETY J. (June 20, 2025) https://fireandsafetyjournalamericas.com/iaff-spotlight-apparatus-crisis-and-its-impact (last visited Oct. 14, 2025).

[113] Musharbash, *supra* note 7.

[114] *Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson* at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Oct. 14, 2025).

period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

107. Defendants concealed their conspiracy by communicating competitively sensitive information to one another through FAMA Statistical Reports that are unavailable to the public. They also attended members-only discussions during twice-annual FAMA meetings, allowing them to surreptitiously communicate and prevent the existence of written records. Because the public had no access to either the FAMA Reports or the FAMA members-only meetings, there was no reason for Plaintiff to suspect that Defendants were engaged in an unlawful anticompetitive scheme.

108. What's more, Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Prior to investigative articles by Basel Musharbash[115] and journalists with the New York Times,[116] Plaintiff reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Manufacturer Defendants' fire truck prices before these recent events.

109. By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff have as a result of the unlawful conspiracy alleged in this Complaint.

110. Further, a continuing violation restarts the statute of limitations period each time Defendants commit an overt act. During the Class Period, Defendants continued to make sales of Fire Trucks whose prices were fixed as a result of Defendants' continually renewed and adjusted price-fixing and information exchange agreement. Defendants needed to continually renew and

---

[115] Musharbash, *supra* note 7.
[116] Baker, Farrell & Kovaleski, *supra* note 27.

adjust their price fixing and information exchange agreement to account for ever-fluctuating economic and market conditions.

111. Defendants' overt acts were new and independent acts that perpetuated their agreement and kept them current with market conditions. They were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiff and Class Members.

112. As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff and Class Members starts the statutory period running again regardless of Plaintiff's knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of Fire Trucks constituted a new cause of action for purposes of the statute of limitations.

## V. ANTITRUST INJURY & DAMAGES

113. Defendants' anticompetitive conduct has had the following effects, among others:

    a.     Price competition for Fire Trucks has been restrained or eliminated;

    b.     Prices for Fire Trucks sold by the Manufacturer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States;

    c.     purchasers of Fire Trucks have been deprived of free and open competition; and

    d.     purchasers of Fire Trucks have paid artificially inflated prices.

114. The ultimate purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of Fire Trucks and, as a direct and foreseeable result, Plaintiff and the Class have paid supra-competitive prices for Fire Trucks during the Class Period.

115. By reason of the alleged violations of the antitrust laws, Plaintiff and Class Members have sustained injury, having paid higher prices for Fire Trucks than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

116. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VI.    CLASS ACTION ALLEGATIONS

117. Plaintiff brings this action on behalf of themselves and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking equitable and injunctive relief, and other relief pursuant to federal antitrust laws on behalf of the following Class:

> All local or municipal governments who directly purchased Fire Trucks from any of the Manufacturer Defendants in the United States at any time from January 1, 2016 until the present.

> Specifically excluded from these Class are Defendants; their officers, directors, or employees; any entity in which a Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of a Defendant; any federal, state, or local governmental entities; any judicial officers presiding over this action and members of their immediate family and staff; and any juror assigned to this action.

118. Plaintiff reserves the right to amend these Class definitions, including, and without limitation, the Class Period.

119. The above-defined Class Members are readily identifiable from information and records in the possession of Defendants.

120. While Plaintiff does not know the exact number of Class Members, Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of Class Members geographically dispersed throughout the United States, such that joinder of all Class Members would be impracticable.

121. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Fire Trucks directly from one or more of the Manufacturer Defendants and was damaged by the same common course of wrongful conduct.

122. Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. Such questions of law and fact common to the Class include, but are not limited to:

    a.    Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of Fire Trucks sold in the United States in violation of federal antitrust laws;

    b.    Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws;

    c.    Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

    d.    The identity of the participants of the alleged conspiracy;

    e.    The scope and duration of the alleged conspiracy;

    f.    The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

    g.    The effect of Defendants' alleged conspiracy on the prices Fire Trucks were sold in the United States during the Class Period;

    h.    Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and other members of the Class;

i. Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

j. The appropriate class-wide measure of damages; and

k. Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the Class.

123. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Fire Trucks. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.

124. Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of other members of the Class and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

125. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical and Class Members do not have interest in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory

judgments and the establishment of incompatible standards of conduct for Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

126. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VII. CAUSES OF ACTION

**COUNT 1**
**Violation of Sections 1 and 3 of the Sherman Act**
**Sections 4 and 16 of the Clayton Act**
**Conspiracy in Restraint of Trade**
**(15 U.S.C. §§ 1, 3, 15(a), 26)**

127. Plaintiff incorporates and realleges, as fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

128. At least as early as January 1, 2016, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Fire Trucks in the United States to supra-competitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

129. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under a rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, such justifications would have been reasonably achieved through less restrictive means of competition.

