# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

| | |
|---|---|
| CITY OF PHILADELPHIA, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>OSHKOSH CORPORATION, PIERCE MANUFACTURING, INC., REV GROUP, INC., ROSENBAUER AMERICA LLC, and FIRE APPARATUS MANUFACTURERS' ASSOCIATION,<br><br>    Defendants. | Case No.:<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff City of Philadelphia brings this action pursuant to Section 1 of the Sherman Act against Defendants. Plaintiff seeks an injunction requiring Defendants to stop their anticompetitive practices, as well as restitution, disgorgement, and civil penalties to the full extent authorized by law. Plaintiff demands a trial by jury.

## I.  INTRODUCTION

1.  On September 10, 2025 the United States Senate Subcommittee for Disaster Relief ("Subcommittee") conducted a hearing ("Fire Apparatus Senate Hearing") to investigate disturbing facts and allegations that first gained wide public awareness with the publication of an article in *The New York Times* on February 17, 2025[1] describing outrageous price increases,

---

[1] See, The New York Times ("NYT"), "*As Wall Street Chases Profits, Fire Departments Have Paid the Price*," Mike Baker, Maureen Farrell, and Serge F. Kovaleski, February 17, 2025, https://www.nytimes.com/2025/02/17/us/fire-engines-shortageprivate-equity.html. This NYT article was preceded and perhaps precipitated by a much less widely disseminated report by Basel Musharbash, "*Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*," published on the substack, BIG by Matt Stoller (Jan. 25, 2025), https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll ("Musharbash"). Mr. Musharbash was one of the witnesses invited to submit a statement and testify before the Subcommittee. See also, Mike Baker, *Senators*

dramatically in excess of inflation, for new fire apparatus consisting of fire trucks and related specialized vehicles (rescue and tanker units etc.) ("Fire Apparatus") in the period commencing January 1, 2016 to date (the "Class Period"). Prior to the Fire Apparatus Senate Hearing, each witness submitted a prepared statement.[2] The witnesses included: Dennis L. Rubin, Fire Chief of the Kansas City, Kansas Fire Department; Edward Kelly, President, International Association of Firefighters; Basel Musharbash, Anti-Monopoly Council; Mike Virnig, President, REV Group; Dan Meyer, Vice President, Sales, Pierce. The witnesses testified in response to energetic bi-partisan questioning by the members of the committee, including Senators Josh Hawley (Chair), Andy Kim (Ranking Member).[3]

2.      The salient facts placed squarely on the table before the Subcommittee included:

- Fire Apparatus prices have doubled in the last ten years. For example, a pumper truck that cost $500,000 in the mid-2010s now costs $1 million and specialized ladder trucks that previously cost $900,000 now cost more than $2 million;

- These price increases far exceed inflation;

- The increased Fire Apparatus prices for new equipment has squeezed municipal budgets and, as reported to the Sub-Committee has delayed[4] or even prevented communities from replacing their old rigs, creating

---

*Investigate Private Equity Role in Soaring Fire-Truck Costs*, NYT (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks- congress-investigation.html.

[2] See, *Subcommittee on Disaster Management, District of Columbia, and Census Sounding the Alarm: America's Fire Apparatus Crisis*, Sept. 10, 2025:  https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/  (witnesses' prepared statements and video of proceedings).
[3] *Id.*

[4] Wait times for new fire trucks have increased from approximately 18 months in the mid-2010s to more than three to four years at present.

dangerous operational situations where equipment failures on older vehicles have resulted in failed responses, injuries, and, unfortunately, the deaths of firefighters. At the same time, wait times for new Fire Apparatus have ballooned from 18 months in the mid-2010s to more than four years today;

• As a result of high prices and long order backlogs, Fire Apparatus in use today is often as much as 30 years old and should normally have been retired after 15 or 20 years.

• Three Fire Apparatus manufacturers—REV Group, Inc. ("REV Group"), Oshkosh Corporation ("Oshkosh"), and Rosenbauer America LLC ("Rosenbauer") (collectively "Manufacturer Defendants") are responsible for increasing Fire Apparatus prices and causing a shortage of new Fire Apparatus; and

• Together, these three manufacturers control between 70 and 80 percent of the U.S. fire truck market, and they have unlawfully conspired to use their collective market power to suppress the fire truck supply and raise prices.

3. The Manufacturer Defendants have perpetuated their conspiracy in part through the Fire Apparatus Manufacturers' Association ("FAMA"). The Manufacturer Defendants, along with most other fire truck manufacturers in the country, submit sensitive, non-public economic data to FAMA. FAMA sends the data to an outside consulting company, which compiles the data into reports that FAMA then distributes to its members. FAMA also provides a forum for Manufacturer Defendants to communicate with each other directly during annual members-only meetings.

4. The economic data manufacturers obtain from FAMA is not the type of information that competitors would provide each other in a normal, competitive market. The Manufacturer

3

Defendants use the sensitive economic data FAMA shares with them to coordinate price increases and suppress production. They also use FAMA to monitor their co-conspirators to ensure continued adherence to the conspiracy.

5.     FAMA reports are not available to anyone other than the manufacturers themselves. As a result, buyers in the market, including Plaintiff and Class members, operate at a disadvantage. By limiting data access, FAMA reports create an information asymmetry that benefits the Manufacturer Defendants at buyers' expense. This information exchange is particularly likely to have anticompetitive effects because, so few sellers control the fire truck market.

6.     Thanks to their conspiracy, Manufacturer Defendants have been able to increase their margins by several percentage points and boost total profits, all without concern that their competitors will try to steal market share. For the same reasons, Manufacturer Defendants are unfazed by the notion of potential new entrants in the marketplace, because high barriers to entry limit or prevent new competitors from coming into the market.

7.     As a result of each Defendant's unlawful conduct, Plaintiff and Class members paid artificially inflated prices for Fire Apparatus during the period from January 1, 2016 through the date of this filing ("Class Period"). These prices exceeded the amount they would have paid if the price for Fire Apparatus had been determined by a competitive market. Therefore, Defendants' conduct has injured Plaintiff and Class members.

8.     Plaintiff City of Philadelphia, individually, and on behalf of all others similarly situated, challenges Defendants' conspiracy. Plaintiff brings this Complaint, alleging violations under both a *per se* or, in the alternative, rule-of-reason standard, under federal antitrust laws.

CaseCase-1:25-12502180G FFeed 11/12/42/25 PPage 5 of 490 DDocument 141-4

## II. PARTIES

### A. Plaintiff City of Philadelphia

9. The City of Philadelphia ("Plaintiff" or "Philadelphia"), the sixth largest city in the United States, has a population exceeding 1.5 million people, and is located in southeastern Pennsylvania.

10. During the Class Period, Philadelphia purchased Fire Apparatus including approximately 59 pumper trucks and 31 ladder trucks directly from KME, Spartan and/or Pierce Manufacturing, each of which is a brand owned by Defendants REV Group, Inc. or Oshkosh, Inc.

### B. Defendants

#### 1. REV Group, Inc.

11. REV Group, Inc. ("REV Group") is a Delaware corporation headquartered in Brookfield, Wisconsin.

12. REV Group manufactures Fire Apparatus under multiple brand names including: E-ONE, Inc. ("E-ONE"), Kovatch Mobile Equipment Corporation ("KME"), Ferrara Fire Apparatus ("Ferrara"), Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower"). 113 dealers nationwide sell fire Fire Apparatus trucks from these brands across all 50 states. Additionally, REV Group sells Spartan cabs and chassis to approximately 40 smaller builders.

13. REV Group currently operates manufacturing plants in Ocala, Florida (E-ONE apparatus), Hamburg, New York (stainless steel E-ONE products), Nesquehoning, Pennsylvania (KME apparatus), Ephrata, Pennsylvania (Ladder Tower, KME, and Ferrara apparatus), Brandon, South Dakota (Spartan pumpers), Charlotte, Michigan (Spartan cabs and chassis), Snyder, Nebraska (Smeal apparatus), and Holden, Louisiana (Ferrara apparatus).

