## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

## GREEN BAY DIVISION

| | |
|---|---|
| CITY OF LA CROSSE, CITY OF ANN ARBOR, CITY OF ONALASKA, CITY OF MILWAUKEE, CITY OF RIDGELAND, CITY OF MIDDLETOWN, AND THE COMMACK FIRE DISTRICT, individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>    v.<br><br>OSHKOSH CORPORATION, PIERCE MANUFACTURING, INC., REV GROUP, LLC, ROSENBAUER AMERICA LLC, FIRE APPARATUS MANUFACTURERS' ASSOCIATION,<br><br>               Defendants. | Case No. 1:25-cv-01252<br><br>**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

011328-11/3505766 V1

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................ 2

II. PARTIES ............................................................................................................ 5

    A. Plaintiffs ................................................................................................. 5

        1. City of La Crosse ......................................................................... 5

        2. City of Ann Arbor ........................................................................ 6

        3. City of Onalaska ........................................................................... 6

        4. City of Milwaukee ....................................................................... 7

        5. Commack Fire District.................................................................. 8

        6. Claverack Fire District.................................................................. 9

        7. City of Ridgeland......................................................................... 9

        8. City of Middletown.................................................................... 10

    B. Defendants ........................................................................................... 10

        1. REV Group ................................................................................ 10

        2. Oshkosh Corporation and Pierce Manufacturing, Inc............... 12

        3. Rosenbauer America LLC.......................................................... 13

        4. The Fire Apparatus Manufacturers' Association....................... 16

        5. Unnamed Defendants and Co-Conspirators.............................. 17

        6. Agents and Affiliates ................................................................. 17

III. JURISDICTION AND VENUE ....................................................................... 18

IV. FACTUAL ALLEGATIONS ........................................................................... 20

    A. The Fire Apparatus Industry Was Diverse and Comprised of Many Independent Sellers Until Approximately 2008, When the Great Recession Devastated the Industry............................................. 20

    B. REV Group, Oshkosh, and Rosenbauer Start Rolling Up Fire Apparatus Manufacturers.................................................................... 21

011328-11/3505766 V1

1. REV Group ................................................................ 21

2. Oshkosh ................................................................. 26

3. Rosenbauer ............................................................. 28

C. Manufacturer Defendants Seek to Cooperate Rather Than Compete With One Another. ................................................. 29

D. Manufacturer Defendants Exchange Confidential, Competitively Sensitive Information Through FAMA. .............................. 31

1. FAMA statistical reports and industry updates. ...................... 32

a. The Data & Research Committee. ............................ 32

b. Defendants share competitively sensitive and thorough information through FAMA. ........................ 33

c. FAMA's data is confidential and kept to its members, which include Defendants. .......................... 40

2. FAMA meetings. ................................................... 42

E. The Conspiracy Enabled Defendants to Suppress Supply and Raise Prices of Fire Apparatus in Parallel During the Class Period. .................................................................... 46

1. Manufacturer Defendants' backlogs soared in parallel during the Class Period. ........................................... 46

2. Despite increasing demand, Manufacturing Defendants decided against increasing their manufacturing capacity. ............. 52

3. The price of Fire Apparatus doubled during the Class Period. ............................................................ 54

4. Manufacturer Defendants used "floating prices" during the class period to charge even more for Fire Apparatus. ............. 56

F. Defendants' Conspiracy Had the Intended Effect of Increasing Each Manufacturers' Prices, Leading to Historic Profit Margins and Revenues. .......................................................... 58

G. Market Power and Barriers to Entry. ................................. 63

1. Relevant markets. .................................................. 63

2. The product market encompasses all Fire Apparatus. ............... 63

011328-11/3505766 V1

3. The geographic market is the United States. ............................................. 67

4. Manufacturer Defendants have market power in the relevant markets. ....................................................................................... 67

5. High barriers to entry in the Fire Apparatus manufacturing market protect Manufacturer Defendants' market shares. ........................ 67

H. Plaintiffs and Other Class Members Have Been Harmed as a Result of the Conspiracy .................................................................................. 68

1. Plaintiffs and other Class members have overpaid for Fire Apparatus as a result of Defendants' anticompetitive behavior. ................................................................................................... 68

2. Inflated prices and long backlogs have prevented Plaintiffs and the other Class members from timely replacing old vehicles in their Fire Apparatus fleets, and their fleets have suffered as a consequence. .............................................. 69

3. Reduced Fire Apparatus fleets are less able to respond to disasters. ....................................................................................... 75

4. Plaintiffs and Class members have also suffered harm because they have had to redirect funds toward purchasing Fire Apparatus that they would have otherwise put toward other essential needs. ................................................................ 80

V. CLASS ACTION ALLEGATIONS .................................................................. 81

A. All Requirements of Federal Rule of Civil Procedure 23(a) Are Met. ............................................................................................................. 82

B. All Requirements of Federal Rule of Civil Procedure 23(b)(3) Are Met. ............................................................................................................. 83

VI. ANTITRUST INJURY ..................................................................................... 84

VII. FRAUDULENT CONCEALMENT & EQUITABLE TOLLING .................................. 85

VIII. CONTINUING VIOLATION ............................................................................. 86

IX. CLAIMS FOR RELIEF ..................................................................................... 88

FIRST CLAIM FOR RELIEF: RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 ................................................. 88

011328-11/3505766 V1

SECOND CLAIM FOR RELIEF: VIOLATION OF SECTION 1 OF THE
SHERMAN ACT, 15 U.S.C. § 1, FOR CONSPIRACY TO EXCHANGE
COMPETITIVE INFORMATION ................................................................ 89

THIRD CLAIM FOR RELIEF: CONNECTICUT ANTITRUST ACT ...................................... 91

FOURTH CLAIM FOR RELIEF: MICHIGAN ANTITRUST REFORM ACT ......................... 92

FIFTH CLAIM FOR RELIEF: MISSISSIPPI ANTITRUST LAW ........................................... 92

SIXTH CLAIM FOR RELIEF: NEW YORK DONNELLY ACT ............................................. 93

SEVENTH CLAIM FOR RELIEF: VIOLATION OF WISCONSIN STATE
ANTITRUST LAW, WIS. STAT. ANN. § 133.01, *et seq.* .................................. 93

EIGHTH CLAIM FOR RELIEF: ALABAMA ANTITRUST LAW ............................................ 94

NINTH CLAIM FOR RELIEF: ALASKA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION ACT .............................................................. 95

TENTH CLAIM FOR RELIEF: ARKANSAS DECEPTIVE TRADE
PRACTICES ACT ......................................................................................... 96

ELEVENTH CLAIM FOR RELIEF: ARIZONA ANTITRUST ACT ......................................... 97

TWELFTH CLAIM FOR RELIEF: ARIZONA CONSUMER FRAUD ACT ............................ 97

THIRTEENTH CLAIM FOR RELIEF: CALIFORNIA CARTWRIGHT ACT .......................... 99

FOURTEENTH CLAIM FOR RELIEF: CALIFORNIA UNFAIR
COMPETITION LAW .................................................................................. 99

FIFTEENTH CLAIM FOR RELIEF: COLORADO STATE ANTITRUST ACT .................... 100

SIXTEENTH CLAIM FOR RELIEF: COLORADO CONSUMER
PROTECTION ACT .................................................................................... 101

SEVENTEENTH CLAIM FOR RELIEF: DISTRICT OF COLUMBIA
ANTITRUST ACT ....................................................................................... 102

EIGHTEENTH CLAIM FOR RELIEF: DISTRICT OF COLUMBIA
CONSUMER PROTECTION PROCEDURES ACT ..................................... 103

NINETEENTH CLAIM FOR RELIEF: FLORIDA DECEPTIVE AND UNFAIR
TRADE PRACTICES ACT .......................................................................... 104

TWENTIETH CLAIM FOR RELIEF: HAWAII ANTITRUST LAW ...................................... 105

TWENTY-FIRST CLAIM FOR RELIEF: ILLINOIS ANTITRUST ACT ............................... 105

011328-11/3505766 V1

TWENTY-SECOND CLAIM FOR RELIEF: ILLINOIS CONSUMER FRAUD
      & DECEPTIVE BUSINESS PRACTICES ACT ........................................................ 106

TWENTY-THIRD CLAIM FOR RELIEF: IOWA COMPETITION LAW ............................... 107

TWENTY-FOURTH CLAIM FOR RELIEF: KANSAS RESTRAINT OF
      TRADE ACT ................................................................................................................. 107

TWENTY-FIFTH CLAIM FOR RELIEF: MAINE ANTITRUST LAW ................................. 108

TWENTY-SIXTH CLAIM FOR RELIEF: MARYLAND ANTITRUST ACT ........................ 108

TWENTY-SEVENTH CLAIM FOR RELIEF: MARYLAND CONSUMER
      PROTECTION ACT ..................................................................................................... 109

TWENTY-EIGHTH CLAIM FOR RELIEF: MASSACHUSETTS CONSUMER
      PROTECTION ACT ..................................................................................................... 110

TWENTY-NINTH CLAIM FOR RELIEF: MICHIGAN ANTITRUST
      REFORM ACT ..............................................................................................................111

THIRTIETH CLAIM FOR RELIEF: MINNESOTA ANTITRUST LAW ................................ 112

THIRTY-FIRST CLAIM FOR RELIEF: MINNESOTA UNIFORM
      DECEPTIVE TRADE PRACTICES ACT .................................................................... 112

THIRTY-SECOND CLAIM FOR RELIEF: MONTANA UNFAIR TRADE
      PRACTICES & CONSUMER PROTECTION ACT .................................................... 113

THIRTY-THIRD CLAIM FOR RELIEF: NEBRASKA JUNKIN ACT ................................... 114

THIRTY-FOURTH CLAIM FOR RELIEF: NEBRASKA CONSUMER
      PROTECTION ACT ..................................................................................................... 115

THIRTY-FIFTH CLAIM FOR RELIEF: NEVADA ANTITRUST ACT ................................. 115

THIRTY-SIXTH CLAIM FOR RELIEF: NEVADA DECEPTIVE TRADE
      PRACTICES ACT ........................................................................................................ 116

THIRTY-SEVENTH CLAIM FOR RELIEF: NEW HAMPSHIRE ANTITRUST
      LAW.............................................................................................................................. 117

THIRTY-EIGHTH CLAIM FOR RELIEF: NEW HAMPSHIRE CONSUMER
      PROTECTION ACT ..................................................................................................... 118

THIRTY-NINTH CLAIM FOR RELIEF: NEW JERSEY ANTITRUST ACT ......................... 118

FORTIETH CLAIM FOR RELIEF: NEW MEXICO ANTITRUST ACT ................................ 119

011328-11/3505766 V1

FORTY-FIRST CLAIM FOR RELIEF: NEW MEXICO UNFAIR PRACTICES
ACT.................................................................................................................... 119

FORTY-SECOND CLAIM FOR RELIEF: NORTH CAROLINA ANTITRUST
LAW.................................................................................................................... 121

FORTY-THIRD CLAIM FOR RELIEF: NORTH DAKOTA UNIFORM STATE
ANTITRUST ACT............................................................................................. 121

FORTY-FOURTH CLAIM FOR RELIEF: OREGON ANTITRUST LAW ............................. 122

FORTY-FIFTH CLAIM FOR RELIEF: OREGON UNFAIR TRADE
PRACTICES ACT .............................................................................................. 122

FORTY-SIXTH CLAIM FOR RELIEF: RHODE ISLAND ANTITRUST ACT ...................... 124

FORTY-SEVENTH CLAIM FOR RELIEF: RHODE ISLAND UNFAIR
TRADE PRACTICE AND CONSUMER PROTECTION ACT ................................. 124

FORTY-EIGHTH CLAIM FOR RELIEF: SOUTH CAROLINA UNFAIR
TRADE PRACTICES ACT (On Behalf of State Law Class Members
that Purchased Fire Apparatus in South Carolina)............................................. 125

FORTY-NINTH CLAIM FOR RELIEF: SOUTH DAKOTA ANTITRUST LAW.................... 126

FIFTIETH CLAIM FOR RELIEF: SOUTH DAKOTA DECEPTIVE TRADE
PRACTICES AND CONSUMER PROTECTION STATUTE ..................................... 127

FIFTY-FIRST CLAIM FOR RELIEF: TENNESSEE FAIR TRADE PRACTICE
ACT.................................................................................................................... 128

FIFTY-SECOND CLAIM FOR RELIEF: UTAH ANTITRUST ACT..................................... 128

FIFTY-THIRD CLAIM FOR RELIEF: VERMONT ANTITRUST LAW................................ 129

FIFTY-FOURTH CLAIM FOR RELIEF: WEST VIRGINIA ANTITRUST ACT .................... 129

FIFTY-FIFTH CLAIM FOR RELIEF: UNJUST ENRICHMENT ........................................... 130

REQUEST FOR RELIEF ...................................................................................................... 130

DEMAND FOR JURY TRIAL............................................................................................... 132

011328-11/3505766 V1

1. Plaintiffs bring this action on behalf of themselves and a proposed class of all others similarly situated who purchased Fire Apparatus[1] made by any of the Manufacturer Defendants[2] from a retailer, dealer or other method that does not include direct purchases from the manufacturers (the "Indirect Purchaser Class") from January 1, 2016 to the present ("the Class Period").

2. Defendants are the Oshkosh Corporation ("Oshkosh"), Pierce Manufacturing, Inc. ("Pierce"), (collectively "Oshkosh Defendants"); the REV Group, LLC (formerly, REV Group, Inc.), ("REV Group"); Rosenbauer America LLC ("Rosenbauer"); and the Fire Apparatus Manufacturers' Association ("FAMA"). All named Defendants are collectively referred to as "Defendants" and any successors, agents, assigns of these named entities. Any unnamed, not yet identified co-conspirators with the Defendants are referred to as "Unnamed Co-Conspirator Defendants."

3. Plaintiffs bring this action against Defendants under Section 1 of the Sherman Act and under state antitrust law and common law. Plaintiffs seek treble damages and all other monetary remedies available under the applicable antitrust laws to compensate them and the class for losses associated with the anti-competitive conduct alleged herein. Plaintiffs also seek injunctive relief requiring Defendants to stop their anticompetitive practices, as well as restitution, disgorgement, and civil penalties to the full extent authorized by law. Plaintiffs demand a trial by jury.

---

[1] Fire Apparatus is defined consistently with NFPA 1900 industry standard as "a vehicle designed to be used under emergency conditions to transport personnel and equipment or to support the suppression of fires or mitigation of other hazardous conditions."

[2] "Manufacturer Defendants" refers to Oshkosh Corporation; Pierce Manufacturing, Inc.; REV Group, Inc.; and Rosenbauer America LLC; including as they acted through, or by directing or controlling, any of their subsidiaries.

011328-11/3505766 V1

# I. INTRODUCTION

4. Fire Apparatus prices have doubled in the last ten years. A Fire Apparatus that cost $500,000 in the mid-2010s now costs $1 million, and a more specialized Fire Apparatus that used to cost $900,000 now costs more than $2 million. Cost increases and inflation alone do not explain these price increases, which have squeezed municipal budgets and prevented communities from replacing their old Fire Apparatus. At the same time, wait times for a new Fire Apparatus have ballooned from 18 months in the mid-2010s to more than four years today.

5. As a result of high prices and long order backlogs, Fire Apparatus that should have been retired after 15 or 20 years are now celebrating their 30th "birthdays" on the front lines. These older trucks break down more frequently and are more difficult to repair than new trucks, leaving gaps in communities' fire protection systems and putting the public in danger. When fires break out and no Fire Apparatus are available to respond, these gaps can have deadly consequences. And even communities that have been able to purchase new Fire Apparatus have had to redirect funds from other priorities to cover the price increases.

6. These dangerous and financially devastating conditions for communities across the United States were created by three main players—the Manufacturer Defendants—who collectively control between 70 and 80 percent of the United States Fire Apparatus market. The Manufacturer Defendants relied on the industry's relatively inelastic demand to artificially create long backlogs of orders from fire departments. In a competitive market, this behavior would be an open invitation for a competitor to increase production and offer competitive pricing to steal their customers. That did not happen. Instead, Manufacturer Defendants exploited their dominant position and conspired to raise prices almost twofold and restrict output rather than compete.

7. The Manufacturer Defendants shared competitively sensitive information to facilitate their scheme through another entity, FAMA, an exclusive trade organization to which

011328-11/3505766 V1

they belonged. This information—sensitive and nonpublic output and pricing data that would not be shared in a competitive market—helped provide the certainty and stability crucial to carrying out the scheme. As it told its members, FAMA is "here to maximize profits of FAMA member companies."[3] Consistent with that candid declaration, FAMA's data is not available to consumers, fire departments, or any other group that does not qualify for its membership. FAMA also held regular meetings attended by the Manufacturer Defendants, which provided ample opportunity to collude.

8. Thanks to their conspiracy, Manufacturer Defendants have been able to increase their margins by several percentage points and boost total profits, all without concern that their competitors will try to steal market share. Nor are Manufacturer Defendants concerned that potential new entrants would compete on price and availability, because high barriers to entry prevent new competitors from coming into the market. And while the increased prices are hurting local governments, Manufacturer Defendants' CEOs and shareholders have cashed out, profiting greatly from the orchestrated backlogs and inflated prices.

9. In fact, REV Group executives celebrated these exorbitant price hikes as "price realization" to investors and bragged about doubling profits through supply restriction and price hikes. In 2018, instead of lamenting hefty backlogs, REV Group's then-CEO Tim Sullivan told investors: "We like backlog, we love backlog," and his successor boasted in 2022 that under his tenure "our backlog for fire apparatus has tripled, growing by over $1 billion."[4] By 2024, REV

---

[3] Meeting Minutes Fire Apparatus Manufacturers' Association Spring Membership Business Meeting, FIRE APPARATUS MFRS. ASS'N, 2, https://www.fama.org/wp-content/uploads/2023/02/1677348633_63fa4f190edd4.pdf (last visited March 23, 2026).

[4] REV Group, Inc. (REVG) Q2 2023 Earnings Call Transcript, https://seekingalpha.com/article/4610397-rev-group-inc-revg-q2-2023-earnings-call-transcript (last visited March 23, 2026).

011328-11/3505766 V1

Group backlogs soared to $4.2 billion in undelivered orders. Similarly, in 2022, Oshkosh CEO John Pfeifer celebrated the backlogs the Oshkosh Defendants were able to engineer, describing a $660 million quarterly backlog as "another record backlog,"[5] later advertising to investors that "[w]e have the strongest backlog we've ever had in Fire & Emergency"[6] and bragging that "Pierce's backlog is at an all-time high up more than 80 percent compared to the prior year."[7]

10. Defendants' conduct has not gone unnoticed. By early 2025, both congressional and FTC investigations had commenced to examine the Fire Apparatus manufacturing industry. For example, on April 15, 2025, in a bipartisan effort, Senators Elizabeth Warren (D-Massachusetts) and James Banks (R-Indiana) sent a letter to Edward A. Kelly, General President, International Association of Fire Fighters, seeking information regarding "the impacts of private equity roll-ups of Fire Apparatus manufacturers, and the adverse impact of this consolidation on fire fighter and public safety."[8] And on September 10, 2025, representatives from Pierce and REV Group were called before the United States Senate Subcommittee for Disaster Relief at a hearing on Capitol Hill and questioned regarding industry price fixing and the devastating effect that the inflated prices were having on the local governments and their fire departments.

---

[5] Oshkosh (0KDI.L) Q1 2023 Earnings Call, https://mlq.ai/stocks/0KDI.L/earnings-call-transcript/Q1-2023/ (last visited March 23, 2026).

[6] OSK Q2 2022 Earnings Call Transcript, https://tickertrends.io/transcripts/OSK/Q2-earnings-transcript-2022 (last visited March 23, 2026).

[7] Oshkosh (OSK) Q3 2022 Earnings Call, https://mlq.ai/stocks/OSK/earnings-call-transcript/Q3-2022/ (last visited March 23, 2026).

[8] Letter from Senator Elizabeth Warren and Senator Jim Banks to Edward Kelly, General President, International Association of Fire Fighters (Apr. 15, 2025), https://www.warren.senate.gov/imo/media/doc/_firefighters.pdf (last visited March 23, 2026).; *see also* Mike Baker, Senators Investigate Private Equity Role in Soaring Fire-Truck Costs, New York Times (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equityfire-trucks-congress-investigation.html (last visited March 23, 2026).

011328-11/3505766 V1

11. Plaintiffs and Class members are among the local governments who have been damaged by Defendants' illegal conduct and had their residents put at risk. Plaintiffs and Class members have paid artificially inflated prices for Fire Apparatus during the Class Period that exceeded the amount they would have paid if the price for Fire Apparatus had been determined by a competitive market. Plaintiffs seek equitable and monetary relief, and to restore competition in the marketplace.

## II. PARTIES

### A. Plaintiffs

#### 1. City of La Crosse

12. Plaintiff City of La Crosse ("La Crosse") is a city of 52,680 people located on Wisconsin's western border.[9] The Fire Apparatus that La Crosse purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. La Crosse has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

13. La Crosse has purchased multiple Fire Apparatuses from Manufacturer Defendants for its fire department since 2016. Among these are two Pierce Arrow XT aerial trucks, a Pierce Saber pumper tanker,[10] two Pierce Ultimate Configuration ("PUC") pumper trucks, and a Spartan truck[11] purchased from Reliant Fire Apparatus, Inc. La Crosse has also purchased a Rosenbauer Panther 4x4 for its airport.

