# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

| | |
|---|---|
| **IN RE: FIRE APPARATUS ANTITRUST LITIGATION** *Document Relates To:* *Direct Purchaser Class* | Case No. 2:26-md-03179 Hon. William C. Griesbach JURY TRIAL DEMANDED |

## DIRECT PURCHASER PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I. NATURE OF THIS ACTION ................................................................................. 1

II. PARTIES ............................................................................................................ 4

    A. Plaintiffs .................................................................................................... 4

        1. The City of Augusta ............................................................................ 4

        2. The Newstead Fire Company, Inc. ..................................................... 5

        3. The City of Philadelphia ..................................................................... 5

        4. The Metropolitan Government of Nashville & Davidson County .............. 5

        5. The City of Revere .............................................................................. 6

        6. The Borough of Roseland ................................................................... 6

    B. Defendants ................................................................................................. 7

        1. Oshkosh Defendants ........................................................................... 7

        2. REV Group Defendants ...................................................................... 8

        3. American Industrial Partners ............................................................ 13

        4. Rosenbauer Defendants .................................................................... 17

        5. Agents and Co-Conspirators ............................................................. 19

III. JURISDICTION AND VENUE ......................................................................... 20

IV. FACTUAL ALLEGATIONS ............................................................................. 21

    A. The Fire Apparatus Industry ................................................................... 21

    B. Relevant Product Markets ........................................................................ 23

    C. Defendants Systematically Rolled Up the Fire Apparatus Market through Competitor Acquisitions .............................................................. 24

        1. AIP and REV Group .......................................................................... 24

        2. Oshkosh and Pierce ........................................................................... 33

        3. Rosenbauer ........................................................................................ 35

    D. Defendants' Anticompetitive Roll-Ups have Substantially Lessened Competition and May Substantially Lessen Competition or Tend to Create a Monopoly in the Relevant Markets .............................................. 35

    E. Manufacturer Defendants Seek to Cooperate Rather than Compete ............. 37

i

F.  Manufacturer Defendants Exchange Confidential, Competitively Sensitive, Proprietary Information through FAMA ....................................................... 39

    1.  FAMA Statistical and Survey Reports........................................................ 39

    2.  FAMA Meetings Presented Manufacturer Defendants the Opportunity to Collude.................................................................................................... 45

G.  Manufacturer Defendants Submit Uniform Pricing to Governmental Cooperative Pricing Consortiums, Undercutting Competitive Bidding ......... 47

H.  Manufacturer Defendants Restrict Supply Despite Significant Backlogs ...... 48

    1.  Backlogs in Fire Apparatus Orders Increased by 40% or More During the Class Period ............................................................................................ 48

    2.  Facing Increasing Demand, Manufacturer Defendants Reduce Capacity and Have Shuttered Facilities ................................................................... 52

I.  Defendants' Conspiracy Caused Significant Price Hikes and a Dangerous Supply Shortage of Fire Apparatus................................................................ 56

    1.  The Price of Fire Apparatus Doubled During the Class Period................ 56

    2.  Manufacturer Defendants Used "Floating Prices" to Charge Even More 59

    3.  Defendants' Conspiracy Had the Intended Effect of Increasing Margins and Revenues ......................................................................................... 60

V.  MARKET POWER AND BARRIERS TO ENTRY ................................................... 61

A.  The Relevant Markets ................................................................................... 61

    1.  The Product Market Encompasses All Fire Apparatus............................. 62

    2.  The Geographic Market is the United States ........................................... 65

    3.  Manufacturer Defendants Have Market Power ....................................... 65

        i.  High Market Concentration .............................................................. 65

        ii.  High Barriers to Entry...................................................................... 66

        iii.  Price Inelasticity.............................................................................. 67

VI.  ANTICOMPETITIVE EFFECTS.............................................................................. 68

A.  Plaintiffs Paid Artificially Inflated Prices for Fire Apparatus ....................... 68

B.  Inflated Prices and Long Backlogs Prevent Plaintiffs and Class Members from Timely Repairing and Replacing Vehicles, Jeopardizing Public Safety ........ 70

C.  Plaintiffs and Class Members Have Been Harmed by Reduced Abilities to Respond to Emergencies and Disasters ......................................................... 72

ii

D. Plaintiffs and Class Members Have Diverted Funds from Other Essential Needs to Pay Artificially Inflated Prices for Fire Apparatus .......................... 74

E. Defendants Concealed the Conspiracy and Plaintiffs Did Not and Could Not Have Discovered Defendants' Anticompetitive Conduct .............................. 74

VII. ANTITRUST INJURY & DAMAGES ......................................................... 76

VIII. CLASS ACTION ALLEGATIONS ........................................................... 77

IX. CAUSES OF ACTION ...................................................................... 80

COUNT I ............................................................................................ 80

COUNT II ........................................................................................... 81

COUNT III .......................................................................................... 82

COUNT IV .......................................................................................... 84

COUNT V ........................................................................................... 85

X. PRAYER FOR RELIEF ..................................................................... 86

XI. DEMAND FOR JURY TRIAL ............................................................. 88

iii

Plaintiffs City of Augusta, Maine; Newstead Fire Company, Inc.; City of Philadelphia, Pennsylvania; the Metropolitan Government of Nashville & Davidson County; City of Revere, Massachusetts; and Borough of Roseland, New Jersey (collectively, **"Plaintiffs"** or **"Direct Purchaser Plaintiffs"**) on behalf of themselves and all others similarly situated, bring this class action against Defendants and unnamed co-conspirators for violations of sections 1 and 2 of the Sherman Act (15 U.S.C. § 1, 2) and section 7 of the Clayton Act (15 U.S.C. § 18). Plaintiffs seek treble damages and all other monetary remedies available under the applicable federal antitrust laws to compensate themselves and the class for losses associated with the anticompetitive conduct alleged herein. Plaintiffs also seek an injunction requiring Defendants to cease all further anticompetitive practices. Plaintiffs demand a trial by jury on all issues so triable.

## I. NATURE OF THIS ACTION

1. Plaintiffs bring this action on behalf of themselves and on behalf of a proposed class of all others similarly situated, who directly purchased Fire Apparatus[1] from any Manufacturer Defendant(s)[2] (the **"Class"**) from January 1, 2016 up to the present (the **"Class Period"**).

2. Defendants are Oshkosh Corporation; Pierce Manufacturing, Inc.; REV Group, LLC (formerly, REV Group, Inc.);[3] E-ONE, Inc.; Ferrara Fire Apparatus, Inc.; Kovatch Mobile Equipment Corp.; Spartan Fire, LLC; Smeal SFA, LLC; Smeal LTC, LLC; Detroit Truck Manufacturing, LLC; Rosenbauer America LLC; Rosenbauer South Dakota, LLC; Rosenbauer

---

[1] **"Fire Apparatus"** is defined, consistent with NFPA 1900 industry standard as a vehicle "designed to be used under emergency conditions to transport personnel and equipment or to support the suppression of fires or mitigation of other hazardous situations."

[2] "Manufacturer Defendant(s)" is used as defined below at ¶ 2.

[3] Throughout this Consolidated Amended Complaint, "REV Group" is used as defined below at ¶ 30.

1

Minnesota, LLC (together **"Manufacturer Defendants"**); AIP, LLC; American Industrial Partners Capital Fund IV, LP; American Industrial Partners Capital Fund IV (Parallel), LP; AIP/CHC Holdings, LLC; AIP CF IV, LLC; AIP/CHC Investors, LLC (collectively, **"AIP"**); (all named Defendants, collectively, **"Defendants"**) and any successors, agents, assigns of these named entities and/or unnamed, not yet identified co-conspirators with the Defendants (**"Co-Conspirator Defendants"**).

3.     The Manufacturer Defendants manufacture, supply, and sell Fire Apparatus throughout the United States. Together, the Manufacturer Defendants control at least 70 percent of the United States Fire Apparatus market. They have used that dominant market power to unlawfully suppress the Fire Apparatus supply and therefore artificially raise prices of Fire Apparatus. As is set forth in detail below, beginning in or about January 1, 2016, Manufacturer Defendants and the other Defendants entered into an agreement, combination, or conspiracy to limit the supply, and to fix, raise, maintain, or stabilize prices of Fire Apparatus sold in the United States at supra-competitive levels. As a result of Defendants' unlawful conduct, Plaintiffs and the Class paid artificially inflated prices for Fire Apparatus during the Class Period, and, as a result, have suffered injury in violation of the federal antitrust laws.

4.     Defendants' conspiracy as described herein has enabled the Manufacturer Defendants to increase their margins by several percentage points consistently and boost overall profits, all without concern that their competitors will try to steal market share. Manufacturer Defendants are also not worried by potential new entrants, because high barriers to entry prevent new competitors from coming into the market.

5.     Indeed, since the start of the Class Period, Fire Apparatus prices have doubled. This rise cannot be explained by inflation or increased costs and has negatively impacted municipal

2

budgets and the safety of communities. Inflated prices along with longer wait times for new Fire Apparatus have forced municipalities to keep and use older, less reliable Fire Apparatus instead of replacing them with newer models.

6. In response to this harsh reality, congressional and FTC inquiries have commenced to analyze the Defendants' impact on the United States Fire Apparatus market and to examine whether anticompetitive behavior is to blame.

7. On April 15, 2025, in a bipartisan effort, Senators Elizabeth Warren (D-Massachusetts) and James Banks (R-Indiana) sent a letter to Edward A. Kelly, General President, International Association of Fire Fighters, seeking information regarding "the impacts of private equity roll-ups of Fire Apparatus manufacturers, and the adverse impact of this consolidation on fire fighter and public safety[,]" and, among other things, a response to certain questions by April 29, 2025.[4] This inquiry was prompted, at least in part, by the exposure of some alarming facts relating to outrageous price increases, dramatically in excess of inflation, for new Fire Apparatus beginning January 1, 2016, in a *New York Times* article published on February 17, 2025.[5] Months later, on September 10, 2025, the United States Senate Subcommittee for Disaster Relief ("Subcommittee") conducted a hearing ("Fire Apparatus Senate Hearing") to investigate many of

---

[4] Letter from Senator Elizabeth Warren and Senator Jim Banks to Edward Kelly, General President, International Association of Fire Fighters (Apr. 15, 2025), https://www.warren.senate.gov/imo/media/doc/_firefighters.pdf ("Warren Letter").

[5] *See The New York Times*, "*As Wall Street Chases Profits, Fire Departments Have Paid the Price*," Mike Baker, Maureen Farrell, and Serge F. Kovaleski, February 17, 2025, https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html ("Baker, Farrell & Kovaleski"). This NYT article was preceded and perhaps precipitated by a much less widely disseminated report by Basel Musharbash, "*Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires*?," published on the substack, BIG by Matt Stoller (Jan. 25, 2025), https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll ("Musharbash"). Mr. Musharbash was one of the witnesses invited to submit a statement and testify before the Subcommittee.

25706812.1

the same disturbing facts and allegations described in the press.[6] During the Fire Apparatus Senate Hearing, witnesses responded to probing questions from various senators, including the leaders of the Subcommittee, Sen. Josh Hawley (R-Missouri) (Chair) and Andy Kim (D-New Jersey) (Ranking Member).[7]

8. As brought to light in the *New York Times*, posited in the joint letter from Senators Warren and Banks, and further probed at the Fire Apparatus Senate Hearing, the skyrocketing prices and shortage of Fire Apparatus were not the results of a natural market. Rather, as fire chiefs across the country have explained, and as the Subcommittee seemed to have understood, these negative circumstances are the result of corporate greed. Indeed, in 2017, REV Group's then Chief Executive Officer put it very simply when speaking to investors: "at REV, it's all about making money."

## II. PARTIES

### A. Plaintiffs

#### 1. The City of Augusta

9. The City of Augusta **("Augusta")** is the capital city of the State of Maine. It has a population of 18,899 people and is located on the Kennebec River in Central Maine.[8]

10. During the Class Period, Augusta purchased Fire Apparatus directly from Ferrara Apparatus, which is owned by REV Group, including a Ferrara Inferno and a Ferrara Inferno Pumper.

---

[6] *Id.; see also* Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, *New York Times* (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html.

[7] *Id*.

[8] *City of Augusta!* https://www.augustamaine.gov/.

25706812.1

### 2. The Newstead Fire Company, Inc.

11. The Newstead Fire Company, Inc. **("Newstead")**, is located in the village of Akron, New York, in western New York state. Newstead services the town of Newstead, New York (population 8,689)[9] and surrounding areas.[10]

12. During the Class Period, Newstead purchased Fire Apparatus, including a Heavy Rescue unit, directly from E-One, a brand owned by REV Group.

### 3. The City of Philadelphia

13. The City of Philadelphia **("Philadelphia")**, with a population exceeding 1.5 million people, located in southeastern Pennsylvania, is the sixth largest city in the United States.

14. During the Class Period, Philadelphia purchased approximately 90 units of Fire Apparatus, including pumper units and ladder units, directly from brands owned by REV Group, including Kovatch Mobile Equipment and/or Spartan, and/or from brands owned by Oshkosh Corp., including Pierce Manufacturing, Inc.

### 4. The Metropolitan Government of Nashville & Davidson County

15. The Metropolitan Government of Nashville & Davidson County **("Nashville")**, located in middle Tennessee with a population exceeding 700,000 people, is the twenty-first largest city in the United States.

16. During the Class Period, Nashville purchased over 40 units of Fire Apparatus, including multiple pumper units, directly from Rosenbauer.

---

[9] TOWN OF NEWSTEAD, https://www4.erie.gov/newstead/.

[10] THE NEWSTEAD FIRE COMPANY, INC., https://newsteadfire.com/.

## 5. The City of Revere

17. The City of Revere (**"Revere"**) is a city located in Suffolk County, Massachusetts, directly bordering the city of Boston, with a population of roughly 62,000. The City has its own fire department with approximately 118 firefighters. The fire department has five fire stations, five engines ("pumpers"), and two ladder trucks. They respond to approximately 12,000 incidents annually. They have faced challenges maintaining a modern fire apparatus fleet to meet the fire protection needs of the city and its residents.

18. In April 2021, Plaintiff Revere purchased two new E-One (REV Group) custom pumper fire trucks for over a million dollars. In November 2018, Plaintiff Revere directly purchased a new custom ladder truck from Kovatch Mobile Equipment Corporation (**"KME"**), a subsidiary of Defendant REV Group for over one million dollars. As part of that sale, Plaintiff Revere directly contracted with KME (REV Group) for the purchase and warranty of the fire truck. Plaintiff Revere was injured in connection with its purchases during the Class Period as a result of Defendants' anticompetitive and unlawful agreements alleged herein.

## 6. The Borough of Roseland

19. The Borough of Roseland (**"Roseland"**) is a borough located in Essex County, New Jersey, with a population of roughly 6,000. Roseland has its own volunteer fire department with approximately 40 volunteer firefighters. The fire department has one station, three engines ("pumpers"), one aerial ladder truck, and one rescue apparatus.

20. Roseland purchased fire apparatus directly from Pierce, including a 2017 Pierce aerial built on a Pierce Enforcer chassis. Roseland was injured in connection with its purchases during the Class Period as a result of Defendants' anticompetitive and unlawful agreements.

6

25706812.1

### B. Defendants

#### 1. Oshkosh Defendants

21. Defendant Oshkosh Corporation **("Oshkosh")** is a Wisconsin Corporation with its primary place of business at 1917 Four Wheel Drive, Oshkosh, Wisconsin. Oshkosh designs, manufactures, and sells commercial and custom Fire Apparatus under its Pierce and Maxi-Metal brands, primarily to governmental entities and local municipalities, and aircraft rescue and firefighting vehicles under its Oshkosh Airport Products brand to commercial airlines, airports, air-freight carriers, ground handling customers and militaries.

22. Defendant Pierce Manufacturing, Inc. **("Pierce")**, is a Wisconsin corporation with its principal place of business at 2600 American Drive, Appleton, Wisconsin. Pierce is a wholly owned subsidiary of Defendant Oshkosh and is its leading North American Fire Apparatus brand. With manufacturing facilities in Appleton, Wisconsin and Bradenton, Florida, Pierce manufactures a full line of Fire Apparatus and emergency vehicles for sale in the U.S., including pumpers, aerial platforms, ladder and tillers, tankers, rescue vehicles, and wildland response. Pierce also manufactures Aircraft Rescue and Firefighting ("ARFF") vehicles for sale in the U.S. through its Oshkosh Airport Products division.

23. Pierce maintains a corporate sales force for factory-direct sales and a network of U.S.-based independent dealers to sell both Pierce and Maxi-Metal branded products and services nationwide, within exclusive designated territories.