130. The contract, combination, or conspiracy alleged herein has had the following effects, among others:

a.    Price competition in the sale of Fire Trucks has been restrained, suppressed, and/or eliminated in the United States;

b.    Prices for Fire Trucks sold by the Manufacturer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

c.    Those who purchased Fire Trucks from the Manufacturer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

131.    Plaintiff and Class Members have been injured and will continue to be injured by paying artificially inflated prices for Fire Trucks purchased from the Manufacturer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

132.    Plaintiff and Class Members seek three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

**COUNT 2**
**Violation of Section 1 of the Sherman Act**
**Exchange of Competitively Sensitive Information**
**(15 U.S.C. § 1)**

133.    Plaintiff incorporates and realleges, as fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

134.    At least as early as January 1, 2016, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially

raise, fix, maintain, or stabilize prices for Fire Trucks in the United States to supra-competitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

135. In furtherance of this scheme, Defendants and co-conspirators have agreed between and among themselves to exchange competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies.

136. Defendants' information exchange has had the intended anti-competitive effects, including inter alia: (a) raising, fixing, maintaining, or stabilizing prices of Fire Trucks at an artificially high level; and (b) eliminating or suppressing, to a substantial degree, competition among the Manufacturer Defendants for sales of Fire Trucks.

137. Defendants' agreement, combination, and/or conspiracy to exchange competitively sensitive information violates Section 1 of the Sherman Act under either a "quick look," or "rule of reason" analysis because the exchange results in the described anticompetitive effects with no valid procompetitive justifications. Any proffered procompetitive justifications do not outweigh the anticompetitive effects and could have been reasonably achieved through means less restrictive of competition.

138. Each Defendant and co-conspirator has participated in one or more overt acts in furtherance of the information exchange.

139. As a direct and proximate result of Defendants' contract, combination, and conspiracy to exchange competitively sensitive information, Plaintiff and Class Members have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits. Absent the conspiracy to exchange competitively sensitive information, Plaintiff and Class Members would have paid less for Fire Trucks.

140. Plaintiff and Class Members seek three times their damages caused by Defendant's violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendant from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

## COUNT 3
### Violation of New York General Business Laws § 340

141. Plaintiff incorporates and realleges, as fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

142. Plaintiff purchased Fire Trucks within New York during the Class Period. But for Defendants' conduct set forth herein, the price of those Fire Trucks would have been lower.

143. Defendants' combinations or conspiracies had the following effects: (1) Fire Truck price competition was restrained, suppressed, and eliminated throughout New York; and (2) Fire Truck prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq*.

144. Plaintiff and members of the Class were injured with respect to purchases of Fire Trucks in New York and are entitled to all relief available under New York General Business Laws § 340, *et seq*.

## VIII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as

43

provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed an unreasonable restraint of trade or commerce in violation of the Sherman Act and a *per se* violation of the Sherman Act;

C.      That Plaintiff and the Class recover damages to the maximum extent allowed under federal law, and that a joint and several judgment in their favor be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained  from  in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

F.      That Plaintiff and the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G. That Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

H. That Plaintiff and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## IX. DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial pursuant to Federal Rule Civil Procedure 38(b) on any and all issues so triable.

Dated: October 31, 2025

By     */s/ Shawn M. Raiter*    
Shawn M. Raiter (WI # 1022977)
**LARSON · KING, LLP**
30 East Seventh Street
Suite 2800
St. Paul, MN 55101
Telephone: (651)312-6518
sraiter@larsonking.com

Michael J. Flannery
**CUNEO GILBERT & LADUCA, LLP**
2 CityPlace Drive
Second Floor
St. Louis, MO 63141
Telephone: (314) 226-1015
mflannery@cuneolaw.com

Evelyn Riley
Cody McCracken
**CUNEO GILBERT & LADUCA, LLP**
2445 M Street NW
Suite 740
Washington, DC 20037
Telephone: (202) 789-3960
evelyn@cuneolaw.com
cmccracken@cuneolaw.com

Marco Cercone
**RUPP PFALZGRAF LLC**
1600 Liberty Building
Buffalo, NY 14202
Telephone: (716) 854-3400
cercone@rupppfalzgraf.com

Case 1:25-cv-12501-WGC Filed 10/31/25 Page 46 of 47 Document 141-2

Don Barrett
Sterling Aldridge
**BARRETT LAW GROUP, P.A.**
404 Court Square North
Lexington, MS 39095-0927
Telephone: (662) 834-9168
donbarrettpa@gmail.com
saldridge@barrettlawgroup.com

Richard R. Barrett
**LAW OFFICES OF RICHARD R. BARRETT, PLLC**
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: (662) 380-5018
rrb@rrblawfirm.net

Patrick W. Pendley
Christopher L. Coffin
**PENDLEY BAUDIN COFFIN**
24110 Eden Street
Plaquemine, LA 70765
Telephone: (225) 687-6396
pwpendley@pbclawfirm.com
ccoffin@pbclawfirm.com

*Counsel for Plaintiff and the Proposed Class*