14.     Of the roughly \$3 billion in annual Fire Apparatus sales in the United States, REV Group captures approximately \$1 billion, or at least 33% of the total.  According to public records, in 2024, REV Group's full year net income was \$257.6 million.

### 2.     Oshkosh Corporation and Pierce Manufacturing, Inc.

15.     Oshkosh Corporation ("Oshkosh") is incorporated in Wisconsin and headquartered in Oshkosh, Wisconsin.[5]

16.     Oshkosh sells Fire Apparatus products in more than 150 countries under a variety of brand names, including JLG Industries, Inc., JerrDan LLC, Hinowa S.p.A, AUSACORP S.L., Oshkosh AeroTech, McNeilus Companies, Inc., Oshkosh Commercial Products, LLC, Iowa Mold Tooling Co., Inc., Maxi-Metal, Inc., Kewaunee Fabrications, LLC, Oshkosh Defense, LLC, and Pratt & Miller Engineering & Fabrications, LLC.[6]

17.     Oshkosh's leading North American brand is Pierce Manufacturing, Inc. ("Pierce"). Pierce is incorporated in Delaware and headquartered in Appleton, Wisconsin.  It produces custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, and other Fire Apparatus in its manufacturing facilities in Appleton and in Bradenton, Florida.  Pierce has 26 dealers across California, Colorado, Florida, Kansas, Massachusetts, Minnesota, Mississippi, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin.[7] Together, this dealer network sells Fire Apparatus trucks to customers in all 50 states.

---

[5] OSHKOSH CORP., FORM 10-K at 3: https://www.investors.oshkoshcorp.com/media/document/cdffc8d8-7620-48f8-9d1a-b5430d2b7d47/assets/2024_Oshkosh_Annual_Report_web.pdf.

[6] *Id.* at 6.

[7] *Find a Dealer*, PIERCE.COM, https://www.piercemfg.com/find-a-dealer.

18.     Oshkosh has reported Net Sales of $7.73 billion, across all of its business lines, including, among others, Fire Apparatus Manufacturing, and estimates total net sales in 2025 of $10.3 and $10.4 billion, including through its subsidiary Pierce Manufacturing.[8]  As a subsidiary of Oshkosh, Pierce's precise, separate quarterly and annual net sales are not publicly available.

### 3.     Rosenbauer America LLC

21.     Rosenbauer America LLC ("Rosenbauer") is a wholly owned subsidiary of Rosenbauer International AG ("Rosenbauer International"), a publicly traded company based in Austria and listed on the Vienna Stock Exchange.[9] Rosenbauer is incorporated in Delaware and headquartered in Lyons, South Dakota.[10]

22.     Rosenbauer has production facilities in Lyons, South Dakota; Wyoming; Minnesota; and Fremont, Nebraska.  Rosenbauer Fire Apparatus includes custom and commercial pumpers, heavy rescues, tenders, mini pumpers and light rescues, aerial ladders and platforms, and electric-powered Fire Apparatus.  Rosenbauer has at least 24 dealers nationwide, located in: Alabama, Arizona, California, Colorado, Florida, Georgia, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York,

---

[8] Oshkosh Corporation, Press Release, announcing Quarterly Report for period ended September 30, 2025, p. 26 (October 29, 2025):

https://www.sec.gov/Archives/edgar/data/775158/000119312525254706/osk-ex99_1.htm.

[9] Press Release, *Rosenbauer International Fully Acquires Rosenbauer America*, (June 23, 2022), https://www.rosenbauer.com/en/company/investor-relations/financial-news/2022/06/rosenbauer-international-fully-acquires-rosenbauer-america.

[10] *A Single-Source Provider for the US Fire Services*, ROSENBAUER.COM, https://www.rosenbauer.com/en/de/rosenbauer-group/company/locations/sales-and-service-locations/rosenbauer-america-llc.

North Carolina, Ohio, Pennsylvania, South Dakota, Texas, Utah, Washington, and West Virginia.[11]  Together, these dealers sell Fire Apparatus to customers in all 50 states.

23.     Rosenbauer captures approximately $307 million in United States Fire Apparatus sales annually, or approximately 10% of the market.[12]

### 4.      The Fire Apparatus Manufacturers' Association

24.     The Fire Apparatus Manufacturers' Association ("FAMA") is a not-for-profit trade association for fire apparatus manufacturers, located in Ocala, Florida.[13]  As of May 2025, FAMA had 55 manufacturer members,[14] including REV Group subsidiaries E-One, Ferrara, KME, and Spartan; Oshkosh subsidiary Pierce; and Rosenbauer.[15]  John Schultz, Vice President and General Manager of Pumper Products at Pierce,[16] is FAMA's Vice-Chair.[17]

25.     FAMA acted as a co-conspirator of the fire truck manufacturers by facilitating the exchange of confidential, proprietary, and competitively sensitive data among the other Defendants.

### III.     JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. Plaintiff brings this

---

[11] *Find a Dealer*, ROSENBAUERAMERICA.COM, https://rosenbaueramerica.com/find-a-dealer.

[12] Musharbash, *supra* n.1.

[13] *How to Join*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/how-to-join/.

[14] *FAMA Releases Fire Apparatus Industry Update*, FIREENGINEERING.COM (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update/.

[15] *Members List*, FIRE APPARATUS MFRS.ASS'N, https://www.fama.org/members/list (last visited Aug. 15, 2025).

[16] *John Schultz*, PIERCEMFG.COM, https://www.piercemfg.com/hubfs/FDIC%202025/Bios/Bio/John%20Schultz%20-%20Pierce%20Manufacturing.pdf (last visited Aug. 15, 2025).

[17] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).

action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiff seeks damages in excess of $5,000,000.

27. This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered Fire Apparatus to purchasing entities throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

28. Defendants' activities were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

29. Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because multiple Defendants resided or transacted business in this District, are licensed to do business or are doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

## IV. FACTUAL ALLEGATIONS

### A. The Fire Apparatus Manufacturing Industry Was Diverse and Comprised of Many Independent Sellers Until the Great Recession of 2008 Devastated the Industry

30. The modern Fire Apparatus manufacturing industry boomed in the post-war decades of the 1950s and 1960s.[18] Small and midsized fire truck manufacturers—typically family-

---

[18] Musharbash, *supra* n.1.

Case 1:25-cv-05125-VMC   Filed 11/24/25   Page 10 of 50   Document 41-4

owned operations—appeared in every region of the country to produce emergency vehicles tailored to the needs of local fire departments. The industry was competitively diversified across at least two dozen companies. Competition among these smaller firms kept fire truck prices near costs, and the existence of these many manufacturers ensured capacity to meet demand.[19] By 2008, these companies sold over 5,000 units of new Fire Apparatus in the United States every year.

31. For decades, the fire truck industry enjoyed relatively stable (inflation-adjusted) prices and ample production capacity. With few exceptions, the annual cost increase for new trucks prior to 2008 was around 3%.[20]

32. Starting in 2008, the Great Recession decimated municipal budgets, which in turn caused a drop-off in demand for new Fire Apparatus. By 2011, the market for new fire truck sales had fallen more than 40% from its peak, from 5,000 units per year to around 3,000 units per year.[21] Many independent fire truck manufacturers folded during this period and demand for new Fire Apparatus did not fully rebound until the mid-2010s.

### B. REV Group, Oshkosh, and Rosenbauer Start Rolling Up Fire Truck Manufacturers

#### 1. American Industrial Partners ("AIP") and REV Group

34. Capitalizing on the economic turbulence of the Great Recession, a midsize private-equity firm, American Industrial Partners ("AIP"), purchased the fire apparatus manufacturing company E-ONE in 2008. E-ONE builds a full line of fire fighting vehicles, from brush trucks and pumpers to aircraft rescue and firefighting vehicles. E-ONE was the first fire truck manufacturer in AIP's portfolio.