---

[9] *Welcome to La Crosse!*, LA CROSSE WISCONSIN, https://www.cityoflacrosse.org/city-services/about-la-crosse-wisconsin (last visited Aug. 19, 2025).

[10] *Fire Wiki*, FANDOM.COM, https://fire.fandom.com/wiki/La_Crosse_Fire_Department_ (Wisconsin)#Apparatus_Roster (last visited Aug. 15, 2025).

[11] *Id.*

011328-11/3505766 V1

### 2. City of Ann Arbor

14. Plaintiff City of Ann Arbor ("Ann Arbor") is located in southeast Michigan with a population of approximately 121,000 people.

15. Throughout the Class Period, Ann Arbor purchased Fire Apparatus from separate authorized dealers of the Manufacturer Defendants. As a direct result of Defendants' conduct alleged herein, Ann Arbor purchased these Fire Apparatus at artificially inflated prices and suffered antitrust injury.

16. On June 14, 2022, Ann Arbor executed a purchase order with Halt Fire, Inc. for a 2022 Pierce Custom Enforcer A Pumper Fire Apparatus for a price of $662,453.00.

17. On February 4, 2025, Ann Arbor executed a purchase order with Halt Fire, Inc. for a Fire Tiller Pierce 107 Tractor Aerial Mounted for a price of $2,384,695.00.

18. Ann Arbor has received delivery of the 2022 Pierce Custom Enforcer A Pump Fire Apparatus. It awaits delivery of the Fire Tiller Pierce 107 Tractor Aerial Mounted.

19. Ann Arbor also executed a purchase order with the REV Group's authorized dealer West Shore Fire Inc. On July 7, 2023, Ann Arbor executed a purchase order with West Shore Fire Inc. for a 2025 E-One Typhoon Engine for a price of $830,000.00. Nearly two and a half years after execution of the purchase order, Ann Arbor still awaits delivery of the E-One truck.

### 3. City of Onalaska

20. Plaintiff City of Onalaska ("Onalaska") is a city in Wisconsin. Since January 1, 2016, Onalaska has indirectly purchased Fire Apparatus from Manufacturer Defendants. The Fire Apparatus that Onalaska purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Onalaska has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

011328-11/3505766 V1

21.     In 2018, Onalaska purchased a Pierce Impel Engine for $550,593. The build time for this Fire Apparatus was 11 to 12 months.

22.     In 2021, Onalaska purchased a Pierce Impel Ladder Truck for $989,170. The build time for this Fire Apparatus was 12.5 to 14.5 months.

23.     In 2025, Onalaska purchased a Pierce Velocity Pumper Tanker for $1,119,921. The build time is estimated to be 52 to 55 months, meaning that Onalaska will not receive this Fire Apparatus until at least 2029. If the cost for materials increases over the next 4 to 5 years, then Onalaska will have to pay more for this Fire Apparatus that is currently on order.

### 4.     City of Milwaukee

24.     Plaintiff City of Milwaukee ("Milwaukee") is the largest city in Wisconsin and home to nearly 600,000 residents. Since January 1, 2016, Milwaukee has purchased Fire Apparatus from dealers of Manufacturer Defendants for the Milwaukee Fire Department. The Fire Apparatus that Milwaukee purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Milwaukee has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

25.     Between 2016 and 2025, Milwaukee purchased 19 Fire Apparatus for a total cost of approximately $20 million dollars.

26.     In 2016, Milwaukee purchased two Pierce Fire Engines from Reliant for $551,034.50 each.

27.     In 2019, Milwaukee purchased two Pierce Fire Engines from Reliant for $499,994.00 each.

28.     In 2019, Milwaukee purchased a Pierce Heavy Rescue from Reliant for $909,970.00.

29. In 2020, Milwaukee purchased two Pierce Aerial Platforms from Reliant for $1,285,025.00 each.

30. In 2021, Milwaukee purchased a Pierce Aerial Platform from Reliant for $1,285,025.00.

31. In 2022, Milwaukee purchased a Pierce Fire Engine from Reliant for $643,782.00.

32. In 2023, Milwaukee purchased two Pierce Fire Engines from Reliant for $755,958.75 each.

33. In 2024, Milwaukee purchased three REV E-One Fire Engines from Fire Services, Inc. for $987,771.00 each.

34. In January 2025, Milwaukee purchased three REV E-One Fire Engines from Fire Services, Inc. for $1,104,400.00 each. To date, these Fire Engines have not been delivered. If the cost of materials increases over the next few years, then Milwaukee will have to pay more for these Fire Apparatus that are currently on order.

35. In June 2025, Milwaukee purchased two REV E-One Ladder Trucks from Fire Services, Inc. for $1,857,972.88 each. To date, the Ladder Trucks have not been delivered. If the cost of materials increases over the next few years, then Milwaukee will have to pay more for these Fire Apparatus that are currently on order

**5. Commack Fire District**

36. Plaintiff Commack Fire District ("Commack") is a fire district located in Commack, New York. Since January 1, 2016, the Commack Fire District has indirectly purchased Fire Apparatus from Manufacturer Defendants. The Fire Apparatus that Commack purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged

herein. Commack has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

37. In 2018, Commack purchased two Pierce Enforcer Pumpers for $1,250,000.

38. Between 2022-2023, Commack purchased through a lease-purchase agreement 2 Pierce Enforcer Pumpers for $1,390,656.66 and 1 Pierce Enforcer Aerial for $1,843,252.

**6. Claverack Fire District**

39. Plaintiff Claverack Fire District ("Claverack") is a fire department located in Claverack, New York. They are a municipal entity. Since January 1, 2016, Claverack has indirectly purchased Fire Apparatus from Manufacturer Defendants. The Fire Apparatus that Claverack purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Claverack has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

40. In 2025, Claverack purchased a Pierce Rescue Engine for $1,683,030 from Firematic Supply Co. Inc.

**7. City of Ridgeland**

41. Plaintiff City of Ridgeland ("Ridgeland") is a city in Mississippi. Since January 1, 2016, Ridgeland has indirectly purchased Fire Apparatus from Manufacturer Defendants. The Fire Apparatus that Ridgeland purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Ridgeland has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

42. On July 10, 2017, Ridgeland purchased a Pierce 2017 Enforcer Pumper with equipment for $409,354 from Emergency Equipment Professionals.

43. On October 1, 2019, Ridgeland purchased a 2020 Pierce Enforcer Customer Pumper for $592,800 from Emergency Equipment Professionals.

011328-11/3505766 V1

44. On October 10, 2024, Ridgeland purchased a Pierce New Ladder Truck for $1,336,786.60 from Emergency Equipment Professionals.

45. On October 10, 2024, Ridgeland also purchased a 2026 Pierce Saber Custom Pumper for $866,698 from Emergency Equipment Professionals.

### 8. City of Middletown

46. City of Middletown ("Middletown") is a city in Connecticut. Since January 1, 2016, Middletown has indirectly purchased Fire Apparatus from Manufacturer Defendants. The Fire Apparatus that Middletown purchased was sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Middletown has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

47. In April 2023, Middletown purchased a Spartan/Smeal 75' Quint Fire Apparatus for $1,150,941 from New England Fire Equipment & Apparatus Corporation.

## B. Defendants

### 1. REV Group

48. REV Group, LLC (previously known as REV Group Inc.) ("REV Group") is incorporated in Delaware and is headquartered in Brookfield, Wisconsin, in the Milwaukee, Wisconsin area.[12]

49. REV Group currently operates manufacturing plants in Ocala, Florida; Hamburg, New York; Nesquehoning, Pennsylvania; Ephrata, Pennsylvania; Brandon, South Dakota; Charlotte, Michigan; Snyder, Nebraska; and Holden, Louisiana.[13]

---

[12] Rev Group, Inc. SEC Form 10K (Oct. 31, 2023), https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2023.pdf (last visited Aug. 15, 2025).

[13] *Who We Are*, REVGROUP.COM, https://revgroup.com/who-we-are (last visited Aug. 15, 2025).

011328-11/3505766 V1

50.    Of the roughly $3 billion in annual Fire Apparatus sales in the United States, REV Group captures approximately $1 billion, or at least 33 percent of the total.[14] In 2024, REV Group's full year net income was $257.6 million.[15]

51.    In October, 2025, months after this lawsuit was filed, REV Group announced it was merging into, and becoming a wholly owned subsidiary of, Terex Corporation.[16] That merger was announced as complete on February 2, 2026.[17] While REV Group is no longer trading on the New York Stock Exchange and is a wholly owned subsidiary of Terex, upon information and belief it will continue to do business as REV Group.

52.    From at least 2010 through March 2024, REV Group was steered by a private equity firm, AIP, LLC and its affiliated funds, whose equity holdings afforded them substantial influence over REV Group's operations, strategy, and board composition. As described more fully below, since at least 2010, REV Group has pursued an aggressive acquisition strategy, consolidating numerous formerly independent Fire Apparatus manufacturers into a single corporate group. As of March 2025, REV Group and its subsidiaries account for approximately 33 percent of U.S. Fire Apparatus sales, making it the dominant supplier in the market.

---

[14] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG BY MATT STOLLER (Jan. 25, 2025), https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll (last visited Aug. 15, 2025) (hereinafter "Musharbash").

[15] Julie Nuernberg, *REV Group, Inc. Reports Strong Fiscal 2024 Fourth Quarter and Full Year Results*, REVGROUP.COM (Dec. 11, 2024), https://revgroup.com/rev-group-inc-reports-strong-fiscal-2024-fourth-quarter-and-full-year-results (last visited Aug. 15, 2025).

[16] https://rvbusiness.com/rev-group-announces-strategic-merger-with-terex-corp/ (last visited March 23, 2026).

[17] https://investors.terex.com/news/news-details/2026/TEREX-AND-REV-GROUP-COMPLETE-MERGER-CREATING-A-PREMIER-SPECIALTY-EQUIPMENT-MANUFACTURER/default.aspx (last visited March 23, 2026).

011328-11/3505766 V1

53. Throughout the Class Period, REV Group sold Fire Apparatus in interstate commerce in the United States and participated and continue to participate in a conspiracy to fix, raise, maintain, or stabilize the prices of Fire Apparatus in the United States.

## 2. Oshkosh Corporation and Pierce Manufacturing, Inc.

54. Oshkosh Corporation ("Oshkosh") is incorporated in Wisconsin and is headquartered in Oshkosh, Wisconsin.[18]

55. Oshkosh's leading North American brand is Pierce Manufacturing, Inc. ("Pierce"). Pierce is incorporated in Delaware and is headquartered in Appleton, Wisconsin. It produces custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, and other Fire Apparatus in its manufacturing facilities in Appleton, Wisconsin and Bradenton, Florida.[19] Pierce has 26 dealers across California, Colorado, Florida, Kansas, Massachusetts, Minnesota, Mississippi, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin.[20] Together, this dealer network sells Fire Apparatus to customers in all 50 states.

56. In late 2025, Oshkosh reported periodic net sales of $7.73 billion across all of its business lines, including Fire Apparatus manufacturing, and estimated total net sales for 2025

---

[18] OSHKOSH CORP., FORM 10-K at 3, https://www.investors.oshkoshcorp.com/media/document/cdffc8d8-7620-48f8-9d1a-b5430d2b7d47/assets/2024_Oshkosh_Annual_Report_web.pdf (last visited Aug. 19, 2025).

[19] *Pierce Manufacturing Joins Oshkosh Corporation to Showcase the Future of Electric Firefighting Technology at CES 2025*, FIREAPPARATUSMAGAZINE.com (Dec. 23, 2024), https://www.fireapparatusmagazine.com/industry-news/pierce-joins-oshkosh-to-showcase-the-future-of-electric-firefighting-technology-at-ces-2025/ (last visited Aug. 15, 2025); *Tour of Pierce Manufacturing,* Inc., R4.IEEE.ORG, https://r4.ieee.org/event/tour-of-pierce-manufacturing-inc/ (last visited Aug. 15, 2025).

[20] *Find a Dealer*, PIERCE.COM, https://www.piercemfg.com/find-a-dealer (last visited Aug. 15, 2025).

011328-11/3505766 V1

between $10.3 and $10.4 billion, including sales through its subsidiary Pierce. Oshkosh, including through Pierce, captures around $750 million in annual Fire Apparatus sales in the United States, or at least 25 percent of the total.[21] Oshkosh's reported 2024 fourth quarter net income was $153.1 million.[22] Pierce has an annual revenue of approximately $1 billion.

57. Defendant Pierce Manufacturing Inc. ("Pierce") is Oshkosh's leading North American subsidiary and operates in Oshkosh's Vocational segment. Pierce's products include custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, elliptical tankers, and homeland security apparatuses. Pierce also manufactures its own custom chassis on which it builds its custom apparatuses. Pierce, which operates factories in Wisconsin and Florida, is incorporated under the laws of the state of Wisconsin, and its principal place of business is in Appleton, Wisconsin.

58. The "Oshkosh Defendants" refer to Oshkosh and Pierce Defendants.

59. Throughout the Class Period, the Oshkosh Defendants sold Fire Apparatus in interstate commerce in the United States. At all relevant times, the Oshkosh Defendants participated and continue to participate in a conspiracy to fix, raise, maintain, or stabilize the prices of Fire Apparatus in the United States.

### 3. Rosenbauer America LLC

60. Rosenbauer America LLC ("Rosenbauer") is a wholly owned subsidiary of Rosenbauer International AG ("Rosenbauer International"), a publicly traded company based in

---

[21] Musharbash, *supra* note 14.

[22] *Oshkosh Corporation Reports 2024 Fourth Quarter and Full Year Results*, OSHKOSHCORP.COM (Jan. 30, 2025), https://investors.oshkoshcorp.com/news/oshkosh-corporation-reports-2024-fourth-quarter-and-full-year-results/f1490807-bbcf-44b4-be51-56294a3276e3 (last visited Aug. 15, 2025).

011328-11/3505766 V1

Austria and listed on the Vienna Stock Exchange.[23] Rosenbauer is incorporated in Delaware and headquartered in Lyons, South Dakota.[24]

61. Rosenbauer has production facilities in Lyons, South Dakota; Wyoming, Minnesota; and Fremont, Nebraska. Rosenbauer produces custom and commercial pumpers, heavy rescues, tenders, mini pumpers and light rescues, aerial ladders and platforms, and electric fire trucks.[25]

62. Rosenbauer has 24 dealers across Alabama, Arizona, California, Colorado, Florida, Georgia, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, South Dakota, Texas, Utah, Washington, and West Virginia.[26] Together, these dealers sell Fire Apparatus to customers in all 50 states.

63. Rosenbauer captures approximately $307 million in United States Fire Apparatus sales annually,[27] or at least 10 percent of the market.[28]

---

[23] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/en/12/rosenbauer-group/investor-relations/financial-news/financial-news-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (last visited Aug. 15, 2025).

[24] *A Single-Source Provider for the US Fire Services*, ROSENBAUER.COM, https://www.rosenbauer.com/en/de/rosenbauer-group/company/locations/sales-and-service-locations/rosenbauer-america-llc (last visited Aug. 15, 2025).

[25] FAMA.ORG, https://www.fama.org/members/company_profile/?id=99 (last visited Aug. 15, 2025).

[26] *Find a Dealer*, ROSENBAUERAMERICA.COM, https://rosenbaueramerica.com/find-a-dealer (last visited Aug. 15, 2025).

[27] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/en/12/rosenbauer-group/investor-relations/financial-news/financial-news-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (converted to U.S. dollars from 262.9 million euros) (last visited Aug. 15, 2025).

[28] Musharbash, *supra* note 14.

011328-11/3505766 V1

64. Significantly, Rosenbauer has a history of engaging in anticompetitive conduct in its home market. In 2011, it participated in two separate conspiracies targeting local fire departments in Europe. First, the German Federal Cartel Office (Bundeskartellamt) found Rosenbauer guilty of participating in a price fixing cartel for Fire Apparatus and fined Rosenbauer 10.5 million Euros.[29] Additionally, a Rosenbauer subsidiary admitted to participating in a ladder fire truck cartel in Europe as follows:

> The German competition authority, the Bundeskartellamt, has imposed a fine of €17.5 million on Iveco Magirus Brandschutztechnik for its involvement in anti-competitive agreements on the manufacture of turntable ladder fire fighting machines.
>
> The authority said in a statement that Metz Aerials, the German aerial ladder subsidiary of Austria's Rosenbauer, was also part of the cartel, but has not been fined because Rosenbauer informed the Bundeskartellamt of the cartel agreement in 2010 "by way of a leniency application".
>
> The Bundeskartellamt said it had referred the sales managers and CEOs involved "to the competent public prosecutor's office for examination under criminal law."
>
> In July, Iveco Magirus Brandschutztechnik said its managing director, Mr Roel Nizet, had resigned from the company in May at his own request.
>
> The cartel agreement concerned the manufacture of fire engines with turntable ladders between 1998 and November 2007, of which Iveco and Rosenbauer have a combined market share of close to 100%, said the Bundeskartellamt.
>
> The authority said that during this period the companies' sales managers met at regular intervals and divided tenders among each other on the basis of project lists.

---

[29] *EANS-Adhoc: Rosenbauer International AG 2010 result higher than expected, due to reversal of provision / Anti-trust proceedings in Germany end with official notice of 10.5 EUR Mio. Fine*, PRESSEPORTAL (Oct. 2, 2011), https://www.presseportal.ch/de/pm/100009184/100618850 (last visited Mar. 23, 2026).

011328-11/3505766 V1

> ***The authority said that to conceal the cartel agreements, the sales managers initially communicated via prepaid mobiles and since the football world championship 2006 in a 'football code' referring to cartel meetings as 'training' and to rebates in the form of match results.*** [30]

65. Throughout the Class Period, Rosenbauer sold Fire Apparatus in interstate commerce in the United States. At all relevant times, Rosenbauer participated and continues to participate in a conspiracy to fix, raise, maintain, or stabilize the prices of Fire Apparatus in the United States.

### 4. The Fire Apparatus Manufacturers' Association

66. The Fire Apparatus Manufacturers' Association ("FAMA") is a not-for-profit trade association for fire apparatus manufacturers, located in Ocala, Florida.[31] As of May 2025, FAMA had 55 manufacturer members,[32] including REV Group subsidiaries E-One, Ferrara, KME, and Spartan; Oshkosh subsidiary Pierce; and Rosenbauer.[33] John Schultz, the Vice President and General Manager of Pumper Products at Pierce,[34] is FAMA's vice-chair.[35]

---

[30] Murray Pollok, KHL.COM, *Iveco Magirus and Metz Aerials in German cartel ruling* https://www.khl.com/news/iveco-magirus-and-metz-aerials-in-german-cartel-ruling/1066089.article (last visited Oct. 1, 2025) (emphasis added).

[31] *How to Join*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/how-to-join/ (last visited Aug. 15, 2025).

[32] *FAMA Releases Fire Apparatus Industry Update*, FIREENGINEERING.COM (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update/ (last visited Aug. 15, 2025).

[33] *Members List*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list (last visited Aug. 15, 2025).

[34] *John Schultz*, PIERCEMFG.COM, https://www.piercemfg.com/hubfs/FDIC%202025/Bios/Bio/John%20Schultz%20-%20Pierce%20Manufacturing.pdf (last visited Aug. 15, 2025).

[35] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).

011328-11/3505766 V1

67. As of October 2025, FAMA had 135 member companies across North America. About 60 percent of FAMA's members are companies that manufacture components of a Fire Apparatus, such as a ladder or a hose. The other 40 percent of FAMA's members are companies who manufacture the Fire Apparatus itself, including the subsidiaries of Manufacturer Defendants: E-ONE, Ferrara, KME, Spartan, Pierce, and Rosenbauer—all of which are members of FAMA.

68. FAMA acted as a co-conspirator of the Manufacturer Defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among the other them.

### 5. Unnamed Defendants and Co-Conspirators

69. Various other persons, firms, and entities not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. Plaintiffs reserve the right to name some or all of those entities as Defendants. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators, whether or not they are named as defendants in this Consolidated Amended Complaint.

### 6. Agents and Affiliates

70. Whenever this Complaint refers to any act, deed, or transaction of any corporation or other business entity, the allegation means that the corporation or business entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

71. Each Defendant acted as the agent or joint venturer of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged in this Complaint. The acts alleged were done through Defendants and their use of Defendants' subsidiaries, affiliates, divisions, or other related entities and through their respective officers, directors, employees,

011328-11/3505766 V1

agents, or representatives, who were acting within the scope of their authority and for the benefit of their respective principals.

72. To the extent that any parent companies, subsidiaries, or affiliates of Defendants participated in, facilitated, or benefitted from the conduct alleged herein, Plaintiffs reserves the right to name them as additional Defendants as their identities and roles become known through discovery.

## III. JURISDICTION AND VENUE

73. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. Plaintiffs brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).

74. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a). Plaintiffs' state law claims derive from the same common nucleus of operative fact as their federal claims, i.e., their federal and state claims all arise from Defendants' anticompetitive behavior in the Fire Apparatus market. Plaintiffs brings state law class claims on behalf of the State Law Class to recover actual and/or compensatory damages, treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct in restricting the supply and increasing the price of Fire Apparatus. Plaintiffs seeks damages in excess of $5,000,000.