24. Specifically, Pierce has 26 dealers across California, Colorado, Florida, Kansas, Massachusetts, Minnesota, Mississippi, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin. Together, this dealer network sells Fire Apparatus to customers in all 50 states.

7

25706812.1

25. Oshkosh also sells or may sell its Fire Apparatus products, among other products, under a variety of additional brand names including: JLG Industries, Inc., JerrDan LLC, Hinowa S.p.A, AUSACORP S.L., Oshkosh AeroTech, McNeilus Companies, Inc., Oshkosh Commercial Products, LLC, Iowa Mold Tooling Co., Inc., Maxi-Metal, Inc., Kewaunee Fabrications, LLC, Oshkosh Defense, LLC, and Pratt & Miller Engineering & Fabrications, LLC.

26. In late 2025, Oshkosh reported periodic net sales of $7.73 billion across all of its business lines, including Fire Apparatus Manufacturing, and estimated total net sales for 2025 between $10.3 and $10.4 billion, including sales through its subsidiary Pierce. Pierce's precise, quarterly, periodic, and annual net sales are not publicly available, but are believed to be at least $1 billion.

27. Throughout the Class Period, Oshkosh and Pierce sold Fire Apparatus in interstate commerce in the United States. At all relevant times, Oshkosh and Pierce participated and continue to participate in a conspiracy to fix, raise, maintain, or stabilize the prices of Fire Apparatus in the United States.

28. Defendants Oshkosh and Pierce are collectively referred to as the **"Oshkosh Defendants."**

29. Defendants Boise Mobile Equipment, Inc. **("Boise Mobile")** and BME Fire Trucks LLC **("BME Fire Trucks")** (collectively**, "BME"),** are manufacturers of wildland fire apparatus with their principal place of business in Boise, Idaho. BME Fire Trucks is a subsidiary of Boise Mobile. In 2021, Pierce acquired a 25% ownership interest in BME Firetrucks and is a co-member of the LLC with Boise Mobile.

### 2. REV Group Defendants

30. Throughout the class period, Defendant REV Group, Inc., now known as REV Group, LLC **("REV Group")**, is organized under the laws of Delaware and, according to its

25706812.1

website, presently maintains its headquarters in Brookfield, Wisconsin,[11] and since 2016 has been headquartered in the Milwaukee, Wisconsin area. From February 2, 2017 through February 1, 2026, REV Group, Inc. was a publicly traded company.[12] Formed on February 2, 2026 as a part of a stock-for-stock merger of REV Group, Inc. and Terex Corporation, REV Group, LLC, is now a wholly owned subsidiary of Terex Corporation (**"Terex"**). Upon information and belief, other than as to trading its common stock on the New York Stock Exchange, REV Group's business has continued, uninterrupted in the ordinary course since the merger.[13] Accordingly, and for the avoidance of doubt, throughout this complaint, "REV Group" includes any and all predecessors, successors, agents, and assigns of the entity now doing business as REV Group®.

31. REV Group is the largest manufacturer of fire apparatus in the United States by unit volume. Through its brands and subsidiaries, REV Group designs, manufactures, distributes, and sells a portfolio of well-known brands through its operation subsidiaries, including E-ONE, Inc., Kovatch Mobile Equipment Corporation, Ferrara Fire Apparatus, Spartan Emergency

---

[11] https://revgroup.com/who-we-are/.

[12] On February 2, 2026, through a series of complex transactions, REV Group and Terex completed a stock for stock merger of equals (**"Terex merger"**) The combined company trades on the New York Stock Exchange as Terex Corporation (NYSE: TEX). In the first part of the transaction, REV Group, Inc. merged into Tag Merger Sub 1, Inc., a pre-existing Terex subsidiary, and the name of the surviving corporation was REV Group, Inc. ("Part 1"). In a second transaction that same day, the surviving corporation Part 1 merged into a second pre-existing Terex subsidiary, Tag Merger Sub 2, LLC, with Tag Merger Sub 2, LLC, a wholly owned subsidiary of Terex Corporation, surviving the merger. Upon completion of necessary post-merger corporate filings, Tag Merger Sub 2, LLC is now known as REV Group, LLC. As a result of the Terex Merger, REV Group ceased trading its stock on the New York Stock Exchange. Upon information and belief, REV Group is a wholly owned subsidiary of Terex, Corp., and continues to do business as REV Group.

[13] https://revgroup.com/who-we-are/.

25706812.1

Response and Spartan Fire Apparatus and Chassis, Smeal Fire Apparatus, Detroit Truck Manufacturing, and Ladder Tower Company.

32.     Defendant E-ONE, Inc. **("E-ONE")** is a Delaware corporation with its principal place of business at 1601 SW 37th Avenue, Ocala, Florida. E-ONE, Inc. is a wholly owned subsidiary of REV Group.  E-ONE operates manufacturing plants in Ocala, Florida, and Hamburg, New York and manufactures pumpers, tankers, aerial ladders and platforms, rescues, and ARFF vehicles for sale in the U.S.

33.     Defendant Ferrara Fire Apparatus, Inc. **("Ferrara")** is a Louisiana corporation with its principal place of business at 27855 James Chapel Road, Holden, Louisiana.  Ferrara is a wholly owned subsidiary of REV Group. Ferrara operates its primary manufacturing facility in Holden, Louisiana and manufactures a full line of Fire Apparatus and chassis for sale in the U.S., including pumpers, tankers, aerial ladders and platforms, rescues, and wildland apparatus. Ferrara was an independent manufacturer of Fire Apparatus since 1979, until 2017, when Rev Group acquired the company for roughly $100 million.

34.     Defendant Kovatch Mobile Equipment Corp., **("KME")** is a Pennsylvania corporation with its principal place of business at 245 S. Executive Drive Brookfield, Wisconsin. KME is a wholly owned subsidiary of REV Group. Until April 2022, KME operated manufacturing facilities in locations including Nesquehoning, Pennsylvania and Roanoke, Virginia. The Nesquehoning and Roanoke facilities were closed in April 2022.  Thereafter, orders for KME apparatus were transferred to other manufacturing facilities within REV Group. Currently, and at all relevant times, KME manufactures and has manufactured a full line of Fire Apparatus for sale in the U.S., including pumpers, tankers, aerial ladders and platforms, rescues, and wildland apparatus.

35.     Defendant Spartan Fire, LLC **("Spartan")** is a Nevada limited liability corporation with a principal place of business at 907 7th Avenue North, Brandon, South Dakota. Spartan is a wholly owned subsidiary of the REV Group and manufactures a full line of Fire Apparatus under the Spartan and Spartan Emergency Response brands for sale in the U.S., including pumpers, aerial ladders and platforms, tankers, rescues, chassis, and wildland apparatus.

36.     Defendant Smeal SFA, LLC **("Smeal")** is a Michigan Limited Liability Company with a principal place of business at 1541 Reynolds Road, Charlotte, Michigan. Smeal is a wholly owned subsidiary of the REV Group. Smeal manufactures a full line of custom and commercial pumpers, tender/tankers, aerial ladders and platforms, and rescues for sale in the U.S. under the Smeal brand. Smeal operates a manufacturing facility in Snyder, Nebraska.

37.     Defendant Detroit Truck Manufacturing, LLC **("DTM")** is a wholly owned subsidiary of REV Group. DTM is a Michigan limited liability company with a principal place of business in Michigan.

38.     Defendant Smeal LTC, LLC **("Ladder Tower")** is a Michigan limited liability company with a principal place of business at 1541 Reynolds Road, Charlotte, MI. Ladder Tower is a wholly owned subsidiary of the REV Group. Ladder Tower has a manufacturing facility in Ephrata, Pennsylvania and specializes in manufacturing custom aerial ladders and platforms for sale in the U.S. under the Ladder Tower brand.

39.     The "**REV Group Defendants**" or "**REV Brands Defendants**" are comprised of E-ONE, KME, Ferrara, Spartan, Smeal, DTM, and Ladder Tower.

40.     E-One, KME, Ferrara, Spartan, Smeal, DTM, and Ladder Tower all have participated in, supported, advanced, and realized profits from REV Group's unlawful conduct. Similarly, the other KME Entities, the other Ferrara Entities, and Smeal Holding, LLC, have

25706812.1

directed, controlled, participated in, or held assets resulting from the fruits of REV Group, E-One, KME, Ferrara, Spartan, Smeal, Ladder Tower, and DTM's unlawful conduct.

41. REV Group itself, or through the REV Group Defendants, operates, or during the Class Period has operated, manufacturing plants in Ocala, Florida, which produces E-ONE apparatus; Hamburg, New York, which produces stainless steel E-ONE products; Nesquehoning, Pennsylvania, which focuses on KME apparatus; Ephrata, Pennsylvania, where Ladder Tower, KME, and Ferrara apparatus are built; Brandon, South Dakota, which makes Spartan pumpers; Charlotte, Michigan, which manufactures Spartan cabs and chassis; Snyder, Nebraska, which produces Smeal apparatus; and Holden, Louisiana, which manufactures Ferrara apparatus.[14]

42. REV Group Defendants sell Fire Apparatus in all 50 states through 113 nationwide dealers, including approximately 22 dealers representing the E-ONE brand, 15 dealers representing the Ferrara brand, 19 dealers representing the KME brand, and 25 dealers representing the Spartan brands.[15]

43. From at least 2010 through March 2024, REV Group was controlled, directly or indirectly, by a private equity firm, AIP, LLC and its affiliated funds, whose equity holdings afforded them substantial influence over REV Group's operations, strategy, and board composition. AIP, LLC and its affiliated funds formed or founded, REV Group's predecessor in interest, Allied Specialty Vehicles, Inc. (**"ASV"**) in 2010, which became REV Group in 2015. As described more fully below, since at least 2010, REV Group has pursued an aggressive acquisition strategy, consolidating numerous formerly independent Fire Apparatus manufacturers into a single

---

[14] https://revgroup.com/who-we-are.

[15] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands ("All the brands within the REV Fire Group account for 113 dealers nationwide.").

25706812.1

corporate group.[16] As of March 2025, REV Group and its subsidiaries account for approximately 33% of U.S. Fire Apparatus sales, making it the dominant supplier in the market.

44. Throughout the Class Period, each of the REV Group Defendants sold Fire Apparatus in interstate commerce in the United States and participated and continue to participate in a conspiracy to fix, raise, maintain, or stabilize the prices of Fire Apparatus in the United States.

### 3. American Industrial Partners

45. Defendant AIP, LLC d/b/a American Industrial Partners (**"AIP, LLC"** or **"American Industrial Partners"**) is a Delaware limited liability company with its principal place of business in New York, New York.

46. Defendant American Industrial Partners Capital Fund IV, LP (**"AIP Fund IV"**) is a Delaware limited partnership with its principal place of business in New York, New York. AIP Fund IV held an ownership interest in REV Group from 2006 until March 2024.

47. Defendant American Industrial Partners Capital Fund IV (Parallel), LP (**"AIP Parallel Fund"**) is a Delaware limited partnership with its principal place of business in New York, New York. AIP Parallel Fund held an ownership interest in REV Group during the relevant period, through 2024.

48. Defendant AIP/CHC Holdings, LLC (**"AIP Holdings"** and together with the AIP Fund IV and AIP Parallel Fund, the **"AIP Funds"**) is a Delaware limited liability company with its principal place of business in New York, New York. AIP Holdings has held an ownership interest in REV Group at all relevant times.

49. Defendant AIP CF IV, LLC (**"AIP CF"**) is the general partner responsible for the management of AIP Fund IV and AIP Parallel Fund, and has exercised control over the funds

---

[16] Warren Letter (Apr. 15, 2025), *supra,* n.4, at 1.

25706812.1

since at least 2008. Defendant AIP/CHC Investors, LLC (**"AIP/CHC"**) is the managing member responsible for the management of AIP Holdings, and has exercised control over the funds since at least 2008. Both AIP CF and AIP/CHC are Delaware limited liability companies, and each share its principal place of business with AIP and the AIP Funds in New York, New York.

50. All of the interrelated AIP Defendants (collectively, **"AIP"**) at all times functioned in unison and with a unity of purpose and identity, or as agents, and were operated, managed, and controlled by the same overlapping directors, officers, managers, and principals.

51. Founded in 2005, AIP is a private equity firm with more than $16 billion of cumulative capital raised since its inception. AIP typically acquires ownership interest in established businesses with sales greater than $500 million and enterprise value of up to $2 billion. AIP refers to such businesses in which it acquires an ownership stake as "portfolio companies." AIP's targets include privately held companies with leading market positions and value creation opportunities through M&A and industry consolidation.

52. Far from being merely a passive investor in its portfolio companies, AIP describes itself as "operationally-minded" and emphasizes its collaborative, hands-on involvement in the businesses it acquires.

53. Until March 2024, even after REV Group's IPO, AIP maintained substantial operational control over REV Group. To carry out its "operationally-minded" involvement in the business affairs of REV Group, and in its direction and furtherance of the anticompetitive exclusionary scheme, AIP used a complex maze of related AIP entities, including investment funds which operate as limited partnerships. Upon information and belief, AIP, through a related holding company, continued to possess a beneficial interest in REV Group until REV Group's stock ceased public trading in connection with the Terex merger.

25706812.1

54. At all relevant times through March 2024, AIP exercised control over the AIP Funds and their affiliates through interlocking directors, officers, and principals, including but not limited to John Becker, Dino Cusumano, Kim Marvin, Paul Bamatter, Graham Sullivan, Justin Fish, Joel Rotroff, and Stanley Edme. Some or all of these individuals were actively involved in the management and operations of REV Group, including through service on its Board of Directors, during the relevant time period.

55. AIP focuses on acquiring industrial businesses and has developed expertise in their management. AIP's website identifies various portfolio companies within its operational or managerial purview. AIP also details success stories related to its profitable exit from portfolio companies it once owned, managed, and controlled, including REV Group.

56. AIP's website purports to describe its own managerial and operational success stories, through profiles of its past investments, including REV Group. There REV is described as "a leading diversified manufacturer of specialty vehicles," that operates in three industry segments. The profile also states that, "[w]ithin the Fire & Emergency segment, REV offers an extensive line of Fire Apparatus under the E-ONE, KME, Ferrara, Spartan, Ladder Tower, and Smeal brand names." Further, it notes that AIP's involvement in this enterprise began with an acquisition made in 2006 and ended with an exit in 2024. In short, AIP touts continuous ownership interest and managerial control over REV Group for 18 years, from 2006-2024.[17]

57. From 2006 through at least 2024, AIP directed or conspired with REV Group to acquire rival Fire Apparatus manufacturers throughout the United States. Acting in concert with one another, and with other members of AIP's exclusionary scheme, AIP committed overt acts

---

[17] https://americanindustrial.com/project/rev-2/.

25706812.1

in furtherance of AIP's exclusionary scheme. AIP provided funding to enhance, extend, and ensure REV Group's market power and obtained financial rewards as a result.

58. Since 2024, when AIP purportedly ceased operational control over REV Group, AIP continue to maintain a beneficial interest in REV Group through AIP Holdings' ongoing REV Group stockholdings and, thus, continue to derive a financial benefit from the exclusionary scheme.

59. AIP has a long history of conducting business in Wisconsin. For instance, AIP held a controlling interest in JHT Holdings, Inc., a transportation and logistics company headquartered in Wisconsin, and actively managed the company there.[18] Before that, AIP also owned and managed Bucyrus International, another company based in Wisconsin.[19] Tim Sullivan was the chief executive officer of Bucyrus International for 35 years before he was picked by AIP to lead REV Group and serve in the same capacity under AIP's management and control.[20]

60. When AIP selected Tim Sullivan to lead REV Group, AIP offered to move REV Group's headquarters to Wisconsin.

61. In 2016, AIP moved REV Group's headquarters to Milwaukee, Wisconsin.

62. AIP currently holds assets located in Wisconsin and/or continues to conduct business in Wisconsin.

---

[18]American Industrial Partners, JHT Holdings, https://americanindustrial.com/project/jht-holdings/; *JHT Holdings: American Industrial Partners Invests in JHT Holdings, Inc.*, WisBusiness, https://www.wisbusiness.com/2005/jht-holdings-american-industrial-partners-invests-in-jht-holdings-inc/.

[19] *American Industrial Partners to Acquire Bucyrus*, *New York Times* (Aug. 1, 1997), https://www.nytimes.com/1997/08/01/business/american-industrial-partners-to-acquire-bucyrus.html

[20] Rick Barrett, *Former Bucyrus CEO bringing a $2 billion company's headquarters to Milwaukee*, (Feb. 22, 2016), https://archive.jsonline.com/business/former-bucyrus-ceo-bringing-a-2-billion-company-headquarters-to-milwaukee-b99674765z1-369735561.html.