---

[19] *Id.*

[20] *Id.*

[21] Musharbash, *supra* n.1.

35. As demand for new Fire Apparatus returned in the mid-2010s, AIP turned its attention to rolling up the fire truck industry. AIP created REV Group (originally Allied Specialty Vehicles) in 2015 from the merger of several companies, including E-ONE.[22]

36. In 2016, REV Group purchased Kovatch Mobile Equipment Corporation ("KME").[23] Headquartered in Nesquehoning, Pennsylvania, KME operates in Pennsylvania, Virginia, New York, and California. It produces a broad array of Fire Apparatus, including pumpers, aerials, and tankers.

37. In April 2017, REV Group purchased Ferrara Fire Apparatus, Inc. ("Ferrara"), based in Holden, Louisiana. The Ferrara product portfolio included custom chassis pumpers, aerials, and industrial apparatus. At the time, Ferrara had more than 450 employees and annual revenue of approximately $140 million. Prior to the purchase, Ferrara had been E-ONE's direct competitor in the southern United States.[24]

38. Dan Peters, President of the fire division within REV Group, noted that "the addition of Ferrara to the REV Fire Group enable[d] a number of new growth opportunities including expansion of our reach nationwide and adding new geographical regions and key accounts."[25] Timothy Sullivan, REV Group's CEO, confirmed that "Ferrara will immediately

---

[22] Mike Baker, Maureen Farrell & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, NYT (Feb. 17, 2025), https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html ("Baker, Farrell & Kovaleski").

[23] *REV Group Acquires Kovatch Mobile Equipment*, REVGROUP.COM (Apr. 11, 2016), https://investors.revgroup.com/investor-releases/2016/11-04-2016.

[24] *REV Group Acquires Ferrara Fire Apparatus, Inc*., REVGROUP.COM (Apr. 25, 2017), https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523.

[25] *REV Group Acquires Ferrara Fire Apparatus, Inc*., FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/.

contribute strategic value by expanding the REV Fire Group national footprint, dealer sales network, service and after-market parts revenue as well as enhancing our robust line of custom chassis and aerial products for multiple market segments."[26] The Ferrara purchase cemented REV Group's position as a dominant fire truck manufacturer.

39. Not satisfied with control over E-ONE, KME, and Ferrara—each a prominent Fire Apparatus brand in its own right—REV Group purchased Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower") in 2020, each of which had a significant presence in the Midwest market.[27] These acquisitions solidified REV Group's position as the top fire truck manufacturer in the United States.

40. REV Group used its market power to tamp down competition in the industry. Although REV Group executives initially made a show of preserving the independence of the company's subsidiary manufacturers and their dealers, they simultaneously warned that aggressive or "negative" competition among subsidiaries would not be tolerated.[28]

41. By 2021, REV Group stopped even pretending to support subsidiary independence. A REV Group investor presentation referred to REV Group as "an industry consolidator."[29] That same presentation highlighted a strategy that called for REV Group's subsidiaries to converge on common designs that can be shared across brands, and to use the chassis/cab Spartan's Metro Star

---

[26] *Id.*

[27] *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, REVGROUP.COM (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03- 2020-135942281.

[28] Musharbash, *supra* n.1.

[29] *REV Group, Inc. Presentation*, REVGROUP at 5 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf.

as the base platform for their offerings. REV Group also ensures its larger fire department customers deal directly with corporate-level staff rather than individual brand representatives. The investor presentation further called for the elimination of geographic overlaps between the marketing of its different fire-truck brands and dealers. REV Group's fire apparatus operations are now "center-led," with REV Group dictating and managing the execution of "margin improvement actions" across its subsidiaries.[30]

42. REV Group explained to shareholders that its goal was to double the fire apparatus companies' profitability. Sullivan, REV Group's CEO, told analysts that the companies REV Group had profit margins of 4 to 5 percent, and that REV Group was on a path "to get all of them above that 10 percent level." Sullivan further explained: "You bring them into the fold, you got to give them the religion, and they've got it now."[31]

### 2. Oshkosh

43. Oshkosh responded to REV Group's roll-up by making acquisitions of its own. In 2021, Oshkosh's primary North American subsidiary, Pierce, announced that it had acquired Boise Mobile Equipment ("BME"). BME's product portfolio, which allowed Pierce to expand its reach and focus to West Coast markets, included fire apparatus like the Model 34, Tactical Tender, and Type 6 Xtreme.[32] In 2022, Oshkosh acquired Maxi-Metal, Inc.,[33] a leading designer and

---

[30] Musharbash, *supra* n.1.

[31] Baker, Farrell & Kovaleski, *supra* n.23.

[32] *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, PIERCEMFG.COM (Sept. 16, 2021), https://www.piercemfg.com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment.

[33] *Oshkosh Corporation Acquires Maxi-Metal, Inc.*, OSHKOSHCORP.COM (Jun. 13, 2022), https://www.investors.oshkoshcorp.com/news/oshkosh-corporation-acquires-maxi-metal-inc/c5afbb77-38ec-4497-a391-f4f56b88d127/.

manufacturer of custom Fire Apparatus. As a result of these expansions, Oshkosh controlled a full quarter of the U.S. fire truck market.

44. In addition to purchasing third-party manufacturers, Oshkosh also embarked on a strategy of consolidating the U.S. brands already within its purview, reducing geographic overlap between its dealers. In July 2018, Pierce subsidiary MacQueen Emergency Group ("MacQueen") acquired Schuhmacher Fire Equipment. The acquisition consolidated MacQueen's control over the upper Midwest, including Minnesota, Nebraska, South Dakota, North Dakota, and 109 counties in Missouri.

45. In January 2019, Pierce dealer Siddons-Martin Emergency Group ("Siddons") acquired Superior Equipment, consolidating control over the American Southwest.[34] Siddons' territory now includes Texas, Louisiana, New Mexico, Utah, and Nevada.

46. In November 2019, Pierce dealer Allegiance Fire and Rescue ("Allegiance") acquired Minuteman Fire and Rescue. The acquisition expanded Allegiance's territory to encompass most of New England, including Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

47. In September 2023, Pierce dealer Firematic Supply Co. Inc. ("Firematic") acquired Churchville Fire Equipment. The acquisition consolidated Firematic's control over Connecticut and New York.

48. Most recently, on June 12, 2025, Pierce dealer Reliant Fire Apparatus brand ("Reliant") acquired Halt Fire, Inc., which expanded Reliant's "exclusive Pierce territory" to include Michigan, adding onto its existing territories in Wisconsin and Iowa. Pierce noted that

---

[34] *Siddons-Martin Emergency Group Expands Territory with Acquisition of Superior Equipment*, PIERCEMFG.COM (Jan. 21, 2020), https://www.piercemfg.com/pierce/press-release/siddons-martin-emergency-group-expands-territory-with-acquisition-of-superior-equipment.

Case 1:25-cv-12521-ADB   Filed 11/04/25   Page 15 of 50   Document 141-4

Reliant would "align Michigan operations with its existing territories" to "ensur[e] a consistent and reliable customer experience."

49.     These consolidations, which have largely eliminated geographic overlaps and given Pierce dealers exclusive control across vast territories, have reduced or eliminated competition among Pierce subsidiaries.

### 3.     Rosenbauer

50.     Rosenbauer International A.G., seeing REV Group's and Oshkosh's consolidation efforts, finalized its acquisition of the remaining 25 percent minority stake in Rosenbauer American from General Safety Equipment Corporation in June 2022.

51.     In March 2023, Rosenbauer announced that IKON Fire, LLC would join its dealer network for Fire Apparatus sales in Colorado and Wyoming.

52.     Rosenbauer's dealers are assigned non-overlapping territories, reducing inter-dealer competition.

### C.     Manufacturer Defendants Seek to Cooperate Rather Than Compete

53.     While rolling up independent fire truck manufacturers and tamping down competition between their own brands, the Manufacturer Defendants have also sought to cooperate, rather than compete.