75. This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant, either directly or through the ownership and/or substantial control of that Defendant's subsidiaries, *inter alia*: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered Fire Apparatus to purchasing entities throughout the United States, including in this District; (c) had substantial contacts with the

United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

76. Defendant REV Group is headquartered in this District and through its wholly owned subsidiaries, sold its products through Fire Apparatus dealers in this District.

77. Defendant Oshkosh, and Defendant Pierce, are headquartered in this District. Defendant Oshkosh, through its wholly owned subsidiaries, sold its products through Fire Apparatus dealers in this District. Defendant Oshkosh operates manufacturing facilities in this District.

78. Defendant Rosenbauer regularly sold its products through Fire Apparatus dealers in this District.

79. Defendant FAMA regularly transacts business with entities headquartered in this District related to this action, including the Manufacturer Defendants. Defendant FAMA regularly receives information from, and shares information to, these entities.

80. Defendants' activities were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

81. Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because multiple Defendants resided or transacted business in this District, are licensed to do business or are doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

011328-11/3505766 V1

## IV. FACTUAL ALLEGATIONS

**A.**  **The Fire Apparatus Industry Was Diverse and Comprised of Many Independent Sellers Until Approximately 2008, When the Great Recession Devastated the Industry.**

82.  The modern Fire Apparatus manufacturing industry boomed in the post-war decades of the 1950s and 1960s.[36] Small and midsized Fire Apparatus manufacturers—typically family-owned operations—appeared in every region of the country to produce emergency vehicles tailored to the needs of local fire departments. The industry was competitively diversified across at least two dozen companies.[37] Competition among these smaller firms kept Fire Apparatus prices near costs, and the existence of a large number of manufacturers ensured redundant manufacturing capacity to meet demand.[38] By 2008, these companies sold over 5,000 new Fire Apparatus in the United States every year.

83.  For decades, the Fire Apparatus industry enjoyed relatively stable (inflation-adjusted) prices and ample production capacity. With few exceptions, the annual cost increase for new Fire Apparatus prior to 2008 was around 3 percent.[39]

84.  Starting in 2008, the Great Recession decimated municipal budgets, which in turn caused a drop-off in demand for new Fire Apparatus. By 2011, the market for new Fire Apparatus sales had fallen more than 40 percent from its peak,[40] from 5,000 a year to around

---

[36] Musharbash, *supra* note 14.

[37] *Letter to FTC and DOJ re Firetrucks*, ECONOMICLIBERTIES.US (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

[38] Musharbash, *supra* note 14.

[39] *Id*.

[40] Paul C. Darley, *The Fire Apparatus Market is Coming Back... Just Look at the Data*, FAMA.ORG (Dec. 5, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/ (last visited Aug. 15, 2025).

011328-11/3505766 V1

3,000 a year.[41] Many independent Fire Apparatus manufacturers folded during this period. Demand for Fire Apparatus did not fully rebound until the mid-2010s.

**B. REV Group, Oshkosh, and Rosenbauer Start Rolling Up Fire Apparatus Manufacturers.**

**1. REV Group**

85. Capitalizing on the economic turbulence of the Great Recession, a midsize private-equity firm, American Industrial Partners ("AIP"), began a twelve-year long strategy to consolidate large portions of the Fire Apparatus industry ultimately under REV Group. Beginning in 2008, AIP purchased the Fire Apparatus manufacturing company E-ONE, Inc. ("E-ONE"). E-ONE builds a full line of Fire Apparatus, from brush trucks and pumpers to aircraft rescue and firefighting vehicles.[42]

86. As demand for Fire Apparatus returned in the mid-2010s, AIP created REV Group (originally Allied Specialty Vehicles) in 2015 from the merger of several companies, including E-ONE.[43]

87. In 2016, REV Group purchased Kovatch Mobile Equipment Corporation ("KME").[44] Headquartered in Nesquehoning, Pennsylvania, KME operates in Pennsylvania,

---

[41] *See id.*; Musharbash, *supra* note 14.

[42] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025).

[43] Mike Baker, Maureen Farrell & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. TIMES (Feb. 17, 2025), https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html (last visited Aug. 15, 2025) (hereinafter "Baker, Farrell & Kovaleski").

[44] *REV Group Acquires Kovatch Mobile Equipment*, REVGROUP.COM (Apr. 11, 2016), https://investors.revgroup.com/investor-releases/2016/11-04-2016 (last visited Aug. 15, 2025); Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-

Virginia, New York, and California. It produces a broad array of Fire Apparatus, including pumpers, aerials, and tankers.[45]

88. In early 2017, AIP debuted REV Group on the public markets through an initial public offering ("IPO") in January 2017 to generate revenue for further consolidation. While continuing to portray its brands to fire departments as steeped in tradition and local community-building, in its prospectus, REV Group marketed itself to Wall Street rather brazenly as an "Experienced Consolidator," telling potential investors that the status quo of small and fragmented manufacturers presented "an opportunity for market leadership" and "acquisitive growth."[46]

89. REV Group's IPO was a smashing success, funneling $275 million in proceeds to REV Group and its controlling shareholders at AIP.[47] This financing enabled the roll-up strategy to proceed quickly, with AIP and REV Group acquiring Ferrara Fire Apparatus, Inc. ("Ferrara") of Holden, Louisiana, in April 2017, thus achieving the consolidation of E-ONE, KME, and now Ferrara under common ownership and control.[48]

---

apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025); *KME Fire Apparatus Sold REV Group*, FIREHOUSE.COM (Apr. 22, 2016), https://www.firehouse.com/apparatus/press-release/12193362/fire-apparatus-manufacturer-kme-kovtach-pumpers-aerials-heavy-rescue-fire-apparatus-builder-kme-fire-apparatus-sold-to-revgroup (last visited Aug. 15, 2025).

[45] Chris Mc Loone, *REV Group, Inc. Acquires KME*, FIREAPPARATUSMAGAZINE.COM (Apr. 11, 2016), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-inc-acquires-kme/ (last visited Aug. 15, 2025).

[46] REV Group, Inc. 2017 10k, at 1, 13; https://www.sec.gov/Archives/edgar/data/1687221/000156459017025241/revg-10k_20171031.htm (last visited March 23, 2026).

[47] *See Id.* at 56.

[48] *Id.* at F-16.

011328-11/3505766 V1

90. The Ferrara product portfolio included custom chassis pumpers, aerials, and industrial apparatus. At the time, Ferrara had more than 450 employees and annual revenue of approximately $140 million.[49] Prior to the purchase, Ferrara had been E-ONE's direct competitor in the southern United States.[50]

91. Dan Peters, President of the fire division within REV Group, noted that "the addition of Ferrara to the REV Fire Group enable[d] a number of new growth opportunities including expansion of our reach nationwide and adding new geographical regions and key accounts."[51] Timothy Sullivan, REV Group's CEO, confirmed that "Ferrara will immediately contribute strategic value by expanding the REV Fire Group national footprint, dealer sales network, service and after-market parts revenue as well as enhancing our robust line of custom chassis and aerial products for multiple market segments."[52] The Ferrara purchase cemented REV Group's position as a dominant Fire Apparatus manufacturer.

92. Not satisfied with control over E-ONE, KME, and Ferrara—each a prominent Fire Apparatus brand in its own right—REV Group purchased Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"),

---

[49] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/ (last visited Aug. 15, 2025).

[50] Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025); *REV Group Acquires Ferrara Fire Apparatus, Inc.*, REVGROUP.COM (Apr. 25, 2017), https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523 (last visited Aug. 15, 2025).

[51] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/ (last visited Aug. 15, 2025).

[52] *Id.*

011328-11/3505766 V1

and Ladder Tower Company ("Ladder Tower") in 2020.[53] These brands had a significant presence in the Midwest market. The acquisitions solidified REV Group's position as the top Fire Apparatus manufacturer in the United States.[54] Specifically, Spartan Emergency Response was a key acquisition, as it was and remains (as Spartan Fire today) one of only three manufacturers of custom chassis that not only use their chassis in their own apparatuses, but also supply their chassis to competing apparatus builders. By gaining control of this critical input on which many smaller competitors depended, REV Group gained effective control over the supply chain of many builders.

93. REV Group used its market power to tamp down competition in the industry. Although REV Group executives initially made a show of preserving the independence of the company's subsidiary manufacturers and their dealers, they simultaneously warned that aggressive or "negative" competition among subsidiaries would not be tolerated.[55]

94. By 2021, REV Group stopped even pretending to support subsidiary independence. A REV Group investor presentation referred to REV Group as "an industry consolidator."[56] That same presentation highlighted a strategy that called for REV Group's

---

[53] Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025); *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, REVGROUP.COM (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03-2020-135942281 (last visited Aug. 15, 2025).

[54] *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, FIREAPPARATUSMAGAZINE.COM (Feb. 3, 2020), https://www.fireapparatusmagazine.com/the-fire-station/the-station-news/rev-group-inc-completes-acquisition-of-spartan-emergency-response/ (last visited Aug. 15, 2025).

[55] Musharbash, *supra* note 14.

[56] *REV Group, Inc. Presentation*, REV GROUP at 5 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf.

011328-11/3505766 V1

subsidiaries to "[c]onverge on common designs that can be shared across brands," and to use Spartan's Metro Star chassis/cab as the "platform" for their offerings. REV Group also ensures its larger fire department customers deal directly with corporate-level staff rather than individual brand representatives.[57] The investor presentation further called for the elimination of geographic overlaps between the marketing of its different Fire Apparatus brands and dealers. REV Group's Fire Apparatus operations are now "center-led," with REV Group dictating and managing the execution of "margin improvement actions" across its subsidiaries.[58]

95. REV Group explained to shareholders that its goal was to double the fire apparatus companies' profitability. Timothy Sullivan, REV Group's CEO, told analysts that the companies REV Group had profit margins of 4 to 5 percent, and that REV Group was on a path "to get all of them above that 10 percent level." Sullivan further explained: "You bring them into the fold, you got to give them the religion, and they've got it now."[59]

---

[57] Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025).

[58] Musharbash, *supra* note 14.

[59] Baker, Farrell & Kovaleski, *supra* note 43.

011328-11/3505766 V1



*Image 1: REV Group's history of consolidation.[60]*

### 2. Oshkosh

96. Oshkosh responded to REV Group's roll-up by making acquisitions of its own. In 2021, Oshkosh's primary North American subsidiary, Pierce, announced that it had acquired Boise Mobile Equipment ("BME").[61] BME's product portfolio, which allowed Pierce to expand its reach and focus to West Coast markets, included Fire Apparatus like the Model 34, Tactical Tender, and Type 6 Xtreme.[62] Subsequent to these expansions, Oshkosh controlled a full quarter of the U.S. Fire Apparatus market.

---

[60] *REV Group, Inc. Presentation July 2021*, REVGROUP.COM, https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Aug. 15, 2025).

[61] *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, OSHKOSHCORP.COM (Sept. 16, 2021), https://www.investors.oshkoshcorp.com/news/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment/16c54803-9007-4e9e-82f2-e6253396d4e0/ (last visited Aug. 15, 2025).

[62] *Pierce Completes Ownership Interest in BME*, FIREHOUSE.COM (Sept. 16, 2021), https://www.firehouse.com/apparatus/press-release/21238596/pierce-manufacturing-custom-fire-truck-builder-pumpers-ladders-quints-rescues-puc-enforcer-pierce-completes-ownership-interest-

97. In addition to purchasing third-party manufacturers, Oshkosh also embarked on a strategy of consolidating the U.S. brands already within its purview, reducing geographic overlap between its dealers. In July 2018, Pierce subsidiary MacQueen Emergency Group ("MacQueen") acquired Schuhmacher Fire Equipment. The acquisition consolidated MacQueen's control over the upper Midwest, including Minnesota, Nebraska, South Dakota, North Dakota, and 109 Missouri counties. [63]

98. In January 2019, Pierce dealer Siddons-Martin Emergency Group ("Siddons") acquired Superior Equipment, consolidating control over the American Southwest.[64] Siddons' territory now includes Texas, Louisiana, New Mexico, Utah, and Nevada.

99. In November 2019, Pierce dealer Allegiance Fire and Rescue ("Allegiance") acquired Minuteman Fire and Rescue. The acquisition expanded Allegiance's territory to encompass most of New England, including Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.[65]

---

in-bme (last visited Aug. 15, 2025); *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, PIERCEMFG.COM (Sept. 16, 2021), https://www.piercemfg.com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment (last visited Aug. 15, 2025).

[63] *MacQueen Emergency Group Territory Expanded to Include 109 Missouri Counties*, PIERCEMFG.COM (July 10, 2018), https://www.piercemfg.com/pierce/press-release/macqueen-emergency-group-territory-expanded-to-include-109-missouri-counties (last visited Aug. 15, 2025).

[64] *Siddons-Martin Emergency Group Expands Territory with Acquisition of Superior Equipment*, PIERCEMFG.COM (Jan. 21, 2020), https://www.piercemfg.com/pierce/press-release/siddons-martin-emergency-group-expands-territory-with-acquisition-of-superior-equipment (last visited Aug. 15, 2025).

[65] *Minuteman Fire and Rescue Acquire by Allegiance Fire and Rescue*, ALLEGIANCEFR.COM (Nov. 19, 2019), https://allegiancefr.com/minuteman-fire-and-rescue-acquired-by-allegiance-fire-and-rescue/ (last visited Aug. 15, 2025).

011328-11/3505766 V1

100.    In September 2023, Pierce dealer Firematic Supply Co. Inc. ("Firematic") acquired Churchville Fire Equipment. The acquisition consolidated Firematic's control over Connecticut and New York.[66]

101.    Most recently, on June 12, 2025, Pierce dealer Reliant Fire Apparatus brand ("Reliant") acquired Halt Fire, Inc., thereby consolidating Reliant's "exclusive Pierce territory" to include Michigan, in addition to its existing territories in Wisconsin and Iowa.[67] Pierce noted that Reliant would "align Michigan operations with its existing territories" to "ensur[e] a consistent and reliable customer experience."[68]

102.    These consolidations, which have largely eliminated geographic overlaps and given Pierce dealers exclusive control across vast territories, have reduced or eliminated competition among Pierce subsidiaries.

### 3.    Rosenbauer

103.    Rosenbauer International A.G., seeing REV Group's and Oshkosh's consolidation efforts, finalized its acquisition of the remaining 25 percent minority stake in Rosenbauer America from General Safety Equipment Corporation in June 2022.[69]

---

[66] *Pierce Dealer Firematic Supply Co. Grows Presence in Northeast with Acquisition of Churchville Fire Equipment*, PIERCEMFG.COM (Sept. 1, 20123), https://www.piercemfg.com/ pierce/press-release/pierce-dealer-firematic-supply-co.-grows-presence-in-northeast-with-acquisition-of-churchville-fire-equipment (last visited Aug. 15, 2025).

[67] *Reliant Fire Apparatus Acquires Halt Fire, Inc. Expands Pierce Dealership Territory to Include the State of Michigan*, PIERCEMFG.COM (Jun 12, 2025), https://www.piercemfg.com/ pierce/press-release/reliant-fire-apparatus-acquires-halt-fire-inc.-expands-pierce-dealership-territory-to-include-the-state-of-michigan (last visited Aug. 15, 2025).

[68] *Id.*

[69] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/pl/fr/group/presse/wirtschaftspresse/wirtschaftspresse-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (last visited Aug. 15, 2025).

011328-11/3505766 V1

104. In March 2023, Rosenbauer announced that IKON Fire, LLC would join its dealer network for apparatus sales in Colorado and Wyoming.[70]

105. Rosenbauer's dealers are assigned non-overlapping territories, reducing inter-dealer competition.



*Image 2: Geographic territories of Rosenbauer dealers.[71]*

## C. Manufacturer Defendants Seek to Cooperate Rather Than Compete With One Another.

106. While rolling up independent Fire Apparatus manufacturers and tamping down competition between their own brands, Manufacturer Defendants have also sought to cooperate, rather than compete, with one another.

---

[70] Rosenbauer America, *Rosenbauer Announces New Partnership with IKON Fire, LLC*, ROSENBAUERAMERICA.COM (Mar. 30, 2023), https://rosenbaueramerica.com/rosenbauer-announces-new-partnership-with-ikon-fire-llc/ (last visited Aug. 15, 2025).

[71] *Find a Dealer*, ROSENBAUERAMERICA.COM, https://rosenbaueramerica.com/find-a-dealer/ (last visited Aug. 15, 2025).

107. For example, REV Group's Vice President of Sales in the Fire Group, Mike Virnig, stated: "What I won't tolerate is negative selling. I won't tolerate it **with our competitors**, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"[72]

108. REV Group company executives have also told analysts that the company would substantially raise its profit margins and that **other companies were doing the same**.[73]

109. Industry insider Jerry Halpin, the co-owner and vice president of sales and marketing for C.E.T. Fire Pumps, noted in 2022 that "people in the fire service industry are talking amongst themselves" and are looking "to **bolster opportunities through partnerships and other alliances**."[74] He also predicted "**cooperation between like businesses** to gain an edge in the marketplace."[75]

110. The Manufacturer Defendants' cooperative relationship is also demonstrated by their follow-the-leader pricing strategies. Defendants shared information on their intent to increase prices, and by how much, for time periods as narrow as six months.[76] This information

---

[72] Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025) (emphasis added).

[73] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Aug. 15, 2025) (emphasis added).

[74] *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIREAPPARATUSMAGAZINE .COM (Dec. 120, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (last visited Aug. 15, 2025) (emphasis added).

[75] *Id*. (emphasis added).

[76] *The Fire Apparatus Industry: An Update (Report V4) April 2021*, Fire Apparatus Mfrs. Ass'n, 22, https://www.fama.org/wp-content/uploads/2021/04/1619117458_6081c5920c940.pdf (last visited March 23, 2026).

allowed the Manufacturer Defendants to impose concurrent price increases with confidence that others would follow. Indeed, the Manufacturer Defendants attributed their increased sales revenue to such price increases within the same years.[77]

**D.      Manufacturer Defendants Exchange Confidential, Competitively Sensitive Information Through FAMA.**

111.    On its site, FAMA purports that its mission is to "advance and protect the interests of the fire and emergency services community through the use of our member companies' resources."[78] FAMA's remarks in a 2022 members-only meeting, however, reveal a different goal: "The FAMA's mission states, we are here to maximize profits of FAMA member companies."[79]

112.    E-One, Ferrara, KME, Spartan, Pierce, and Rosenbauer, which together represent all three Manufacturer Defendants, are members of FAMA.[80] FAMA colludes with the

---

[77] *See* REV Group 2021 Annual Report, https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/revg-annual-report-2021.pdf (attributing increased revenue to price in 2021) (last visited March 23, 2026); Oshkosh 2021 Annual Report, https://www.investors.oshkoshcorp.com/media/document/22f86d57-d1cc-4871-94fb-e43f63cfe3dd/assets/Oshkosh_AR21_update_35243.pdf?disposition=inline (same) (last visited March 23, 2026); REV Group, Inc. Reports Strong Fiscal 2023 Fourth Quarter and Full Year Results, Provides Fiscal 2024 Full Year Guidance, REV Group (Dec. 13, 2023), https://investors.revgroup.com/investor-releases/2023/12-13-2023-120038628 (same but for 2023) (last visited March 23, 2026); Oshkosh 2024 Annual Report, https://www.investors.oshkoshcorp.com/media/document/cdffc8d8-7620-48f8-9d1a-b5430d2b7d47/assets/2024_Oshkosh_Annual_Report_web.pdf?disposition=inline (same) (last visited March 23, 2026).

[78] *Mission*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/mission/ (last visited March 23, 2026).

[79] Meeting Minutes Fire Apparatus Manufacturers' Association Spring Membership Business Meeting, FIRE APPARATUS MFRS. ASS'N, 2, https://www.fama.org/wp-content/uploads/2023/02/1677348633_63fa4f190edd4.pdf (last visited March 23, 2026).

[80] *Members List*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list (last visited Aug. 15, 2025).

Manufacturer Defendants to enable an information exchange through statistical reports and by organizing twice-yearly in-person meetings.

### 1. FAMA statistical reports and industry updates.

113. FAMA describes access to competitors' data as "one of the most valuable reasons" for companies to join the organization. At one of its members-only meetings, a FAMA board member delivering a report on behalf of the board stated: "[W]e need to understand why companies join FAMA today."[81] The board member then proceeded to list four "primary reasons and key deliverables of FAMA"—the first on that list was "statistics."[82]

### a. The Data & Research Committee.

114. FAMA has an entire committee, the Data & Research Committee, dedicated to enabling this data exchange. FAMA describes the Data & Research Committee's mission as helping to "strengthen FAMA member companies by providing actionable data," including economic data, "for strategic business planning."[83] The Committee is tasked with "collect[ing] and distribut[ing] data regarding apparatus sales and orders" and distributing it on at least a quarterly basis.[84]

115. Since 2021, the Data & Research Committee has been led by employees of the Manufacturer Defendants. John Schultz, the current Vice Chair of the Committee, works as a Vice President for Pierce—the primary subsidiary for Defendant Oshkosh. For the last four

---

[81] Meeting Minutes Fire Apparatus Manufacturers' Association Spring Membership Business Meeting, Fire Apparatus Mfrs. Ass'n, 2, https://www.fama.org/wp-content/uploads/2023/02/1677348633_63fa4f190edd4.pdf (last visited March 23, 2026).

[82] *Id.*

[83] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).