25706812.1

63. Acting through REV Group, AIP has sold fire apparatus across the entire country, including in Wisconsin and in this District. AIP's sale of fire apparatus through REV Group was specifically directed at states across the country, including in Wisconsin and in this District.

### 4. Rosenbauer Defendants

64. Defendant Rosenbauer America LLC **("Rosenbauer America")** is a wholly owned subsidiary of Rosenbauer International AG (**"Rosenbauer International"**), a publicly traded company based in Austria and listed on the Vienna Stock Exchange. Rosenbauer America is a Delaware Corporation with its primary place of business at 100 3rd St., Lyons, South Dakota.

65. Defendant Rosenbauer South Dakota, LLC **("Rosenbauer SD")** is a Delaware limited liability company with its principal place of business at 100 3rd Street, Lyons, South Dakota. Rosenbauer SC is a wholly owned subsidiary of Rosenbauer America. Rosenbauer SC manufacturers Fire Apparatus for sale in the U.S., including aerials, pumpers, pumpers-tankers/tenders, and special service vehicles.

66. Defendant Rosenbauer Minnesota, LLC **("Rosenbauer MN")** is a Delaware limited liability company with its principal place of business at 5181 260th Street, Wyoming, Minnesota. Rosenbauer MN is a wholly owned subsidiary of Rosenbauer America. Rosenbauer MN manufactures for sale in the U.S. wildland and brush apparatus, aerials, pumpers, pumpers-tankers/tenders, ARFF vehicles, special service vehicles, and electric/alternative fuel apparatus.

67. Defendants Rosenbauer America, Rosenbauer SD, and Rosenbauer MN are collectively referred to as **"Rosenbauer."**

68. Rosenbauer has production facilities in Lyons, South Dakota; Wyoming, Minnesota; and Fremont, Nebraska. Rosenbauer produces custom and commercial pumpers, heavy rescues, tenders, mini pumpers and light rescues, aerial ladders and platforms, and electric fire engines. Rosenbauer has dealers across Alabama, Arizona, California, Colorado, Florida, Georgia,

Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, South Dakota, Texas, Utah, Washington, and West Virginia. Together, these dealers sell Fire Apparatus to customers in all 50 states.

69.     Rosenbauer captures approximately $307 million in United States Fire Apparatus sales annually, or at least 10% of the market.

70.     Notably, Rosenbauer has a history of engaging in anticompetitive conduct in its home market. In 2011, it participated in two separate conspiracies targeting local fire departments in Europe. First, the German Federal Cartel Office (Bundeskartellamt) found Rosenbauer guilty of participating in a price fixing cartel for Fire Apparatus and fined Rosenbauer 10.5 million Euros, which fine Rosenbauer did not contest.[21] Additionally, a Rosenbauer subsidiary admitted to participating in a ladder Fire Truck cartel in Europe as follows:

> The German competition authority, the Bundeskartellamt, has imposed a fine of €17.5 million on Iveco Magirus Brandschutztechnik for its involvement in anti-competitive agreements on the manufacture of turntable ladder fire fighting machines.

> The authority said in a statement that Metz Aerials, the German aerial ladder subsidiary of Austria's Rosenbauer, was also part of the cartel, but has not been fined because Rosenbauer informed the Bundeskartellamt of the cartel agreement in 2010 "by way of a leniency application".

> The Bundeskartellamt said it had referred the sales managers and CEOs involved "to the competent public prosecutor's office for examination under criminal law."

> In July, Iveco Magirus Brandschutztechnik said its managing director, Mr Roel Nizet, had resigned from the company in May at his own request.

> The cartel agreement concerned the manufacture of fire engines with turntable ladders

---

[21] SJ Berwin LLP EU & Competition, MONDAQ.COM, *German Federal Cartel Office Fines Producers Of Fire Engines €20.5m For Price Fixing And Quota Agreements*, https://www.mondaq.com/germany/eu-law-regulatory/123096/german-federal-cartel-office-fines-producers-of-fire-engines-%E2%82%AC205m-for-price-fixing-and-quota-agreements.

between 1998 and November 2007, of which Iveco and Rosenbauer have a combined market share of close to 100%, said the Bundeskartellamt.

The authority said that during this period the companies' sales managers met at regular intervals and divided tenders among each other on the basis of project lists.

***The authority said that to conceal the cartel agreements, the sales managers initially communicated via prepaid mobiles and since the football world championship 2006 in a 'football code' referring to cartel meetings as 'training' and to rebates in the form of match results.*** [22]

71. Throughout the Class Period, Rosenbauer sold Fire Apparatus in interstate commerce in the United States. At all relevant times, Rosenbauer participated and continues to participate in a conspiracy to fix, raise, maintain, or stabilize the prices of Fire Apparatus in the United States.

### 5. Agents and Co-Conspirators

72. **"Defendants,"** as used herein, refers to and includes each of the named Defendants' predecessors, successors, assigns, agents, parents, wholly owned or controlled subsidiaries, affiliates, employees, officers, and directors.

73. Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions while they were actively engaged in the management, direction, control, or transaction of the corporations' business or affairs, and for whom they are liable.

74. Various other persons, firms, and entities not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof.

---

[22] Murray Pollok, KHL.COM, (Jul. 29, 2011) *Iveco Magirus and Metz Aerials in German cartel ruling* https://www.khl.com/news/iveco-magirus-and-metz-aerials-in-german-cartel-ruling/1066089.article (emphasis added).

25706812.1

Plaintiffs reserve the right to name some or all of these entities as Defendants. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators, whether or not they are named as defendants in this Complaint.

75. To the extent that discovery reveals there are subsidiaries, holding companies, or other entities affiliated with any Defendant that participated in, supported, advanced, and/or held assets resulting from the unlawful conduct alleged herein, Plaintiffs reserve the right to name any such entities as Defendants.

76. Whenever reference is made to any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

77. Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## III.   JURISDICTION AND VENUE

78. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, as this action arises out of and seeks relief pursuant to sections 1, 2, and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 2, 3), as well as sections 4, 7, and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 18, 26). Plaintiffs seek damages in excess of $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

79. Venue is appropriate in this District pursuant to 15 U.S.C. §§ 15 and 22, as well as 28 U.S.C. § 1391(b), (c), and (d) in that at least one or more of the Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because

20

25706812.1

a substantial portion of the affected interstate commerce described herein was carried out in this District.

80. This Court has personal jurisdiction over Defendants because they: (1) transacted business throughout the United States, including in this District; (2) have substantial contacts within the United States, including in this District; and/or (3) are engaged in an antitrust conspiracy that was and is directed at, and had and has the intended effect of causing injury to, persons residing in, located in, and/or doing business in the United States, including in this District.

81. The activities of the Defendants and all co-conspirators, as described herein, were intended to and did have a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District. Defendants sell their products and services in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

## IV. FACTUAL ALLEGATIONS

### A. The Fire Apparatus Industry

82. Fire Apparatus, commonly referred to outside the industry as fire trucks, or fire engines, includes pumpers, aerial trucks, and rescue units that are designed for use by fire departments and emergency services. Fire Apparatus are built on unique chassis specifically designed for fire trucks, that generally position the driver over or in front of the front wheels as well as other features that make them suitable for building fire apparatus. The Fire Apparatus market is a critical sector of the national economy, providing municipalities, private contractors, and other entities with specialized vehicles and equipment to provide essential services such as fire suppression, emergency and rescue response, disaster relief, aircraft rescue, and firefighting.

21

83. The modern Fire Apparatus manufacturing industry boomed in the post-war decades of the 1950s and 1960s.[23]  Small and midsized Fire Apparatus manufacturers—typically family-owned operations—appeared in every region of the country to produce emergency vehicles tailored to the needs of local fire departments.  The industry was competitively diversified across at least two dozen companies.  Competition among these smaller firms kept prices near costs, and the existence of a large number of manufacturers ensured adequate manufacturing capacity to meet demand.[24]

84. For decades, the diverse Fire Apparatus industry enjoyed relative stability under competitive conditions. Fire Apparatus prices rose annually by about 3%, adjusted for inflation. By 2008, about 5,000 new units of Fire Apparatus were being sold in the United States each year.

85. However, the Fire Apparatus industry (like many others) ground to a halt during the 2008 financial crisis.  Local governments and other Fire Apparatus buyers saw their budgets slashed, which caused a temporary drop in demand for new Fire Apparatus. By 2011, new Fire Apparatus sales had decreased by more than 40% from its peak.

86. The product life cycle for Fire Apparatus is characterized by long service durations and high capital costs. For example, pumpers (which carry water to pump into a fire) and aerial ladders (units equipped with an extendable ladder) generally have useful lives of 10–12 years and 20–30 years, respectively.  Despite relatively low annual mileage, Fire Apparatus will become technologically obsolete before reaching the end of useful mechanical life, necessitating periodic fleet renewal to maintain both operational readiness and compliance with evolving safety standards.

---

[23] Musharbash, *supra*, n.5.

[24] Musharbash, *supra*, n.5.

87. Over the past decade, Fire Apparatus prices have surged, with pumpers now often exceeding $1 million per unit and ladder units often surpassing $2 million per unit. By contrast, in 2013, a pumper unit cost $500,000, and a ladder unit cost $900,000. This precipitous price increase far outpaces inflation for heavy duty truck manufacturing in the same time period.

88. In addition to rising prices, manufacturers have maintained a growing backlog, leading to wait times that can now be as long as 4.5 years. Since 2019, the lead times for Fire Apparatus delivery have increased from 1 year, to 2 years, and now up to 3.5 years.[25]

89. The Fire Apparatus industry is highly concentrated, with three manufacturers—REV Group, Oshkosh/Pierce, and Rosenbauer America—collectively controlling at least 70% of the market.[26]

**B.      Relevant Product Markets**

90. Defendants' anticompetitive conduct has substantially lessened competition and harmed purchasers within the market for fire apparatus (fire trucks). Within the broader market for fire apparatus are several sub-markets for specialty parts and vehicles, including the market for fire apparatus chassis and the market for wildland fire apparatus.

91. The hypothetical monopolist test ("HMT") is an academically accepted test that economists employ to determine the outer bounds of a relevant market for analyzing anticompetitive effects. The HMT tests whether a hypothetical monopolists of the theorized relevant market would be able to profitably impose a small but significant and non-transitory price increase ("SSNIP"). If a hypothetical monopolist could do so profitably—that is without losing

---

[25] Warren Letter (Apr. 15, 2025), *supra*, n.4, at 3.

[26] Letter from Senator Josh Hawley and Senator Andy Kim to Mark Skonieczny, John Pfeifer, and Rob Kreikemeier (Apr. 3, 2025), https://www.hawley.senate.gov/wp-content/uploads/2025/04/Hawley-Letter-to-Firetruck-Executives.pdf.

too many customers to other products outside of the proposed relevant market—then the market is considered a valid market for antitrust purposes in which competition is sufficiently isolated.

92. In each of the identified markets, a hypothetical monopolist would be able to profitably impose a SSNIP, and therefore each market, including the sub-markets within the market for Fire Apparatus generally, such as for Fire Apparatus chassis and wildland Fire Apparatus is a valid market for antitrust purposes.

93. Assessment of the *Brown Shoe* factors are another means by which courts and economists isolate markets of competition and determine relevant markets for antitrust purposes. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

94. The *Brown Shoe* factors all support the relevant product market and sub-markets identified above.

95. The industry and the public recognize that Fire Apparatus, custom chassis, and specialized wildland fire apparatus are distinct economic markets in which competition is isolated.

96. For all of the reasons described above, each of the products (fire trucks and chassis) within the broader Fire Apparatus market and submarkets for chassis and wildlands fire apparatus have "peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."

### C. Defendants Systematically Rolled Up the Fire Apparatus Market through Competitor Acquisitions

#### 1. AIP and REV Group

97. AIP is a Wall Street-based private equity firm that specializes in the investment and active management of industrial businesses. AIP has a specific approach to maximizing investment returns. AIP looks to acquire "leaders in their industrial market niches," but have "unexploited opportunities." First, AIP "pursues businesses that enjoy competitive positions, proprietary

25706812.1

capabilities, and/or leading market shares." Second, AIP manages the acquired companies to "significantly increase" earnings by implementing what it calls an Operating Agenda. The Operating Agenda is a "detailed action plan" that AIP develops and implements "in partnership with management." "Based on the experience of the AIP team," the Operating Agenda typically includes (among other things): "add-on acquisitions and divestitures," "operating expense rationalization," "lean manufacturing," "warranty cost reduction," and "aftermarket opportunities."[27] AIP runs an entire team "consist[ing] of engineers and operating executives in addition to financial professionals" to develop and execute the Operating Agenda.[28]

98.     On August 5, 2008, AIP announced that it had entered the Fire Apparatus market through AIP Fund IV's direct acquisition of E-ONE in a carveout transaction from Federal Signal Corporation. E-ONE, a leading Fire Apparatus manufacturer, became the foundation for AIP's planned roll-up of the Fire Apparatus Market. As described by an AIP managing partner at the time, E-ONE was "a premier brand name in the fire rescue market [which] has a tremendous franchise that we can build on."[29] E-ONE then manufactured and continues to manufacture a complete range of Fire Apparatus, including brush units, pumpers, and aircraft rescue and firefighting vehicles.

99.     On August 18, 2008, AIP closed its AIP Fund IV with committed capital in excess of its $405 million target. The fund's limited partners included HSBC, Partners Group, FLAG

---

[27]*Investment Philosophy*, American Industrial Partners, https://americanindustrial.com/investment-philosophy/.

[28] *Values*, American Industrial Partners, https://americanindustrial.com/about/values/.

[29] American Industrial Partners, Acquisition of E-ONE, Inc., https://americanindustrial.com/american-industrial-partners-announces-acquisition-of-e-one-inc-a-subsidiary-of-federal-signal-corporation/.

Capital Management, Goldman Sachs, Grove Street Advisors, John Hancock Life Insurance Company, and Parish Capital.

100. On August 24, 2010, AIP formed REV Group's predecessor, ASV, through the combination of E-ONE with three other AIP portfolio companies.[30] With approximately $1 billion in combined revenue, ASV became an immediate market leader in specialty vehicles, including Fire Apparatus.

101. On July 9, 2014, AIP offered Timothy M. Sullivan the role of CEO of ASV, describing a partnership that could create $800 million to $1 billion in shareholder value over a three-year period. In its offer, AIP highlighted ASV's 14 manufacturing sites, $1.7 billion revenue—a 70 percent increase from just four years earlier—and market leading positions across multiple specialty vehicle categories, including fire and emergency. AIP stated that Sullivan was "ideal to lead ASV as its end markets accelerate with the recovery of municipal and discretionary consumer spending and as we prepare for a public exit of a rapidly improving business." Among Sullivan's top priorities was to assist AIP "with the purchase and integration of targeted acquisitions and preparing [REV Group] for a highly successful public exit."

102. On November 1, 2015, under AIP's ownership, direction and control, ASV changed its name to REV Group, Inc. to signal the company's planned growth strategy.[31] As Sullivan explained, "Like a revving engine letting bystanders know a car is preparing for a quick acceleration, REV communicates to the world that we are set for growth."

---

[30] *AIP Announces the Formation of Allied Specialty Vehicles, Inc.*, American Industrial Partners (Aug. 24, 2010), https://americanindustrial.com/american-industrial-partners-announces-the-formation-of-allied-specialty-vehicles-inc-a-leading-manufacturer-of-specialty-vehicles-in-north-america/.

[31] *Allied Specialty Selects REV as New Company Name*, Fire Apparatus & Emergency Equipment (Nov. 2, 2015), https://www.fireapparatusmagazine.com/fire-apparatus/ambulances/allied-specialty-vehicles-selects-rev-as-new-company-name/.

25706812.1

103. In early 2016, under AIP's direction and active management, REV Group's corporate headquarters were relocated from Orlando, Florida to Milwaukee, Wisconsin.

104. After the rebranding, AIP accelerated its pace of rolling up Fire Apparatus manufacturers and consolidating the market through REV Group.

105. In 2016, through AIP's expertise and long-term plan to roll-up the market, and under AIP's ownership, direction, and control, REV Group purchased KME, based in Nesquehoning, Pennsylvania for $40 million. Founded in 1946 as a family business, at the time, KME had more than 800 associates and operated in Pennsylvania, Virginia, New York, and California. KME had an "extensive independent dealer network" and produced a broad array of Fire Apparatus, including pumpers, aerials, and tankers.[32] KME still produces a broad array of Fire Apparatus, including pumpers, aerials, and tankers.