54.     For example, REV Group's Vice President of Sales in the Fire Group, Mike Virnig stated, "What I won't tolerate is negative selling. I won't tolerate it with our competitors, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"[35]

---

[35] Chris McLoone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-

Case 1:25-cv-12521-BCG   Filed 11/04/25   Page 16 of 50   Document 141-4

55.     REV Group company executives have also told analysts that the company would substantially raise its profit margins and that other companies were doing the same.[36]

56.     Industry insider Jerry Halpin, the co-owner and vice president of sales and marketing for C.E.T. Fire Pumps, noted in 2022 that "people in the fire service industry are talking amongst themselves" and are looking "to ***bolster opportunities through partnerships and other alliances***."[37]  He also predicted "***cooperation between like businesses*** to gain an edge in the marketplace."[38]

### D.     Manufacturer Defendants Exchange Confidential, Competitively Sensitive Information Through FAMA

57.     E-One, Ferrara, KME, Spartan, Pierce, and Rosenbauer, which together represent all three Manufacturer Defendants, are members of FAMA. FAMA colludes with the Manufacturer Defendants to enable an information exchange through statistical reports and by organizing twice-yearly in-person meetings.

### 1.     FAMA Statistical Reports

58.     FAMA describes access to competitors' data as "one of the most valuable reasons" for companies to join the organization. FAMA has an entire committee, the Data & Research Committee, dedicated to enabling this data exchange. FAMA describes the Data & Research Committee's mission as helping to "strengthen FAMA member companies by providing actionable

---

apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (emphasis added).

[36] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, NYT (Apr. 15, 2025):  https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html.

[37] *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIREAPPARATUS MAGAZINE.COM (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain/ (emphasis added).

[38] *Id.* (emphasis added).

data," including economic data, "for strategic business planning."[39] The Committee is tasked with "collect[ing] and distribut[ing] data regarding apparatus sales and orders" and distributing it on at least a quarterly basis.[40] FAMA describes this "detailed data" as "invaluable" to members "for their internal business purposes."[41]

59.     The Data & Research Committee maintains a digital data portal through which apparatus manufacturers enter economic data. That data is sent to an accounting firm, which compiles the data and returns it to the Data & Research Committee. The Committee then uploads the data onto the FAMA website.

60.     Not just anyone can access this data, however. "FAMA does not release this information to the public."[42] Instead, the data is uploaded onto a secure portion of the FAMA website that FAMA describes as a "members-only section."[43] "Only those companies that participate in the statistical studies and members are privy to these reports."[44]

61.     FAMA imposes strict limits on who can become a member, and consequently, who has access to these reports. To join FAMA, an entity must (a) be "engaged in the manufacture of firefighting or fire protection apparatus, including rescue vehicles;" or (b) "manufacture components or products which are incorporated by the manufacturer as a permanent part of the completed fire apparatus such as chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices,

---

[39] *Data & Research Committee*, FIRE APPARATUS MFRS.ASS'N, https://www.fama.org/data-research-committee.

[40] *Id.*

[41] *Why Join?*, FIRE APPARATUS MFRS.ASS'N, https://www.fama.org/why-join.

[42] *Id.*

[43] *Id.*

[44] *Id.*; see also, https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data.

CaseCase-1:25-12/521800CG Filed 11/14/22/55 PPage 7.8 f0450 DDocument 141-4

apparatus valves and other water control appliances."[45]  Notably, fire departments, municipalities, and other buyers of fire apparatus are *not* eligible to join FAMA under this definition. Such entities—apparatus manufacturers' customers—are denied access to the data that manufacturers exchange among themselves.



**INDUSTRY STATISTICS**

FAMA is the ONLY source for accurate fire service statistics provided quarterly and summarized at year end. Only FAMA members are privy to these reports since they are not released to the public. Members find this research invaluable  for their internal business purposes regarding apparatus purchases by state, product category, pump type and more.

*Image 1: Section of a flyer titled "Why Join FAMA?"*[46]

### 2.     FAMA Meetings

63.     In addition to providing economic data to their members, FAMA also organizes twice-yearly meetings, in the spring and the fall, to "provide a forum [for members] to share information."[47]

64.     At these meetings, attendees, including direct competitors, listen to presentations that include economic forecasts regarding the fire truck manufacturing market.

---

[45] *Id.*

[46] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join.

[47] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join.

65.     Attendees also engage in "purchasing roundtables" and FAMA members-only meetings and discussion groups.

66.     Manufacturer Defendants had ample time and opportunity to exchange sensitive economic information and coordinate supply restrictions and price hikes at these meetings. FAMA advertises these "networking" events as one of the reasons to join FAMA.



**NETWORKING**

FAMA's spring and fall meetings provide a great opportunity to network with industry professionals. The meetings also keep members up-to-date with new information, allow for group formulations of organizational goals and provide a forum to share information.

*Image 2: Section of a flyer titled "Why Join FAMA?"*[48]

67.     In addition to the statistical reports and twice-yearly in-person meetings, FAMA communicates with its members on a regular basis via emails, its website and an extensive FAMA newsletter.  These missives offered another avenue for communication and coordination among Manufacturer Defendants.

**E.      The Conspiracy Enabled Defendants To Suppress Supply and Raise Prices of Fire Apparatus During the Class Period**

**1.      Fire truck backlogs soared by 40% or more during the Class Period**

68.     Demand for new Fire Apparatus picked up in the mid-2010s as the economy rebounded after the Great Recession, increasing steadily until approximately 2020.  Between 2020

---

[48] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join.

Case 1:25-cv-12521-BCG   Filed 11/04/25   Page 20 of 50   Document 141-4

and 2022, the number of fire truck orders spiked as municipal coffers became flush with COVID relief funds.  Since about 2022, order activity has hovered between 5,500 and 6,500 new units per year.

69.    Manufacturer Defendants' production of new Fire Apparatus has not kept pace with this increased demand. Particularly within the last few years, order backlogs have ballooned.  For example, REV Group reported a record $3.6 billion backlog in late 2023, a 41% increase over 2022. REV Group's backlog increased again in 2024.  As of last October, REV Group had a $4.4 billion backlog on fire and emergency vehicle orders in the United States.[49]

70.    Oshkosh and Rosenbauer have reported similar huge backlogs. Oshkosh's backlog of fire truck orders quadrupled from 2019 to 2023; it recently reported some $4 billion in orders placed but not fulfilled.[50]  Rosenbauer announced an approximately $2.67 billion backlog at the end of 2024.

71.    Increased backlogs have translated to substantial delays prior to delivery of new Fire Apparatus. Wait times in some areas have more than quadrupled, from one year to 4.5 years.[51] An individual going by the username "Capttomo" complained in an online forum in January 2023 that "lead times for delivery from date the order is placed to final inspection has gone from 10-12

---

[49] Rev Group, Inc. SEC Form 10-K (fiscal year ended Oct. 31, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001687221/000095017024135208/revg-20241031.htm.

[50] Baker, Farrell & Kovaleski, *supra* n.23.

[51] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

months to greater than 2 years in many cases and in some cases approaching 3 years."[52] Another user noted that a REV Group dealer "added 15 months to the delivery time" for a fire truck.[53] A third reported an estimated delivery time of 48 months from a Pierce dealer for "a very cookie cutter" truck "without any interior customization."[54] Yet another described a 435 day waiting period for a single component of a Rosenbauer truck, with full wait times up to 3 years.[55]



*Image 3: Forum comment by Capttomo regarding state of the fire truck industry.*[56]



*Image 4: Forum comment by Sfdc111 regarding state of the fire truck industry.*[57]



---

[52] *Skyrocketing Apparatus Costs and Outrageous Delivery Times*, NYCFIRE.NET, https://www.nycfire.net/forums/threads/skyrocketing-apparatus-costs-and-outrageous-delivery-times.75187.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

*Image 5: Forum comment by CFDMarshal regarding state of the fire truck industry.*[58]

72.     As another example, Sue Finkam, Mayor, Carmel, Indiana, said her city was growing and needed to add more fire stations. As matters stand now, however, the city expects to be able to acquire land, design a fire station, construct the building, hire firefighters and train them, while still waiting for the station's fire engines to be delivered.[59]

73.     The data bears out these anecdotes. While orders spiked to 45% above average levels, order fulfillment dropped nearly 10% below average levels in 2022, as illustrated in the graph below.