[84] *Id.*

011328-11/3505766 V1

years, Shultz has served as chairperson of the Data & Research Committee. Prior to this, the Committee was chaired by Mike Schoenberger, Director of Dealer Development for Defendant Rosenbauer. The same trend can be observed with FAMA's Board of Directors; since 2009, the following Manufacturer Defendants' employees have sat on the FAMA Board of Directors: Harold Boer, Rosenbauer; John E. Sztykiel, Spartan; Mike Power, Pierce; Phil Gerace, KME; Mike Schoenberger, Rosenbauer; Michael Moore, Pierce; John Slawson, Spartan; Jeromie Johnston, Pierce; Bert McCutcheon, Ferrara; and Gary Pacilio, E-ONE.

### b. Defendants share competitively sensitive and thorough information through FAMA.

116. The Data & Research Committee maintains a digital data portal through which apparatus manufacturers enter economic data. That data is sent to an accounting firm, which compiles the data and returns it to the Data & Research Committee. The Committee then uploads the data onto the FAMA website for the members to access.

117. Some of the types of competitively sensitive data that FAMA collects from its members and then shares are sales and shipments data.

118. The data shared through FAMA is granular. Members submit the units sold by type of apparatus and price to FAMA on a quarterly basis. Members can then view the submitted data, which includes the state where the sale occurred, and deduce the amount of apparatus other manufacturers are making and selling. FAMA even guides members on how to derive their own market share from FAMA data on the website (*see Image 3*).[85]

---

[85] 2022 Spring Meeting, FIRE APPARATUS MFRS. ASS'N, 120, https://www.fama.org/wp-content/uploads/2022/03/1646772096_6227bf80d4238.pdf (last visited March 23, 2026).

011328-11/3505766 V1



*Image 3: FAMA Presentation showing members how to calculate market share from the*

*information available in FAMA's online portal*

The FAMA portal also shows pricing information for Fire Apparatus sold by members (*see*

*Image 4*).



011328-11/3505766 V1

**Image 4: FAMA online data portal displaying data for Fire Apparatus booked, including price, country, chassis type, pump type, and more (close-up versions below).[86]**

| Vehicle Classification | Country | | | Chassis | | | | Pump |
|---|---|---|---|---|---|---|---|---|
| | Canada | United States | Other | Commercial Hi Torque Trans (1251+ Ft/Lbs) | Commercial Lo Torque Trans (0-1250 Ft/Lbs) | Custom Hi Torque Trans (1251+ Ft/Lbs) | Custom Lo Torque Trans (0-1250 Ft/Lbs) | Mid | Rear | Fr |
| Aerial Ladder waterway 0-94 Mid. | 0 | 21 | 0 | 0 | 0 | 21 | 0 | 14 | 0 | |

| | Pump Type | | | | Axle | | Foam | | | | Foam Type | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| None | Up To 1000 Gpm | 1250 To 1750 Gpm | 2000 + Gpm | None | Single | Tandem | Class A | Class B | Class A And B | Compressed Air | None | Automatic | Manual | None | Number Reporte |
| 7 | 0 | 10 | 4 | 7 | 13 | 8 | 4 | 0 | 1 | 0 | 16 | 3 | 2 | 16 | |

| | Foam Type | | | Totals | | |
|---|---|---|---|---|---|---|
| e | Automatic | Manual | None | Number Of Trucks Reported With Sales Price | Average | Total |
| | 3 | 2 | 16 | 14 | 911034.97 | 12754489.53 |
| | 19 | 5 | 41 | 11 | 895196.74 | 9847164.14 |

119. As soon as 2010, FAMA's statistics committee reported to members that "they will be collecting selling price information for future reports" to member companies.[87]

120. The data shared through FAMA is also contemporaneous and can be indexed based on time. Indeed, in a 2013 FAMA Newsletter, the then-president of FAMA instructed

---

[86] 2022 Spring Meeting, FIRE APPARATUS MFRS. ASS'N, 118, https://www.fama.org/wp-content/uploads/2022/03/1646772096_6227bf80d4238.pdf (last visited March 23, 2026).

[87] FAMA Flyer Stoking the Fire Together, FIRE APPARATUS MFRS. ASS'N, 5, https://www.fama.org/wp-content/uploads/2015/09/1442838951_55fff9a76a7cb.pdf (last visited March 23, 2026).

011328-11/3505766 V1

members that "[i]t is very important that apparatus manufacturers report as quickly as possible so that we can get these timely reports. This allows all of us to react and adjust to market conditions."[88] That newsletter was titled "A Rising Tide Lifts All Boats."

121. Not just anyone can access FAMA's data, however. "FAMA does not release this information to the public."[89] Instead, the data is uploaded onto a secure portion of the FAMA website that FAMA describes as a "members-only section."[90] "Only those companies that participate in the statistical studies and members are privy to these reports."[91]

122. In addition to the data portal, FAMA provides valuable information to members in the form of confidential industry updates.[92] These updates are created from FAMA data

---

[88] *FAMAflyer A rising tide lifts all boats*, FIRE APPARATUS MFRS. ASS'N, 2, https://www.fama.org/wp-content/uploads/2015/09/1442788119_55ff33177212f.pdf (last visited March 23, 2026).

[89] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).

[90] FIRE APPARATUS MFRS. ASS'N, WHY JOIN FAMA, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Aug. 15, 2025).

[91] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join; https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data (last visited Aug. 15, 2025).

[92] *The Fire Apparatus Industry: An Update (Report V3)*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/wp-content/uploads/2020/06/1592318495_5ee8da1fc8b1e.pdf (last visited March 23, 2026); *The Fire Apparatus Industry: An Update (Report V4) April 2021*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/wp-content/uploads/2021/04/1619117458_6081c5920c940.pdf (last visited March 23, 2026); *The Fire Apparatus Industry: An Update (Report V4 Abridged) April 2021*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/wp-content/uploads/2021/04/1619117536_6081c5e08de0d.pdf (last visited March 23, 2026).

provided by FAMA members.[93] Similar to the portal, FAMA updates include member data on the number of Fire Apparatus units booked, sorted by year, state, type of apparatus.[94]

123. These updates also include results from long-term questions signaling FAMA members' intent on pricing and output decisions. For example, an update reported that, "by a ratio exceeding 12 to 1," FAMA member respondents "expect to be able to sustain some upward pressure on prices charged" over the next six months.[95] The results of that survey also distinguished between expectations that orders, sales, and sales volume would increase "[s]ignficantly" or "[s]lightly" (*see Image 5*, below).[96]

---

[93] *The Fire Apparatus Industry: An Update (Report V4) April 2021*, FIRE APPARATUS MFRS. ASS'N, 5, 20-22, https://www.fama.org/wp-content/uploads/2021/04/1619117458_6081c5920c940.pdf (last visited March 23, 2026); *The Fire Apparatus Industry: An Update (Report V3)*, Fire Apparatus Mfrs. Ass'n, 4, https://www.fama.org/wp-content/uploads/2020/06/1592318495_5ee8da1fc8b1e.pdf (last visited March 23, 2026).

[94] *The Fire Apparatus Industry: An Update (Report V3)*, FIRE APPARATUS MFRS. ASS'N, 12, 15, https://www.fama.org/wp-content/uploads/2020/06/1592318495_5ee8da1fc8b1e.pdf (last visited March 23, 2026).

[95] *The Fire Apparatus Industry: An Update (Report V4) April 2021*, Fire Apparatus Mfrs. Ass'n, 22, https://www.fama.org/wp-content/uploads/2021/04/1619117458_6081c5920c940.pdf (last visited March 23, 2026).

[96] *Id.*

011328-11/3505766 V1

Exhibit 13. FAMA Member Confidence Index

|  | Orders | Sales | Sales Prices |
|---|---|---|---|
| Index Reading | | | |
|  | 54.9 | 55.2 | 66.2 |
| Expectations | | | |
| Increase Significantly | 7.8% | 6.5% | 7.8% |
| Increase Slightly | 36.4% | 37.7% | 55.8% |
| No Change | 27.3% | 28.6% | 31.2% |
| Decrease Slightly | 24.7% | 24.7% | 3.9% |
| Decrease Significantly | 3.9% | 2.6% | 1.3% |

Source: Sage; FAMA

***Image 5: Table from FAMA Industry Update showing pricing and output trend expectations among FAMA members.[97] "Sage" (Sage Policy Group, Inc.) is the firm contracted by FAMA to produce the update.[98]***

124. FAMA's updates also reported on members' current factory utilization (almost three-quarters of respondents indicated that their factories were not at full utilization),[99] "how many employees at their company were involved in fire apparatus or equipment manufacturing,"[100] whether they expected industry consolidation to increase or decrease,[101] and more.

---

[97] *Id.*

[98] *Id.* at 5.

[99] *See id.* at 18.

[100] *Id.* at 20.

[101] *Id.* at 21.

011328-11/3505766 V1

125. These updates also included considerable consumer-side data, such as data on the age of fire departments' fleets.[102]

126. Accordingly, not only could FAMA members likely discern their competitors' pricing and output from the data available within their FAMA portals, but they could be reassured not to deviate from price increases or output restraints using these updates.

127. Indeed, FAMA's own members attest to the competitive usefulness of this data. When asked to rate on a scale of 1-10 how "valuable" FAMA's data was, over eighty percent of members gave ratings of 7-10.[103] Thirty percent gave a perfect rating.[104] FAMA also asked its members to rate 1-10 "how actionable is the statistics data available today."[105] Over sixty-five percent gave ratings of 7-10.[106] Only under eight percent of all respondents rated the actionability of the data under 5.[107]

128. And, in a newsletter jointly issued with FAMA, a Fire and Emergency Manufacturers and Services Association ("FEMSA") board member lauded FAMA's detailed information and usefulness: "FAMA has been compiling detailed statistics for apparatus and pumps for nearly 50 years. Not only do they track quarterly shipments (sales), but they also keep a pulse on the new order activity which is equally as important. The quarterly FAMA results are

---

[102] *The Fire Apparatus Industry: An Update (Report V3)*, FIRE APPARATUS MFRS. ASS'N, 20, https://www.fama.org/wp-content/uploads/2020/06/1592318495_5ee8da1fc8b1e.pdf (last visited March 23, 2026).

[103] *See* Meeting Minutes Fire Apparatus Manufacturers' Association Spring Membership Business Meeting, Fire Apparatus Mfrs. Ass'n, 3, https://www.fama.org/wp-content/uploads/2023/02/1677348633_63fa4f190edd4.pdf (last visited March 23, 2026).

[104] *See id.*

[105] *Id.*

[106] *See id.*

[107] *See id.*

talked about in our industry more than ever these days. Many members use this information as the definitive benchmark . . . . Based on these reports, if your company's numbers are good, you will mention that you are doing better than the market. And if not, you have a crutch to fall back on by noting that 'everyone' was off."[108] FEMSA added that it would follow FAMA's example in providing information to its members.[109]

### c. FAMA's data is confidential and kept to its members, which include Defendants.

129. FAMA imposes strict limits on who can become a member, and consequently, who has access to its reports and data. To join FAMA, an entity must (a) be "engaged in the manufacture of fire fighting or fire protection apparatus, including rescue vehicles," or (b) "manufacture components or products which are incorporated by the manufacturer as a permanent part of the completed fire apparatus . . . such as chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices, apparatus valves and other water control appliances."[110] Notably, fire departments, municipalities, and other buyers of Fire Apparatus are *not* eligible to join FAMA under this definition. Such entities—apparatus manufacturers' customers—are denied access to the data that manufacturers exchange among themselves.

130. Even among its members, FAMA further restricts data access to those companies that provide their own data, in a give-data-to-get-data scheme. FAMA states data access "may be denied" to any company "that was given the opportunity to participate in the program but

---

[108] *FAMA FEMSA news Elevating Effectiveness*, FIRE APPARATUS MFRS. ASS'N, 3, https://www.fama.org/wp-content/uploads/2015/09/1442788434_55ff3452210ac.pdf (last visited March 23, 2026).

[109] *Id.*

[110] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Aug. 15, 2025).

011328-11/3505766 V1

refused."[111] Data may also be denied to any company "that does not agree in advance of participation to keep the results confidential."[112] Participating in the information exchange scheme, then is crucial, because without participation, FAMA members could not determine their competitor's supply, pricing, and their own market share.

131.    FAMA itself acknowledges how necessary membership is to compete, noting that it is the only source for non-public competitive information in the Fire Apparatus market.



**INDUSTRY STATISTICS**

FAMA is the ONLY source for accurate fire service statistics provided quarterly and summarized at year end. Only FAMA members are privy to these reports since they are not released to the public. Members find this research invaluable for their internal business purposes regarding apparatus purchases by state, product category, pump type and more.

*Image 6: Section of a flyer titled "Why Join FAMA?"[113]*

---

[111] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).

[112] *Id.*

[113] FIRE APPARATUS MFRS. ASS'N, WHY JOIN FAMA, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Aug. 15, 2025).

011328-11/3505766 V1

### 2. FAMA meetings.

132. In addition to providing economic data to their members, FAMA also organizes twice-yearly meetings, in the spring and the fall, to "provide a forum [for members] to share information."[114]

133. At these meetings, attendees, including direct competitors, listen to presentations that include economic forecasts regarding the Fire Apparatus manufacturing market.



*Image 7: Anirban Basu, Chairman & CEO of the Sage Policy Group, presenting an economic forecast at a FAMA gathering.[115]*

134. Attendees also engage in "purchasing roundtables" and FAMA members-only meetings and discussion groups.

---

[114] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Aug. 15, 2025).

[115] Fire Apparatus Mfrs. Ass'n, *FAMA Membership Meetings*, YOUTUBE.COM (Feb. 26, 2016), https://www.youtube.com/watch?v=dbdjUvqfFAw (last visited Aug. 15, 2025).

011328-11/3505766 V1



*Image 8: FAMA Purchasing Roundtable[116]*



*Image 9: Rosenbauer employees attending a FAMA meeting[117]*

---

[116] *Id.*

[117] *Id.*

011328-11/3505766 V1



*Image 10: FAMA members-only meeting[118]*



*Image 11: FAMA discussion group[119]*

---

[118] *Id.*

[119] *Id.*

011328-11/3505766 V1



*Image 12: FAMA discussion group[120]*

135. Manufacturer Defendants had ample time and opportunity to exchange sensitive economic information and coordinate supply restrictions and price hikes at these meetings. FAMA advertises these "networking" events as one of the reasons to join FAMA.



**NETWORKING**

FAMA's spring and fall meetings provide a great opportunity to network with industry professionals. The meetings also keep members up-to-date with new information, allow for group formulations of organizational goals and provide a forum to share information.

*Image 13: Section of a flyer titled "Why Join FAMA?"[121]*

---

[120] *Id.*

[121] Fire Apparatus Mfrs. Ass'n, Why Join FAMA, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Aug. 15, 2025).

011328-11/3505766 V1

136. In addition to the statistical reports and twice-yearly in-person meetings, FAMA "communicates with its members on a regular basis via emails, its website and an extensive FAMA newsletter."[122] These missives offered another avenue for communication and coordination among Manufacturer Defendants.

**E.     The Conspiracy Enabled Defendants to Suppress Supply and Raise Prices of Fire Apparatus in Parallel During the Class Period.**

**1.     Manufacturer Defendants' backlogs soared in parallel during the Class Period.**

137. Demand for Fire Apparatus picked up in the mid-2010s as the economy rebounded after the Great Recession, increasing steadily until approximately 2020. Between 2020 and 2022, the number of Fire Apparatus orders spiked as municipal coffers became flush with COVID relief funds. Since about 2022, order activity has hovered between 5,500 and 6,500 trucks per year.

138. Manufacturer Defendants' production has not kept pace with this increased demand. Particularly within the last few years, Manufacturer Defendants' order backlogs have ballooned in parallel.

139. For example, before 2020, REV Group had a backlog of roughly $1 billion worth of fire department orders.[123] In 2021, that backlog had increased to $1.499 billion, a 55.2 percent increase from 2020.[124] In 2022, the backlog increased again to $2.589 billion, a 72.8 percent

---

[122] *Id.*

[123] REV Group 2019 Annual Report, https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2019.pdf (last visited March 23, 2026).

[124] REV Group 2021 Annual Report, https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/revg-annual-report-2021.pdf (last visited March 23, 2026).

011328-11/3505766 V1

increase from 2021.[125] By 2023, REV Group reported a record $3.65 billion backlog, a 41

percent increase over 2022.[126] REV Group's backlog increased again in 2024. As of October

2024, REV Group had a $4.4 billion backlog on fire and emergency vehicle orders in the United

States.[127]

140. Before 2020, Oshkosh similarly had a backlog of approximately $1 billion for its

fire and emergency segment.[128] In 2021, that backlog increased to $1.39 billion, a 27.6 percent

increase from 2020.[129] In 2022, the backlog increased again to $2.9 billion, a 85.4 percent

increase from 2021.[130] By 2023, that backlog was up to $4.0 billion, a 42.1 percent increase from

2022.[131]

141. In a 2020 earnings call, when it was reported that Pierce had a "record backlog of

more than $1.3 billion," Oshkosh replied that "it puts us in a strong position and provides

[125] REV Group 2022 Annual Report, https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/revg-2022-annual-report.pdf (last visited March 23, 2026).

[126] Reuters, *Fire Truck Boom Highlights Divide in US Manufacturing*, U.S. NEWS (Jan. 19, 2024), https://money.usnews.com/investing/news/articles/2024-01-19/fire-truck-boom-highlights-divide-in-us-manufacturing (last visited Aug. 15, 2025).

[127] Rev Group, Inc. SEC Form 10K (Oct. 31, 2024), https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm (last visited Aug. 15, 2025).

[128] Oshkosh 2019 Annual Report, https://www.investors.oshkoshcorp.com/media/document/96a3d771-f1f2-480b-8f7a-b8a220a1231e/assets/Oshkosh_2019AR_10K_34031.pdf?disposition=inline (last visited March 23, 2026).

[129] Oshkosh 2021 Annual Report, https://www.investors.oshkoshcorp.com/media/document/22f86d57-d1cc-4871-94fb-e43f63cfe3dd/assets/Oshkosh_AR21_update_35243.pdf?disposition=inline (last visited March 23, 2026).

[130] REV Group 2022 Annual Report, https://www.investors.oshkoshcorp.com/media/document/6dfcbf22-9d70-4ba8-8571-21fb66f7df75/assets/oshkosh_ar22_35748.2.pdf?disposition=inline (last visited March 23, 2026).

[131] Oshkosh 2023 Annual Report, https://www.investors.oshkoshcorp.com/media/document/6ca5f796-6438-464e-b753-e69cf8085767/assets/2023%20Oshkosh%20Corporation%20Annual%20Report.pdf?disposition=inline (last visited March 23, 2026).

011328-11/3505766 V1

visibility well into 2021." As the backlog continued increasing, reaching as high as $5.67 billion in 2024, Oshkosh viewed this favorably remarking it provides "strong visibility over horizon."

142. Rosenbauer's backlogs have also substantially increased. Before 2020, Rosenbauer reported a €355.4 million backlog for its Americas region.[132] In 2022, the backlog had increased to €560.1 million, a 56.6 percent increase from 2021.[133] By 2023, its backlog was €725.0, a 25.8 percent increase from 2022.[134] And by 2024, Rosenbauer's backlog soared again to €989.8 million, a 31.6 percent increase from 2023.[135] That same year, in 2024, Rosenbauer stated that "prices have improved due to price increases in manufacturers' order backlogs."[136]Increased backlogs have translated to substantial delays prior to delivery of new Fire Apparatus. Wait times in some areas have more than quadrupled, from 1 year to 4.5 years.[137] An individual going by the username "Capttomo" complained in an online forum in January 2023 that "lead times for delivery from date the order is placed to final inspection has gone from 10-12 months to greater than 2 years in many cases and in some cases approaching 3 years."[138]

---

[132] Rosenbauer 2021 Annual Report, https://bericht.rosenbauer.com/2021/wp-content/uploads/Rosenbauer_Annual_Report_2021.pdf (last visited March 23, 2026).

[133] Rosenbauer 2024 Annual Report, https://bericht.rosenbauer.com/2024/wp-content/uploads/RB_Annual_Report_2024.pdf (last visited March 23, 2026).

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

[138] *Skyrocketing Apparatus Costs and Outrageous Delivery Times*, NYCFIRE.NET, https://www.nycfire.net/forums/threads/skyrocketing-apparatus-costs-and-outrageous-delivery-times.75187 (last visited Aug. 15, 2025).

011328-11/3505766 V1

Another user noted that a REV Group dealer "added 15 months to the delivery time" for a Fire Apparatus.[139] A third reported an estimated delivery time of 48 months from a Pierce dealer for "a very cookie cutter" truck "without any interior customization."[140] And yet another described a 435 day waiting period for a single component of a Rosenbauer truck, with full wait times up to 3 years.[141]



*Image 14: Forum comment by Capttomo regarding state of the Fire Apparatus industry.[142]*



*Image 15: Forum comment by Sfdc111 regarding state of the Fire Apparatus industry.[143]*



*Image 16: Forum comment by CFDMarshal regarding state of the Fire Apparatus industry.[144]*

---

[139] *Id.*

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] *Id.*

[144] *Id.*

011328-11/3505766 V1

143. As another example, Sue Finkam, the mayor of Carmel, Indiana, said her city was growing and needed to add more fire stations. But as matters stand now, the city expects to be able to acquire land, design a fire station, construct the building, hire firefighters and train them, while still waiting for the station's Fire Apparatus to be delivered.[145]

144. The data bears out these anecdotes. While orders spiked to 45 percent above average levels, order fulfillment dropped nearly 10 percent below average levels in 2022, as illustrated in the graph below.