106. On February 1, 2017, AIP took REV Group public, selling 12.5 million shares at $22.00 per share for gross proceeds of $275 million. Following the IPO, AIP retained—through the AIP Funds—approximately 70% of REV Group's outstanding shares as of December 15, 2017.[33] As one Wells Fargo analyst observed, AIP held "substantial control over corporate actions irrespective of how other shareholders vote."[34]

---

[32] REV Group Acquires Kovatch Mobile Equipment, REV Group (Apr. 11, 2016), https://investors.revgroup.com/investor-releases/2016/11-04-2016; Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, Fire Apparatus & Emergency Equipment (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/; *KME Fire Apparatus Sold REV Group*, Firehouse (Apr. 11, 2016), https://www.firehouse.com/apparatus/press-release/12193362/fire-apparatus-manufacturer-kme-kovtach-pumpers-aerials-heavy-rescue-fire-apparatus-builder-kme-fire-apparatus-sold-to-revgroup/.

[33] Investors.com, The New America, (Mar. 17, 2017) "This Fire Truck Maker Hopes to Catch Hot Market at Right Time," https://www.investors.com/research/the-new-america/this-ipo-looks-to-transport-an-older-urbanized-population/.

[34] *Id*.

25706812.1

107. In connection with the offering, AIP entered into an amended and restated shareholders agreement ("REV Shareholders Agreement") granting AIP expansive governance rights and control over REV Group. Under the REV Shareholders Agreement, so long as AIP maintained 15% of all outstanding shares of REV Group's common stock, AIP would hold the right to exercise control over all major REV Group corporate actions, and AIP exercised all such rights.

108. Specifically, under the REV Shareholders Agreement, so long as AIP held at least 15% of REV Group's outstanding shares it would retain the ability to nominate the greater of five board members or a majority of directors, designate the Board Chairman, approve special dividends exceeding $10 million, approve mergers or asset sales involving more than 15% of REV Group's consolidated assets or revenues, and approve any bankruptcy proceedings or voluntary dissolution of the company or material subsidiaries.

109. Shortly after the IPO, in March 2017, under AIP's direction and control, for $100 million, REV Group completed the acquisition of another family-owned business, Ferrara Fire Apparatus, Inc., based in Holden, Louisiana. At the time, Ferrara had more than 450 employees and annual revenue of approximately $140 million. [35] Before the purchase, Ferrara was a key competitor of E-ONE in the southern United States.[36] In REV Group's own words, Ferrara was a "leading custom fire apparatus" manufacturer. By acquiring Ferrara, AIP ensured that REV Group

---

[35] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/.

[36] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/; *REV Group Acquires Ferrara Fire Apparatus, Inc.,* REVGROUP.COM (Apr. 25, 2017), https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523.

enhanced its "geographic markets and its product offering, particularly with custom Fire Apparatus including pumpers, aerials, and industrial vehicles."

110. Dan Peters, then-President of the fire division within REV Group, noted in 2017 that "the addition of Ferrara to the REV Fire Group enable[d] a number of new growth opportunities including expansion of our reach nationwide and adding new geographical regions and key accounts." Timothy Sullivan, REV Group's then-CEO, speaking to investors confirmed, "Ferrara will immediately contribute strategic value by expanding the REV Fire Group national footprint, dealer sales network, service and after-market parts revenue as well as enhancing our robust line of custom chassis and aerial products for multiple market segments." Explaining the significance of REV Group's acquisition of Ferrara, Sullivan also said, "We now have by far the largest portfolio of fire apparatus of any competitor in the United States, which means that we can effectively bid on everything that's out there."

111. With the acquisition of Ferrara, REV Group wielded substantially increased market power. At this point, REV Group's subsidiaries included E-ONE, KME, and Ferrara, each a major Fire Apparatus brand in its own right, all consolidated into one company. Yet AIP was not satisfied and continued rolling up the market by acquiring additional Fire Apparatus manufacturers, further eliminating competition.

112. These roll-up acquisitions of competitors and potential competitors also had the desired effect of increasing the remaining manufacturer's ability to coordinate amongst each other on prices and output.

113. In 2020, for $55 million, AIP-controlled REV Group purchased Spartan Emergency Response and its affiliated brands, Spartan Fire Apparatus and Chassis, Smeal Fire Apparatus,

25706812.1

Detroit Truck Manufacturing, and Ladder Tower Company.[37] These brands had a significant presence in the Midwest market. These acquisitions solidified AIP and REV Group's position as the top Fire Apparatus manufacturer in the United States, representing at least 30-40% of all U.S. Fire Apparatus sales. The acquisition of Spartan was key to AIP and REV Group's control over the industry, because Spartan was one of only three manufactures of fire apparatus chassis that supplied other competing manufacturers with their chassis—a critical input into the manufacture of fire apparatus. By gaining control of this critical input on which other competitors depended, AIP and REV Group acquired significant power over its competitors' supply chains.

114. AIP's acquisitions of competitor Fire Apparatus manufacturers since 2008 substantially reduced competition in the Fire Apparatus manufacturing market, creating and maintaining REV Group's position as a dominant Fire Apparatus manufacturer in the United States not through internal expansion and competition on the merits, but through mergers and acquisitions that eliminated REV's competition and allowed the remaining manufacturers to coordinate on prices and output far more effectively.

**Figure 1. REV Group's Acquisitions of Fire Apparatus Manufacturers**

| Acquisition | Year | Value | Significance |
|---|---|---|---|
| E-ONE, Inc. | 2008 | $20M | • Third largest manufacturer at the time<br>• Set the base for horizontal roll-ups |
| Kovatch Mobile Equipment Corporation | 2016 | $40M | • Family-owned, founded in 1946<br>• Full Fire Apparatus product portfolio<br>• More than 800 employees |

---

[37] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/; *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, REVGROUP.COM (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03-2020-135942281.

25706812.1

| | | | |
|---|---|---|---|
| Ferrara Fire Apparatus, Inc. | 2017 | $100M | • Family-owned, founded in 1982<br>• E-ONE's direct competitor<br>• More than 450 employees<br>• Allowed REV Group to cover the "entire map" |
| Spartan Emergency Response | 2020 | $55M | • Over a century in the Fire Apparatus market<br>• "[S]olidified REV as the number one player in the North American Fire & Emergency market" |

115.    AIP and REV Group used this acquired market power to tamp down competition. Although REV executives initially made a show of preserving the independence of the company's subsidiary manufacturers and their dealers, they simultaneously warned that aggressive or "negative" competition among subsidiaries would not be tolerated.[38]

116.    By 2021, REV Group stopped pretending to support subsidiary independence. A REV Group investor presentation referred to REV Group as "an industry consolidator." That same presentation highlighted a strategy that called for REV Group's subsidiaries to "[c]onverge on common designs that can be shared across brands." REV Group also ensured its larger fire department customers dealt directly with corporate-level staff rather than individual brand representatives.[39]  That same REV Group investor presentation further called for the elimination of geographic overlaps between the marketing of its different Fire Apparatus brands and dealers. REV's Fire Apparatus operations are now "center-led," with REV Group dictating and managing the execution of "margin improvement actions" across its subsidiaries.[40]

---

[38] Musharbash, *supra,* n.5.

[39] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/.

[40] Musharbash, *supra*, n.5.

25706812.1

117. REV Group explained to shareholders that its goal was to double the Fire Apparatus companies' profitability. Timothy Sullivan, REV Group's then-CEO, told analysts that REV companies had profit margins of 4 to 5 percent, and that REV was on a path "to get all of them above that 10 percent level." Sullivan further explained: "You bring them into the fold, you got to give them the religion, and they've got it now."[41]

118. In early 2024, AIP completed its strategic exit from REV Group through a two-part transaction. On February 20, 2024, AIP disposed of 18,400,000 shares for approximately $290 million in gross proceeds. This was followed by a second offering on March 15, 2024, in which AIP sold 7,385,191 shares for approximately $127.6 million. Upon information and belief, since March 2024, AIP has retained a beneficial ownership interest below 5% of all outstanding shares in REV Group through AIP Holdings.

119. Prior to its exit, AIP controlled REV Group either as its outright or largest owner under the terms of the REV Shareholders Agreement.[42] From 2017 until its March 15, 2024 exit, AIP maintained an ownership interest in REV Group from as high as 70% to at least 46.3%:

| Date | Ownership Interest |
|---|---|
| 2/1/2017 | 70.0% |
| 12/15/2017 | 52.7% |
| 12/16/2018 | 53.9% |
| 10/31/2019 | 54.3% |
| 10/31/2020 | 53.3% |
| 10/31/2021 | 42.7% |
| 10/31/2022 | 46.5% |
| 10/31/2023 | 46.3% |
| 3/15/2024 | 3.4% |

---

[41] Baker, Farrell & Kovaleski, *supra*, n.5.

[42] Prior to the second quarter of the fiscal year 2024, AIP was REV Group's largest equity holder.

120. AIP's ownership interest in REV Group never fell below 15% at any time between REV Group's IPO and the closing of AIP's exit transaction on March 15, 2024. All the while, and from time to time, AIP sold portions of its REV shareholdings. Accordingly, under the REV Shareholders Agreement, AIP was able to maintain and exercise management and control over REV Group's strategic direction and major corporate decisions throughout its post-IPO investment period, ensuring control over key transactions, acquisitions, and governance matters even as its ownership percentage declined over time.

121. At all times since 2008 when AIP acquired E-ONE Inc. and then founded ASV, the predecessor of REV Group, until March 15, 2024, AIP both took independent action and actively managed, controlled, and directed REV Group in pursuit of the anticompetitive scheme to roll-up the Fire Apparatus industry, eliminate competition, reduce supply, and increase prices.

### 2. Oshkosh and Pierce

122. Oshkosh's primary North American subsidiary, Pierce, announced in 2021 that it had acquired a significant ownership interest in Boise Mobile and was working collaboratively with BME. BME's product portfolio, which allowed Pierce to expand its reach to West Coast markets, included Fire Apparatus like the Model 34, Tactical Tender, and Type 6 Xtreme.

123. Pierce and BME have admitted to their agreement to collaborate and work together as partners, rather than compete. Pierce's website states that the ownership interest will facilitate greater collaboration between Pierce and BME and that Pierce and BME will now work together.

124. In 2022, Oshkosh acquired Maxi-Metal, Inc., a leading designer and manufacturer of custom Fire Apparatus.

125. In addition to purchasing third-party manufacturers, Oshkosh also consolidated the brands already within its purview, reducing geographic overlap between dealers. In July 2018,

Pierce subsidiary MacQueen Emergency Group ("MacQueen") acquired Schuhmacher Fire Equipment. The acquisition consolidated MacQueen's control over Minnesota, Nebraska, South Dakota, North Dakota, and Missouri.

126. In January 2019, Pierce dealer Siddons-Martin Emergency Group ("Siddons") acquired Superior Equipment, consolidating control over Texas, Louisiana, New Mexico, Utah, and Nevada.

127. In November 2019, Pierce dealer Allegiance Fire and Rescue ("Allegiance") acquired Minuteman Fire and Rescue. The acquisition expanded Allegiance's territory to encompass most of New England, including Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

128. In September 2023, Pierce dealer, Firematic Supply Co. Inc. ("Firematic") acquired Churchville Fire Equipment. The acquisition consolidated Firematic's control over Connecticut and New York.

129. Most recently, on June 12, 2025, Pierce's Reliant Fire Apparatus brand ("Reliant") acquired Halt Fire, Inc., consolidating Reliant's "exclusive Pierce territory" to include Michigan, in addition to its pre-existing exclusive territories in Wisconsin and Iowa.[43] Pierce noted that Reliant would "align Michigan operations with its existing territories" to "ensur[e] a consistent and reliable customer experience."

---

[43] *Reliant Fire Apparatus Acquires Halt Fire, Inc. Expands Pierce Dealership Territory to Include the State of Michigan*, PIERCEMFG.COM (Jun 12, 2025), https://www.piercemfg.com/pierce/press-release/reliant-fire-apparatus-acquires-halt-fire-inc.-expands-pierce-dealership-territory-to-include-the-state-of-michigan.

34

### 3. Rosenbauer

130. Rosenbauer International A.G. purchased the remaining 25 percent minority stake in Rosenbauer American held by General Safety Equipment Corporation in June 2022. The following year, in March 2023, Rosenbauer announced that IKON Fire, LLC would join its dealer network to handle apparatus sales in Colorado and Wyoming.

131. Rosenbauer assigns exclusive, non-overlapping territories to its dealers, minimizing competition among them.



**Figure 2. Exclusive geographic Territories of Rosenbauer dealers**[44]

### D. Defendants' Anticompetitive Roll-Ups have Substantially Lessened Competition and May Substantially Lessen Competition or Tend to Create a Monopoly in the Relevant Markets

132. There is significant evidence that Defendants' roll-ups and acquisitions of their competitors have led to substantial concentration within the Relevant Markets. The serial

[44] Rosenbauer, Find a Dealer,
https://web.archive.org/web/20250501023624/https://rosenbaueramerica.com/find-a-dealer/.

25706812.1

acquisitions have led to Defendants' market power and caused anticompetitive effects, including increased prices, reductions in quality and variety (consumer choice), increased wait times and availability of fire apparatus, and worse contract terms for purchasers.

133. The acquisitions eliminated substantial, direct head-to-head competition between the acquirer and the acquired competitors; precluded nascent or on-the-edge-of-the-market competitors from entering the Relevant Markets; allowed the few remaining competitors to more easily coordinate and collude on prices, supply, quality, and terms; and substantially increased barriers to entry, preventing other new market entrants from entering the Relevant Market even as prices substantially increased. By significantly consolidating the critical supply of fire apparatus chassis to all fire apparatus, Defendants gained the power to preclude new entrants from entering the market and gave them the power to raise rivals' costs.

134. The serial acquisitions substantially concentrated the Relevant Markets and substantially lessened competition.

135. The Herfindahl-Hirschman Index ("HHI") is a method to calculate the concentration within a particular market that has been used by economists for years and is often relied on by courts to assess the relative increases or decreases in market concentration.

136. The calculation is performed by summing the squares of the market shares of all market participants. By using the square of each market share, larger market shares increase the HHI calculation much more significantly than smaller market shares.

137. For example, in a market with five firms, in which the largest firm has 60% market share, and the remaining four firms each have 10% market share, the market would have an HHI of 4,000 ($60^2 + 10^2 + 10^2 + 10^2 + 10^2$), which is considered extremely concentrated. The higher the HHI, the more concentrated the market. The lower the HHI, the more deconcentrated the market.

138. Based on publicly available information, the HHI of the fire apparatus market is highly concentrated with an HHI index of over 1,800.

139. The AIP Defendants and Rev Group's acquisitions of E-One, KME, Ferrara, and Spartan resulted in an HHI increase of more than 100 in the fire apparatus market.

140. Based on publicly available information, the REV Group Defendants hold a market share of more than 30% in the markets for fire apparatus and fire apparatus chassis.

141. Based on publicly available information, the Oshkosh Defendants' ownership interest in, and collaboration with, the BME defendants, increased their combined market share to over 30% in the fire apparatus market and the wildlands fire apparatus market.

142. Based on publicly available information, the Oshkosh Defendants' ownership interest in, and collaboration with, the BME defendants, increased the HHI by more than 100 points in the fire apparatus market and the wildlands fire apparatus market, each of which is a highly concentrated market with an HHI of more than 1,800.

143. Based on publicly available information, the Oshkosh Defendants' acquisition of Maxi-Metal, increased their combined market share to over 30% in the Fire Apparatus market.

**E.      Manufacturer Defendants Seek to Cooperate Rather than Compete**

144. While consolidating the market, the Manufacturer Defendants also actively sought to cooperate, rather than compete, with one another.

145. Consolidating the industry and eliminating numerous independent competitors made coordination and cooperation on prices and output far more feasible among the remaining few manufacturers.

146. For example, REV's Vice President of Sales in the Fire Group, Mike Virnig, stated: "What I won't tolerate is negative selling. I won't tolerate it with our competitors, and I won't

tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"[45]

147.    REV Group company executives also told analysts that the company would substantially raise its profit margins and that other companies were doing the same.[46]

148.    Industry insider Jerry Halpin, the co-owner and vice president of sales and marketing for C.E.T. Fire Pumps, noted in 2022, "people in the fire service industry are talking amongst themselves" and are looking to "***bolster opportunities through partnerships and other alliances***."[47] He also predicted "***cooperation between like businesses*** to gain an edge in the marketplace."