*Image 6: North America Fire Apparatus Trend.*[60]

---

[58] *Id.*

[59] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, NYT (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html.

[60] *FAMA Releases Fire Apparatus Industry Update*, FIRE ENGINEERING (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update.

74.     While the rate of order fulfillment has ticked up again in recent years, that increase has not been nearly enough to dent the serious backlog.

75.     In addition to delays for new Fire Apparatus, delays have also increased for replacement part orders. Gil Carpenter, a fire chief in Benton, Arkansas, explained that prior to REV Group rolling up Ferrara, he would call a contact named Charlie whenever he needed a Ferrara replacement part. Charlie would ship him the part the next day.  However, in 2024, when one of the department's vehicles needed new parts, delivery was delayed for more than 10 months. Mr. Carpenter's fire department was left without one of its eight trucks for nearly a year.[61]

76.     These backlogs cannot be explained away as supply-chain disruptions in the wake of the COVID-19 pandemic or other geopolitical events of the early 2020s.  Although supply-chain issues plagued industries across the United States in 2021 and 2022, the Federal Reserve Bank of New York's Global Supply Chain Pressure Index returned to baseline by early 2023, hitting its lowest point on record in May 2023.[62]



---

[61] Baker, Farrell & Kovaleski, *supra* n.23.

[62] Diccon Hyatt, *Supply Chains Have Healed From Pandemic Disruptions*, INVESTOPEDIA (June 7, 2023), https://www.investopedia.com/supply-chains-have-healed-from-pandemic-disruptions-7509263.

Case 1:25-cv-12521-BCG   Filed 11/04/25   Page 24 of 50   Document 141-4

> **2. In the face of increasing demand, Manufacturer Defendants have failed to increase capacity and, in some cases, have shuttered manufacturing facilities, worsening the fire truck shortage**

77. Under typical market conditions, such a significant surge in demand would be met with a corresponding increase in manufacturing capacity; however, no such manufacturing capacity increase has materialized. REV Group has recently spent only a small portion of its revenue— about 1 percent—on upgrading its buildings and equipment. Alexander Yaggy, a former investor in REV Group's stock, called this minimal investment in the face of significant industry backlogs "reflective of an uncompetitive market."[64] Neither Oshkosh nor Rosenbauer have attempted to meet this surge in demand or increase their respective market shares by ramping up production.

78. Manufacturer Defendants have not only failed to add manufacturing capacity, in some cases, they have in fact *closed* existing plants. In September of 2021, REV Group shut down two KME custom fire truck manufacturing facilities in Pennsylvania and Virginia.[65] The closure cut the company's manufacturing footprint by roughly one third.[66]

79. REV Group orders currently in progress at the two KME facilities were to be transferred to other REV Group manufacturing plants and this process, unsurprisingly, resulted in additional, substantial delays. Matthew R. Timerman, a fire chief whose department had ordered a $1.2 million ladder truck from REV Group slated to be completed at the KME Pennsylvania

---

[63] *Global Supply Chain Pressure Index (GSCPI)*, FED. RESERVE BANK OF N.Y. (July 2025), https://www.newyorkfed.org/research/policy/gscpi#/interactive.

[64] Baker, Farrell & Kovaleski, *supra* n.23.

[65] Chris Reber, *KME Plant to Close in April 2022*, TIMES NEWS ONLINE, (Sept. 11, 2021), https://www.tnonline.com/20210911/kme-plant-to-close-in-april-2022.

[66] Baker, Farrell & Kovaleski, *supra* n.23.

plant, discovered the truck would instead be assembled at three different manufacturing sites, resulting in additional delays.[67] The end result was that Mr. Timerman received his truck more than four years after his department first placed the order.[68]

80. Despite these record-setting backlogs, the Manufacturer Defendants appear unconcerned that their customers might cancel orders or that a competitor might steal their business.[69] Mark Skonieczny, REV Group's current chief executive, explained during a 2023 conference call that the company did not expect the delays to cause cancellations because once a city sets aside the money, it is "earmarked" and REV Group gets a deposit. "That money is allocated to those units, so we feel good about that."[70] Skonieczny further commented, "I don't think it's impacting our market share."[71] According to REV Group's SEC reports, the company considers its backlog to *enhance* its value to shareholders by giving the company "strong visibility into future net sales."[72]

### 3. The price of Fire Apparatus doubled during the Class Period

81. Because of growing demand and flat or declining supply, the cost of new Fire Apparatus has soared. In the mid-2010s, a standard pumper truck cost approximately $300,000 to $500,000.[73] Within the last few years, prices have increased to an average of $1 million per

---

[67] *Id.*

[68] *Id.*

[69] Musharbash, *supra* n.1.

[70] Baker, Farrell & Kovaleski, *supra* n.23.

[71] Eman Abu-Khaled, *REV Group Takes Steps to Normalcy After Supply-Chain Setbacks*, TRAILER BODY BUILDERS (Mar. 22, 2023), https://www.trailer-bodybuilders.com/truck-bodies/article/21262503/rev-group-takes-steps-to-normalcy-after-supply-chain-setbacks.

[72] Musharbash, *supra* n.1.

[73] *Id*.

pumper truck.[74]  Similarly, ladder trucks that cost $750,000 to $900,000 in the mid-2010s cost upward of $2 million today.[75]  An industry leader commented that the industry has "reached a new level of price psychology.  Today, relationships start at a half million dollars, and 10 years ago that was a remote concept."[76]

82.     Nor is seeking out competition a viable option for customers looking to get a better deal on fire apparatus.  As one industry executive has observed, "[t]here are now times when all vendors at a bid table, each with a 'different' product, are all owned and managed by the same parent company.  How is that competitive for the purchaser?"[77]  Fire departments across the country have little alternative than to pay the exorbitant prices Manufacturer Defendants are charging for their new Fire Apparatus.

### 4.     Manufacturer Defendants used "floating prices" during the Class Period to charge even more for Fire Apparatus

83.     On top of already high base prices for new Fire Apparatus, REV Group, Oshkosh, and Rosenbauer have relied on the significant industry backlog to justify imposing "floating prices" on their customers.  Using the purported difficulty of projecting material costs over a years-long lead time as an excuse, Manufacturer Defendants have added price clauses to their contracts that allow Manufacturer Defendants to increase the final price of a fire truck *after* it goes into

---

[74] *Id.*

[75] Baker, Farrell & Kovaleski, *supra* n.23; Musharbash, *supra* n.1.

[76] Chris McLoone, *Fire Industry Outlook: 10 Years After the Great Recession*, FIRE APPARATUS &EMERGENCY EQUIPMENT (Dec. 1, 2018), https://www.fireapparatusmagazine.com/fire-apparatus/fire-industry-outlook-10-years-after-the-great-recession.

[77] Musharbash, *supra* n.1.

production.  Due to production delays, this means Manufacturer Defendants can increase their prices years after a fire department initially orders a truck.[78]

84.     One fire department in Massachusetts ordered a fire truck in 2022 and then added two more trucks to their original order in 2023.  After the second order, the fire truck manufacturer increased the price of the truck ordered in 2022 by $150,000 to match the price of the trucks ordered in 2023.  The manufacturer threatened not to deliver the truck ordered in 2022 unless the fire department agreed to the price increase.  The fire chief felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."[79]

85.     As another example, a fire department in Indiana was hit with a more than $100,000 price increase for the same pumper truck after a 7-month delay.[80]

### F.     Defendants' Conspiracy Had the Intended Effect of Increasing Manufacturers' Margins and Revenues

86.     Defendants have reaped the profits of these price increases.  In July 2021, REV Group announced that it had "[e]xceeded consensus earnings estimates for five consecutive quarters."[81]  In 2024, REV Group's profit margins jumped to what the company described as an "exceptional 8.9 percent" for the division that includes new Fire Apparatus.[82]

---

[78] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, (Apr. 15, 2025), https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing.