*Image 17: North America Fire Apparatus Trend.[146]*

[145] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Aug. 15, 2025).

[146] *FAMA Releases Fire Apparatus Industry Update*, FIRE ENGINEERING (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update (last visited Aug. 15, 2025).

145.    While the rate of order fulfillment has ticked up again in recent years, that increase has not been nearly enough to dent the serious backlog.

146.    In addition to delays for new Fire Apparatus, delays have also increased for replacement part orders. Gil Carpenter, a fire chief in Benton, Arkansas, explained that prior to REV Group rolling up Ferrara, he would call a contact named Charlie whenever he needed a Ferrara replacement part. Charlie would ship him the part the next day. But in 2024, when one of the department's vehicles needed new parts, delivery was delayed for more than 10 months. Mr. Carpenter's fire department was left without one of its eight trucks for nearly a year.[147]

147.    These backlogs cannot be explained by supply chain disruptions in the wake of the COVID-19 pandemic or other geopolitical events of the early 2020s. Although supply chain issues plagued industries across the United States in 2021 and 2022, the Federal Reserve Bank of New York's Global Supply Chain Pressure Index returned to baseline by early 2023, hitting its lowest point on record in May 2023.[148]

---

[147] Baker, Farrell & Kovaleski, *supra* note 43; *see also* Fire Apparatus & Emergency Equipment Staff, *REV Group Fire Division Launches New E-Commerce Website for Fire Truck Aftermarket Parts Sales and Service*, FIRE APPARATUS & EMERGENCY EQUIPMENT (July 29, 2019), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-fire-division-launches-new-ecommerce-website-for-fire-truck-aftermarket-parts-sales-and-se (last visited Aug. 15, 2025).

[148] Diccon Hyatt, *Supply Chains Have Healed From Pandemic Disruptions*, INVESTOPEDIA (June 7, 2023), https://www.investopedia.com/supply-chains-have-healed-from-pandemic-disruptions-7509263 (last visited Aug. 15, 2025).

011328-11/3505766 V1



*Image 18: Global Supply Chain Pressure Index from June 30, 2017 to June 30, 2025.*[149]

### 2. Despite increasing demand, Manufacturing Defendants decided against increasing their manufacturing capacity.

148. In the face of increasing demand, Manufacturer Defendants have failed to increase capacity and in some cases, have shuttered manufacturing facilities, worsening the Fire Apparatus shortage. This is inconsistent with a market operating free from collusion.

149. Under typical market conditions, such a significant surge in demand would be met with a corresponding increase in manufacturing capacity. But no such manufacturing capacity increase has materialized. REV Group has recently spent only a small portion of its revenue— about 1 percent—on upgrading its buildings and equipment. Alexander Yaggy, a former investor in REV Group's stock, called this minimal investment in the face of significant industry backlogs "reflective of an uncompetitive market."[150] And neither Oshkosh nor Rosenbauer have attempted to meet this surge in demand or capture market share by ramping up their production.

150. Not only have Manufacturer Defendants failed to add manufacturing capacity, in some cases they have in fact *shuttered* existing plants. In September of 2021, REV Group shut

---

[149] *Global Supply Chain Pressure Index (GSCPI)*, FED. RESERVE BANK OF N.Y. (July 2025), https://www.newyorkfed.org/research/policy/gscpi#/interactive (last visited Aug. 15, 2025).

[150] Baker, Farrell & Kovaleski, *supra* note 43.

down two KME custom Fire Apparatus manufacturing facilities in Pennsylvania and Virginia.[151] The closure cut the company's manufacturing footprint by roughly one third.[152]

151. During the September 2025 Senate Subcommittee Hearing, President of REV Specialty Group Mike Virnig admitted that following the acquisition of KME manufacturing operations were consolidated, and with consolidation came "[r]educed production of KME trucks and resulting delayed deliveries." These delays were felt by real departments at the receiving end.

152. In a press release, REV Group stated that orders currently in progress at the two KME facilities would be transferred to other REV Group manufacturing plants.[153] The process, unsurprisingly, resulted in additional, substantial delays. Matthew R. Timerman, a fire chief whose department had ordered a $1.2 million ladder truck from REV Group slated to be completed at the KME Pennsylvania plant, discovered the truck would instead be assembled at three different manufacturing sites, resulting in additional delays.[154] Eventually, Mr. Timerman received his truck more than *four years* after his department first placed the order.[155]

153. Despite these record-setting backlogs, the Manufacturer Defendants appear unconcerned that their customers might cancel orders or that a competitor might steal their

---

[151] Chris Reber, *KME Plant to Close in April 2022*, TIMES NEWS ONLINE, (Sept. 11, 2021), https://www.tnonline.com/20210911/kme-plant-to-close-in-april-2022 (last visited Aug. 15, 2025).

[152] Baker, Farrell & Kovaleski, *supra* note 43.

[153] Andrew Corselli, *REV Group Announces Plans to Shift KME Production to Other REV Fire Group Facilities*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 10, 2021), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-announces-plans-to-shift-kme-production-to-other-rev-fire-group-facilitie (last visited Aug. 15, 2025).

[154] Baker, Farrell & Kovaleski, *supra* note 43.

[155] *Id.*

business.[156] Mark Skonieczny, REV Group's current chief executive, explained during a 2023 conference call that the company did not expect the delays to cause cancellations because once a city sets aside the money, it is "earmarked" and REV Group gets a deposit. "That money is allocated to those units, so we feel good about that."[157] Skonieczny further commented, "I don't think it's impacting our market share."[158] According to REV Group's SEC reports, the company considers its backlog to *enhance* its value to shareholders by giving the company "strong visibility into future net sales."[159]

### 3. The price of Fire Apparatus doubled during the Class Period.

154. Unsurprisingly, given growing demand and flat or declining supply, the cost of Fire Apparatus has soared. In the mid-2010s, a standard pumper truck cost approximately $300,000 to $500,000.[160] Within the last few years, prices have increased to an average of $1 million per pumper truck.[161] Similarly, ladder trucks that cost $750,000 to $900,000 in the mid-

---

[156] Musharbash, *supra* note 14.

[157] Baker, Farrell & Kovaleski, *supra* note 43.

[158] Eman Abu-Khaled, *REV Group Takes Steps to Normalcy After Supply-Chain Setbacks*, TRAILER BODY BUILDERS (Mar. 22, 2023), https://www.trailer-bodybuilders.com/truck-bodies/article/21262503/rev-group-takes-steps-to-normalcy-after-supply-chain-setbacks (last visited Aug. 15, 2025).

[159] Musharbash, *supra* note 14.

[160] *Id.*; CHRIS GODFREY, AN EVALUATION OF FIRE APPARATUS USAGE AND OPERATING COST FOR GREEN TOWNSHIP FIRE & EMS at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188 (last visited Aug. 15, 2025); Patrick Varine, *Despite Grant, PA Dept. Says Rising Apparatus Costs a Challenge*, FIREHOUSE (Aug. 3, 2023), https://www.firehouse.com/apparatus/news/53068052/despite-fire-act-grant-export-pa-fire-department-says-rising-fire-apparatus-costs-a-challenge ("'In 1994, we brought a new KME front-line pumper truck in for $200,000,' Export fire Chief and Councilman David Silvis said. 'Today, we're probably between $800,000 and $900,000 to fund this new truck.'") (last visited Aug. 15, 2025).

[161] Musharbash, *supra* note 14.

011328-11/3505766 V1

2010s cost upward of $2 million today.[162] An industry leader commented that the industry has "reached a new level of price psychology. Today, relationships start at a half million dollars, and 10 years ago that was a remote concept."[163]

155. Mini pumper trucks have also experienced an unprecedented price hike. On an online forum regarding the price of Fire Apparatus, one user commented the following in April 2025:

> My department was looking into replacing our 30 year old second due engine with a quick attack mini pumper which would work great for our service area. It's basically a Ford F350 crew cab with a pump, tank, and box on it. When we first priced it 2 years ago, the price tag was $350k. We didn't get the grant so we priced it again the following year to try for the grant again and the price shot up to $500k in just a years time. A small rural department simply doesn't have the money to purchase trucks at these prices.

156. Another user commented:

> The department I volunteer is a smaller department in Iowa. We run about 225 calls. We recently signed a contract for a new engine that won't get delivered until 2029. The cost of that truck was 1.2 million. We ordered a new engine in 2016, which is basically a twin to our newly ordered truck. Cost on it was $450,000 and took 16 months to get.

157. Seeking out competition is not a viable option for customers looking to get a better deal on Fire Apparatus. As one industry executive has observed, "[t]here are now times

---

[162] CHRIS GODFREY, AN EVALUATION OF FIRE APPARATUS USAGE AND OPERATING COST FOR GREEN TOWNSHIP FIRE & EMS at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188 (last visited Aug. 15, 2025); Baker, Farrell & Kovaleski, *supra* note 43; Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025); Musharbash, *supra* note 14.

[163] Chris Mc Loone, *Fire Industry Outlook: 10 Years After the Great Recession*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 1, 2018), https://www.fireapparatusmagazine.com/fire-apparatus/fire-industry-outlook-10-years-after-the-great-recession (last visited Aug. 15, 2025).

011328-11/3505766 V1

when all vendors at a bid table, each with a 'different' product, are all owned and managed by the same parent company. How is that competitive for the purchaser?"[164] Fire departments across the country have little alternative than to pay the exorbitant prices Manufacturer Defendants are charging for their Fire Apparatus.

> **4. Manufacturer Defendants used "floating prices" during the class period to charge even more for Fire Apparatus.**

158. On top of already high base prices for new Fire Apparatus, REV Group, Oshkosh, and Rosenbauer have relied on the significant industry backlog to justify imposing "floating prices" on their customers. Using the purported difficulty of projecting material costs over a years-long lead time as an excuse, Manufacturer Defendants have added price clauses to their contracts that allow Manufacturer Defendants to increase the final price of a Fire Apparatus *after* it goes into production. Due to production delays, this means Manufacturer Defendants can increase their prices years after a fire department initially orders a truck.[165] Mark Fusco, the president of Rosenbauer, has conceded that his company imposes "surcharges that might occur during the build times" on Rosenbauer customers.[166]

159. Jason Shivers, chair of the International Association of Fire Chief's ("IAFC") Emergency Vehicle Management Section, submitted testimony for the September 2025 Senate Subcommittee Hearing, stating that "[i]n some cases, fire departments are being asked to pay

---

[164] Musharbash, *supra* note 14.

[165] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing (last visited Aug. 15, 2025).

[166] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 20, 2022), https://www.fireapparatusmagazine .com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (last visited Aug. 15, 2025).

011328-11/3505766 V1

deposits for vehicles and then have to pay unbudgeted additional costs over the time period for construction and delivery of the apparatus."

160. Edward Kelly, General President of the International Association of Firefighters (IAFF), refers to floating prices as "the real crime" because the backlogs are created artificially by these companies. Kelly explained during the September 2025 Senate Subcommittee Hearing that "'floating prices' ha[ve] added even more instability to apparatus procurement by allowing manufacturers to arbitrarily raise prices of a vehicle before delivery…Floating prices are even more troubling when considering that the very backlogs created by consolidation are being then used to justify these mid-contract hikes." Further, for some municipalities, Fire Apparatus "spending must compete with other important and necessary municipal expenditures."

161. At the Senate Subcommittee Hearing, Jason Shivers, the chair of the Emergency Vehicle Management Section of the International Association of Fire Chiefs, testified that "in some cases, fire departments are being asked to pay deposits for vehicles and then have to pay unbudgeted additional costs over the time period for construction and delivery of the apparatus."

162. One fire department in Massachusetts ordered a Fire Apparatus in 2022 and then added two more to their original order in 2023. After the second order, the Fire Apparatus manufacturer increased the price of the apparatus ordered in 2022 by $150,000 to match the price of the apparatuses ordered in 2023. The manufacturer threatened not to deliver the apparatus ordered in 2022 unless the fire department agreed to the price increase. The fire chief felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."[167]

---

[167] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing (last visited Aug. 15, 2025).

011328-11/3505766 V1

163. As another example, a fire department in Indiana was hit with a more than $100,000 price increase for the same pumper apparatus after a 7-month delay.[168] And in yet a third example, the Loveland Fire Rescue Authority in Colorado experienced a surcharge of $29,000 on a pending order.[169]

**F. Defendants' Conspiracy Had the Intended Effect of Increasing Each Manufacturers' Prices, Leading to Historic Profit Margins and Revenues.**

164. Manufacturer Defendants have reaped the profits of these price increases. In July 2021, REV Group announced that it had "[e]xceeded consensus earnings estimates for five consecutive quarters."[170] In 2024, REV Group's profit margins jumped to what the company described as an "exceptional 8.9 percent" for the division that includes Fire Apparatus.[171]

165. In June 2025, Oshkosh stated that its adjusted operating margins had grown from 4.8 percent to 10.5 percent from 2022 to 2024, delivering on "key 2022 Investor Day targets one year early."[172]

---

[168] *Id.*

[169] *"Floating" Prices & Lengthy Delivery Times for Fire Apparatus CSFC Members' Perspective*, at 1 (Aug. 25, 2022), https://static1.squarespace.com/static/5ea64a6b9614427 b0ff93e6d/t/63080a517f782438bdd6f98e/1661471313934/Floating+Prices+Lenghty+Delivery+ Time+for+Fire+Apparatus+Aug+25+2022%5B42%5D.pdf (last visited Aug. 15, 2025).

[170] *REV Group, Inc. Presentation*, REV GROUP at 4 (July 2021), https://investors.revgroup .com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Aug. 15, 2025).

[171] Baker, Farrell & Kovaleski, *supra* note 43.

[172] OSHKOSH, INVESTOR DAY at 83 (June 5, 2025), https://online.flippingbook.com/view/ 29819025/3 (last visited Aug. 15, 2025).

011328-11/3505766 V1



*Image 19: Oshkosh's financial performance, 2022 to 2024.[173]*

166. Oshkosh anticipates its adjusted operating margins will grow to 12 or 14 percent by 2028, with revenue of $13-14 billion.[174] According to the company, that revenue growth will be "supported by strong backlog" and price increases.[175]

167. With a few exceptions during the pandemic years, overall revenues for Fire Apparatus manufacturers in the U.S., including Manufacturer Defendants, have increased significantly since 2015.

---

[173] *Id.*

[174] *Id.* at 86.

[175] *Id.* at 87.

011328-11/3505766 V1



2012     2016     2020     2024

Category

● Annual Revenue ($bn)
● Change (%)

***Image 20: Fire Apparatus Manufacturing Revenue in the United States.[176]***

168. The REV Group substantially increased prices as evidenced by their massive increase in sales revenues. In 2021, the net sales from REV Group's fire and emergency segment were $1.125 billion.[177] When commenting on its net sales for that year, REV Group noted that it had "strong price realization" in that segment.[178] REV Group's net sales in its fire and emergency segment continued to increase to $1.174 billion in 2023.[179] In the fourth quarter of 2023, alone, the net sales were $339.1 million, an increase of $86.1 million, from $253.0 million

---

[176] Oliwier Samorajski, *Fire Truck Manufacturing in the US – Market Research Report (2015-2030)*, IBIS WORLD (Apr. 2025), https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645 (last visited Aug. 15, 2025).

[177] REV Group 2021 Annual Report, https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/revg-annual-report-2021.pdf (last visited March 23, 2026).

[178] *Id*.

[179] REV Group 2023 Annual Report, https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2023.pdf (last visited March 23, 2026).

011328-11/3505766 V1

in the fourth quarter of 2022.[180] REV Group attributed this increase compared to the prior quarter, in part, to "price realizations."[181]

169.     Similarly, and in parallel, Oshkosh raised prices as demonstrated by their increase in sales revenues. In 2021, the net sales from Oshkosh's fire and emergency segment were $1.227 billion, a 10.8 percent  increase from 2020.[182] That same year, Oshkosh primarily attributed the increase in its gross margin from that segment to "improved pricing."[183] In 2023, Oshkosh combined its fire and emergency segment with its commercial segment to create a new vocational segment. That year, the vocational segment had net sales of $2.578 billion.[184] Oshkosh pointed to "higher pricing" as a reason for its increased net sales and again primarily attributed the increase in its gross margin to "improved pricing."[185] In 2024, when Oshkosh reported $3.31 billion in net sales for its vocational segment, it again attributed the increase in its net sales and gross margins to "improved pricing."[186]

---

[180] REV Group, Inc. Reports Strong Fiscal 2023 Fourth Quarter and Full Year Results, Provides Fiscal 2024 Full Year Guidance, REV Group (Dec. 13, 2023), https://investors .revgroup.com/investor-releases/2023/12-13-2023-120038628 (last visited March 23, 2026).

[181] *Id.*

[182] Oshkosh 2021 Annual Report, https://www.investors.oshkoshcorp.com/media/document/ 22f86d57-d1cc-4871-94fb-e43f63cfe3dd/assets/Oshkosh_AR21_update_35243.pdf?disposition= inline (last visited March 23, 2026).

[183] *Id.*

[184] Oshkosh 2023 Annual Report, https://www.investors.oshkoshcorp.com/media/document/ 6ca5f796-6438-464e-b753-e69cf8085767/assets/2023%20Oshkosh%20Corporation%20Annual %20Report.pdf?disposition=inline (last visited March 23, 2026).

[185] *Id.*

[186] Oshkosh 2024 Annual Report, https://www.investors.oshkoshcorp.com/media/ document/cdffc8d8-7620-48f8-9d1a-b5430d2b7d47/assets/2024_Oshkosh_Annual_Report_ web.pdf?disposition=inline (last visited March 23, 2026).

011328-11/3505766 V1

170. Rosenbauer similarly and in parallel to Oshkosh and REV Group raised prices as demonstrated by their historic increase in revenues. For its Americas region, Rosenbauer reported revenues of €271.5 million in 2022, €275.7 million in 2023, and €346.8 million in 2024.[187]

171. In the September 2025 Senate Subcommittee Hearing, Senator Josh Hawley said to an executive of REV Group, "Your profits have grown five times over the last five years to 250 million dollars, but nobody can get their equipment."[188] In the same hearing, Senator Hawley sharply criticized REV Group for paying dividends to investors and doing stock buybacks rather than investing in addressing the multi-billion-dollar backlog, describing their conduct as "a heist."[189] Indeed, in a 2025 earnings call, REV Group announced that given their strong financial performance, "we made the decision to repurchase approximately 2,900,000.0 shares of our common stock for $88,000,000 within the quarter."[190]

172. Significantly, the Federal Trade Commission opened an inquiry into the Fire Apparatus industry. Two of the Defendants—Pierce Manufacturing, Inc., and REV Group, LLC—are cooperating with the FTC's investigation.

---

[187] Rosenbauer 2024 Annual Report, https://bericht.rosenbauer.com/2024/wp-content/uploads/RB_Annual_Report_2024.pdf (last visited March 23, 2026).

[188] Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt., District of Columbia, and Census, 119 Cong., https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/ (last visited March 23, 2026).

[189] *See id.*

[190] REV Group Inc. R (1RG.F) Q2 FY2025 earnings call transcript, https://finance.yahoo.com/quote/1RG.F/earnings/1RG.F-Q2-2025-earnings_call-324839.html (last visited March 23, 2026).

011328-11/3505766 V1

**G.** **Market Power and Barriers to Entry.**

**1.** **Relevant markets.**

173. One tool that courts use to assess the competitive effects of concerted action is defining the relevant market. The relevant market is the zone of competition among agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). Here, the product market is all Fire Apparatus, and the geographic market is the United States.

**2.** **The product market encompasses all Fire Apparatus.**

174. This case concerns Fire Apparatus as recognized by the National Fire Protection Association ("NFPA") Standard 1900 regarding automotive Fire Apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing (together, the "Standards"). These Standards classify Fire Apparatus within the United States into seven types, all of which are at issue in this case:[191]

- **Type 1** fire trucks are often referred to as an engine company, engine pumper, or structural firefighting truck. This is the most common type of fire truck in use today. Urban, suburban, and rural fire departments all rely on Type 1 fire trucks. Type 1 fire trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. Every Type 1 fire truck is required to have a pump with a minimum tank size of 300 gallons and to be equipped with 2.5- and 1.5-inch hoses of varying lengths. These trucks must also include a full complement of ground ladders, nozzles, forcible entry equipment, rear access and

---

[191] *Types of Fire Trucks: An Overview and Comparison*, Pierce (Nov. 14, 2023), https://www.piercemfg.com/pierce/blog/types-of-fire-trucks (last visited Aug. 15, 2025).

011328-11/3505766 V1

egress, and some level of first aid equipment. They are designed to carry four firefighters.

- **Type 2** fire trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. They are most commonly used in urban and suburban settings. They typically carry three to four firefighters.

- **Type 3** fire trucks are often referred to as a wildland fire truck or a brush truck. They are typically used in rural and wildland settings. NFPA standards require a Type 3 engine to have a minimum of a 500-gallon water tank and a pump capable of a minimum of 150 US gallons per minute at a pressure of 250 pounds per square inch. Many Type 3 fire engines also feature an auxiliary pump in addition to the main water pump. The auxiliary pump can be powered by a separate diesel engine that is connected to the pump. This pump-and-roll technique means that a truck operator can drive the truck while crew members man the pump and hoses, allowing firefighters to follow along as forest fires and brush fires move with the weather, and to create fire lines, wetting down areas ahead of an advancing wildfire. Type 3 Fire Engines must be equipped to carry at least three passengers.