149.    However, the Defendants would use their trade organization, the Fire Apparatus Manufacturers' Association ("FAMA") to more effectively and efficiently exchange information and coordinate their conspiracy.

150.    FAMA is a nonprofit trade association for Fire Apparatus manufacturers, located in Ocala, Florida.[48] Upon information and belief, as of May 2025, FAMA had 55 manufacturer members, including REV Group subsidiaries E-ONE, Ferrara, KME, and Spartan; Oshkosh subsidiary Pierce; and Rosenbauer. FAMA's Data and Research Committee Chairman is Paul Bostrom, President and CEO of H.O. Bostrom Company, a fire and rescue seating manufacturer.

---

[45] Chris McLoone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/.

[46] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html.

[47] *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIREAPPARATUSMAGAZINE.COM (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (emphasis added).

[48] *How to Join*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/how-to-join/.

The Vice-Chair of the Data and Research Committee is John Schultz, who is Pierce Manufacturing's Vice President and General Manager of Pumper Product.[49]

### F. Manufacturer Defendants Exchange Confidential, Competitively Sensitive, Proprietary Information through FAMA

> People of the same trade seldom meet together,
> even for merriment and diversion, but the
> conversation ends in a conspiracy against the
> public, or in some contrivance to raise prices.
> - Adam Smith, *Wealth of Nations* (1776)

151. The REV Group Defendants, Oshkosh, Pierce, and Rosenbauer, are the largest Fire Apparatus manufacturers in the United States. All of them are active members of FAMA. At all relevant times, FAMA colluded with the Manufacturer Defendants to coordinate the exchange of information through statistical reports and surveys, and bi-annual in-person membership meetings.

### 1. FAMA Statistical and Survey Reports

152. FAMA describes access to competitors' data as "one of the most valuable reasons" for companies to join the organization.

153. Indeed, FAMA's mission is to maximize profits for its member companies and that one of the primary reasons that to join is to gain access to FAMA's statistics.

154. FAMA maintains a dedicated Data & Research Committee (the "Committee") to facilitate and enable data exchange between competing manufacturers. The Committee's stated purpose is to "strengthen FAMA member companies by providing actionable data," including economic data, "for strategic business planning." The Committee is tasked with "collect[ing] and distribut[ing] data regarding apparatus sales and orders" and distributing it on at least a quarterly

---

[49] *John Schultz*, Pierce Manufacturing,
https://www.piercemfg.com/hubfs/FDIC%202025/Bios/Bio/John%20Schultz%20-%20Pierce%20Manufacturing.pdf.

basis. FAMA describes this "detailed data" as "invaluable" to members "for their internal business purposes."[50]

**MISSION**

The mission of the Data & Research Committee is to help strengthen FAMA member companies by providing actionable data for strategic business planning. This includes economic data, fire market trends, and apparatus sales and order statistics.

**OBJECTIVES**

- To collect and distribute data regarding apparatus sales and orders on a quarterly basis
- To gather data from various sources that is helpful in business planning by member companies

**Image 1. FAMA Data & Research Committee, "Mission" and "Objectives"[51]**

**ADDED BENEFITS**

Among the most powerful benefits of FAMA membership are the statistical reports provided quarterly and encapsulated for every year-end. Only those companies that participate in the statistical studies and members are privy to these reports. FAMA does not release this information to the public. Members find this research invaluable for their internal business purposes.

**Image 2. FAMA Membership, "Why Join"[52]**

155. According to FAMA, "[t]he Data and Research Committee oversees collection and presentation of the most comprehensive data set in the industry" and this "data helps to monitor and understand trends in the fire service."[53] A 2022 FAMA presentation, for example, listing

---

[50] Paul C. Darley, *The Fire Apparatus Market is Coming Back… Just Look at the Data*, FIRE APPARATUS MFRS. ASS'N (Dec. 4, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data; *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join.

[51] *Data & Research Committee*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/data-research-committee/.

[52] *Why Join?*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/why-join/.

[53] *FAMA Releases Fire Apparatus Industry Update*, Fire Apparatus & Emergency Equipment (May 27, 2025), https://www.fireapparatusmagazine.com/fama/fama-releases-fire-apparatus-industry-update/.

representatives of Pierce and Rosenbauer as Committee co-chairs, or members, references the Committee's efforts in putting together an "industry forecast" as well as continuing to "publish[] quarterly data in a timely manner." FAMA has explained that this type of "detailed data is reserved exclusively for [its] members."[54]

156.    The Committee maintains an online data portal where apparatus manufacturers upload economic data. That data is sent to an accounting firm for processing and returned to the Committee, which then uploads the processed data to the FAMA website. The Committee then uploads the data onto the FAMA website.

157.    FAMA restricts public access to this information. The data is stored and made available in a secure, members-only section of the website. In fact, a document available on FAMA's website touts the benefits of membership including, "FAMA is the ONLY source for accurate fire service statistics provided quarterly and summarized at year end. Only FAMA members are privy to these reports since they are not released to the public. Members find this research invaluable for their internal business purposes regarding apparatus purchases by state, product category, pump type and more."[55]

158.    The password-protected web portal provides access to "Interactive" data, including information about sales booked, but not shipped, maps and other location data related to sales markets, "Raw Data," all of which in itself and together allows users to determine OEM market share and engage in detailed component forecasting, with instructions for data analysis.

---

[54] Paul C. Darley, *The Fire Apparatus Market Is Coming Back...Just look at the Data*, FAMA (Dec. 4, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/.

[55] Why Join Fama, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf.

41

25706812.1



**Image 3. FAMA Portal for Interactive Data and Statistics**[56]



**Image 4. FAMA Portal for Raw Data Analysis**[57]

---

[56] FAMA, 2022 Spring Meeting Presentation (PDF), at 116, https://www.fama.org/wp-content/uploads/2022/03/1646772096_6227bf80d4238.pdf

[57] *Id.* at 118.

25706812.1



**Image 5. FAMA Instructions for OEM Market Share Analysis**[58]

159. FAMA limits membership to companies that can meet strict eligibility criteria. To join FAMA, an entity must (a) be "engaged in the manufacture of firefighting or fire protection apparatus, including rescue vehicles," or (b) "manufacture components or products which are incorporated by the manufacturer as a permanent part of the completed fire apparatus . . . such as chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices, apparatus valves and other water control appliances."[59]

160. Notably, Fire Apparatus purchasers—such as fire departments and municipalities—are *not* eligible to for FAMA membership and therefore do not have access to the data that manufacturers exchange among themselves.

161. Even among its members, FAMA further restricts data access to those companies that provide their own data. FAMA states data access "may be denied" to any company "that was

---

[58] *Id.* at 120.

[59] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join.

25706812.1

given the opportunity to participate in the program but refused."[60] Data may also be denied to any

company "that does not agree in advance of participation to keep the results confidential."[61]

**FAMA statistics _and_ reports are CONFIDENTIAL and are available only to member companies. FAMA data shall not be distributed, repurposed or exchanged with any non-member parties.**

**Image 6. FAMA Confidential Data Warning**[62]

162.　This kind of information exchange is precisely the kind of conduct that the FTC has

cautioned against. In their guidance titled "Spotlight on Trade Associations" the FTC wrote:

> [E]mployees should be careful when sharing information they could not otherwise share with competitors through intermediaries such as a financial analyst or even a supplier if the consultant were to share that specific information with the company's competitors, resulting in a change in their pricing strategy, such indirect communications could be seen as facilitating an agreement if other evidence points to a coordinated strategy.[63]

163.　The "Guidelines for Collaborations Among Competitors" issued in 2000 by the

United States Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") provide:

> Agreements that facilitate collusion sometimes involve the exchange or disclosure of information…. [I]n some cases, the sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to

---

[60] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee.

[61] Statistics, Fire Apparatus Mfrs Ass'n https://www.fama.org/statistics/

[62] FAMA, 2017 Letter to All FAMA Members (PDF), https://www.fama.org/wp-content/uploads/2017/05/1494518464_59148ac0cc41b.pdf.

[63] *Spotlight on Trade Associations*, FTC, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-competitors/spotlight-trade-association.

25706812.1

raise competitive concern than the sharing of information relating to less competitively sensitive variables.[64]

164. A decade later, in 2010, the United States submitted the following comments to the Organization for Economic Cooperation and Development on the legal approach to information sharing among competitors:

> [C]ertain information exchanges among competitors may violate Section 1 of the Sherman Act, which prohibits a "contract, combination … or conspiracy" that unreasonably restrains trade. The antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. Thus, for example, exchanges on price may lead to illegal price coordination.[65]

165. In 2014, the FTC issued general guidance entitled "Information exchange: be reasonable," confirming that "when competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws."[66]

### 2. FAMA Meetings Presented Manufacturer Defendants the Opportunity to Collude

166. In addition to providing advanced economic data to its members, FAMA also organizes twice-yearly meetings, in the spring and the fall, to "provide a forum [for members] to

---

[64] Roundtable on Joint Ventures, *Note by the US Federal Trade Commission and the US Department of Justice*, 15–16 (Oct. 9, 2000), https://www.ftc.gov/system/files/attachments/us-submissions-oecd-other-international-competition-fora-2000-2009/2000-rdtble_on_joint_ventures_ftc_doj.pdf.

[65] OECD, *Information Exchanges Between Competitors under Competition Law 294* (2010), at p. 307, https://www.academia.edu/79222152/Information_Exchanges_Between_Competitors_under_Competition_Law.

[66] Michael Bloom, *Information exchange: be reasonable*, FTC (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable.

25706812.1

share information."[67] Attached hereto as Exhibit A are examples of past FAMA meetings during the Class Period and a list of the Manufacturer Defendants in attendance.

167. At these meetings, attendees, including Manufacturer Defendants and their direct competitors, participate in "purchasing roundtables" and listen to presentations and reports on the statistical data collected as related to the Fire Apparatus market, including about Original Equipment Manufacturer ("OEM") market share, market trends, industry backlogs, sales forecasting, and results of the Industry and Member Outlook surveys.

168. Meeting attendees also engage in members-only meetings and discussion groups tailored to specific aspects of the industry.

169. These meetings provide Manufacturer Defendants with ample time and opportunity to exchange sensitive economic information and coordinate supply restrictions and price hikes.

170. As one manufacturer publicly reported after attending a FAMA meeting, "I'll tell you, all of the talk down there was about industry statistics. And, while I can't share those details with you, unless you're a FAMA member, what I can tell you is last year in 2022, there were over 6000 new fire apparatus sold here in the United States."[68]

171. In addition to the production of statistical reports and twice-yearly in-person meetings, FAMA "communicates with its members on a regular basis via emails, [password protected areas of] its website and an extensive FAMA newsletter." These platforms offered another avenue for communication and coordination among Manufacturer Defendants.

172. Indeed, Manufacturer Defendants regularly attend FAMA meetings together and are heavily involved in the organization. For example, Phil Gerace of E-ONE is chairman of the

---

[67] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join.

[68] Inside Darley April 2023, DARLEY (Mar. 31, 2023), https://www.darley.com/media/inside-darley-april-2023/.

FAMA Bylaws Committee; John Schultz of Pierce Manufacturing is vice-chair of the Data & Research Committee: Drew Kirvida of Rosenbauer has served on the same Committee with Schultz; Larry Daniels from E-ONE chairs the Marketing & Trade Shows Committee; and Roger Lackore of Spartan is the chairman of the Technical Committee, of which John Brady (KME), Wyatt Compton (Spartan), and Dale Katz (E-ONE) are also members.

### G. Manufacturer Defendants Submit Uniform Pricing to Governmental Cooperative Pricing Consortiums, Undercutting Competitive Bidding

173. Manufacturer Defendants further restrained competition by submitting uniform, non-competitive pricing structures for key products to governmental cooperative purchasing organizations, including Sourcewell and Houston-Galveston Area Council ("HGAC"), which are used by government and municipal entities to negotiate pricing contracts through which municipalities may then directly purchase Fire Apparatus.

174. For example, in response to Sourcewell's October 12, 2021 Request for Proposals, Defendants Pierce, Ferrara, and KME each submitted coordinated pricing for custom pumpers, tankers, rescues, and aerials at 5% off their respective, undisclosed list prices.

175. Pierce was so bold to disclose in its Response to Sourcewell's solicitation that it "will not favor one GPO [Group Purchasing Organization] over another" and its "pricing model is consistent across all."[69]

176. Not only did these Manufacturer Defendants coordinate their pricing to Sourcewell, but they offered the same pricing structure to HGAC to further avoid competing on price. For example, Defendants Pierce, Ferrara, KME, and E-ONE each submitted the same 5% discount on

---

[69] Master Cooperative Purchasing Agreement, No. 113021-OKC, between Sourcewell and Oshkosh Corp. (April 5, 2022) https://files.sourcewell.org/public/Shared%20Documents/Solicitations/10462/00004210/Contract%20Documents/Oshkosh%20Contract%20113021.pdf.

25706812.1

custom pumpers, tankers, rescues, and aerials in response to HGAC's July 26, 2023 Request for Proposals.

177. Instead of competing independently for each cooperative solicitation, Manufacturer Defendants submitted identical pricing structures—both to each other and across solicitations—regardless of the competitive environment or purchasing group.

**H.     Manufacturer Defendants Restrict Supply Despite Significant Backlogs**

      **1.     Backlogs in Fire Apparatus Orders Increased by 40% or More During the Class Period**

178. After the economy recovered from the 2008 financial crisis, demand for Fire Apparatus grew steadily, with orders peaking in 2022. Since then, order activity has hovered between 5,500 and 6,500 units per year—at about the same level as the early 2000s.[70]

179. Manufacturer Defendants failed to keep pace with demand, and, in recent years, production delays have caused a dramatic increase in order backlogs. For example, REV Group reported a record $3.6 billion backlog as of October 31, 2023—an increase of 41% from just the previous year. Backlogs continued to rise at REV Group through 2025. Indeed, by the end of the 2025 fiscal year, REV Group's backlog reached $4.4 billion in unfulfilled fire and emergency vehicle orders, an increase of 5.3% over the prior year. REV Group's backlog more than quadrupled between 2017 and 2025.

180. Oshkosh and Rosenbauer have reported similar production shortfalls. Oshkosh's backlog of unfulfilled Fire Apparatus orders quadrupled between 2019 and 2024.[71] Rosenbauer announced an approximately $2.67 billion backlog at the close of 2024.

---

[70] *See, e.g.,* Sounding the Alarm: America's Fire Apparatus Crisis (Sept. 10, 2025), https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/.

[71] Baker, Farrell & Kovaleski, *supra*, n.5.

25706812.1

181. These production shortfalls have resulted in a supply restriction for new Fire Apparatus and order backlogs resulting in severe delivery delays. Wait times for new Fire Apparatus have more than quadrupled in some cases—from about one year to 4.5 years.[72] This has caused serious problems for Plaintiffs and the Class.

182. For example, City of Revere has experienced significant delays when purchasing fire apparatus, including pumpers and ladders from the Defendants. Previously, purchases of Fire Apparatus might take a year or less. But now, purchases are not fulfilled for roughly 3 years, putting significant strain on their fire department's ability to keep their fleet modern and operational. Ensuring a healthy and modern fleet is critical to fire response preparedness, and also to the health, safety, and protection of the City of Revere's many brave firefighters who risk their lives fighting fires. These firefighters, like those across the country, depend on high-functioning, modern, dependable Fire Apparatus.

183. Like many other departments, the City of Revere has had to borrow Fire Apparatus from neighboring cities, or has had to rely on rehabilitated old Fire Apparatus units while waiting for delivery of new apparatus ordered years ago. For example, at one point during the Class Period, the City of Revere was forced to expend substantial repair costs to rehabilitate a roughly 20-year-old unit while awaiting the delivery of a new Fire Apparatus unit for one of the city's new fire stations that should have been delivered but was delayed. As delivery time increased over the Class Period, Fire Apparatus prices have also significantly increased.

---

[72] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf .

184. Sue Finkam, mayor of Carmel, Indiana, explained that her growing city required additional fire stations, but the price of a new pumper increased by approximately 10% in a single year, while the delivery time for a tiller apparatus is now more than four years.[73] She expects the city "to be able to acquire land, design a fire station, construct the building, hire firefighters and train them, while still waiting for the station's fire engines to be delivered."[74]

185. Firefighters in online forums have expressed similar frustrations with the severe backlogs caused by Manufacturer Defendants. For example, in January 2023, one firefighter complained that "lead times for delivery from date the order is placed to final inspection has gone from 10-12 months to greater than 2 years in many cases and in some cases approaching 3 years." Another reported that a REV Group company "added 15 months to the delivery time" for a new Fire Apparatus unit. A third stated that "a very cookie cutter" Pierce unit "without any interior customization" now takes 48 months for delivery. Yet another described waiting 435 days for a single Rosenbauer component ordered in August 2022, for a total lead time of about three years.