[79] *Id.*

[80] *Id.*

[81]*REV Group, Inc. Presentation*, REVGROUP at 4 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf.

[82] Baker, Farrell & Kovaleski, *supra* n.23.

87.     In June 2025, Oshkosh stated that its adjusted operating margins had grown from 4.8% to 10.5% from 2022 to 2024, delivering on "key 2022 Investor Day targets one year early."[83]



*Image 8: Oshkosh's financial performance, 2022 to 2024.*[84]

88.     Oshkosh anticipates its adjusted operating margins will grow to 12 or 14 percent by 2028, with revenue of $13-14 billion.[85]  According to the company, that revenue growth will be "supported by strong backlog" and price increases.[86]

89.     With a few exceptions during the pandemic years, overall revenues for fire truck manufacturers in the U.S., including Manufacturer Defendants, have increased significantly since 2015.

---

[83] OSHKOSH, INVESTOR DAY at 83 (June 5, 2025), https://online.flippingbook.com/view/29819025/3.

[84] *Id.*

[85] *Id.* at 86.

[86] *Id.* at 87.



***Image 9: Fire Truck Manufacturing Revenue in the United States.***[87]

## G. Market Power and Barriers to Entry

### 1. Relevant Markets

90. Courts assess the competitive effects of concerted action by first defining the relevant market. A relevant market is the zone of competition among agreeing rivals in which the agreement may affect competition and contains both a geographic dimension (the "geographic market") and a product dimension (the "product market"). Here, the geographic market is the United States and the product market is all Fire Apparatus.

#### a. The product market encompasses all Fire Apparatus.

91. This case concerns Fire Apparatus as recognized by the National Fire Protection Association ("NFPA") Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing (together, the

---

[87] Oliwier Samorajski, *Fire Truck Manufacturing in the US – Market Research Report (2015-2030)*, IBISWORLD (Apr. 2025), https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645.

Case 1:25-cv-12521-WGG   Filed 11/04/25   Page 30 of 50   Document 141-4

"Standards"). These standards classify Fire Apparatus within the United States into seven types, all of which are at issue in this case:[88]

- **Type 1** fire trucks are engine company, engine pumper, or structural firefighting trucks, the most common type of fire truck in use today. Every Type 1 fire truck is required to have a pump with a minimum tank size of 300 gallons and to be equipped with 2.5- and 1.5-inch hoses of varying lengths. Such apparatus must also include a full complement of ground ladders, nozzles, forcible entry equipment, rear access and egress, and some level of first aid equipment and can carry four firefighters.

- **Type 2** fire trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. They are most commonly used in urban and suburban settings and typically carry three to four firefighters.

- **Type 3** fire trucks, often referred to as a "wildland fire trucks" or "brush trucks," are typically used in rural and wildland settings. Type 3 apparatus have a minimum of a 500-gallon water tank and a pump capable of a minimum of 150 US gallons per minute at a pressure of 250 pounds per square inch. Type 3 apparatus may also feature an auxiliary pump in addition to the main water pump which can allow a truck operator to drive the truck while crew members man the pump and hoses, allowing firefighters to follow along as forest fires and brush fires move with the

---

[88] *Types of Fire Trucks: An Overview and Comparison*, PIERCE (Nov. 14, 2023), https://www.piercemfg.com/pierce/blog/types-of-fire-trucks.

weather, and to create fire lines, wetting down areas ahead of an advancing wildfire. Type 3 apparatus carry at least three passengers.

- **Type 4** fire trucks, like Type 3 trucks, are often used in wildland firefighting. Compared to Type 3 trucks, Type 4 trucks have a larger water tank and reduced hose capacity requirements. Type 4 fire trucks must have a 750-gallon water tank that offers 50 gallons per minute of water transfer at a pressure of 100 pounds per square inch. Type 4 trucks carry at least two people.

- **Types 5, 6, and 7** fire trucks are often grouped together because they feature many of the same design qualities. These vehicles are typically based on a medium duty chassis pick-up truck with 4-wheel drive. The main difference between Type 5, Type 6, and Type 7 fire trucks is the difference in their maximum gross vehicle weight rating ("GVWR"): Type 5 trucks have a maximum GVWR of 26,000 pounds; Type 6 trucks have a maximum GVWR of 19,500 pounds, and Type 7 trucks have a maximum GVWR of 14,000 pounds. Type 5, 6, and 7 trucks typically carry a 300-gallon water tank and a small booster pump with a minimum capacity of 50 gallons per minute. These types carry at least two firefighters.

CaseCase 1:25-1:25-1250-18001G FFiled 11/14/02/25 PPage 332 of 450 DDocument 141-4



***Image 10: Firetruck types and specifications.***[89]

92.     Some trucks are specially equipped to conform to additional standards.  For example, NFPA Chapter 5 describes the requirement for a truck to be considered a Pumper Fire Apparatus, NFPA Chapter 9 describes the requirements for a Quint Fire Apparatus, NFPA Chapter 11 describes the requirements for a Mobile Foam Fire Apparatus, and NFPA Chapter 19 describes the requirements for Aerial Fire Apparatus (which include trucks equipped with aerial ladders, elevating platforms or towers, and water tower devices).[90]  These specialty trucks are also included in the relevant product market.

---

[89]  BOISE MOBILE EQUIPMENT, *Types of Fire Trucks and Their Purpose* (Feb. 21, 2022), https://www.bmefire.com/types-of-fire-trucks.

[90]  PIERCE, *Types of Aerial Fire Trucks: NFPA Classification Overview* (Nov. 8, 2022), https://www.piercemfg.com/pierce/blog/types-of-aerial-fire-truck.

### b. The geographic market is the United States

93. As described above, all three Manufacturer Defendants sell Fire Apparatus to fire departments across the 50 states. Accordingly, the relevant market is the United States.

### 2. Manufacturer Defendants have market power in the relevant markets

94. As a result of industry roll-ups from the mid-2010s through today, the overwhelming majority of the Fire Apparatus industry's sales and capacity are now concentrated among three dominant manufacturers: REV Group, Oshkosh, and Rosenbauer. As described above, REV Group captures around $1 billion of annual fire truck sales made in the United States, Oshkosh captures around $750 million, and Rosenbauer captures around $307 million. In combination, these three companies capture between 70 and 80 percent of the national market.[91]

### 3. High barriers to entry in the fire truck manufacturing market protect Manufacturer Defendants' market share

95. Fire Apparatus is expensive, made-to-order, specialty equipment. End-users can and typically do specify nearly every aspect of the apparatus they order, from the size of the motor to the placement of emergency lights and the location of equipment storage compartments.

96. This demand for customization stems from the diversity of the customer base. There are approximately 30,000 fire departments in the United States, ranging from large urban departments to small rural agencies. Among these departments, 68 percent have a single fire station, 17 percent have two stations, and 15 percent have three or more stations. In total, there are approximately 52,000 fire stations across the country. Each fire department, and sometimes each fire station, has their own specific set of requirements. As Kent Tyler, president of REV

---

[91] Baker, Farrell & Kovaleski, *supra* n.23.

Group's Fire Group put it, "[t]hese are fully custom trucks, and they don't just happen overnight."[92] What's more, fire departments buy new trucks infrequently, on average every 10 to 15 years.[93] Only about 10,000 units of new Fire Apparatus, of all types, are manufactured each year.[94]

97. Given this backdrop, breaking into the Fire Apparatus manufacturing industry is challenging. The cost of producing Fire Apparatus, combined with the long lead times, mean that only well-funded, established corporations have much chance of sustaining themselves through the initial investment period. The large capital outlays required limit market entry, as it can be difficult for firms to raise the required funds.