- **Type 4** fire trucks, like Type 3 trucks, are often used in wildland firefighting. Compared to Type 3 trucks, Type 4 trucks have a larger water tank and reduced hose capacity requirements. Type 4 fire trucks must have a 750-gallon water tank that offers 50 gallons per minute of water transfer at a pressure of 100 pounds per square inch. Type 4 trucks must be equipped to carry at least two people.

011328-11/3505766 V1

- **Types 5, 6, and 7** fire trucks are often grouped together because they feature many of the same design qualities. These vehicles are typically pick-up truck-based with 4-wheel drive on a medium duty chassis. The main difference between Type 5, Type 6, and Type 7 fire trucks is the difference in their maximum gross vehicle weight rating ("GVWR"): Type 5 trucks have a maximum GVWR of 26,000 pounds; Type 6 trucks have a maximum GVWR of 19,500 pounds, and Type 7 trucks have a maximum GVWR of 14,000 pounds. Type 5, 6, and 7 trucks typically carry a 300-gallon water tank and a small booster pump with a minimum capacity of 50 gallons per minute. They must be equipped to carry two firefighters.

011328-11/3505766 V1



| SPECS | STRUCTURE | | WILDLAND BRUSH TRUCKS | | | | |
|---|---|---|---|---|---|---|---|
| | TYPE 1 | TYPE 2 | TYPE 3 | TYPE 4 | TYPE 5 | TYPE 6 | TYPE 7 |
| TANK MIN. CAPACITY (GAL) | 300 | 300 | 500 | 750 | 400 | 150 | 50 |
| PUMP MIN. FLOW (GPM) | 1000 | 500 | 150 | 50 | 50 | 50 | 10 |
| @ RATED PRESSURE (PSI) | 150 | 150 | 250 | 100 | 100 | 100 | 100 |
| HOSE 2½" (MIN. FT) | 1200 | 1000 | ✕ | ✕ | ✕ | ✕ | ✕ |
| HOSE 1½" (MIN. FT) | 500 | 500 | 1000 | 300 | 300 | 300 | ✕ |
| HOSE 1" (MIN. FT) | ✕ | ✕ | 500 | 300 | 300 | 300 | 200 |
| LADDERS | ✓ | ✓ | ✕ | ✕ | ✕ | ✕ | ✕ |
| PUMP AND ROLL | ✕ | ✕ | ✓ | ✓ | ✓ | ✓ | ✓ |
| MAX. GVWR (LBS) | ✕ | ✕ | ✕ | ✕ | 26,000 | 19,500 | 14,000 |
| PERSONNEL (MIN.) | 4 | 3 | 3 | 2 | 2 | 2 | 2 |
| TYPICAL USES | STRUCTURAL FIRE RESPONSE | STRUCTURAL FIRE RESPONSE | BRUSH FIRE RESPONSE | BRUSH FIRE RESPONSE | INITIAL ATTACK, BRUSH PATROL | INITIAL ATTACK, BRUSH PATROL | PATROL, MOP UP, INITIAL ATTACK |

✓ REQUIRED   ✕ NOT REQUIRED/OPTIONAL

*Image 21: NFPA types and specifications.*[192]

175.    Some trucks are specially equipped to conform to additional standards. For example, NFPA Chapter 5 describes the requirement for a truck to be considered a Pumper Fire Apparatus, NFPA Chapter 9 describes the requirements for a Quint Fire Apparatus, NFPA Chapter 11 describes the requirements for a Mobile Foam Fire Apparatus, and NFPA Chapter 19 describes the requirements for Aerial Fire Apparatus (which include trucks equipped with aerial ladders, elevating platforms or towers, and water tower devices).[193] These trucks are also included in the relevant product market.

---

[192] BOISE MOBILE EQUIPMENT, *Types of Fire Trucks and Their Purpose* (Feb. 21, 2022), https://www.bmefire.com/types-of-fire-trucks (last visited Aug. 15, 2025).

[193] PIERCE, *Types of Aerial Fire Trucks: NFPA Classification Overview* (Nov. 8, 2022), https://www.piercemfg.com/pierce/blog/types-of-aerial-fire-truck (last visited Aug. 15, 2025).

011328-11/3505766 V1

### 3. The geographic market is the United States.

176. As described above, all three Manufacturer Defendants sell Fire Apparatus to fire departments across the 50 states. The relevant market is the United States.

### 4. Manufacturer Defendants have market power in the relevant markets.

177. As a result of industry roll-ups from the mid-2010s through today, the overwhelming majority of the Fire Apparatus industry's sales and capacity are now concentrated among three dominant manufacturers: REV Group, Oshkosh, and Rosenbauer. As described above, REV Group captures around $1 billion of annual Fire Apparatus sales made in the United States, Oshkosh captures around $750 million, and Rosenbauer captures around $307 million. In combination, these three companies capture between 70 and 80 percent of the national market.[194]

### 5. High barriers to entry in the Fire Apparatus manufacturing market protect Manufacturer Defendants' market shares.

178. There are high barriers to becoming a manufacturer of Fire Apparatus. Fire Apparatus is expensive equipment that must meet strict NFPA design, safety, and performance standards. Accordingly, to enter into the market, a new manufacturer would need a significant amount of capital to afford the cost of materials, equipment, regulatory compliance, and skilled labor necessary to construct Fire Apparatus.

179. The low-volume nature of Fire Apparatus production presents an additional hurdle as it makes it difficult for new manufacturers to achieve cost competitiveness without an established order backlog. The cost of producing Fire Apparatus, combined with the long lead times, means that only well-funded, established corporations have much chance of sustaining themselves through the initial investment period.

---

[194] Baker, Farrell & Kovaleski, *supra* note 43.

011328-11/3505766 V1

180. New entrants also face the challenges associated with a highly concentrated market. The Manufacturer Defendants have consolidated control over the Fire Apparatus market in the past decade by serially acquiring their competitors. New entrants, then, must compete against incumbents with deep institutional knowledge, longstanding relationships with municipalities, and extensive dealer networks.

181. Taken together, these structural features make breaking into the Fire Apparatus industry challenging.

**H.      Plaintiffs and Other Class Members Have Been Harmed as a Result of the Conspiracy**

**1.      Plaintiffs and other Class members have overpaid for Fire Apparatus as a result of Defendants' anticompetitive behavior.**

182. If the price of Fire Apparatus had increased only at the rate of inflation between 2015 and 2025, pumper trucks would cost approximately $680,000 (rather than the current cost of $1 million), and ladder trucks would cost approximately $1.2 million (rather than $2 million).[195] Municipalities across the country are therefore paying approximately 47 percent (or $320,000) more for pumpers and 66 percent (or $800,000) more for ladder trucks in 2025 than would be expected based on inflationary costs alone.

183. There are approximately 5,000 new Fire Apparatus sold in the United States every year.[196] Of these, about 75 percent are pumpers.[197] That means that since 2016, Plaintiffs and

---

[195] Calculated assuming a pumper cost $500,000 and a ladder truck cost $900,000 in 2015.

[196] Jeffrey Bonior, *Get to Know Sutphen, Which Has Been Making Fire Engines in the United States Since 1890*, SUTPHEN (Mar. 12, 2021), https://www.sutphen.com/get-to-know-sutphen-which-has-been-making-fire-engines-in-the-united-states-since-1890 (last visited Aug. 15, 2025).

[197] Alan M. Petrillo, *What's the Right Size Pump for Your Apparatus and How Does It Affect the Design?*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 27, 2023), https://www.fire apparatusmagazine.com/fire-apparatus/pumpers/whats-the-right-size-pump-for-your-apparatus-and-how-does-it-affect-the-design (last visited Aug. 15, 2025).

011328-11/3505766 V1

other Class members have paid a combined total of approximately $56.25 billion for new Fire Apparatus[198]—$19.8 billion more than expected based on increased inflation alone.[199]

184. Even accounting for issues facing the Fire Apparatus market in terms of supply chain and labor shortage challenges, these increases are far beyond what would be expected in a competitive market.

**2. Inflated prices and long backlogs have prevented Plaintiffs and the other Class members from timely replacing old vehicles in their Fire Apparatus fleets, and their fleets have suffered as a consequence.**

185. As Fire Apparatus age, they become prone to more frequent and serious breakdowns, leading to more costly repairs and prolonged downtime. The National Fire Protection Association recommends that apparatus should be moved from the frontlines to the reserve fleet after 15 years and removed from service completely at the 20- or 25-year mark.[200]

186. Skyrocketing prices and longer delivery times have made it difficult for municipalities to replace aging apparatus in their fire departments' fleets in a timely manner. In many cases, fire departments are operating using apparatus that have exceeded their service life because buying new trucks is prohibitively expensive. According to the president of the International Association of Fire Fighters, Edward Kelly, cities and towns across the country are facing a crisis where demand for new Fire Apparatus has outstripped availability and funding.[201]

---

[198] Calculated as ((3,750 pumper trucks per year * 9 years *$1 million) + (1,250 ladder trucks per year * 9 years * $2 million)).

[199] Cost based on inflation alone ($36.45 billion) calculated as ((3,750 pumper trucks per year * 9 years *$680,000) + (1,250 ladder trucks per year * 9 years * $1.2 million)).

[200] Joseph Murray, *Fire Chief Considerations: Making the Case for Apparatus Replacement*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Jan. 22, 2025) (citing NFPA 1900), https://www.fireapparatusmagazine.com/fire-apparatus/fire-chief-considerations-making-the-case-for-apparatus-replacement/ (last visited Mar. 23, 2026).

[201] Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-

011328-11/3505766 V1

187.    For example, Plaintiff La Crosse is currently operating a 2006 Pierce Enforcer (a quint fire apparatus),[202] a vehicle that is nearly 20 years old. Although La Crosse has ordered a replacement for the vehicle, long expected delivery times mean La Crosse will need to rely on this outdated Fire Apparatus for several more years.

188.    Price and availability concerns also spurred the La Crosse Fire Department to change its operating plan, which previously relied on three apparatus, to a plan based on the cheaper configuration of two apparatus. In some cases, La Crosse has been shut out of the market altogether: although it recently looked at purchasing a new Fire Apparatus for its airport, the $1 million price tag and the long wait time were too much for the city, which decided to make do with its current fleet. To try to adapt to ever-increasing prices and lengthening backlogs, the La Crosse Fire Department has already begun requesting funds for a replacement apparatus that it will not need until 2030.

189.    Other examples of aging fleets abound. In January 2025, the Chicago fire department threw a mock thirtieth birthday celebration for one of its trucks, which was older than many firefighters on the force.

---

regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025).

[202] FIREFIGHTING WIKI, *La Crosse Fire Department (Wisconsin)*, https://fire.fandom.com/ wiki/La_Crosse_Fire_Department_(Wisconsin)#Apparatus_Roster (last visited Aug. 15, 2025).

011328-11/3505766 V1



*Image 22: Celebration of Chicago Fire Department Truck D545's 30th birthday[203]*

190.  In Los Angeles, the city's fire department has long aimed to have 90 percent of its fleet ready for deployment at any given time, but it has averaged only 78 percent in recent years as older apparatus are pulled for maintenance.[204] Union officials have said that rising prices for replacement vehicles have forced the department to order fewer new rigs than it had planned.[205]

---

[203] Katherine Laidlaw, *Why Does a Fire Truck Cost $2 Million?*, HUSTLE (July 18, 2025), https://thehustle.co/originals/why-does-a-fire-truck-cost-2-million (last visited Aug. 15, 2025).

[204] Baker, Farrell & Kovaleski, *supra* note 43.

[205] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Aug. 15, 2025).

011328-11/3505766 V1

191.     Auditors in Atlanta found that more than a third of the city's aging firefighting fleet was out of commission.[206] Atlanta, Georgia was using pick-up trucks to fight fires when one-third of their fleet was out of service. Houston and Seattle have reported similar struggles with their fleets.[207]

192.     Smaller municipalities, including towns in Connecticut, Illinois, Michigan, New York, New Jersey, Pennsylvania, Texas, Kansas, and West Virginia, have faced comparable difficulties.[208] For example, in 2024, the city of Evanston, Illinois had to persuade a dealer to sell a demonstration vehicle to accelerate delivery of a $2.3 million new apparatus to only "12 to 14 months" to replace an 18 year old reserve apparatus with "major defects… that would cost around $300,000 to fix."[209] The Chief of the Ann Arbor, Michigan fire department recently observed that "[t]he price of fire trucks has become bonkers," revealing "almost a monopoly

---

[206] Baker, Farrell & Kovaleski, *supra* note 43; Riley Bunch, *City Leaders Reveal Plans to Address Aging Fire Trucks*, ATLANTA JOURNAL-CONSTITUTION, (Aug. 19, 2024), https://www.ajc.com/news/atlanta-news/city-leaders-reveal-plans-to-address-aging-fire-trucks/YGFTTY7ZPRBPJP54Z2RYDMXLOA (last visited Aug. 15, 2025).

[207] Christy Grimes, *Houston Fire Department Navigating Supply Chain Hurdles with Fleet Replacements*, GOV'T FLEET (Sept. 11, 2023), https://www.government-fleet.com/10206016/houston-fire-department-to-replace-aging-vehicles (last visited Aug. 15, 2025); David Kroman, *Seattle Firetruck Fleet Deteriorating Faster than Repairs Can Keep Up*, SEATTLE TIMES (Apr. 1, 2024), https://www.seattletimes.com/seattle-news/politics/seattle-fire-truck-fleet-deteriorating-faster-than-repairs-can-keep-up (last visited Aug. 15, 2025).

[208] CBS NEWS, *North Texas Fire Department in Crisis Needs Financial Windfall To Overcome Equipment Challenges* (Jan. 23, 2025), https://www.cbsnews.com/texas/video/north-texas-fire-department-in-crisis-needs-financial-windfall-to-overcome-equipment-challenges (last visited Aug. 15, 2025); Allen Clayton, *City of Clarksburg Approves $3.1 Million to Purchase New Fire Trucks*, 12WBOY (Feb. 29, 2024), https://www.wboy.com/news/harrison/city-of-clarksburg-approves-3-1-million-to-purchase-new-fire-trucks (last visited Aug. 15, 2025); Musharbash, *supra* note 14; Baker, Farrell & Kovaleski, *supra* note 43.

[209] Bill Smith, *Council OK's Fire Truck Buy*, EVANSTON NOW (Mar. 26, 2024), https://evanstonnow.com/council-oks-fire-truck-buy (last visited Aug. 15, 2025).

011328-11/3505766 V1

market," such that their next truck will cost $2.4 million and take 4 years to deliver.[210] The

number of service calls received by the Ann Arbor Fire Department ("AAFD") across its six fire

stations has been steadily increasing for more than a decade, increasing from 6,953 in 2016 to

13,432 in 2025.[211] Furthermore, a recent boom in downtown development as well as increasingly

variable weather patterns have the AAFD facing a need for more specialized training in

responding to additional challenges, such as how to navigate high-rise buildings and respond to

damage caused by intense storms. To respond to such service calls, AAFD access to fully

functioning Fire Apparatus is paramount. And the fire chief of Watertown, New York, has said,

his department was so desperate for a new apparatus to keep operations running that it bought

one used from another city, even though that apparatus was already more than two decades

old.[212]

193.    The Fire Department of Quincy, Massachusetts ordered new Fire Apparatus in

2022, but because of manufacturing delays, it has been forced to buy used apparatus from other

cities.[213] Some of the Fire Apparatus still in rotation in the Quincy fleet are more than twenty

years old, and as a result are constantly undergoing repairs.[214] Much like the fire departments in

---

[210] Ryan Stanton, *Ann Arbor Is Getting a New Fire Truck, But It Will Take 4 Years and Cost $2.4 M*, MLIVE (Feb. 7, 2025), https://www.mlive.com/news/ann-arbor/2025/02/ann-arbor-is-getting-a-new-fire-truck-but-it-will-take-4-years-and-cost-24m.html (last visited Aug. 15, 2025).

[211] Ann Arbor Fire Department, 2025 Annual Report, https://www.a2gov.org/media/4glhvywf/2025-aafd-annual-report.pdf (last visited March 23, 2026).

[212] Baker, Farrell & Kovaleski, at n.43.

[213] Mike Sullivan, *Nationwide fire truck shortage impacting Mass. departments. IAFF asks for investigation*, CBS News (May 17, 2025), https://www.cbsnews.com/boston/news/fire-truck-shortage-massachusetts/ (last accessed Mar. 23, 2026).

[214] *Id.*

011328-11/3505766 V1

Columbus, Ann Arbor, and Storm Lake, Quincy Fire Department was given a quote of over $2 million and a four year wait time to receive their replacement Fire Apparatus.[215]

194. According to testimony given by IAFF General President Edward Kelly, at the September 2025 Senate Subcommittee Hearing, 17 of San Francisco's 34 ladder trucks are more than 20 years old.[216] Two of them are over 30 years old.[217] Due to the city's characteristically hilly streets, these older rigs are more prone to stalling, thus forcing firefighters to take alternate, lengthier routes to avoid those hills.[218] This increases response time and the likelihood of a more precarious situation once the firefighters do arrive at the scene.[219]

195. The city of Pittsburgh is currently grappling with how to replace their aging fleet. Pittsburgh's fire bureau shared, "in an ideal situation, fire trucks would be used for 7 years at the maximum, then spend 3 years in the reserve backup fleet before being retired. A more realistic, 'achievable' approach would be to have trucks operating for 10 years and then no more than 5 on the reserve fleet."[220] However, this timeline is unachievable due to delays and prices.[221] The next best option would be repairing the current fleets but even that is a challenge because an older

---

[215] *See id.*

[216] Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt., District of Columbia, and Census, 119 Cong., https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/ (last visited March 23, 2026).

[217] *Id.*

[218] *See id.*

[219] *See id.*

[220] Julia Maruca, *Why Pittsburgh's fire and EMS vehicle fleets are facing a crisis,* 90.5 WESA (May 16, 2025), https://www.wesa.fm/politics-government/2025-05-16/pittsburgh-fire-ems-vehicle-fleet-crisis (last visited March 23, 2026).

[221] *Id.*

011328-11/3505766 V1

vehicle means replacement parts are harder to come by.[222] Leaders are facing pressure to solve the "aging fleet" problem. Robert Brooks, president of the Pennsylvania Professional Firefighters Association, shared his experience with pricing: "Twenty years ago, I started fighting fires, and a ladder truck was about $800,000. Now it's in the $2 million range. An engine, a pumper that was somewhere around $400,000 to $500,000 is now $1 million to $1.2 million."[223] Altogether, the city of Pittsburgh would have to put aside $20 million a year to replace the whole fleet. Pete McDevitt, City Council Budget Director, guesses it would take more than 10 years to replace everything.[224] Even upon approval of these high prices, there is still the issue of delays.[225] Some of the orders wouldn't be delivered for 2-4 years, which would prolong the cycle to half a decade.[226]

### 3. Reduced Fire Apparatus fleets are less able to respond to disasters.

196. High prices and long waits for Fire Apparatus are endangering public safety in communities across the country, particularly those facing natural disasters.

197. Los Angeles's experience in January 2025, when two large fires raged for days and killed 29 people, is a particularly poignant example of the harm communities can suffer when their Fire Apparatus fleets are reduced.[227] More than 100 of the Los Angeles Fire

---

[222] *Id.*

[223] Julia Maruca, *Why Pittsburgh's fire and EMS vehicle fleets are facing a crisis*, 90.5 WESA (May 16, 2025), https://www.wesa.fm/politics-government/2025-05-16/pittsburgh-fire-ems-vehicle-fleet-crisis (last visited March 23, 2026).

[224] *Id.*

[225] *Id.*

[226] *Id.*

[227] Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025).

011328-11/3505766 V1

Department's ("LAFD") 183 Fire Apparatus were out of service at the time the fires broke out.[228]

Chuong Ho, a firefighter and union leader who was among those who reported for work during the fires, said the lack of Fire Apparatus meant many of the firefighters who were available to help that day could not be sent to the front lines.[229] Kristin Crowley, the LAFD fire chief, confirmed that the lack of a fully staffed Fire Apparatus fleet impeded the department's ability to respond to the fires.[230] Had additional firefighters been able to combat the blazes, they might have been able to prevent the devastation that followed, including $350 million in damage to L.A. public facilities[231] and the loss of homes and lives.[232]

---

[228] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

[229] Baker, Farrell & Kovaleski, *supra* note 43.

[230] *Id.*

[231] David Zahniser, *Fires and Windstorms Caused at Least $350 Million in Damage to L.A. Public Facilities, Report Says*, L.A. TIMES (Jan. 22, 2025), https://www.latimes.com/california/story/2025-01-22/la-me-wildfire-costs-los-angeles-public-infrastructure (last visited Aug. 15, 2025).

[232] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

011328-11/3505766 V1



***Image 23: Out-of-service Fire Apparatus sitting in the LAFD's Bureau of Supply and Maintenance lot while fires ravage the city.[233]***



***Image 24: Out-of-service Fire Apparatus sitting in the LAFD's Bureau of Supply and Maintenance lot while fires ravage the city.[234]***

---

[233] Perkin Amalaraj, *Dozens of Fire Trucks Waiting for Repair while Fires Ravage LA*, DAILY MAIL (Jan. 14, 2025), https://www.msn.com/en-ae/news/other/dozens-of-fire-trucks-waiting-for-repair-while-fires-ravage-la/ar-BB1rr7vy (last visited Aug. 15, 2025).