186. According to industry data, in 2022, Fire Apparatus orders rose to 45% above normal levels, while order fulfillment fell nearly 10% below average, as shown in the chart below. Although fulfillment rates have slightly improved in recent years, they have not meaningfully reduced the backlog.

---

[73] Press Release, Sen. Jim Banks, *Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing* (Apr. 15, 2025), https://www.banks.senate.gov/news/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing/.

[74] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. Times (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html.



**Figure 3. North America Fire Apparatus Trend** [75]

187. While the rate of order fulfillment has ticked up again in recent years, that increase has not been nearly enough to reduce the serious backlog.

188. In addition to delivery delays for new Fire Apparatus, delays have also increased for replacement part orders. These backlogs cannot be explained by supply chain disruptions in the wake of the COVID-19 or other global disruptions. While various industries were impacted by supply chain issues in 2021 and 2022, the Federal Reserve Bank of New York's Global Supply Chain Pressure Index returned to baseline by early 2023, hitting its lowest point on record in May 2023.[76] There is therefore no legitimate justification for continued production crisis among Manufacturer Defendants.

---

[75] *FAMA Releases Fire Apparatus Industry Update*, FIRE ENGINEERING (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update .

[76] Diccon Hyatt, *Supply Chains Have Healed From Pandemic Disruptions*, INVESTOPEDIA (June 7, 2023), https://www.investopedia.com/supply-chains-have-healed-from-pandemic-disruptions-7509263.

25706812.1



**Figure 4. Global Supply Chain Pressure Index from June 30, 2017 to June 30, 2025**[77]

189.     These replacement part delays also place fire departments at risk. As Gil Carpenter, fire chief in Benton, Arkansas explained, before REV Group acquired Ferrara, he could simply call a contact named Charlie whenever he needed a Ferrara replacement part, and the part would arrive the next day.  In 2024, however, when one of the department's vehicles required new parts, delivery was delayed for more than ten months, leaving the department without the ability to use one of its eight Fire Apparatus units for nearly a year.[78]

### 2.     Facing Increasing Demand, Manufacturer Defendants Reduce Capacity and Have Shuttered Facilities

190.     Under typical competitive market conditions, such a significant surge in demand would be met with a corresponding increase in manufacturing capacity. But no such manufacturing capacity increase has materialized. REV Group historically has spent only a small portion of its revenue—about 1 percent—on upgrading its buildings and equipment.[79] Neither Oshkosh nor Rosenbauer have attempted to meet this surge in demand or capture market share by ramping up their production.

---

[77] *Global Supply Chain Pressure Index (GSCPI)*, FED. RES. BANK OF N.Y. (July 2025), https://www.newyorkfed.org/research/policy/gscpi#/interactive.

[78] Baker, Farrell & Kovaleski, *supra*, n.5.

[79] *Id*.

25706812.1

191. Instead, Manufacturer Defendants have invested only the bare minimum required to replace depreciated equipment at existing Fire Apparatus plants. For instance, under AIP's management and direction, REV Group had a policy of limiting capital expenses that will not immediately "improve returns on invested capital." Alexander Yaggy, a former REV Group shareholder, called out REV Group's refusal to meet its "$4 billion backlog" as "reflective of an uncompetitive market."[80]

192. Not only have Manufacturer Defendants failed to add manufacturing capacity, in some cases they have in fact *shuttered* existing plants, reducing capacity further. In September 2021, REV Group shut down two KME custom Fire Apparatus manufacturing facilities in Pennsylvania and Virginia.[81] The closure cut the company's manufacturing footprint by roughly one third.[82] REV Group openly boasted to investors about reducing manufacturing facilities.



**Image 7. Slide from a REV Group investor presentation**

---

[80] *Id.*

[81] Chris Reber, *KME Plant to Close in April 2022*, TIMES NEWS ONLINE (Sept. 11, 2021), https://www.tnonline.com/20210911/kme-plant-to-close-in-april-2022

[82] Baker, Farrell & Kovaleski, *supra*, n.5.

25706812.1

193. In a press release announcing the closures, REV Group stated that orders currently in progress at the two KME facilities would be transferred to other REV Group manufacturing plants.[83] The process, unsurprisingly, resulted in additional, substantial delays.[84]

194. For example, Chief Matthew R. Timerman's fire department had ordered a $1.2 million ladder unit from REV Group that was to be built at the KME Pennsylvania plant that was shut down.[85] Since the plant's closure, however, the work of assembling that unit was spread across three different manufacturing sites, requiring additional time for completion. Ultimately, the process took over four years from order to delivery.[86]

195. Despite these substantial and record-breaking backlogs, the Manufacturer Defendants appear unconcerned that their customers might cancel orders or that a competitor might steal their business.[87] Mark Skonieczny, REV Group's current chief executive, explained during a 2023 conference call that the company did not expect the delays to cause cancellations because once a city sets aside the money, it is "earmarked," and REV gets a deposit. "That money is allocated to those units, so we feel good about that."[88] Skonieczny further commented, "I don't

---

[83] Andrew Corselli, *REV Group Announces Plans to Shift KME Production to Other REV Fire Group Facilities*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 10, 2021), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-announces-plans-to-shift-kme-production-to-other-rev-fire-group-facilities/.

[84] Baker, Farrell & Kovaleski, *supra*, n.5.

[85] *Id.*

[86] *Id.*

[87] Musharbash, *supra*, n.5.

[88] Baker, Farrell & Kovaleski, *supra,* n.5.

25706812.1

think it's impacting our market share."[89] According to REV's SEC reports, the company considers its backlog to enhance its value to shareholders by giving the company "strong visibility into future net sales."[90]

196. At the Fire Apparatus Senate Hearing, REV Group's Mike Virnig testified—despite closing manufacturing plants amid skyrocketing backlogs—that "everything we do in the fire division is to build more trucks" and that "we agree that backlogs are too long." Virnig (falsely) blamed this backlog on an increase in orders in 2022 and 2023. Pierce's VP of Sales, Dan Meyer, likewise testified that the growing lead time is "bad for [Pierce's] business."[91]

197. But for years—far before the peak in orders—Manufacturer Defendants have boasted about growing backlogs. In 2018, for example, REV Group's then-CEO Tim Sullivan said, "We like backlog, we love backlog. We like long backlogs that are out for months." In 2019, Sullivan continued to cite "a record backlog level" as "an encouraging sign." In January 2020, Oshkosh also boasted about record backlogs, noting "[o]ur Fire & Emergency team posted a solid quarter characterized by strong order growth and an all-time high backlog." And in a 2025 Investor Day presentation, Oshkosh stated that it intended to further increase its profit

---

[89] Eman Abu-Khaled, *REV Group Takes Steps to Normalcy After Supply-Chain Setbacks*, TRAILER BODY BUILDERS (Mar. 22, 2023), https://www.trailer-bodybuilders.com/truck-bodies/article/21262503/rev-group-takes-steps-to-normalcy-after-supply-chain-setbacks.

[90] Musharbash, *supra*, n.5.

[91] Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt., D.C. & Census of the S. Comm. on Homeland Sec. & Gov't Affs, 119th Cong. (2025), https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/.

margins to record levels through "[p]ricing realization from backlog":



**Figure 5. Revenue growth supported by strong backlog**

198. In short, rather than meeting demand, Manufacturer Defendants have chosen to restrict supply. In a properly functioning competitive market, rational companies would boost production to meet rising demand, invest in facilities and further manufacturing capacities, satisfy the needs of customers, and outperform competitors. But in the Fire Apparatus market, the opposite is true. The big three have shuttered factories and restricted supply despite growing demand.

**I.      Defendants' Conspiracy Caused Significant Price Hikes and a Dangerous Supply Shortage of Fire Apparatus**

        **1.      The Price of Fire Apparatus Doubled During the Class Period**

199. As demand increased while supply remained flat or declined, the cost of Fire Apparatus rose sharply throughout the Class Period. In the mid-2010s, a standard pumper unit cost

25706812.1

approximately $300,000 to $500,000.[92] Within the last few years, prices have increased to an average of $1 million per pumper unit.[93] Similarly, ladder units that cost $750,000 to $900,000 in the mid-2010s cost upward of $2 million today.[94] An industry leader commented that the industry has "reached a new level of price psychology. Today, relationships start at a half million dollars, and 10 years ago that was a remote concept."[95]

200.     As an example, Plaintiff City of Philadelphia's class period purchases of Fire Apparatus reveal price increases of 134.8% for pumper apparatus and 151.6% for ladder apparatus between 2015 and 2024. As shown in the figure below, these price increases are wildly disproportionate when viewed against the Producer Price Index ("PPI") for comparable products during this time period:[96]

---

[92] Chris Godfrey, *An Evaluation Of Fire Apparatus Usage And Operating Cost For Green Township Fire & Ems* at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188; Patrick Varine, *Despite Grant, PA Dept. Says Rising Apparatus Costs a Challenge*, FIREHOUSE (Aug. 3, 2023), https://www.firehouse.com/apparatus/news/53068052/despite-fire-act-grant-export-pa-fire-department-says-rising-fire-apparatus-costs-a-challenge ("'In 1994, we brought a new KME front-line pumper truck in for $200,000,' Export fire Chief and Councilman David Silvis said. 'Today, we're probably between $800,000 and $900,000 to fund this new truck.'").

[93] Musharbash, *supra*, n.5.

[94] Chris Godfrey, *An Evaluation Of Fire Apparatus Usage And Operating Cost For Green Township Fire & Ems* at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188; Baker, Farrell & Kovaleski, *supra*, n.5; Musharbash, *supra,* n.5.

[95] Chris McLoone, *Fire Industry Outlook: 10 Years After the Great Recession*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 1, 2018), https://www.fireapparatusmagazine.com/fire-apparatus/fire-industry-outlook-10-years-after-the-great-recession.

[96] Federal Reserve Bank of St. Louis, *Producer Price Index by Industry: Heavy Duty Truck Manufacturing*, https://fred.stlouisfed.org/series/PCU336120336120; Federal Reserve Bank of St. Louis, *Producer Price Index by Industry: Farm Machinery and Equipment Manufacturing*, https://fred.stlouisfed.org/series/PCU333111333111#.

25706812.1



**City of Philadelphia Fire Apparatus Price Increases Compared to PPI Increases for Comparable Products (2015-2024)**

201. Customers cannot seek a better deal by turning to the competition. As one industry executive observed, "[t]here are now times when all vendors at a bid table, each with a 'different' product, are all owned and managed by the same parent company. How is that competitive for the purchaser?"[97] Customers nationwide therefore have little choice but to accept the prices charged by Manufacturer Defendants.

202. The increases in Fire Apparatus prices have far exceeded inflation and cannot be explained by other ordinary economic factors, such as increased supply costs.

203. Moreover, with increased demand for Fire Apparatus, manufacturers acting independently in their own self-interest would increase output and supply to meet that demand, thereby stabilizing prices.

---

[97] Musharbash, *supra*, n.5.

25706812.1

204. The Manufacturer Defendants' failure to meet demand with adequate supply is against each individual Defendants' own economic self-interest absent an agreement or coordination among them.

### 2. Manufacturer Defendants Used "Floating Prices" to Charge Even More

205. On top of already high base prices for new Fire Apparatus, Manufacturer Defendants have relied on the significant industry backlog to justify imposing "floating prices" on their customers. Using the purported difficulty of projecting material costs over a years-long lead time as an excuse, Manufacturer Defendants have added price clauses to their contracts that allow them to increase the final price of a Fire Apparatus unit after it goes into production. Due to production delays, this means Manufacturer Defendants can increase their prices years after a fire department initially orders a unit. Mark Fusco, the president of Rosenbauer America, conceded that his company imposes "surcharges that might occur during the build times" on Rosenbauer customers.[98]

206. This policy has real world consequences for customers. For example, public records demonstrate that a fire department in Massachusetts ordered a Fire Apparatus unit in 2022 and then, in 2023, added two more units to the original order. After the second order was placed, the manufacturer increased the price of the original unit, ordered in 2022, by $150,000 to match the price of the units added to the order in 2023. The manufacturer threatened not to deliver the Fire Apparatus ordered in 2022 unless the fire department agreed to the price increase. The fire chief

---

[98] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain.

25706812.1

felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."[99]

207. Other fire departments reported similar treatment. A Kansas fire department saw the unit price of Fire Apparatus increase by 22% before delivery.[100] In Indiana, a fire department faced an increase of over $100,000 after a seven-month delay.[101] Similarly, in Colorado, the Loveland Fire Rescue Authority experienced a surcharge of $29,000 on a pending order.[102]

### 3. Defendants' Conspiracy Had the Intended Effect of Increasing Margins and Revenues

208. Defendants' agreement to artificially raise, fix, maintain, or stabilize prices for Fire Apparatus and to exchange competitively sensitive information regarding Fire Apparatus has had the intended effect of artificially inflating the prices for those pieces of equipment. As a result, Defendants have obtained considerable profit increases.

209. In July 2021, REV announced that it had "[e]xceeded consensus earnings estimates for five consecutive quarters." In 2024, REV's profit margins jumped to what the company described as an "exceptional 8.9 percent" for the division that includes Fire Apparatus.

---

[99] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing.

[100] Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt, D.C. & Census of the S. Comm. on Homeland Sec. & Gov't Affs, 119th Cong. (2025) (testimony of Dennis L. Rubin, Fire Chief, Kansas City Kansas Fire Dep't), https://www.hsgac.senate.gov/wp-content/uploads/Rubin-Testimony.pdf.

[101] *Id*.

[102] *"Floating" Prices & Lengthy Delivery Times for Fire Apparatus CSFC Members' Perspective* at 1 (Aug. 25, 2022), https://static1.squarespace.com/static/5ea64a6b9614427b0ff93e6d/t/63080a517f782438bdd6f98e/1661471313934/Floating+Prices+Lenghty+Delivery+Time+for+Fire+Apparatus+Aug+25+2022%5B42%5D.pdf .

25706812.1

210. For Oshkosh, in June 2025 they stated that its adjusted operating margins had grown from 4.8% to 10.5% from 2022 to 2024, delivering on previously announced key targets one year early.

211. Oshkosh anticipates its adjusted operating margins will grow to 12 or 14 percent by 2028, with revenue of $13-14 billion, revenue growth that will be "supported by strong backlog" and price increases.

212. In April 2025, Rosenbauer reported its full year 2024 financial results, including EBIT margin of 5.0% for the year, up from 3.5% in 2023. In November 2025, Rosenbauer projected full year 2025 EBIT margin would reach 5.5%, which figure will not be confirmed until its full year 2025 results are reported.[103] Rosenbauer typically reports its full year financial results in April.

213. These profit increases are present across the industry. With a few exceptions during the pandemic years, overall revenues for Fire Apparatus manufacturers in the U.S., including Manufacturer Defendants, have increased significantly since 2015.

## V. MARKET POWER AND BARRIERS TO ENTRY

### A. The Relevant Markets

214. A relevant market refers to "an area of effective competition" between firms, consisting of both "product" and "geographic elements."[104]

---

[103] The Rosenbauer Defendants (which are the wholly owned U.S.-based subsidiaries of Rosenbauer International, an Austrian corporation) do not report their financial results separately from its parent, but its financial results are included within the reported financial results for the entire company.

[104] *4.3. Market Definition*, U.S. Dep't of Just. Antitrust Div. (July 2, 2024), https://www.justice.gov/atr/merger-guidelines/tools/market-definition .

61

25706812.1

215.     Manufacturer Defendants each sell fire apparatus throughout the United States. Accordingly, the relevant product market is Fire Apparatus, and the relevant geographic market is the United States.

### 1.     The Product Markets Encompasses All Fire Apparatus, Including Structural and Wildland Fire Apparatus

216.     This case concerns Fire Apparatus as recognized by the National Fire Protection Association ("NFPA") Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing (together, the "Standards"). These Standards classify Fire Apparatus within the United States.

217.     Under NFPA 1900, Fire Apparatus are grouped into two primary categories, (1) structural fire apparatus used to respond to structural incidents or other non-wildland incidents, and (2) wildland fire apparatus used primarily for wildland fire response. Each category includes multiple apparatus types summarized in the chart below.