98. The specialized nature of the new Fire Apparatus market is an additional barrier to entry. The niche engineering expertise needed to meet NFPA standards and fire departments' demands is confined to current manufacturers. The effort required to develop the necessary expertise is another deterrent to new market entrants.

### H. Plaintiff and Other Class Members Have Been Harmed As a Result of the Conspiracy

#### 1. Plaintiff and other Class members have overpaid for fire trucks as a result of Defendants' anticompetitive behavior.

99. If the price of new Fire Apparatus increased at the rate of inflation between 2015 and 2025, pumper trucks would cost approximately $680,000 (rather than the current cost of $1

---

[92] Chris McLoone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIRE APPARATUS &EMERGENCY EQUIPMENT (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands.

[93] Baker, Farrell & Kovaleski, *supra* n.23.

[94] *Id.*

million), and ladder trucks would cost approximately $1.2 million (rather than $2 million).[95] Municipalities across the country are therefore paying approximately 47 percent (or $320,000) more for pumpers and 66 percent (or $800,000) more for ladder trucks in 2025 than would be expected based on inflationary costs alone.

100.    Approximately 75% of new Fire Apparatus sold in the United States every year are pumpers.  Based on an estimated 5,000 new fire trucks sold per year, that means that since 2016, Plaintiff and other Class members have paid a combined total of approximately $56.25 billion for new fire trucks[96]—$19.8 billion more than expected based on increased inflation alone.[97]

101.    Even accounting for issues facing the new Fire Apparatus market in terms of supply chain and labor shortage challenges, these increases are far beyond what would be expected in a competitive market.

> **2.      Inflated prices and long backlogs have prevented Plaintiff and the other Class members from timely replacing old Fire Apparatus and their fleets have suffered**

102.    As fire vehicles age, they become prone to more frequent and serious breakdowns, leading to more costly repairs and prolonged downtime.  The National Fire Protection Association recommends that apparatus should be moved from the frontlines to the reserve fleet after 15 years and removed from service completely at the 20- or 25-year mark.

103.    Skyrocketing prices and longer delivery times have made it difficult for municipalities to replace aging vehicles in their fire departments' fleets in a timely manner.  In many cases, fire departments are operating using trucks that have exceeded their service life

---

[95] Calculated assuming a pumper cost $500,000 and a ladder truck cost $900,000 in 2015.

[96] Calculated as ((3,750 pumper trucks per year * 9 years *$1 million) + (1,250 ladder trucks per year * 9 years * $2 million)).

[97] Cost based on inflation alone ($36.45 billion) calculated as ((3,750 pumper trucks per year * 9 years *$680,000) + (1,250 ladder trucks per year * 9 years * $1.2 million)).

because buying new trucks is prohibitively expensive. According to the president of the International Association of Fire Fighters, Edward Kelly, cities and towns across the country are facing a crisis where demand for new fire trucks has outstripped availability and funding.[98]

104. Plaintiff City of Philadelphia is no different and is currently operating dozens of pieces of fire apparatus, in fact a majority of its serviceable fleet, that are well past a normal replacement age.[99] Although Philadelphia has ordered newer used replacements for some of these vehicles,[100] long expected delivery times for brand new apparatus means plaintiff will need to rely on its fleet composed largely of outdated apparatus for several more years.

105. According to former Philadelphia Fire Commissioner Adam K. Thiel, the Philadelphia Fire Department ("PFD") is and has been "[O]ne of the busiest fire and EMS agencies in the nation." Nonetheless, due to budget constraints, PFD was forced to deactivate some seven of its fire companies on January 5, 2009 and four more companies in 2009; not being able to begin to restore service until 2023. [101] In recent years, PFD generally has responded to more than 800 emergency incidents per day (Fiscal Year 2023), for an annual total of more than 50,000 fire incidents and more than 268,000 EMS incidents. [102]

---

[98] Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13.

[99] See, https://fire-apparatus.fandom.com/wiki/Philadelphia_Fire_Department.

[100] Newer fire apparatus on order includes ***used equipment*** including: two 2019 Spartan Metro Star MFD/LTC pumpers; and six 2019 Spartan ERV Metro Star MFD pumpers. *Id.*

[101] See, *Fire Department gets $22 million grant to reopen companies*; September 29, 2023, Kathy Matheson, Philadelphia Fire Department: https://www.phila.gov/2023-09-29-fire-department-gets-22-million-grant-to-reopen-companies/.

[102] *Id.*

106.    At present, public records show Plaintiff's fleet of Fire Apparatus manufactured by Defendants, purchased during the class period, includes, at least 31 vehicles that have been delivered, while several other vehicles have been ordered, but not yet delivered.[103]

### 3.    Reduced fire truck fleets are less able to respond to disasters.

110.    High prices and long waits for fire apparatus are endangering public safety in Philadelphia and communities across the country, particularly those facing natural disasters.

111.    Perhaps the most well-known, recent, and catastrphic example of the harm communities can suffer when fire truck fleets are reduced, is Los Angeles's experience in January 2025, when two large fires raged for days, killing 29 people.  When the files broke out, more than 100 of the Los Angeles Fire Department's ("LAFD") 183 fire trucks were out of service.[104] Chuong Ho, a firefighter and union leader who was among those who reported for work during the fires, reported the lack of fire apparatus meant many of the firefighters who were available to help that day could not be sent to the front lines.[105]  Kristin Crowley, the LAFD fire chief, confirmed that the lack of a fully staffed fire truck fleet impeded the department's ability to respond to the fires.[106]  Had additional firefighters been able to combat the blazes, they might have been able to prevent the devastation that followed, including hundreds of millions in damage to L.A. public facilities and the loss of homes and lives.[107]

---

[103] See, *https://fire-apparatus.fandom.com/wiki/Philadelphia_Fire_Department* .

[104] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

[105] Baker, Farrell & Kovaleski, *supra* n.23.

[106] *Id.*

[107] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal

**4.      Plaintiff and Class members have also suffered harm because they have had to redirect funds toward purchasing Fire Apparatus that they would have otherwise put toward other essential needs**

112.    In addition to problems adequately responding to disasters with diminished fleets, the rising cost of Fire Apparatus maintenance and replacement has squeezed fire departments' and municipalities' budgets, leaving them with fewer resources for other needs including recruiting and retaining firefighters.[108]   For example, cities whose fire departments are facing budget challenges, including those in Spokane, Washington and Mills, Wyoming, have had to cancel essential training and even lay off firefighters.[109]

**I.      Defendants Actively Concealed the Conspiracy and Plaintiff Did Not and Could Not Have Discovered Defendants' Anticompetitive Conduct**

113.    Plaintiff had neither actual nor constructive knowledge of the facts constituting their claim for relief.  Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the price of fire trucks.  Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

---

Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

[108] Musharbash, *supra* note 11.

[109] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

114. Defendants concealed their conspiracy by communicating competitively sensitive information to one another through FAMA Statistical Reports that are unavailable to the public. They also attended members-only discussions during twice-annual FAMA meetings, allowing them to surreptitiously communicate and prevent the existence of written records. Because the public had no access to either the FAMA Reports or the FAMA members-only meetings, there was no reason for Plaintiff to suspect that Defendants were engaged in an unlawful anticompetitive scheme.

115. What's more, Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Fire Apparatus is not exempt from antitrust regulation. Prior to the investigative articles by Basel Musharbash[110] and journalists with the New York Times,[111] Plaintiff reasonably considered new Fire Apparatus manufacturing to be competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Manufacturer Defendants' hyper-inflated Fire Apparatus prices before these recent events.

116. By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff has as a result of the unlawful conspiracy alleged in this Complaint.

## V.     CLASS ACTION ALLEGATIONS

118. Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking injunctive relief pursuant to federal law, and damages pursuant to various state antitrust, unfair competition, unjust enrichment, and

---

[110] Musharbash, *supra* n.1.