[234] *Id.*

198. Other communities have faced similar difficulties. Jesse M. Flax, the fire chief in Camden, New Jersey, said that Fire Apparatus manufacturing delays and rising prices were "creating greater risk for the public and firefighters."[235] During a 2024 house fire in Camden, crews were slowed in their response by mechanical trouble on a truck that caused its hose to go limp. A resident died in that blaze.[236] And in Castle Rock, Colorado, firefighters responded to incidents in Type 3 brush trucks, rather than in other preferred vehicles, due to a four-year delivery delay of new apparatus.[237]

199. In the September 2025 Senate hearing, Edward Kelly, General President of IAFF, described how long backlogs threaten firefighters' ability to protect the communities that they serve. Kelly responded:

> Chief Rubin [Fire Chief of the Kansas City Fire Department] testified earlier, in his city, they had to put, because they did not have enough apparatus on hand to staff the firehouses, they were putting firefighters out basically on pickup trucks like painting crews with ground ladders. Now, if you're trapped in the third or fourth floor, you're jumping.[238]

200. Kelly provided another harrowing tale of the Defendants' impact on firefighters' ability to protect their communities, explaining that in Chicago, fire fighters who were responding to a deadly house fire—which killed four people, including a five-year-old—were delayed when

---

[235] Baker, Farrell & Kovaleski, *supra* note 43.

[236] *Id*.

[237] Isabelle Crow, *IAFF Spotlight Apparatus Crisis and Its Impact*, FIRE & SAFETY J. (June 20, 2025) https://fireandsafetyjournalamericas.com/iaff-spotlight-apparatus-crisis-and-its-impact (last visited Aug. 15, 2025).

[238] Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt., District of Columbia, and Census, 119 Cong., https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/ (last visited March 23, 2026).

011328-11/3505766 V1

their Fire Apparatus stalled.[239] Kelly told Senators, "Fire Fighters had to restart the truck to raise the ladder and rescue victims . . . [a]nd the scariest part is, today on September 10, two-and-a-half months after that incident, that very same rig is still in service."[240]

201. Jason Shivers, chair of the International Association of Fire Chief's ("IAFC") Emergency Vehicle Management Section, submitted testimony to the U.S. Senate as well, on behalf of the IAFC.[241] He stated Fire Apparatus costs have risen by 20 to 25 percent since 2020 and fire chiefs can order Fire Apparatus and expect their delivery in four years.[242] Because of the supracompetitve prices and delays, fire departments have been forced to use apparatus past the 15-year recommended age limit and reserve fleets that do not have up-to-date safety improvements.[243] According to his testimony, these Fire Apparatus problems affected community safety: "Some fire departments did not have fire apparatus to use for consistent and reliable response to mutual aid response requests from their local neighbors or from across the nation."[244]

202. Some cities have finally had enough. In April 2025, the San Diego County Board of Supervisors voted to pursue legal challenges to what they described as a corporate monopoly of Fire Apparatus and firefighting equipment.[245] The Board voted unanimously to explore legal

---

[239] *See id.*

[240] *Id.*

[241] Jason Shivers, Sounding the Alarm: America's Fire Apparatus Crisis, Hearing Before the Subcomm. on Disaster Mgmt., District of Columbia, and Census, https://www.iafc.org/docs/default-source/1gr/gr_testimonyhsgachearingfireapparatus10sep25.pdf (last visited March 23, 2026).

[242] *Id.* at 2.

[243] *Id.*

[244] *Id.* at 3.

[245] SD County Board of Supervisors votes to challenge 'corporate monopoly' of firetruck supply chain, abc10 News San Diego, https://www.10news.com/news/local-news/sd-county-

011328-11/3505766 V1

action, citing soaring prices and the substantial increase in wait time to deliver the Fire Apparatus, noting the increased consolidation of the market into the hands of just a few companies.[246] In particular, the Board emphasized that the crisis facing California was not being caused by wildfires, but by a supply chain "taken over by corporate consolidation and greed."[247]

### 4. Plaintiffs and Class members have also suffered harm because they have had to redirect funds toward purchasing Fire Apparatus that they would have otherwise put toward other essential needs.

203. In addition to problems adequately responding to disasters with diminished fleets, the rising cost of Fire Apparatus maintenance and replacement has squeezed fire departments' and municipalities' budgets, leaving them with fewer resources for other needs including recruiting and retaining firefighters.[248] For example, cities whose fire departments are facing budget challenges, including those in Spokane, Washington and Mills, Wyoming, have had to cancel essential training and even lay off firefighters.[249]

204. These shortages in equipment are so critical that some municipalities are being forced to cancel or postpone the training of new firefighters. On March 26, 2025, the Chief of the Columbus Division of Fire, Jeff Happ, told his division that active Fire Apparatus could no longer be used for training, and that any training cadets missed as a result would have to be made up at

---

board-of-supervisors-votes-to-challenge-corporate-monopoly-of-firetruck-supply-chain (last visited March 23, 2026).

[246] *Id.*

[247] *Id.*

[248] Musharbash, *supra* note 14.

[249] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 2 (May 13, 2025), https://www.economicliberties .us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

011328-11/3505766 V1

a later date.[250] The president of the firefighter union, Steven Stein, said in a statement that having to choose between adequately training cadets or removing a valuable Fire Apparatus from a neighborhood is "unacceptable."[251] In addition, two-thirds of the City of Columbus's fleet are operating outside their recommended life expectancy.[252] The city submitted an order for a new tiller ladder truck from Pierce Manufacturing in November 2023 for $2.3 million (as compared with a similar truck for which they paid roughly $968,000 in 2012).[253] The city was told it could expect delivery in late 2027 or early 2028.[254]

## V.    CLASS ACTION ALLEGATIONS

205.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking injunctive relief pursuant to federal law, and damages pursuant to various state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states listed below on behalf of the members of the following Classes:

- **Nationwide Class**: All local or municipal government entities with fire departments that indirectly purchased Fire Apparatus from Manufacturer Defendants in the United States at any time from January 1, 2016, until the present.

---

[250] Columbus fire truck shortage reaching critical state, local firefighter union says, The Columbus Dispatch, https://www.dispatch.com/story/news/local/2025/04/02/columbus-firefighter-union-fire-truck-shortage-ohio/82755623007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z1133xxp000850c000850e1133xxv003648d--65--b--65--&gca-ft=157&gca-ds=sophi (last visited March 23, 2026).

[251] *Id.*

[252] *Id.*

[253] *Id.*

[254] *Id.*

011328-11/3505766 V1

- **State Law Class**: All persons, fire departments, municipalities, and entities that indirectly purchased Fire Apparatus from Manufacturer Defendants in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and/or Wisconsin at any time from January 1, 2016, until the present.

206. Specifically excluded from these Classes are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from these Classes are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

**A.      All Requirements of Federal Rule of Civil Procedure 23(a) Are Met.**

207. A class action is warranted in this case because the Class members are so numerous that joinder of all members is impracticable; there are questions of law or fact common to the Classes; the claims of the representative parties are typical of the claims of the Classes; and the Plaintiffs named in this Complaint will fairly and adequately protect the interests of the Classes.

208. **Numerosity**: Class members are so numerous (including thousands of municipalities) that joinder of all Class members in a single proceeding would be impracticable.

011328-11/3505766 V1

The disposition of the claims asserted through this class action will enhance efficiency and will benefit the parties and the Court.

209. **Commonality**: Plaintiffs' antitrust claims are common to all Class members, and individual complaints otherwise may result in inconsistent or varying adjudications.

210. **Typicality**: Antitrust violations and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members.

211. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class members in that Plaintiffs have no interests adverse to, or that conflict with, the Classes which Plaintiffs seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex class actions of this nature.

**B.      All Requirements of Federal Rule of Civil Procedure 23(b)(3) Are Met.**

212. In addition to satisfying the prerequisites of Fed. R. Civ. P. 23(a), this case qualifies for class action treatment because questions of law or fact common to the Classes predominate over any questions affecting only individual Class members, and because a class action suit is superior to other available methods for adjudicating the controversy.

213. **Predominance**: Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, but are not limited to:

- Whether Defendants engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Fire Apparatus sold in interstate commerce in the United States;

011328-11/3505766 V1

- The duration of the conspiracy alleged herein and the acts performed by Defendants in furtherance of the conspiracy;

- The effect of Defendants' alleged conspiracy on the prices of Fire Apparatus;

- Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the Plaintiffs and other Class members;

- The effect of Defendants' alleged conspiracy on the prices of Fire Apparatus sold in the United States during the class period;

- Whether Plaintiffs and other Class members are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

- The appropriate Class-wide measure of damages.

214. **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. It would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct, both for Class members themselves and for the court system. Individualized litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the courts. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI. ANTITRUST INJURY

215. Defendants' anticompetitive conduct had the following effects, among others:

- Price competition has been restrained or eliminated with respect to Fire Apparatus;

011328-11/3505766 V1

84

- The prices of Fire Apparatus have been fixed, raised, stabilized, or maintained at artificially inflated levels;

- Plaintiffs and other Class members have been deprived of free and open competition; and

- Plaintiffs and other Class members have paid artificially inflated prices for Fire Apparatus, causing substantial harm to Plaintiffs and other Class members.

216. The purpose of Defendants' conspiratorial conduct was to raise, fix, or maintain the price of Fire Apparatus. As a direct and foreseeable result, Plaintiffs and other Class members paid supra-competitive prices for Fire Apparatus during the class period.

217. By reason of the alleged violations of the antitrust laws, Plaintiffs and other Class members have been injured because they paid higher prices for Fire Apparatus than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## VII. FRAUDULENT CONCEALMENT & EQUITABLE TOLLING

218. Plaintiffs and Class members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class members did not discover and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or Class members on inquiry notice that there was a conspiracy to fix prices for Fire Apparatus. The contract, combination, or conspiracy alleged herein was fraudulently concealed by Defendants throughout the Class Period by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of

011328-11/3505766 V1

written records, limitation of any explicit reference to competitor pricing, communications on documents, communication of competitively sensitive data to one another through the members-only FAMA-created channels detailed herein, which kept both the content and identity of participants in the system secret, and the concealment of the existence and nature of their competitor price discussions from non-conspirators (including customers).

219. Additionally, Defendants fraudulently concealed their wrongful conduct by providing pretextual reasons for their supracompetitive prices and prolonged wait times. For example, in the September 2025 Senate Subcommittee Hearing, Mike Virnig, President of REV Group, explained the price increases and delivery times were due to inflation of input and manufacturing costs over recent years, including increased costs of labor, raw materials and other inputs, as well as operational challenges and spikes in demand.

220. By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and Class members have as a result of the unlawful contract, combination, or conspiracy alleged in this complaint.

## VIII. CONTINUING VIOLATION

During the Class Period, Manufacturer Defendants continued to make sales to Plaintiffs and Class members of Fire Apparatus whose prices were fixed as a result of Defendants' continually renewed and adjusted price-fixing and information exchange agreement. Defendants needed to continually renew and adjust their price fixing and information exchange agreement to account for ever-fluctuating economic and market conditions.

221. Defendants' meetings and misrepresentations were overt acts that began a new statute of limitations because these events advanced the objectives of Defendants' conspiracy.

011328-11/3505766 V1

222. Defendants' overt acts, which were new acts beyond the initial price fixing that were necessary to perpetuate Defendants' agreement, continued throughout the Class Period. Each sale of a Fire Apparatus by a Manufacturer Defendant at a supracompetitive price was a new overt act that was part of Defendants' antitrust violations that injured Plaintiffs and Class members and started the statutory period running again.

223. Defendants' overt acts were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiffs and Class members.

224. Further, each purchase by Plaintiffs and Class members through the Class Period of Defendants' Fire Apparatus, the price which resulted from Defendants' continually renewed and adjusted price-fixing agreement, necessarily caused new and accumulating injury to Plaintiffs and Class members.

225. As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiffs and Class members starts the statutory period running again regardless of Plaintiffs' knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of a Fire Apparatus to Plaintiffs and Class members constituted a new cause of action for purposes of the statute of limitations.

011328-11/3505766 V1

## IX.   CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF:

## RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF
## THE  SHERMAN ACT, 15 U.S.C. § 1
### (On Behalf of the Nationwide Class For Injunctive and Equitable
### Relief Against All Defendants)

226.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

227.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016 and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price of Fire Apparatus in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

228.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants achieved the following conspiratorial outcomes:

- Fixing, raising, and stabilizing the price of Fire Apparatus; and

- Allocating among themselves and collusively reducing the production of Fire Apparatus.

229.    The combination and conspiracy alleged herein has had the following effects, among others:

- Price competition has been restrained or eliminated with respect to Fire Apparatus;

- The production of Fire Apparatus has been restrained at artificially low levels;

- The price of Fire Apparatus has been fixed, raised, stabilized, or maintained at artificially inflated levels;

011328-11/3505766 V1

- Plaintiffs and other Class members have been deprived of free and open competition; and

- Plaintiffs and other Class members have paid artificially inflated prices for Fire Apparatus, causing substantial harm to Plaintiffs and other Class members.

230. Plaintiffs and other Class members have been injured and will continue to be injured by paying more for Fire Apparatus from Manufacturer Defendants than they would have paid and will pay in the absence of the combination and conspiracy.

231. Plaintiffs and other Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF:**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1, FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION (on behalf of the Nationwide Class for injunctive and equitable relief)**

232. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

233. Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2016, and continuing through the present, Defendants entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

234. The relevant product market is Fire Apparatus as recognized by NFPA Standard 1900 regarding automotive Fire Apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing. The relevant geographic market is the United States.

011328-11/3505766 V1

235. Manufacturer Defendants possess market power in the relevant market. Manufacturer Defendants control between 70 and 80 percent of the relevant market. Manufacturer Defendants' collective market power includes the power to artificially deflate the number of Fire Apparatus produced in the United States below competitive levels and to artificially inflate the price Plaintiffs and other members of the Nationwide Class pay for Fire Apparatus above competitive levels.

236. An increase in the price of Fire Apparatus could be imposed collectively by Manufacturer Defendants without losing customers. The Fire Apparatus market is a unique product market.

237. The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public economic information. The information exchanges included the exchange through FAMA Statistical Reports and FAMA meetings.

238. Manufacturer Defendants' regular information exchanges through FAMA reflected concerted action between competitors in the market for Fire Apparatus.

239. Each Manufacturer Defendant furnished competitively sensitive information to other Manufacturer Defendants through FAMA with the understanding that it would be reciprocated. FAMA enforced this understanding by requiring Manufacturer Defendants to share data in order to receive comparable data.

240. The agreement to regularly exchange detailed and non-public economic information about their companies suppressed competition between Manufacturer Defendants.

241. When defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly,

011328-11/3505766 V1

Manufacturer Defendants used the data obtained through FAMA to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the Fire Apparatus market. This strategic information was a material factor in Manufacturer Defendants' decisions to inflate the prices that Plaintiffs and other members of the Nationwide Class paid for Fire Apparatus during the class period.

242. Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose.

243. The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Manufacturer Defendants in the market for Fire Apparatus in the United States, and (2) inflating the prices of Fire Apparatus during the class period.

244. As a result of the unlawful agreement alleged herein to exchange information, Plaintiffs and the other Class members have been injured in their business or property by paying artificially inflated prices for Fire Apparatus during the class period.

### THIRD CLAIM FOR RELIEF:

### CONNECTICUT ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Connecticut)**

245. Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-24, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout Connecticut, and (2) Fire Apparatus prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Connecticut commerce and caused Class members in Connecticut to pay supracompetitive

011328-11/3505766 V1

prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Connecticut seek all forms of relief available under Conn. Gen. Stat. § 35-24, *et seq*.

## FOURTH CLAIM FOR RELIEF:

### MICHIGAN ANTITRUST REFORM ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Michigan)**

246. Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws § 445.771, *et seq*. Defendants' flagrantly unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Michigan; and (2) Fire Apparatus prices in the State of Michigan were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Michigan commerce and caused Class members in Michigan to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Michigan seek all forms of relief available under Mich. Comp. Laws § 445.771, *et seq*.

## FIFTH CLAIM FOR RELIEF:

### MISSISSIPPI ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Mississippi)**

247. Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code Ann. § 75-21-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Mississippi; and (2) Fire Apparatus prices in the State of Mississippi were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Mississippi commerce and caused Class members in Mississippi to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs

011328-11/3505766 V1

and Class members in Mississippi seek all forms of relief available under Miss. Code Ann. § 75-21-1, *et seq.*

## SIXTH CLAIM FOR RELIEF:

### NEW YORK DONNELLY ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in New York)**

248. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. Gen. Bus. Law § 340, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of New York; (2) Fire Apparatus prices in the State of New York were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New York commerce and caused Class members in New York to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in New York seek all forms of relief available under N.Y. Gen. Bus. Law § 340, *et seq.*

## SEVENTH CLAIM FOR RELIEF:

### VIOLATION OF WISCONSIN STATE ANTITRUST LAW,
### WIS. STAT. ANN. § 133.01, *et seq.*
**(On Behalf of the State Law Class Members that Purchased Fire Apparatus in Wisconsin)**

249. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

250. Wisconsin state antitrust law aims "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. Ann. § 133.01.

011328-11/3505766 V1

251. Plaintiffs purchased Fire Apparatus within Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price of those Fire Apparatus would have been lower, in an amount to be determined at trial.

252. Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in the market for Fire Apparatus, in violation of Wis. Stat. Ann. § 133.01, *et seq.*

253. Plaintiffs and members of the Wisconsin Class were injured with respect to purchases of Fire Apparatus in Wisconsin and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## EIGHTH CLAIM FOR RELIEF:

### ALABAMA ANTITRUST LAW
### (On Behalf of State Law Class Members that Purchased Fire Apparatus in Alabama)

254. Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of Ala. Code § 6-5-60, *et seq.* Defendants' unlawful conduct had the following effects: (1) competition for Fire Apparatus was restrained, suppressed, and eliminated within Alabama; (2) Fire Apparatus prices in the State of Alabama were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals in Alabama have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Alabama commerce and caused Class members in Alabama to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and the Class members in Alabama seek all forms of relief available under Ala. Code § 6-5-60, *et seq.*

011328-11/3505766 V1

## NINTH CLAIM FOR RELIEF:

### ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### (On Behalf of State Law Class Members that Purchased Fire Apparatus in Alaska)

255. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Alaska, by affecting, fixing, controlling, and/or maintaining, at artificial and non- competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Alaska. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Alaska; (2) Fire Apparatus prices in the State of Alaska were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and

011328-11/3505766 V1

Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, Plaintiffs and Class members in Alaska seek all relief available under that statute.

**TENTH CLAIM FOR RELIEF:**

**ARKANSAS DECEPTIVE TRADE PRACTICES ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Arkansas)**

256. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Arkansas, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Arkansas. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Arkansas; (2) Fire Apparatus prices in the State of Arkansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including

011328-11/3505766 V1

their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-101, *et seq.*, and, accordingly, Plaintiffs and Class members in Arkansas seek all relief available under that statute.

## ELEVENTH CLAIM FOR RELIEF:

## ARIZONA ANTITRUST ACT
**(On Behalf of State Law Class Members That Purchased Fire Apparatus in Arizona)**

257. Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of Ariz. Rev. Stat. § 44-1401, *et seq.* Defendants' unlawful conduct had the following effects: (1) competition for Fire Apparatus was restrained, suppressed, and eliminated throughout Arizona; (2) Fire Apparatus prices in the State of Arizona were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals in Arizona have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Arizona commerce and caused Class members in Arizona to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Arizona seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq.*

## TWELFTH CLAIM FOR RELIEF:

## ARIZONA CONSUMER FRAUD ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Arizona)**

258. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521, *et seq.* Defendants

011328-11/3505766 V1

agreed to, and did in fact, act in restraint of trade or commerce in Arizona, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Arizona. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Arizona; (2) Fire Apparatus prices in the State of Arizona were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Arizona commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1521, *et seq*., and, accordingly, Plaintiffs and Class members in Arizona seek all relief available under that statute.

## THIRTEENTH CLAIM FOR RELIEF:

### CALIFORNIA CARTWRIGHT ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in California)**

259. Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code § 16700, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout California; (2) Fire Apparatus prices in the State of California were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected California commerce and caused Class members in California to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in California seek all forms of relief available under Cal. Bus. & Prof. Code § 16700, *et seq*.

### FOURTEENTH CLAIM FOR RELIEF:

### CALIFORNIA UNFAIR COMPETITION LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in California)**

260. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in California, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in California. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State

011328-11/3505766 V1

of California; (2) Fire Apparatus prices in the State of California were raised, fixed, maintained, and stabilized at artificially high levels in violation of both the Sherman Act and California's Cartwright Act; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected California commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., and, accordingly, Plaintiffs and Class members in California seek all relief available under that statute.

### FIFTEENTH CLAIM FOR RELIEF:

### COLORADO STATE ANTITRUST ACT
### (On Behalf of State Law Class Members that Purchased Fire Apparatus in Colorado)

261. Defendants have entered into an unlawful agreement in restraint of trade in violation of Colo. Rev. Stat. § 6-4-101, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout Colorado; (2) Fire Apparatus prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially

011328-11/3505766 V1

affected Colorado commerce and caused Class members in Colorado to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Colorado seek all forms of relief available under Colo. Rev. Stat. § 6-4- 101, *et seq.*

### SIXTEENTH CLAIM FOR RELIEF:

### COLORADO CONSUMER PROTECTION ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Colorado)**

262. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Colorado, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Colorado. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Colorado; (2) Fire Apparatus prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire

011328-11/3505766 V1

Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and Class members seek all relief available under that statute.