**Figure 6. NFPA 1900 Fire Apparatus Types**

| TYPE OF FIRE APPARATUS | NFPA 1900 DEFINITION |
| --- | --- |
| **Structural Fire Apparatus** | |
| Pumper | Fire apparatus with a permanently mounted fire pump of at least 750 gpm (3000 L/min) capacity, water tank, and hose body whose primary purpose is to combat structural and |
| Initial Attack | Fire apparatus with a fire pump of at least 250 gpm capacity, water tank, and hose body whose primary purpose is to initiate a fire suppression attack on structural, vehicular, or vegetation fires, and to support associated fire department |
| Mobile Water Supply (Tanker, Tender) | A vehicle designed primarily for transporting (pickup, transporting, and delivering) water to fire emergency scenes to be applied by other vehicles or pumping equipment. |

25706812.1

| | |
|---|---|
| Aerial | A vehicle equipped with an aerial ladder, elevating platform, or water tower that is designed and equipped to support firefighting and rescue operations by positioning personnel, handling materials, providing continuous egress, or discharging water at positions elevated from the |
| Quint | Fire apparatus with a permanently mounted fire pump, a water tank, a hose storage area, an aerial ladder or elevating platform with a permanently mounted waterway, and a complement of ground ladders. |
| Special Service | A multipurpose vehicle that primarily provides support services at emergency scenes. |
| Mobile Foam | Fire apparatus with a permanently mounted fire pump, foam proportioning system, and foam concentrate tank(s) whose primary purpose is the control and extinguishment of flammable and combustible liquid fires in storage tanks |
| **Wildland Fire Apparatus** | |
| Wildland Fire Suppression | A fire apparatus designed for fighting wildland fires that is equipped with a pump, a water tank, limited hose and equipment, and pump-and-roll capability. |
| Wildland Mobile Water Supply (Water Tender) | A fire apparatus designed for transporting water (pickup, transporting, and delivering) and fighting wildland fires on and off road that is equipped with a wildland fire pump, a water tank with minimum capacity of 1000 gal (4000 L), limited hose and equipment, and pump-and-roll capability. |
| Wildland Crew Carrier | Fire apparatus designed for transporting 10 or fewer personnel in the cab and crew compartment for the purpose of wildland fire suppression. |

218. Along with NFPA 1900, the National Wildfire Coordinating Group ("NWCG"), classifies seven types of structural (Types 1-2) and wildland (Types 3-7) fire engines based on minimum requirements for tank capacity, pump flow, hose size, number of personnel, and other requirements. These standards classify Fire Apparatus within the United States into seven types, all of which are at issue in this case:

- **Type 1** fire engines are engine company, engine pumper, or structural firefighting engines, the most common type of fire engine in use today. Every Type 1 fire engine is required to have a pump with a minimum tank size of 300 gallons and to be equipped with 2.5- and 1.5-inch hoses of varying lengths. Such apparatus must also include a full

25706812.1

complement of ground ladders, nozzles, forcible entry equipment, rear access and egress, and some level of first aid equipment and can carry four firefighters.

- **Type 2** fire engines carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. They are most commonly used in urban and suburban settings and typically carry three to four firefighters.

- **Type 3** fire engines, often referred to as a "wildland fire trucks" or "brush trucks," are typically used in rural and wildland settings. Type 3 apparatus have a minimum of a 500-gallon water tank and a pump capable of a minimum of 150 US gallons per minute at a pressure of 250 pounds per square inch. Type 3 apparatus may also feature an auxiliary pump in addition to the main water pump which can allow an operator to drive the unit while crew members man the pump and hoses, allowing firefighters to follow along as forest fires and brush fires move with the weather, and to create fire lines, wetting down areas ahead of an advancing wildfire. Type 3 apparatus carry at least three passengers.

- **Type 4** fire engines, like Type 3 units, are often used in wildland firefighting. Compared to Type 3 engines, Type 4 engines have a larger water tank and reduced hose capacity requirements. Type 4 apparatus must have a 750-gallon water tank that offers 50 gallons per minute of water transfer at a pressure of 100 pounds per square inch. Type 4 engines carry at least two people.

- **Types 5, 6, and 7** fire engines are often grouped together because they feature many of the same design qualities. These vehicles are typically based on a medium duty chassis pick-up engine with 4-wheel drive. The main difference between Type 5, Type

6, and Type 7 fire engines is the difference in their maximum gross vehicle weight rating ("GVWR"): Type 5 fire engines have a maximum GVWR of 26,000 pounds; Type 6 fire engines have a maximum GVWR of 19,500 pounds, and Type 7 fire engines have a maximum GVWR of 14,000 pounds. Type 5, 6, and 7 units typically carry a 300-gallon water tank and a small booster pump with a minimum capacity of 50 gallons per minute. These types carry at least two firefighters.

219.    Certain units of Fire Apparatus, including Pumper Fire Apparatus, Quint Fire Apparatus, Mobile Foam Fire Apparatus, and Aerial Fire Apparatus are equipped to conform to additional NFPA standards.  These specialty units are also included in the relevant product market.

### 2.    The Geographic Market is the United States

220.    As described above, all three Manufacturer Defendants sell Fire Apparatus to fire departments nationwide, across the 50 states and in the District of Columbia. Accordingly, the relevant market is the United States.

### 3.    Manufacturer Defendants Have Market Power

221.    The Fire Apparatus manufacturing market has hallmark features typically found in markets with cartel behavior, including but not limited to (1) a highly concentrated market; (2) high barriers to entry; and (3) inelastic demand.

#### i.    High Market Concentration

222.    The Fire Apparatus manufacturing market is highly concentrated and dominated by just three companies—REV Group, Oshkosh, and Rosenbauer. Together, they account for the vast majority of domestic preproduction and sales. REV Group generates roughly $1 billion in annual

25706812.1

U.S. Fire Apparatus sales, Oshkosh around $750 million, and Rosenbauer about $307 million. Together, these three companies control at least 70% of the national market for Fire Apparatus.[105]

223.    High market concentration increases the likelihood of collusion and other anticompetitive practices. When only a few companies dominate an industry, they can more easily monitor each other's behavior, coordinate territorial allocations and price increases, and maintain supracompetitive prices over time. The consolidation of the U.S. Fire Apparatus manufacturing industry among Manufacturer Defendants has eliminated meaningful competition and increased both the opportunity and incentive for collusion.

### ii.        High Barriers to Entry

224.    Under basic economic principles, supracompetitive pricing ordinarily would attract new entrants seeking to capitalize on elevated margins. However, when significant barriers to entry exist, new competitors are far less likely to enter. The Fire Apparatus market is characterized by exceptionally high barriers to entry that insulate incumbent manufacturers from competitive pressure.

225.    Manufacturers of fire apparatus must comply with a complex set of industry standards (most notably, NFPA standards) and a wide range of federal and state regulations governing safety, emissions, and performance. These requirements demand substantial engineering, testing, certification capabilities, and ongoing compliance infrastructure. Established manufacturers have already invested heavily in these systems, giving them a significant advantage over would-be entrants.

226.    Fire Apparatus production requires significant capital investment in engineering, manufacturing facilities, specialized equipment, and a highly trained labor force. Developing the

---

[105] Baker, Farrell & Kovaleski, *supra*, n.5.

25706812.1

capacity to design and build heavy, complex, mission-critical vehicles requires expertise and financial resources that few potential entrants possess. Entrants would face high average costs and years of investment before reaching competitive scale.

227. Manufacturer Defendants have also strengthened barriers to entry by securing exclusive arrangements with suppliers of essential components—including steel and other inputs—and with key government procurement platforms. Such exclusivity limits new manufacturers' access to critical materials and purchasing channels, further impeding entry. In addition, REV Group's sale of Spartan chassis to smaller manufacturers affords it leverage and influence over potential competitors who depend on its chassis as an essential input.

228. These and other entry barriers prevent new manufacturers from successfully entering or expanding within the fire apparatus market. As a result, Manufacturer Defendants' dominant market positions remain protected from meaningful competitive threats.

229. Given this backdrop, breaking into the Fire Apparatus manufacturing industry is a daunting task. The cost of producing and certifying Fire Apparatus, combined with the long lead times, mean that only well-funded, established corporations have much chance of sustaining themselves through the initial investment period. The large capital outlays required and significant delays of any return on those investments effectively prevent market entry.

### iii. Price Inelasticity

230. Demand in the Fire Apparatus market is highly inelastic, a condition that economic theory recognizes as making industries especially susceptible to cartel or other anticompetitive behavior. When demand is inelastic, increases in price do not meaningfully reduce the quantity purchased, allowing firms engaged in collusion to raise prices without risking significant loss of sales.

25706812.1

231.    Demand for Fire Apparatus is inelastic because they are necessary to provide critical, firefighting services. To protect lives and properties, municipalities and government agencies consistently require new apparatus and/or replacement parts regardless of their prices. As Senator Andy Kim emphasized at a recent hearing, Fire Apparatus "is not equipment that small towns or even big cities can forego." On average, fire departments need to buy new Fire Apparatus units every 10–15 years. And the United States has roughly 30,000 fire departments operating approximately 52,000 stations nationwide.

232.    Buyers like Plaintiffs are more vulnerable to collusion among the Defendants, who are able to raise prices without fearing lost sales or substitution.

## VI.    ANTICOMPETITIVE EFFECTS

### A.    Plaintiffs Paid Artificially Inflated Prices for Fire Apparatus

233.    The Defendants' inflated profit margins came at the expense of municipalities, volunteer departments, and other government entities, like the Plaintiffs, that purchased Fire Apparatus.

234.    If the price of Fire Apparatus had increased only at the rate of inflation between 2015 and 2025, pumper units would cost approximately $680,000 (rather than the current cost of $1 million), and ladder units would cost approximately $1.2 million (rather than $2 million).[106] Municipalities across the country are therefore paying approximately 47 percent (or $320,000) more for pumper units and 66 percent (or $800,000) more for ladder units in 2025 than would be expected based on inflationary costs alone.

---

[106] Calculated assuming a pumper cost $500,000 and a ladder truck cost $900,000 in 2015.

25706812.1

235. There are approximately 5,000-6,000 new Fire Apparatus units sold in the United States every year. Of these, about 75% are pumpers.[107] That means that since 2016, Plaintiffs and other Class members have paid a combined total of approximately $56.25 billion for new Fire Apparatus—$19.8 billion more than expected based on increased inflation alone.[108]

236. These price increases cannot be attributed to any increase in labor or production cost because, during the class period, the price increase of "stock" or "base model" Fire Apparatus (typically purchased through buying consortiums) is approximately ***ten times greater*** than the price increase across the heavy duty truck manufacturing industry during that time. These artificial prices increases, which cannot be explained by inflation or other variable production cost, are evident in the prices of both aerial and pumper apparatus compared to the industry PPI:



**Figure 7: Prices of Aerial Fire Apparatus Compared to**

---

[107] Alan M. Petrillo, *What's the Right Size Pump for Your Apparatus and How Does It Affect the Design?*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 27, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/pumpers/whats-the-right-size-pump-for-your-apparatus-and-how-does-it-affect-the-design.

[108] Cost based on inflation alone ($36.45 billion) calculated as ((3,750 units of pumper apparatus per year * 9 years *$680,000) + (1,250 units of ladder apparatus per year * 9 years * $1.2 million)).



**Figure 8: Prices of Pumper Fire Apparatus Compared to
PPI of Heavy Duty Truck Manufacturing, 2015-2023** [110]

237. Even accounting for any putative labor or supply chain issues facing the Fire Apparatus market, these increases are far beyond what would be expected in a competitive market, particularly when compared to the *absence* of any similar increases in the industry PPI.

**B.     Inflated Prices and Long Backlogs Prevent Plaintiffs and Class Members from Timely Repairing and Replacing Vehicles, Jeopardizing Public Safety**

238. As Fire Apparatus ages, it becomes increasingly prone to serious and frequent mechanical failures, resulting in costly repairs and extended downtime. Once Fire Apparatus reaches the end of its useful life, it must be replaced to ensure safe operations. The NFPA

---

[109] Figure 7 depicts HGAC consortium price increases for aerial apparatus between 2015 and 2023. All prices are indexed against 2015 prices, which serve as the baseline for price increases through 2023.

[110] Figure 8 depicts HGAC consortium price increases for pumper apparatus between 2015 and 2023. All prices are indexed against 2015 prices, which serve as the baseline for price increases through 2023.

recommends that apparatus should be moved from the frontlines to the reserve fleet after 15 years and removed from service completely at the 20- or 25-year mark.

239. Skyrocketing prices and longer delivery times have made it difficult for municipalities to replace aging vehicles in their fire department fleets in a timely manner. In many cases, fire departments use Fire Apparatus units that have exceeded their service life because replacing them is prohibitively expensive.

240. This aging equipment can—and has—endangered communities across the country, particularly in the face of natural disasters.

241. There are numerous examples of aging fleets and the concomitant hazards related to keeping Fire Apparatus units beyond their intended service life. As but one example, in January 2025, Chicago's fire department held a mock thirtieth birthday celebration for one of its engines, which was older than many of its firefighters.

242. In Los Angeles, the fire department aims to keep 90% of its fleet ready for deployment, but recently it has managed only around 78% as older Fire Apparatus units require frequent repairs. Rising costs for new vehicles have also forced the department to scale back on planned purchases.

243. In Atlanta, auditors discovered that over a third of the city's aging firefighting vehicles were out of service. Fire departments in Houston and Seattle face similar challenges, as do smaller municipalities in states such as Connecticut, Illinois, Michigan, New York, New Jersey, Pennsylvania, Texas, Kansas, and West Virginia.

244. For instance, in 2024, the city of Evanston, Illinois, had to negotiate with a regional Pierce Manufacturing dealer to purchase a demonstration model just to shorten the delivery time of a $2.3 million unit to roughly 12–14 months. The new Fire Apparatus unit was needed to replace

71

an 18-year-old reserve unit with serious mechanical issues that would have cost about $300,000 to repair.

245. In Ann Arbor, Michigan, the fire chief remarked that the price of Fire Apparatus has become "bonkers," describing what appears to be "almost a monopoly market." The city's next Fire Apparatus unit is projected to cost $2.4 million and take four years to arrive.

246. Similarly, the fire chief in Watertown, New York, explained that his department was so short on equipment that it resorted to buying a 20-year-old ladder unit from another city.[111]

**C. Plaintiffs and Class Members Have Been Harmed by Reduced Abilities to Respond to Emergencies and Disasters**

247. Plaintiffs and Class members have suffered from reduced firefighting capabilities against natural disasters, which endangered firefighters as well as the communities they protect.

248. Chad A. Russell, president of the Kansas State Association of Fire Chiefs, describes the impact of the Fire Apparatus shortage crisis caused by Defendants' conduct as follows:

> This is not just a matter of dollars and cents—it is a public safety issue. When rigs are sidelined or unavailable, our ability to respond is compromised. Mutual aid systems strain, response times increase, and the safety of our citizens and firefighters is jeopardized.

249. With natural disasters expected to increase in frequency and scale, communities across the country are at an elevated risk of fire emergencies but lack the necessary apparatus to respond to them.

250. The devastating wildfires of Los Angeles in January 2025—where entire neighborhoods were destroyed and hundreds of lives were lost—is a tragic example. When the fires broke out, the Los Angeles Fire Department had 183 units of Fire Apparatus, of which more than 100 were out of service. Due to this critical lack of safe, operative Fire Apparatus, available

---

[111] Baker, Farrell & Kovaleski, *supra*, n.5.

firefighters were unable to deploy to the frontlines.[112] Kristin Crowley, the LAFD fire chief, confirmed that the lack of a fully staffed Fire Apparatus fleet impeded the department's ability to respond to the fires.[113] Had additional firefighters been able to combat the blazes, they might have been able to prevent the devastation that followed, including $350 million in damage to L.A. public facilities and the loss of livelihoods.[114]

251. Other communities have faced similar difficulties. Jesse M. Flax, the fire chief in Camden, New Jersey, said that Fire Apparatus manufacturing delays and rising prices were "creating greater risk for the public and firefighters."[115] During a 2024 house fire in Camden, crews were slowed in their response by mechanical trouble on a unit. A resident died in that blaze.[116] And in Castle Rock, Colorado, firefighters responded to incidents in Type 3 brush units, rather than in other preferred vehicles, due to a four-year delivery delay of a new unit.[117]

---

[112] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf .

[113] Baker, Farrell & Kovaleski, *supra*, n.5.

[114] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

[115] Baker, Farrell & Kovaleski, *supra*, n. 5.

[116] *Id*.

[117] Isabelle Crow, *IAFF Spotlight Apparatus Crisis and Its Impact*, FIRE & SAFETY J. (June 20, 2025) https://fireandsafetyjournalamericas.com/iaff-spotlight-apparatus-crisis-and-its-impact .