[111] Baker, Farrell & Kovaleski, *supra* n.23.

consumer protection laws of the states listed below on behalf of the members of the following Class:

*All local or municipal government entities that purchased fire trucks directly from Manufacturer Defendants in the United States from January 1, 2016 through the present.*

119. Specifically excluded from the Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

### A. All Requirements of Federal Rule of Civil Procedure 23(a) Are Met

120. A class action is warranted in this case because the Class members are so numerous that joinder of all members is impracticable; there are questions of law or fact common to the Classes; the claims of the representative parties are typical of the claims of the Classes; and the Plaintiff named in this Complaint will fairly and adequately protect the interests of the Classes.

121. **Numerosity**: Class members are so numerous (including thousands of municipalities) that joinder of all Class members in a single proceeding would be impracticable. The disposition of the claims asserted through this class action will enhance efficiency and will benefit the parties and the Court.

122. **Commonality**: Plaintiff's antitrust claims are common to all Class members, and individual complaints otherwise may result in inconsistent or varying adjudications.

123. **Typicality**: Antitrust violations and resulting harms alleged by the named Plaintiff are typical of the legal violations and harms suffered by all Class members.

124. **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class members in that Plaintiff has no

40

interests adverse to, or that conflict with, the Classes which Plaintiff seeks to represent.  Plaintiff has retained counsel with substantial experience and success in the prosecution of complex class actions of this nature.

**B.      All Requirements of Federal Rule of Civil Procedure 23(b)(3) Are Met**

125.    In addition to satisfying the prerequisites of Fed. R. Civ. P. 23(a), this case qualifies for class action treatment because questions of law or fact common to the Classes predominate over any questions affecting only individual Class members, and because a class action suit is superior to other available methods for adjudicating the controversy.

126.    **Predominance**: Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members.  Such common questions of law or fact include, but are not limited to:

- Whether Defendants engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of fire trucks sold in interstate commerce in the United States;

- The duration of the conspiracy alleged herein, and the acts performed by Defendants in furtherance of the conspiracy;

- Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the Plaintiff and other Class members;

- The effect of Defendants' alleged conspiracy on the prices of fire trucks sold in the United States during the Class Period;

- Whether Plaintiff and other Class members are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

- The appropriate Class-wide measure of damages.

127.    **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  It would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct, both for Class members themselves and for the court system.  Individualized litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the courts.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.    ANTITRUST INJURY

128.    Defendants' anticompetitive conduct had the following effects, among others:

- Price competition has been restrained or eliminated with respect to new Fire Apparatus;

- The prices of new Fire Apparatus have been fixed, raised, stabilized, or maintained at artificially inflated levels;

- Plaintiff and other Class members have been deprived of free and open competition; and

- Plaintiff and other Class members have paid artificially inflated prices for new Fire Apparatus, causing substantial harm to Plaintiff and other Class members.

129.    The purpose of Defendants' conspiratorial conduct was to raise, fix, or maintain the price of new Fire Apparatus.  As a direct and foreseeable result, Plaintiff and other Class members paid supra-competitive prices for new Fire Apparatus during the Class Period.

130. By reason of the alleged violations of the antitrust laws, Plaintiff and other Class members have been injured because they paid higher prices for new Fire Apparatus than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. This is an injury of the type that the antitrust laws are intended to punish and prevent.

## VII. CLAIMS FOR RELIEF

### A. First Claim for Relief: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for conspiracy to restrain production (on behalf of the Nationwide Class for injunctive and equitable relief)

131. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

132. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016 and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price of new Fire Apparatus in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

133. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants achieved the following conspiratorial outcomes:

- Fixing, raising, and stabilizing the price of new Fire Apparatus; and

- Allocating among themselves and collusively reducing the production of new Fire Apparatus.

134. The combination and conspiracy alleged herein has had the following effects, *inter alia*:

- Restrained or eliminated price competition has been with respect to new Fire Apparatus;

- Reduced production of new Fire Apparatus to artificially low levels;

- Artificially fixed, raised, stabilized, or maintained prices of new Fire Apparatus at inflated levels;

- Plaintiff and other Class members have been deprived of free and open competition; and

- Plaintiff and other Class members have paid artificially inflated prices for new Fire Apparatus, causing substantial harm to Plaintiff and other Class members.

135. Plaintiff and other Class members have been injured and will continue to be injured by paying more for new Fire Apparatus from Manufacturer Defendants than they would have paid and would pay going forward in the absence of the combination and conspiracy.

136. Plaintiff and other Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**B. Second Claim for Relief: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for conspiracy to exchange competitive information (on behalf of the Nationwide Class for injunctive and equitable relief)**

137. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

138. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016, and continuing through the present, Defendants entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

139. The relevant product market is new Fire Apparatus as recognized by NFPA Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group

Standards for Wildland Fire Resource Typing. The relevant geographic market is the United States.

140. Manufacturer Defendants possess market power in the relevant market. Manufacturer Defendants control between 70 and 80 percent of the relevant market for new Fire Apparatus. Manufacturer Defendants' collective market power includes the power to artificially constrict and reduce the number of new fire trucks produced in the United States below competitive levels and to artificially inflate the price Plaintiff and other members of the Nationwide Class pay for fire trucks above competitive levels.

141. An increase in the price of fire trucks could be imposed collectively by Manufacturer Defendants without losing customers. The fire truck market is a unique product market.

142. The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public economic information. The information exchanges included the exchange through FAMA Statistical Reports and FAMA meetings.

143. Manufacturer Defendants' regular information exchanges through FAMA reflected concerted action between competitors in the market for fire trucks.

144. Each Manufacturer Defendant furnished competitively sensitive information to other Manufacturer Defendants through FAMA with the understanding that it would be reciprocated. FAMA enforced this understanding by requiring Manufacturer Defendants to share data in order to receive comparable data.

145. The agreement to regularly exchange detailed and non-public economic information about their respective companies suppressed competition between the Manufacturer Defendants.

146. When defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, the Manufacturer Defendants used data obtained through FAMA to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the fire truck market. This strategic information was a material factor in Manufacturer Defendants' decisions to inflate the prices that Plaintiff and other members of the Nationwide Class paid for fire trucks during the Class Period.

147. Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose.

148. The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Manufacturer Defendants in the market for new Fire Apparatus in the United States, and (2) inflating the prices of new Fire Apparatus during the Class Period.

149. As a result of the unlawful agreement alleged herein to exchange information, Plaintiff and the other Class members have been injured in their business or property by paying artificially inflated prices for fire trucks during the Class Period.

## VIII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Classes of all others so similarly situated, respectfully request judgment against Defendants as follows:

A. The Court determine that this action may be maintained as a class action under

Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

B.      The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act and listed state antitrust and common law;

C.      Plaintiff and the Classes recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiff and the other Class members be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf. or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that is withheld from the public;

F.     Plaintiff and Class members be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.     Plaintiff and Class members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.     Plaintiff and Class members have such other and further relief as the case may require and the court may deem just and proper.

## IX.     DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

[SPACE INTENTIONALLY BLANK]

CaseCase5-1x25-1cv-5012/50218OCG   Filed 11/2/25   Page 49 of 50   DDocument141-4

Dated: November 14, 2025

Respectfully submitted,

**BARRACK, RODOS & BACINE**

_/s/ Stephen R. Basser_
Stephen R. Basser (WIED No. 121590)
Samuel M. Ward (WIED No. 216562)
600 West Broadway, Suite 900
San Diego, CA 92101
Tel.: (619) 230-0800
Fax: (619) 230-1874
E-mail: sbasser@barrack.com
E-mail: sward@barrack.com

Jeffrey A. Barrack*
Danielle M. Weiss*
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-0600
Fax: (215) 963-0838
E-mail: jbarrack@barrack.com
E-mail: dweiss@barrack.com

William J. Ban*
Eleven Times Square
640 8th Avenue, 10th Floor
New York, New York 10036
Tel.: (212) 688-0782
Fax.: (212) 688-0783
E-mail: wban@barrack.com

_Counsel for Plaintiff City of Philadelphia and the Proposed Class_

_* Application for admission to be filed_

49