**SEVENTEENTH CLAIM FOR RELIEF:**

**DISTRICT OF COLUMBIA ANTITRUST ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in the District of Columbia)**

263. Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code § 28-4501, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Fire Apparatus prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and Purchased Fire Apparatus in the District of Columbia, paid supra-competitive, artificially inflated prices for Fire Apparatus. During the Class Period, Defendants' unlawful conduct substantially affected the District of Columbia's commerce and caused Class members in the District of Columbia to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in the District of Columbia seek all forms of relief available under D.C. Code § 28-4501, *et seq*.

011328-11/3505766 V1

## EIGHTEENTH CLAIM FOR RELIEF:

### DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT
(On Behalf of State Law Class Members that Purchased Fire Apparatus in the District of Columbia)

264.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the District of Columbia Consumer Protection Procedures Act, D.C. Code, § 28-3901, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in the District of Columbia, by affecting, fixing, controlling, and/or maintaining, at artificial and non- competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in the District of Columbia. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Fire Apparatus prices in the District of Columbia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected the District of Columbia's commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and

011328-11/3505766 V1

omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and Class members in the District of Columbia seek all relief available under that statute.

### NINETEENTH CLAIM FOR RELIEF:

### FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Florida)**

265. Defendants' unfair competition or unfair, and unconscionable acts or practices violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Florida, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Florida. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Florida; (2) Fire Apparatus prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and Class members in Florida seek all relief available under that statute.

011328-11/3505766 V1

## TWENTIETH CLAIM FOR RELIEF:

### HAWAII ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Hawaii)**

266.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Haw. Rev. Stat. Ann. § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout Hawaii; (2) Fire Apparatus prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; and (3) Plaintiffs and members of the Class, including those who resided in the Hawaii and Purchased Fire Apparatus in Hawaii, paid supracompetitive, artificially inflated prices for Fire Apparatus. During the Class Period, Defendants' unlawful conduct substantially affected Hawaii commerce and caused Class members in Hawaii to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Hawaii seek all forms of relief available under Haw. Rev. Stat. Ann. § 480-1, *et seq*.

## TWENTY-FIRST CLAIM FOR RELIEF:

### ILLINOIS ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Illinois)**

267.     Defendants have entered into an unlawful agreement in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout Illinois; (2) Fire Apparatus prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; and (3) Plaintiffs and members of the Class, including those who resided in the Illinois and Purchased Fire Apparatus in Illinois, paid supra-competitive, artificially inflated prices for Fire Apparatus. During the Class Period, Defendants' unlawful conduct substantially affected Illinois commerce and caused Class members in Illinois to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in

011328-11/3505766 V1

Illinois seek all forms of relief available under 740 Ill. Comp. Stat. 10/1, *et seq*.

## TWENTY-SECOND CLAIM FOR RELIEF:

## ILLINOIS CONSUMER FRAUD & DECEPTIVE BUSINESS PRACTICES ACT
### (On Behalf of State Law Class Members that Purchased Fire Apparatus in Illinois)

268. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Illinois, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Illinois. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair.

269. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Illinois; (2) Fire Apparatus prices in the State of Illinois were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Illinois commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire

011328-11/3505766 V1

Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1, *et seq*., and, accordingly, Plaintiffs and Class members in Illinois seek all relief available under that statute.

## TWENTY-THIRD CLAIM FOR RELIEF:

### IOWA COMPETITION LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Iowa)**

270.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) Fire Apparatus prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' unlawful conduct substantially affected Iowa commerce and caused Class members in Iowa to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Iowa seek all forms of relief available under Iowa Code § 553.1, *et seq*.

## TWENTY-FOURTH CLAIM FOR RELIEF:

### KANSAS RESTRAINT OF TRADE ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Kansas)**

271.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. Ann. § 50-101, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Kansas; (2) Fire Apparatus prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially

011328-11/3505766 V1

affected Kansas commerce and caused Class members in Kansas to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Kansas seek all forms of relief available under Kan. Stat. Ann. § 50-101, *et seq*.

## TWENTY-FIFTH CLAIM FOR RELIEF:

### MAINE ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Maine)**

272. Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Stat. Tit. 10, §1101, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Maine; and (2) Fire Apparatus prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Maine commerce and caused Class members in Maine to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Maine seek all forms of relief available under Me. Stat. Tit. 10, § 1101, *et seq*.

## TWENTY-SIXTH CLAIM FOR RELIEF:

### MARYLAND ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Maryland)**

273. Defendants have entered into an unlawful agreement in restraint of trade in violation of Md. Code Ann., Com. Law § 11-201, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Maryland; and (2) Fire Apparatus prices in the State of Maryland were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Maryland commerce and caused Class members in Maryland to pay supracompetitive prices for Fire Apparatus.

011328-11/3505766 V1

Accordingly, Plaintiffs and Class members in Maryland seek all forms of relief available under Md. Code Ann., Com. Law § 11- 201, *et seq*.

### TWENTY-SEVENTH CLAIM FOR RELIEF:

### MARYLAND CONSUMER PROTECTION ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Maryland)**

274. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Maryland Consumer Protection Act, Md. Code Ann. Com. Law § 13-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Maryland, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Maryland. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Maryland; (2) Fire Apparatus prices in the State of Maryland were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Maryland commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe

that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law § 13- 101, *et seq*., and, accordingly, Plaintiffs and Class members in Maryland seek all relief available under that statute.

**TWENTY-EIGHTH CLAIM FOR RELIEF:**

**MASSACHUSETTS CONSUMER PROTECTION ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Massachusetts)**

275. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A § 1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Massachusetts, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Massachusetts. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus.

276. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the Commonwealth of Massachusetts; (2) Fire Apparatus prices in the Commonwealth of Massachusetts were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and

proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ann. Ch. 93A § 1, *et seq.*, and, accordingly, Plaintiffs and Class members seek all relief available under that statute.

## TWENTY-NINTH CLAIM FOR RELIEF:

### MICHIGAN ANTITRUST REFORM ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Michigan)**

277. Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws § 445.771, *et seq.* Defendants' flagrantly unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Michigan; and (2) Fire Apparatus prices in the State of Michigan were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Michigan commerce and caused Class members in Michigan to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Michigan seek all forms of relief available under Mich. Comp. Laws § 445.771, *et seq.*

011328-11/3505766 V1

## THIRTIETH CLAIM FOR RELIEF:

### MINNESOTA ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Minnesota)**

278. Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. § 325D.49, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Minnesota; and (2) Fire Apparatus prices in the State of Minnesota were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Minnesota commerce and caused Class members in Minnesota to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Minnesota seek all forms of relief available under Minn. Stat. § 325D.49, *et eq.*

## THIRTY-FIRST CLAIM FOR RELIEF:

### MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Minnesota)**

279. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43-48, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Minnesota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Minnesota. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated

011328-11/3505766 V1

throughout the State of Minnesota; (2) Fire Apparatus prices in the State of Minnesota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43-48, *et seq*., and, accordingly, Plaintiffs and Class members seek all relief available under that statute.

## THIRTY-SECOND CLAIM FOR RELIEF:

### MONTANA UNFAIR TRADE PRACTICES & CONSUMER PROTECTION ACT
(On Behalf of State Law Class Members that Purchased Fire Apparatus in Montana)

280. Defendants' unfair, unconscionable, or deceptive acts or practices violated the Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code, §§ 30-14-101, *et seq*., and 30-14-201, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Montana, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Montana. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus

was restrained, suppressed, and eliminated throughout the State of Montana; (2) Fire Apparatus prices in the State of Montana were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq*., and 30-14-201, *et seq*., and, accordingly, Plaintiffs and Class members seek all relief available under that statute.

## THIRTY-THIRD CLAIM FOR RELIEF:

### NEBRASKA JUNKIN ACT
### (On Behalf of State Law Class Members that Purchased Fire Apparatus in Nebraska)

281. Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. § 59-801, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Nebraska; and (2) Fire Apparatus prices in the State of Nebraska were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Nebraska commerce and caused Class members in Nebraska to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Nebraska seek all forms of relief available under Neb. Rev. Stat. § 59-801, *et seq*.

011328-11/3505766 V1

## THIRTY-FOURTH CLAIM FOR RELIEF:

## NEBRASKA CONSUMER PROTECTION ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Nebraska)**

282. Defendants' unfair competition or unfair, and unconscionable acts or practices violated the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nebraska, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Nebraska. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Nebraska; (2) Fire Apparatus prices in the State of Nebraska were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59- 1601, *et seq*., and, accordingly, Plaintiffs and Class members in Nebraska seek all relief available under that statute.

## THIRTY-FIFTH CLAIM FOR RELIEF:

## NEVADA ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Nevada)**

283. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A.210, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Nevada; and (2) Fire Apparatus prices in the State of Nevada

011328-11/3505766 V1

were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Nevada commerce and caused Class members in Nevada to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Nevada seek all forms of relief available under Nev. Rev. Stat. Ann. § 598A.210, *et seq*.

## THIRTY-SIXTH CLAIM FOR RELIEF:

### NEVADA DECEPTIVE TRADE PRACTICES ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Nevada)**

284. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Nevada; (2) Fire Apparatus prices in the State of Nevada were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful

and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*, and, accordingly, Plaintiffs and Class members in Nevada seek all relief available under that statute.

## THIRTY-SEVENTH CLAIM FOR RELIEF:

### NEW HAMPSHIRE ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in New Hampshire)**

285. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of New Hampshire; and (2) Fire Apparatus prices in the State of New Hampshire were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected New Hampshire commerce and caused Class members in New Hampshire to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in New Hampshire seek all forms of relief available under N.H. Rev. Stat. Ann. § 356:1, *et seq.*

011328-11/3505766 V1

**THIRTY-EIGHTH CLAIM FOR RELIEF:**

**NEW HAMPSHIRE CONSUMER PROTECTION ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in New Hampshire)**

286. Defendants' unfair competition or unfair, and unconscionable acts or practices violated the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Hampshire, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in New Hampshire. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of New Hampshire; (2) Fire Apparatus prices in the State of New Hampshire were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. § 358-A:1, *et seq*., and, accordingly, Plaintiffs and Class members in New Hampshire seek all relief available under that statute.

**THIRTY-NINTH CLAIM FOR RELIEF:**

**NEW JERSEY ANTITRUST ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in New Jersey)**

287. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.J. Stat. Ann. § 56:9-1, *et seq*. Defendants' unlawful conduct had the following

011328-11/3505766 V1

effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of New Jersey; (2) Fire Apparatus prices in the State of New Jersey were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New Jersey commerce and caused Class members in New Jersey to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in New Jersey seek all forms of relief available under N.J. Stat. Ann. § 56:9-1, *et seq.*

## FORTIETH CLAIM FOR RELIEF:

### NEW MEXICO ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in New Mexico)**

288. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.M. Stat. Ann. § 57-1-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of New Mexico; (2) Fire Apparatus prices in the State of New Mexico were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New Mexico commerce and caused Class members in New Mexico to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in New Mexico seek all forms of relief available under N.M. Stat. Ann. § 57-1-1, *et*

## FORTY-FIRST CLAIM FOR RELIEF:

### NEW MEXICO UNFAIR PRACTICES ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in New Mexico)**

289. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the N.M. Stat. § 57-12-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or

011328-11/3505766 V1

maintaining at non-competitive and artificially inflated levels, the prices at which Fire Apparatus were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and Class members. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and Class members and the prices paid by them for Fire Apparatus as set forth in N.M. Stat. § 57-12-2E. Plaintiffs and Class members were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and Class members had no power to negotiate a lower price. Moreover, Plaintiffs and Class members lacked any meaningful choice in purchasing Fire Apparatus because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and Class members could avoid the overcharges. Defendants' conduct with regard to sales of Fire Apparatus, including their illegal conspiracy to secretly fix the price of Fire Apparatus at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and Class members. Defendants took grossly unfair advantage of Plaintiffs and Class members. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Fire Apparatus. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of New Mexico; (2) Fire Apparatus prices in the State of New Mexico were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open

011328-11/3505766 V1

competition. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and Class members have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and Class members in New Mexico seek all relief available under that statute.

**FORTY-SECOND CLAIM FOR RELIEF:**

**NORTH CAROLINA ANTITRUST LAW**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in North Carolina)**

290. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. Gen. Stat. § 75-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of North Carolina; (2) Fire Apparatus prices in the State of North Carolina were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected North Carolina commerce and caused Class members in North Carolina to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in North Carolina seek all forms of relief available under N.C. Gen. Stat. § 75-1, *et seq*.

**FORTY-THIRD CLAIM FOR RELIEF:**

**NORTH DAKOTA UNIFORM STATE ANTITRUST ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in North Dakota)**

291. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01 *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated

011328-11/3505766 V1

throughout the State of North Dakota; (2) Fire Apparatus prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected North Dakota commerce and caused Class members in North Dakota to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in North Dakota seek all forms of relief available under N.D. Cent. Code § 51-08.1- 01, *et seq*.

## FORTY-FOURTH CLAIM FOR RELIEF:

### OREGON ANTITRUST LAW
### (On Behalf of State Law Class Members that Purchased Fire Apparatus in Oregon)

292. Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Oregon; (2) Fire Apparatus prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Oregon commerce and caused Class members in Oregon to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Oregon seek all forms of relief available under Or. Rev. Stat. § 646.725, *et seq*.

## FORTY-FIFTH CLAIM FOR RELIEF:

### OREGON UNFAIR TRADE PRACTICES ACT
### (On Behalf of State Law Class Members that Purchased Fire Apparatus in Oregon)

293. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Oregon Unfair Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Oregon, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which

011328-11/3505766 V1

Fire Apparatus were sold, distributed, or obtained in Oregon. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Oregon; (2) Fire Apparatus prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Oregon commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*, and, accordingly, Plaintiffs and Class members in Oregon seek all relief available under that statute.

011328-11/3505766 V1

## FORTY-SIXTH CLAIM FOR RELIEF:

### RHODE ISLAND ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Rhode Island)**

294. Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws § 6-36-7, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Rhode Island; (2) Fire Apparatus prices in the State of Rhode Island were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Rhode Island commerce and caused Class members in Rhode Island to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Rhode Island seek all forms of relief available under R.I. Gen. Laws § 6-36-7, *et seq.*

### FORTY-SEVENTH CLAIM FOR RELIEF:

### RHODE ISLAND UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Rhode Island)**

295. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non- competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had

011328-11/3505766 V1

the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Rhode Island; (2) Fire Apparatus prices in the State of Rhode Island were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, *et seq*., and, accordingly, Plaintiffs and Class members in Rhode Island seek all relief available under that statute.

**FORTY-EIGHTH CLAIM FOR RELIEF:**

**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in South Carolina)**

296. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of South Carolina; (2) Fire Apparatus prices in the State of South Carolina were raised, fixed,

011328-11/3505766 V1

maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants unlawful conduct, Plaintiffs and South Carolina Class members have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq.*, and, accordingly, Plaintiffs and Class members in South Carolina seek all relief available under that statute.

**FORTY-NINTH CLAIM FOR RELIEF:**

**SOUTH DAKOTA ANTITRUST LAW**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in South Dakota)**

297. Defendants have entered into an unlawful agreement in restraint of trade in violation of S.D. Codified Laws § 37-1-3.1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of South Dakota; (2) Fire Apparatus prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected South Dakota commerce and caused Class members in South Dakota to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in South Dakota seek all forms of relief available under S.D. Codified Laws § 37-1-3.1, *et seq.*

**FIFTIETH CLAIM FOR RELIEF:**

**SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION STATUTE**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in South Dakota)**

298.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of South Dakota; (2) Fire Apparatus prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information

011328-11/3505766 V1

material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiffs and Class members in South Dakota seek all relief available under that statute.

## FIFTY-FIRST CLAIM FOR RELIEF:

### TENNESSEE FAIR TRADE PRACTICE ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Tennessee)**

299. Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. § 47-25-101, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for the sale of Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for Fire Apparatus, tangible goods, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Tennessee commerce and caused Class members in Tennessee to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Tennessee seek all forms of relief available under Tenn. Code Ann. § 47-25-101, *et seq.*

## FIFTY-SECOND CLAIM FOR RELIEF:

### UTAH ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Utah)**

300. Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Ann. § 76-10-3101, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for the sale of Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Utah; (2) prices for Fire Apparatus in the State of Utah were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been

011328-11/3505766 V1

deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Utah commerce and caused Class members in Utah to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Utah seek all forms of relief available under Utah Code Ann. § 76-10-3101, *et seq*.

## FIFTY-THIRD CLAIM FOR RELIEF:

### VERMONT ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Vermont)**

301.     Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vt. Stat. Ann. § 2453, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Vermont; (2) Fire Apparatus prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Vermont commerce and caused Class members in Vermont to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Vermont seek all forms of relief available under 9 Vt. Stat. Ann. § 2465, *et seq*.

## FIFTY-FOURTH CLAIM FOR RELIEF:

### WEST VIRGINIA ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in West Virginia)**

302.     Defendants have entered into an unlawful agreement in restraint of trade in violation of W. Va. Code § 47-18-1, *et seq*. Defendants' Conspiracy had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of West Virginia; (2) Fire Apparatus prices in the State of West Virginia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct

011328-11/3505766 V1

substantially affected commerce in the State of West Virginia and caused Class members in West Virginia to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in West Virginia seek all forms of relief available under W. Va. Code § 47-18-1, *et seq*.

## FIFTY-FIFTH CLAIM FOR RELIEF:

### UNJUST ENRICHMENT
### (on behalf of the State Law Class)

303. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

304. As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from Fire Apparatus.

305. Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and members of the State Law Class.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Classes of all others so similarly situated, respectfully request judgment against Defendants as follows:

A. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

B. The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act and listed state antitrust and common law;

011328-11/3505766 V1

C.      Plaintiffs and the Classes recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiffs and the other Class members be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that is withheld from the public;

F.      Plaintiffs and Class members be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.      Plaintiffs and Class members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      Plaintiffs and Class members have such other and further relief as the case may require and the Court may deem just and proper.

011328-11/3505766 V1

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Dated: March 23, 2026

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: _/s/ Steve W. Berman_
    Steve W. Berman (Bar #12536)
Moses Jehng  (Bar #64333)
Stephanie Verdoia (Bar #58636)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: moses.jehng@hbsslaw.com
Email: stephaniev@hbsslaw.com


By: _/s/ Erin K. Dickinson_
    Erin Dickinson (Bar #1036707)
Charles Crueger (Bar #1029825)
**CRUEGER DICKINSON LLC**
4532 North Oakland Avenue
Milwaukee, WI 53211
Telephone: (414) 210-3868
Email: ekd@cruegerdickinson.com
Email: cjc@cruegerdickinson.com


By: _/s/ Daniel E. Gustafson_
    Daniel E. Gustafson (Bar #202241)
Daniel C. Hedlund (Bar #025833)
Joshua J. Rissman (Bar #0391500)
Frances Mahoney-Mosedale (Bar #402741)
Gabrielle M. Kolb (Bar #504386)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 S Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
Email: dgustafson@gustafsongluek.com
Email: dhedlund@gustafsongluek.com
Email: jrissman@gustafsongluek.com

011328-11/3505766 V1

Email: fmahoneymosedale@gustafsongluek.com
Email: gkolb@gustafsongluek.com

*Interim Co-Lead Counsel for Indirect Purchaser Plaintiffs and Counsel for the Cities of La Crosse and Onalaska and the Claverack Fire District*

Paul F. Novak
Casey Verville
Milena Lai
**WEITZ & LUXENBERG, P.C.**
Fisher Building
3011 West Grand Blvd., 24th Floor
Detroit, MI 48202
Phone: (313) 800-4170
Fax: (646) 293-7992
Email: pnovak@weitzlux.com
Email: cverville@weitzlux.com
Email: mlai@weitzlux.com

*Executive Committee Counsel for Indirect Purchaser Plaintiffs and for the Cities of Ann Arbor, Middletown, and Ridgeland*

Kevin Landau
Brett Cebulash
Miles Greaves
**TAUS, CEBULASH & LANDAU, LLP**
123 William Street, Suite 1900A
New York, New York 10038
Telephone: 646-873-7654
Facsimile: 212-931-0703
Email: klandau@tcllaw.com
Email: bcebulash@tcllaw.com
Email: mgreaves@tcllaw.com

*Executive Committee Counsel for Indirect Purchaser Plaintiffs and for the Commack Fire District*

Douglas P. Dehler (Bar #1000732)
Joseph D. Newbold (Bar #1085294)
**O'NEIL, CANNON, HOLLMAN, DEJONG & LAING S.C.**
111 E. Wisconsin Avenue, Suite 1400
Milwaukee, Wisconsin 53202

011328-11/3505766 V1

Phone: (414) 276-5000
Email: doug.dehler@wilaw.com
Email: joseph.newbold@wilaw.com

James C. Shah
Natalie Finkelman Bennett
**MILLER SHAH LLP**
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Ph. 866-540-5505
Email: jcs@millershah.com
Email: nfinkelman@millershah.com

*Counsel for Plaintiffs and the City of Milwaukee*

011328-11/3505766 V1