25706812.1

**D. Plaintiffs and Class Members Have Diverted Funds from Other Essential Needs to Pay Artificially Inflated Prices for Fire Apparatus**

252. In addition to problems adequately responding to disasters with diminished fleets, the rising cost of Fire Apparatus maintenance and replacement has forced Plaintiffs and Class members to shift critical funds toward purchasing and repairing old Fire Apparatus, leaving them with fewer resources for other essential needs, such as recruiting, training, and retaining firefighters.[118]

253. For example, cities whose fire departments are facing budget challenges, including those in Spokane, Washington and Mills, Wyoming, have had to cancel essential training and even lay off firefighters due to severe budget restraints.[119]

**E. Defendants Concealed the Conspiracy and Plaintiffs Did Not and Could Not Have Discovered Defendants' Anticompetitive Conduct**

254. Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs did not discover, and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the price of Fire Apparatus. Throughout the class period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.

---

[118] Musharbash, *supra*, n.5.

[119] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

74

25706812.1

255.    Defendants concealed their conspiracy by communicating competitively sensitive information to one another through FAMA Statistical Reports that are unavailable to the public. They also attended members-only discussions during twice-annual FAMA meetings, allowing them to surreptitiously communicate and prevent the existence of written records. Because the public had no access to either the FAMA Reports or the FAMA members-only meetings, there was no reason for Plaintiffs to suspect that Defendants were engaged in an unlawful anticompetitive scheme.

256.    What's more, Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Prior to investigative articles published in early 2025,[120] Plaintiffs reasonably considered Fire Apparatus manufacturing and sales to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Manufacturer Defendants' Fire Apparatus prices before these recent events.

257.    By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs have as a result of the unlawful conspiracy alleged in this Consolidated Amended Complaint.

258.    Further, a continuing violation restarts the statute of limitations period each time Defendants commit an overt act. During the Class Period, Defendants continued to make sales of Fire Apparatus whose prices were fixed as a result of Defendants' continually renewed and adjusted price-fixing and information exchange agreement. Defendants needed to continually renew and adjust their price fixing and information exchange agreement to account for ever-fluctuating economic and market conditions.

---

[120] Musharbash, *supra,* n.5; Baker, Farrell & Kovaleski, *supra*, n.5.

259. Defendants' overt acts were new and independent acts that perpetuated their agreement and kept them current with market conditions. They were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiffs and Class Members.

260. As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiffs and Class Members starts the statutory period running again regardless of Plaintiffs' knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of Fire Apparatus constituted a new cause of action for purposes of the statute of limitations.

## VII.    ANTITRUST INJURY & DAMAGES

261. Defendants' anticompetitive conduct has had the following effects, among others:

   a.    Price competition for Fire Apparatus has been restrained or eliminated;

   b.    Prices for Fire Apparatus sold by the Manufacturer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States;

   c.    purchasers of Fire Apparatus have been deprived of free and open competition; and

   d.    purchasers of Fire Apparatus have paid artificially inflated prices.

262. The ultimate purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of Fire Apparatus and, as a direct and foreseeable result, Plaintiffs and the Class have paid supra-competitive prices for Fire Apparatus during the Class Period.

25706812.1

263. By reason of the alleged violations of the antitrust laws, Plaintiffs and Class Members have sustained injury, having paid higher prices for Fire Apparatus than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

264. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII. CLASS ACTION ALLEGATIONS

265. Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking equitable and injunctive relief, and other relief pursuant to federal antitrust laws on behalf of the following Class:

> All direct purchasers of Fire Apparatus from any of the Manufacturer Defendants in the United States at any time from January 1, 2016 until the present.

> Specifically excluded are Defendants; their officers, directors, or employees; any entity in which a Defendant has a controlling interest; any affiliate, legal representative, or assign of a Defendant; any State of the United States, the District of Columbia or any Territory of the United States; the United States Government, or any agency or department thereof; any judicial officers presiding over this action and members of their immediate family and staff; and any juror assigned to this action.

266. Plaintiffs reserve the right to amend these Class definitions, including, and without limitation, the Class Period.

267. The above-defined Class Members are readily identifiable from information and records in the possession of Defendants.

268. While Plaintiffs does not know the exact number of Class Members, Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of Class Members geographically dispersed throughout the United States, such that joinder of all Class Members would be impracticable.

77

25706812.1

269.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs purchased Fire Apparatus directly from one or more of the Manufacturer Defendants and was damaged by the same common course of wrongful conduct.

270.    Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. Such questions of law and fact common to the Class include, but are not limited to:

a.      Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of Fire Apparatus sold in the United States in violation of federal antitrust laws;

b.      Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws;

c.      Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

d.      The identity of the participants of the alleged conspiracy;

e.      The scope and duration of the alleged conspiracy;

f.      The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

g.      The effect of Defendants' alleged conspiracy on the prices of Fire Apparatus sold in the United States during the Class Period;

h.      Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and other members of the Class;

25706812.1

i.      Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

j.      The appropriate class-wide measure of damages; and

k.      Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiffs and the Class.

271.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Fire Apparatus. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.

272.    Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of other members of the Class and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

273.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical and Class Members do not have interest in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for Defendants and would

greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

274. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## IX. CAUSES OF ACTION

### COUNT I
### Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (against All Defendants)

275. Plaintiffs incorporate and reallege all preceding paragraphs as though fully set forth herein.

276. At least as early as January 1, 2016, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Fire Apparatus in the United States to supra-competitive levels, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

277. In particular, Defendants have contracted, combined, and conspired to (1) restrict the output of Fire Apparatus in the United States and (2) raise, fix, maintain, and/or stabilize the prices of Fire Apparatus sold directly to purchasers in the United States; and (3) share competitively sensitive confidential information that enable coordinated non-competitive conduct on pricing and output.

278. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under a rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive

25706812.1

justifications, such justifications would have been reasonably achieved through less restrictive means of competition.

279. The contract, combination, or conspiracy alleged herein has had the following effects, among others:

     a. Price competition in the sale of Fire Apparatus has been restrained, suppressed, and/or eliminated in the United States;

     b. Prices for Fire Apparatus sold by the Manufacturer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

     c. Those who purchased Fire Apparatus from the Manufacturer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

280. Plaintiffs and Class Members have been injured and will continue to be injured by paying artificially inflated prices for Fire Apparatus purchased from the Manufacturer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

281. Plaintiffs and Class Members seek three times their damages caused by Defendants' violations of section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of section 1 of the Sherman Act.

**COUNT II**

**Restraint of Trade in Violation of Section  7 of the Clayton Act, 15 U.S.C. § 18
(against AIP, REV Group Defendants, and Oshkosh Defendants)**

282. Plaintiffs incorporate and reallege all preceding paragraphs as though fully set forth herein.

283. Defendants unlawful conduct, as described above, substantially lessened competition or tended to create a monopoly in the market for Fire Apparatus, Fire Apparatus Chassis, and Wildland Fire Apparatus in the United States.[121]

284. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members were injured in their business or property.

285. This offense is likely to continue unless injunctive relief, including divestiture and other equitable remedies, is granted.

286. Plaintiffs and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT III
### Declaratory and Injunctive Relief for Violations of Section 1 of the Sherman Act and Section 7 of the Clayton Act, 15 U.S.C. §§ 1, 18
### (against All Defendants)

287. Plaintiffs incorporate and reallege all preceding paragraphs as though fully set forth herein.

288. Plaintiffs seek declaratory and injunctive relief under the federal antitrust laws.

289. Plaintiffs' allegations described herein constitute violations of section 1 of the Sherman Act and section 7 of the Clayton Act.

---

[121] "A company's history of expansion through mergers presents a different economic picture than a history of expansion through unilateral growth. Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output. It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry." *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962).

25706812.1

290. Defendants effectuated a scheme to restrain trade and substantially lessen competition in the United States market for Fire Apparatus.

291. There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' conduct that outweighs its harmful effect.

292. As a direct and proximate result of Defendants' anticompetitive scheme, as alleged herein, Plaintiffs and the Class were harmed.

293. The purpose and effect of the scheme was to prevent or delay competition in order to charge supracompetitive prices for Fire Apparatus without a substantial loss of sales.

294. The anticompetitive agreements alleged herein should be declared invalid and unenforceable.

295. Plaintiffs and the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count. Their injury includes paying higher prices for Fire Apparatus than they would have paid in the absence of those violations. These injuries will continue unless halted.

296. Plaintiffs and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a Declaratory Judgment that Defendants' conduct constitutes a violation of section 1 of the Sherman Act and section 7 of the Clayton Act.

297. Plaintiffs and the Class further seek equitable and injunctive relief pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## COUNT IV

## Attempted Monopolization in Violations of Section 2 of the Sherman Act, 15 U.S.C. § 2
## (against REV Group Defendants and AIP)

298. Plaintiffs incorporate and reallege all preceding paragraphs as though fully set forth herein.

299. From 2008 to 2020, AIP and REV Group engaged in a series of horizontal roll-up acquisitions in the markets for Fire Apparatus and Fire Apparatus Chassis that were designed to give REV Group and AIP market power in the relevant markets, for the specific purpose of lessening competition, monopolizing the market, and giving AIP and REV Group the power to increase prices and lower quality.

300. AIP directed, controlled, managed, and encouraged this anticompetitive course of conduct, including by utilizing their specific expertise in roll-up acquisitions and consolidation that AIP had previously engaged in other markets. AIP used its own sources of capital and its ability to access outside capital to roll up the market and concentrate economic power in its wholly owned subsidiary REV Group.

301. Through this anticompetitive course of conduct and attempted monopolization, REV Group did in fact acquire market power as demonstrated by both indirect evidence of market shares within the relevant markets, substantial barriers to entry and their ability to raise rivals costs and prevent new market entry, as well as direct evidence that they were able to raise prices above competitive levels and reduce output below competitive supply levels. AIP and REV Group's market power produced anticompetitive effects, including increased prices, reduction in quality, reduction in choices, reduction in supply leading to increased wait times for Fire Apparatus, and worsened terms.

302. Plaintiffs and the class have been directly harmed by this anticompetitive conduct.

84

25706812.1

303. There is a dangerous probability that AIP and REV Group's anticompetitive roll-up acquisition scheme will result in REV Group and AIP achieving a monopoly in the Relevant Markets for Fire Apparatus and Fire Apparatus Chassis in the United States.

**COUNT V**
**Attempted Monopolization in Violations of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**(against Oshkosh Defendants and BME)**

304. Plaintiffs incorporate and reallege all preceding paragraphs as though fully set forth herein.

305. From 2021 to 2022, the Oshkosh Defendants engaged in a series of horizontal roll-up acquisitions and partnerships with its competitors in the markets for Fire Apparatus and Fire Apparatus Chassis that were designed to give Oshkosh Defendants market power in the relevant markets, and for the specific purpose of lessening competition, monopolizing the markets, and giving the Oshkosh Defendants the power to increase prices and lower quality.

306. In 2021, the Oshkosh Defendants acquired a 25% ownership interest in BME and began to collaborate and cease competing with BME. The Oshkosh Defendants and BME now consider themselves to be partners rather than competitors, and they actively coordinate and collaborate on innovation and price among other things.

307. In 2022, the Oshkosh Defendants acquired Maxi-Metal, a competitor and potential competitor in the Relevant Markets.

308. Through this anticompetitive course of conduct and attempted monopolization, the Oshkosh Defendants did in fact acquire and maintain market power as demonstrated by both indirect evidence of market shares within the relevant markets, substantial barriers to entry and their ability to raise rivals' costs and prevent new market entry, as well as direct evidence that they were able to raise prices above competitive levels and reduce output below competitive supply

levels. The Oshkosh Defendants' market power produced anticompetitive effects, including increased prices, reduction in quality, reduction in choices, reduction in supply leading to increased wait times for Fire Apparatus, and worsened terms.

309.    Plaintiffs and the class have been directly harmed by this anticompetitive conduct.

310.    There is a dangerous probability that the Oshkosh Defendants' anticompetitive roll-up acquisition scheme will result in the Oshkosh Defendants achieving a monopoly in the Relevant Markets in the United States.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, demand judgment against Defendants as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed an unreasonable restraint of trade or commerce in violation of the Sherman Act and a *per se* violation of the Sherman Act, and which caused harm to Plaintiffs and the Class;

C.    In the alternative, that the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed an unreasonable restraint of trade or commerce in violation of the Sherman Act under a *Rule of Reason* analysis and which violation caused harm to Plaintiffs and the Class;

25706812.1

D.     That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed to have substantially lessened competition or tended to create a monopoly in the market for fire apparatus in the United States in violation of the Clayton Act, which caused harm to Plaintiffs and the Class;

E.     That Plaintiffs and the Class are entitled to recover damages to the maximum extent allowed under federal law, and that a judgment in their favor be entered against Defendants, jointly and severally, in an amount to be trebled to the extent such laws permit;

F.     That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained  from  in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.     That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

H.     Order all divestitures as necessary to restore independent competitors and competition within the relevant markets;

87

I.	That Plaintiffs and the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

J.	That Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law;

K.	Defendants are to be held jointly and severally financially responsible for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class; and

L.	That Plaintiffs and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XI.	DEMAND FOR JURY TRIAL

Plaintiffs demands a jury trial pursuant to Federal Rule Civil Procedure 38(b) on any and all issues so triable.

Dated: March 11, 2026	Respectfully submitted:


*s/ Gregory P. Hansel*	*s/	Beth J. Kushner*
Gregory P. Hansel (WIED No. 607101)	Beth Kushner, SBN 1008591
Michael S. Smith (WIED No. 004986)	Christopher E. Avallone, SBN1095465
Elizabeth F. Quinby (WIED No. 006168)	von BRIESEN & ROPER, s.c.
Michael D. Hanify (WIED No. 010257)	411 East Wisconsin Avenue, Suite 1000
PRETI FLAHERTY BELIVEAU &	Milwaukee, WI 53202
PACHIOS, LLP	Tel: (414) 276-1122
One City Center	beth.kushner@vonbriesen.com
P.O. Box 9546	christopher.avallone@vonbriesen.com
Portland, ME 04112-9546
Tel: (207)791-3000	*Interim Direct Purchaser Class Liaison Counsel*
ghansel@preti.com
msmith@preti.com
equinby@preti.com
mhanify@preti.com

*Interim Co-Lead Direct Purchaser Class Counsel*

25706812.1

/s/ Michael J. Flannery
Michael J. Flannery (WIED No. 110084)
CUNEO GILBERT FLANNERY &
LADUCA, LLP
2 CityPlace Drive
Second Floor
St. Louis, MO 63141
Telephone: (314) 226-1015
mflannery@cuneolaw.com

*Interim Co-Lead Direct Purchaser Class Counsel*

/s/ Jeffrey A. Barrack
Jeffrey A. Barrack (WIED No. 78438)
Danielle M. Weiss (WIED No. 033342005)
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-0600
Fax: (215) 963-0838
E-mail: jbarrack@barrack.com
E-mail: dweiss@barrack.com
*Interim Co-Lead Direct Purchaser Class Counsel*

Evelyn Riley*
Cody McCracken*
CUNEO GILBERT FLANNERY &
LADUCA, LLP
2445 M Street NW
Suite 740
Washington, DC 20037
Telephone: (202) 789-3960
evelyn@cuneolaw.com
cmccracken@cuneolaw.com

*Interim Co-Lead Direct Purchaser Class Counsel*

Stephen R. Basser (WIED No. 121590)
Samuel M. Ward (WIED No. 216562)
BARRACK, RODOS & BACINE
600 West Broadway, Suite 900
San Diego, CA 92101
Tel.: (619) 230-0800
Fax: (619) 230-1874
E-mail: sbasser@barrack.com
E-mail: sward@barrack.com
*Interim Co-Lead Direct Purchaser Class Counsel*

William J. Ban (WIED No. 1870690)
BARRACK, RODOS & BACINE
Eleven Times Square
640 8th Avenue, 10th Floor
New York, New York 10036
Tel.: (212) 688-0782
Fax: (212) 688-0783
E-mail: wban@barrack.com

*Interim Co-Lead Direct Purchaser Class Counsel*

s/ Joseph R. Saveri
Joseph R. Saveri (WIED No. 130064)
Ronnie Spiegel (WA State Bar No. 33721)*^
David Seidel (CA State Bar No 307135)*
SAVERI LAW FIRM, LLP
550 California Street, Suite 910
San Francisco, California 94108
Tel: (415) 500-6800
Fax: (415) 395-9940
E-mail: jsaveri@saverilawfirm.com
        rspiegel@saverilawfirm.com
        dseidel@saverilawfirm.com
*Interim Co-Lead Direct Purchaser Class Counsel*
*Application for Admission to be filed*
^ Located in Washington State

89