| | |
|---|---|
| IN RE: FIRE APPARATUS ANTITRUST LITIGATION | Case No. 2:26-md-3179-WCG<br><br>Hon. William C. Griesbach |

**NON-CLASS ACTION PLAINTIFFS' OPPOSITION TO**
**CLASS COUNSEL'S MOTION FOR "CURATIVE COMMUNICATION" (ECF NO. 89)**

Non-Class Action Plaintiffs ("NCAPs")[1] hereby oppose Class Counsel's Motion for

"Curative Communication" (ECF No. 89). This Response in opposition to the Motion is

supported by the Declarations of John P. Fiske ("Fiske Decl."), Catherine S. Simonsen

("Simonsen Decl."), and Thomas L. Young ("Young Decl."), the points and authorities cited

herein, and any further argument and authority entertained by the Court.

---

[1] At Class Counsel's request, Non-Class Action Plaintiffs have dropped the word "Direct" from the title they use to refer to themselves.

**TABLE OF CONTENTS**

I.    Introduction.................................................................................................................. 1

II.   Class Counsel Seeks to Have this Court Mandate the Dissemination of Misleading Statements and Incorrect Advice to Class Members and Omits Material Information .............. 3

III.  The Non-Class Actions Have Alleged Different Facts, Legal Theories, and Claims Against Different Defendants Such that It Would Be Inappropriate to Advise Public Entities that Their Rights Are Fully Protected While the Class Actions Are Pending........................... 5

   A.    The Non-Class Actions Challenge Acquisitions in Six Relevant Markets Under Clayton Act Section 7 and Sherman Act Section 2 and Pierce's Exclusionary Restraints in Replacement Parts Markets; Seek Damages for Delivery Delays and Umbrella Price Effects; and Name Unique Defendants ................................................................................................. 6

   B.    In Contrast, the Relevant Class Complaint(s) Allege a Conspiracy, Omit Numerous Relevant Markets, Name Rosenbauer and FAMA, Have Omitted BME Defendants, Have Omitted Clayton Act Section 7 and Sherman Act Section 2 Claims, and Do Not Challenge Pierce's Replacement Parts Conduct ...................................................................................... 8

   C.    The Class Actions Fail to Assert Federal or State-Law Claims on Behalf of Their Putative Class Members...................................................................................................... 12

IV.   Lead NCAP Counsel's Accurate Initial Informational Brochure Sent to Attorneys for Sophisticated Public Entities, Resulting in Either No Action or the Start of a Highly Deliberative Process, Misled No One...................................................................................... 17

V.    The Order Class Counsel Asks the Court to Enter Would Violate the First Amendment's Prohibition on Undue Restraints on Speech and Compelled Speech ...................................... 19

   A.    The Informational Brochure Is Truthful and Not Misleading, and Therefore Any Interference with That Speech Must Satisfy Intermediate Scrutiny ...................................... 20

   B.    Class Counsel Has Failed to Demonstrate Any Harm Caused by the Informational Brochure or That Their Proposed "Notice" Will Do Anything Other than Prejudice and Mislead Public Entities ...................................................................................................... 20

   C.    Class Counsel Seeks to Have the Court Compel Lead NCAP Counsel's Speech Against Their Informed Judgment ................................................................................................... 22

VI.   No Facts Establish the "Clear Record" or Permit the "Specific Findings" of a "Serious Threat to the Fairness" of this Proceeding to Justify Class Counsel's Requested Infringement of First Amendment Rights................................................................................................... 23

VII.  Conclusion .............................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023)..................................................................................................... 25

*Bates v. State Bar of Ariz.,*
433 U.S. 350 (1977)..................................................................................................... 24

*Braswell v. Bow Plumbing Grp., Inc.,*
2024 U.S. Dist. LEXIS 92478 (M.D. Ala. May 23, 2024) ......................................... 31

*Burrow v. Sybaris Clubs Int'l, Inc.,*
2014 U.S. Dist. LEXIS 148576 (N.D. Ill. Oct. 17, 2014)........................................... 28

*Calobrace v. Am. Nat'l Can Co.,*
1995 U.S. Dist. LEXIS 1348 (N.D. Ill. Feb. 2, 1995) ......................................... 25, 27

*Camp v. Alexander,*
300 F.R.D. 617 (N.D. Cal. 2014) ............................................................................... 31

*CBS Corp. v. Sumitomo Corp. (In re Copper Antitrust Litig.),*
2000 U.S. Dist. LEXIS 23741 (W.D. Wis. July 7, 2000)............................................. 8

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,*
447 U.S. 557 (1980)......................................................................................... 21, 22, 23

*Cnty of Santa Clara v. Astra USA, Inc.,*
2010 U.S. Dist. LEXIS 78312 (N.D. Cal. July 8, 2010)............................................. 31

*Crown v. Parker,*
462 U.S. 345 (1983)..................................................................................................... 17

*FCC v. League of Women Voters of Cal.,*
468 U.S. 364 (1984)..................................................................................................... 20

*Fla. Bar v. Went for It,*
515 U.S. 618 (1995)............................................................................................... 21, 22

*Fox v. Cty. of Saginaw,*
2021 U.S. Dist. LEXIS 192576 (E.D. Mich. Oct. 5, 2021) ....................................... 30

*Fox v. Saginaw Cty.,*
35 F.4th 1042 (6th Cir. 2022)................................................................................ 27, 30

ii

*FTC v. Deere & Co.*,
  2025 U.S. Dist. LEXIS 109177 (N.D. Ill. June 9, 2025)............................................................. 7

*FTC v. Edwards Lifesciences Corp.*,
  2026 U.S. Dist. LEXIS 19409 (D.D.C. Jan. 9, 2026) ................................................................ 12

*FTC v. Procter & Gamble Co.*,
  386 U.S. 568 (1967).................................................................................................................. 12

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981)......................................................................................................... 2, 25, 26

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977)........................................................................................................ 13, 14, 16

*Illumina, Inc. v. FTC*,
  88 F. 4th 1036 (5th Cir. 2023).................................................................................................. 12

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*,
  418 F.3d 277 (3d Cir. 2005) ................................................................................................ 21, 27

*In re Lupron Marketing and Sales Practices Litigation*,
  2004 U.S. Dist. LEXIS 26461 (D. Mass. 2004) ....................................................................... 30

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1239 (N.D. Cal. 2000) ....................................................................... 26, 28, 29

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  2014 U.S. Dist. LEXIS 142213 (E.D.N.Y. Oct. 3, 2014). ......................................................... 30

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  2026 U.S. Dist. LEXIS 101635 (E.D.N.Y. May 7, 2026).......................................................... 30

*In re Uranium Antitrust Litig.*,
  556 F. Supp. 806 (N.D. Ill. 1983) ............................................................................................... 8

*Jones v. Jeld-Wen*,
  250 F.R.D. 554 (S.D. Fla. 2008) .............................................................................................. 31

*Kay Co., LLC v. Equitable Prod. Co.*,
  246 F.R.D. 260 (S.D. W. Va. 2007).......................................................................................... 27

*Lukis v. Whitepages Inc.*,
  549 F. Supp. 3d 798 (N.D. Ill. 2021)          26

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
  952 F.3d 832 (7th Cir. 2020) ....................................................................... 14

*Masonek v. Wells Fargo Bank*,
  2009 U.S. Dist. LEXIS 136738 (C.D. Cal. Dec. 21, 2009) ....................................... 29

*Matson v. NIBCO Inc.*,
  2021 U.S. Dist. LEXIS 108683 (W.D. Tex. June 10, 2021) ....................................... 29

*McCullen v. Coakley*,
  573 U.S. 464 (2014)................................................................................. 20

*McWilliams v. Advanced Recovery Systems*,
  176 F. Supp. 3d 635 (S.D. Miss. 2016)............................................................ 30

*Mitchell v. CoreLogic, Inc.*,
  2019 U.S. Dist. LEXIS 221927 (C.D. Cal. July 19, 2019)......................................... 31

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
  585 U.S. 755 (2018)............................................................................. 1, 20

*Riley v. Flowers Baking Co. of Jamestown, LLC*,
  2015 U.S. Dist. LEXIS 90597 (W.D.N.C. July 13, 2015) .......................................... 32

*Rochford v. Joyce*,
  755 F. Supp. 1423 (N.D. Ill. 1990) .............................................................. 17

*Slamon v. Carrizo (Marcellus) LLC*,
  2018 U.S. Dist. LEXIS 126157 (M.D. Pa. July 27, 2018).......................................... 31

*Stanich v. Travelers Indem. Co.*,
  259 F.R.D. 294 (N.D. Ohio 2009).................................................................. 26

*Thomas v. Trs. of Ind. Univ.*,
  2018 U.S. Dist. LEXIS 198454 (S.D. Ind. Nov. 21, 2018).......................................... 27

*United States Gypsum Co. v. Ind. Gas Co.*,
  350 F.3d 623 (7th Cir. 2003)...................................................................... 8

*United States v. Falstaff Brewing Corp.*,
  410 U.S. 526 (1973)............................................................................... 12

*United States v. Franklin Elec. Co., Inc.*,
  130 F. Supp. 2d 1025 (W.D. Wis. 2000) ............................................................ 7

iv

*United States v. Philadelphia National Bank*,
  374 U.S. 321, 363 (1963).................................................................................................... 7

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
  425 U.S. 748 (1976)........................................................................................................... 1

*Williams v. Chartwell Fin. Servs.*,
  204 F.3d 748 (7th Cir. 2000)............................................................................................. 2

**Statutes**

15 U.S.C. § 1...................................................................................................................... 10

Fed. R. Civ. P. 23(d)......................................................................................................... 25

Wis. Stat. Ann. § 133.18(2).............................................................................................. 16

**Other Authorities**

Joshua P. Davis & Candice L. Enders, *The ABA's Ethical Codes*, in
  *Class Actions and Other Complex Litigation: Ethics* § 1.03 (LexisNexis 2023) ..................... 26

Manual for Complex Litigation (Fourth) § 21.12 (2004) ............................................... 26

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
  Their Application* (5th ed. 2026)....................................................................................... 8, 14

U.S. Dep't of Justice & FTC, Merger Guidelines § 5.3 (2023) ...................................... 7

## I. Introduction

Class Counsel's Motion rests on the misguided argument that any time a putative class action is filed that implicates the rights of public entities, and interim lead counsel for the putative class is appointed, no other lawyer may *initiate* communications with attorneys for public entities who are members of the proposed class, with accurate statements about *different*, non-class claims they may wish to file against *different* defendants seeking *different* relief, without in the *same* communication advising those public-entity lawyers of the existence of the putative class action and encouraging them not to file their own case. Class Counsel cites no authority supporting their request to enlist the Court in interfering with the constitutionally protected right to the free exchange of information and to treat sophisticated, counseled public entities as incapable of understanding their legal options.

Class Counsel seemingly seeks to tarnish the image of Lead Non-Class Action Plaintiffs' ("NCAP") Counsel before the Court by implying that there is something inherently improper about their informational brochure. But "'*[t]he best test of truth is the power of the thought to get itself accepted in the competition of the market*,' . . . and the people lose when the government is the one deciding which ideas should prevail." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 772 (2018) (quoting Justice Holmes) (emphasis added). As the Supreme Court has explained:

> Advertising . . . is . . . dissemination of information as to who is producing and selling what product, for what reason, and at what price. So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable.

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 765 (1976). Ironically in this antitrust litigation, it is competition in the marketplace of ideas that Class

1

Counsel seeks to shut down with their Motion. As much as Class Counsel wishes otherwise, they must recognize that the class cases are not the only cases in this proceeding. Twenty-one public entities and counting—including the Cities of Baltimore, Green Bay, Oakland, Hartford, Portland, and Tucson, and the Counties of Los Angeles and San Diego—have filed non-class actions based on different facts and claims, and they stand to recover individualized damages through those actions. Seemingly threatened by these class members' informed decisions not to remain passive members of the putative classes, Interim Lead Class Counsel ostensibly seeks a "curative communication," though their stated intent is to stop Lead NCAP Counsel from filing cases on public entities' behalf. *See* Simonsen Decl. ¶¶ 5-6.

The only facts in the record are that Lead NCAP Counsel sent a truthful and accurate initial informational brochure to attorneys for sophisticated public entities who are members of an uncertified, putative class, welcoming them to contact Lead NCAP Counsel to learn more about potential claims that differ materially from the claims filed by Lead Class Counsel. The brochure prominently labeled the informational brochure "ADVERTISEMENT," clearly disclosed it was created by Lead NCAP Counsel, and did not create the false appearance that the document was an official court "notice." Lead NCAP Counsel did not ask—much less pressure—the contacted attorneys to opt the public entities they represent out of the putative classes or to retain Lead NCAP Counsel to file their own actions. Indeed, all public entities that meet the putative class definitions remain class members, and no one has opted out of or given up rights to recover anything. Some of the public entities whose attorneys received the brochure thereafter made a fully informed decision to initiate litigation after a highly deliberative process. On these facts, there is no "clear record" and there can be no "specific findings" of serious abuse or misrepresentation required to justify the sweeping invasion of First Amendment rights Class

2

Counsel requests. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981); *Williams v. Chartwell Fin. Servs.*, 204 F.3d 748, 759 (7th Cir. 2000). The Court should deny the Motion.

## II. Class Counsel Seeks to Have this Court Mandate the Dissemination of Misleading Statements and Incorrect Advice to Class Members and Omits Material Information

At the outset, NCAP Counsel wishes to clarify what Class Counsel seeks in their Motion—far more than a "curative communication." Class Counsel seeks an order requiring NCAP Counsel to give *Interim Lead DPP Class Counsel* contact information for the attorneys for every public entity who received NCAP Counsel's informational brochure—including NCAP Counsel's *own clients*—and allowing Interim Lead DPP Class Counsel to send an email to each of these public-entity attorneys containing inaccurate information, as outlined below. ECF No. 90-1. They further seek to compel NCAP Counsel to "amend[]" their informational brochure "to include" the same misleading information and advice. ECF No. 89-1 at 4 ¶ 7.

First, Class Counsel would have this Court order that attorneys for public-entity members of the putative classes be told that "[u]ntil the Court decides whether th[]e [putative class] cases may proceed as class actions, *the statute of limitations has been suspended* on any antitrust claim you may have within the scope of the Case." ECF No. 89-1 at 4 ¶ 7; ECF No. 90-1 at 1 (emphasis added). But because of the substantial differences in allegations, causes of action, and even named defendants between the class cases and Non-Class Actions, Defendants will undoubtedly argue that the putative class actions have *not* tolled all of NCAPs' statutes of limitations for all claims. *See infra*, page 16 & n.16.

Second, Class Counsel would have this Court order that attorneys for public-entity members of the putative classes be told that "[w]hile the proposed class action is pending, *you do not need to sue* because you may be part of a proposed class." ECF Nos. 89-1 at 4 ¶ 7, 90-1 at 1 (emphasis added). This statement is false. The class actions filed by Interim Lead Class Counsel

3

have omitted entire defendants, causes of action, and claims for relief. If public entities do not file their own action, they may forfeit those claims and recoveries. *See infra*, Section III.

Third, Class Counsel would have the Court compel Lead NCAP Counsel to tell public entities that, "[i]f you prefer, you have the right to hire your own attorneys and *pay them yourself* to file an individual lawsuit." ECF Nos. 89-1 at 4 ¶ 7, 90-1 at 1 (emphasis added). Lead NCAP Counsel's actual and prospective clients have not "pa[id]" and will not "pay them" anything, unless there is a recovery; as the brochure makes clear, the representation involves "[z]ero upfront cost" because Lead NCAP Counsel "are plaintiff law firms working on a contingency basis." ECF No. 91-1 at 8. Again, Class Counsel's proposed forced speech is inaccurate.

Class Counsel has known about the brochure *since February*, *see* ECF No. 91 ¶ 9, and was apparently so unconcerned that absent class members would be misled that they did nothing to obtain a "curative communication" until *the day this Court appointed Simonsen Sussman and Baron & Budd as Lead NCAP Counsel*, when they promptly sent Lead NCAP Counsel an email at 10:45 p.m. threatening to "take further action" "[a]bsent a full explanation and appropriate resolution." Simonsen Decl. ¶¶ 8-10. During a subsequent meet and confer on this issue, Lead NCAP Counsel repeatedly requested Class Counsel's legal authority. Interim Lead DPP Class Counsel's only response was, "You'll see it when we file our motion." *Id.* ¶¶ 11-15.

Finally, at the May 13 Telephone Conference, Interim Lead DPP Class Counsel represented to this Court that "the allegations in the [DPP first amended consolidated class action] complaint would not change" from the original consolidated amended class action complaint ("CAC") they filed in March before Judge Conway, stating that at most "there might be a need for -- for an amendment by way of, if you will, of interlineation to add a couple of the parties who at the time of the MDL had not been moved in to the case," or "a slight tweak of the

4

complaint on that basis, but *the substance of the complaint would not change*, Your Honor." Tr. of Tel. Conf. at 9 (May 13, 2026) (Simonsen Decl. ¶ 16 & ECF No. 68-1) (emphasis added). Yet on May 22, Interim Lead DPP Class Counsel filed a first amended class CAC in which they have attempted to borrow large swaths of and entire claims from Non-Class Action Plaintiffs' complaints that DPPs had previously omitted from every single class complaint they had filed. *See* ECF No. 59; Simonsen Decl. Ex. A (redline showing changes).[2] Interim Lead DPP Class Counsel appears to base their argument that their pleading is "redundant" of NCAPs' on these last-minute efforts to conform their pleading to NCAPs' allegations, while failing to acknowledge that for nearly the entire duration of Lead NCAP Counsel's outreach efforts of which Class Counsel complains, the prior version of the DPP class CAC, not the late-breaking May 22 version, was in effect. Nevertheless, substantial gaps remain, as discussed below.

### III. The Non-Class Actions Have Alleged Different Facts, Legal Theories, and Claims Against Different Defendants Such that It Would Be Inappropriate to Advise Public Entities that Their Rights Are Fully Protected While the Class Actions Are Pending

Class Counsel repeatedly mischaracterizes the Non-Class Actions as "seeking the same relief for the same claims" as and "already encompassed by the pending class cases" (ECF No. 90 at 1-2). Based on these mischaracterizations, Class Counsel argues, "public entit[ies] [are] not required to file a separate lawsuit to recover damages or obtain other non-economic relief" (*id.* at 2). These statements are incorrect. NCAPs' actions contain distinct claims, seek distinct forms of

---

[2] For example, whereas no DPP class complaint had ever alleged a Sherman Act Section 2 claim, DPPs' latest pleading now purports to add these causes of action. *Id.* ¶¶ 298-310. Whereas DPP Class Counsel had previously alleged only a single relevant market for fire apparatuses, their new pleading now attempts to add a "fire apparatus chassis" and wildland fire apparatus market. *Id.* ¶¶ 90-96, 283, 299, 305. Whereas they had never named Boise Mobile Equipment Inc. and BME Fire Trucks, LLC ("BME Defendants"), DPPs' latest class CAC for the first time adds these parties—but only as to their new Sherman Act Section 2 claims and not their preexisting Clayton Act Section 7 claim. *Id.* ¶¶ 29, 37, 49.

relief, and name a distinct set of defendants from Lead Class Counsel's complaints. NCAPs cannot obtain the full relief they seek through their membership in the putative classes.

### A. The Non-Class Actions Challenge Acquisitions in Six Relevant Markets Under Clayton Act Section 7 and Sherman Act Section 2 and Pierce's Exclusionary Restraints in Replacement Parts Markets; Seek Damages for Delivery Delays and Umbrella Price Effects; and Name Unique Defendants

The Non-Class Actions complain of unlawful *mergers and acquisitions* by the REV Group Defendants and AIP Defendants, the Oshkosh Defendants, and the BME Defendants, in violation of Clayton Act Section 7, Sherman Act Section 2, and state-law analogues.[3] Specifically, NCAPs allege the AIP and REV Group Defendants' acquisitions of four independent fire apparatus manufacturers substantially lessened competition in relevant national markets for Custom Chassis (the frame on which Custom Fire Apparatuses are built), Custom Pumpers, Custom Aerials, Custom Quints, and the broader national market for Fire Apparatuses. *See* ECF No. 53 ("NCAP CAC") ¶¶ 471-478. NCAPs also allege that the Oshkosh Defendants' acquisition of Maxi-Métal and acquisition of an ownership interest in the BME Defendants similarly substantially harmed competition in the relevant national markets for Custom Chassis, Custom Pumpers, Wildland Fire Apparatuses, and Fire Apparatuses. *Id.* ¶¶ 479-495.

NCAPs define six distinct relevant markets over 50 paragraphs of detailed factual allegations. *Id.* ¶¶ 182-231. NCAPs' complaints specify Defendants' respective alleged market

---

[3] The "REV Group Defendants" refer to REV Group, LLC (f/k/a REV Group, Inc.) and its subsidiaries E-ONE, Inc.; Kovatch Mobile Equipment Corp.; KME Global, LLC; KME Holdings, LLC; KME RE Holdings LLC; Ferrara Fire Apparatus, Inc.; FFA Holdco, Inc.; FFA Acquisition Co., Inc.; Ferrara Fire Apparatus Holding Company, Inc.; Spartan Fire, LLC; Smeal SFA, LLC; Smeal LTC, LLC; Smeal Holding, LLC; and Detroit Truck Manufacturing, LLC. The "AIP Defendants" refer to AIP, LLC; American Industrial Partners Capital Fund IV LP; American Industrial Partners Capital Fund IV (Parallel), LP; AIP/CHC Holdings, LLC; AIP CF IV, LLC; and AIP/CHC Investors, LLC. The "Oshkosh Defendants" refer to Oshkosh Corporation; Pierce Manufacturing Inc.; and Maxi-Métal, Inc.

6

shares; report the changes in concentration levels (known as the Herfindahl-Hirschman Index, or HHI) in each relevant market resulting from each at-issue acquisition; and explain the at least nine ways the acquisitions harmed competition. *Id.* ¶¶ 256-325. They also allege the market shares and HHI changes required to obtain a presumption under U.S. Supreme Court precedent that the acquisitions violated Clayton Act Section 7. *Id.* ¶¶ 285-302; *see United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963); U.S. Dep't of Justice & FTC, Merger Guidelines § 5.3 (2023); *United States v. Franklin Elec. Co., Inc.*, 130 F. Supp. 2d 1025, 1032 (W.D. Wis. 2000).

The Non-Class Actions also allege that Pierce designs its apparatuses and works with its parts dealers to restrict customers' ability to purchase replacement parts from competing manufacturers, harming competition in defined relevant replacement parts markets. NCAP CAC ¶¶ 340-377. They allege this conduct violates Sherman Act Section 2, Clayton Act Section 3, and analogous state laws. *Id.* ¶¶ 964-1055; *see, e.g.*, *FTC v. Deere & Co.*, 2025 U.S. Dist. LEXIS 109177, at \*19-20 (N.D. Ill. June 9, 2025).

NCAPs' purchases for which they claim damages include their purchases of Defendants' *and non-defendants'* apparatuses, under the theory of umbrella price effects. *See, e.g.*, NCAP CAC ¶¶ 379-382. As a leading antitrust treatise explains:

> When some competitors . . . limit their output and thereby bring about higher market prices, their [innocent] rivals might . . . maintain their previous output and thereby enjoy higher prices . . . . [T]he [anticompetitive conduct] caused market prices to rise and thereby to injure consumers,  regardless of whether they purchased from the [wrongdoers] or from their innocent rivals. . . . Because purchasers from the innocent suppliers pay a monopoly overcharge just as certainly as if they had bought from the [wrongdoers], their injury can be compensated only by allowing them to sue the [wrongdoers].

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 347 (5th ed. 2026).[4] For example, one NCAP purchased apparatuses directly from Seagrave at inflated prices. It seeks to recover damages from the named Defendants for the overcharges it paid Seagrave, which foreseeably and directly resulted from Defendants' consolidation of the relevant markets. *See* NCAP CAC ¶¶ 455-458.

Finally, another significant source of damages to public entities is delivery delays. *See, e.g.*, NCAP CAC ¶¶ 383, 393. Fire departments used to be able to obtain a customized fire apparatus, built to the department's specifications, within a year of order. *See, e.g., id.* ¶ 393. Now, because of the acquisitions, fire departments are waiting three or four years or longer. *See, e.g., id.* ¶¶ 412, 439. Some have even been told by Defendants that the only way to get their apparatus on time is to pay even more. *Id.* ¶¶ 460-461. As NCAPs allege, every year of delay is worth potentially hundreds of thousands of dollars. *Id.* ¶ 383. The Non-Class Actions seek to recover damages for these delivery delays.

### B. In Contrast, the Relevant Class Complaint(s) Allege a Conspiracy, Omit Numerous Relevant Markets, Name Rosenbauer and FAMA, Have Omitted BME Defendants, Have Omitted Clayton Act Section 7 and Sherman Act Section 2 Claims, and Do Not Challenge Pierce's Replacement Parts Conduct

In contrast to the Non-Class Actions, the class actions allege a *conspiracy* amongst REV Group, Oshkosh, and *Rosenbauer* entities (which are not named as defendants in the Non-Class

---

[4] As the Seventh Circuit has explained in the context of a cartel, "A cartel cuts output, which elevates price throughout the market; customers of fringe firms (sellers that have not joined the cartel) pay this higher price, and thus suffer antitrust injury, just like customers of the cartel's members." *United States Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627-28 (7th Cir. 2003); *see also In re Uranium Antitrust Litig.*, 556 F. Supp. 806, 807-08 (N.D. Ill. 1983); *CBS Corp. v. Sumitomo Corp. (In re Copper Antitrust Litig.)*, 2000 U.S. Dist. LEXIS 23741, at *51 (W.D. Wis. July 7, 2000). The umbrella price-effects theory applies equally to unlawful consolidation, which allows the merged party to cut output and elevate prices even more effectively than a cartel.

Actions), through the *Fire Apparatus Manufacturers' Association* (also not named as a defendant in the Non-Class Actions), to exchange information, reduce output, and increase prices for fire apparatuses. As the first substantive paragraph of DPPs' Consolidated Amended Class Action Complaint ("DPP CAC"), filed in March by Interim Lead DPP Class Counsel,[5] summarizes:

> [B]eginning in or about January 1, 2016, Manufacturer Defendants and the other Defendants entered into an agreement, combination, or conspiracy to limit the supply, and to fix, raise, maintain, or stabilize prices of Fire Apparatus sold in the United States at supra-competitive levels. As a result of Defendants' unlawful conduct, Plaintiffs and the Class paid artificially inflated prices for Fire Apparatus during the Class Period.[6]

Similarly, IPPs' CAC filed in March by Interim Lead IPP Class Counsel alleges:

> Manufacturer Defendants . . . conspired to raise prices almost twofold and restrict output rather than compete. The Manufacturer Defendants shared competitively sensitive information to facilitate their scheme through another entity, FAMA, an exclusive trade organization to which they belonged. . . . FAMA also held regular meetings attended by the Manufacturer Defendants, which provided ample opportunity to collude. Thanks to their conspiracy, Manufacturer Defendants have been able to increase their margins by several percentage points and boost total profits, all without concern that their competitors will try to steal market share.[7]

---

[5] NCAPs cite to the CACs filed by Interim Lead DPP and IPP Counsel in March before Judge Conway because these were the operative complaints for the majority of the period of outreach efforts of which Class Counsel complains, and they conform substantially to the original class action complaints these Counsel filed in August and October 2025. *See* Class Action Complaint, *City of La Crosse v. Oshkosh Corp., et al.*, Case No. 25-cv-01252-BBC (Aug. 20, 2025), ECF No. 1 ("*La Crosse* Complaint"); Class Action Complaint, *City of Augusta v. Oshkosh Corp., et al.*, Case No. 25-cv-01543-BBC (Oct. 7, 2025), ECF No. 1 ("*Augusta* Complaint"). As discussed *supra*, Section II, on May 22, 2026, Interim Lead DPP Class Counsel filed a materially different first amended CAC in which they attempted superficially to import some (but not nearly all) of the unique allegations, relevant markets, claims, and defendants from NCAPs' complaints.

[6] DPP CAC ¶ 3, *In re Direct Purchaser Fire Apparatus Antitrust Litig.*, Case No. 25-cv-1252-BBC (March 11, 2026), ECF No. 90 at ¶ 3.

[7] IPP Consolidated Amended Class Action Complaint ("IPP CAC"), *City of La Crosse, et al. v. Oshkosh Corp., et al.*, Case No. 25-cv-01252-BBC (March 23, 2026), ECF No. 94 at ¶¶ 6-8.

The class CACs allege a single relevant market—the national market for fire apparatuses. *See* DPP CAC ¶ 182; IPP CAC ¶ 173. The CACs do not allege NCAPs' relevant markets for Custom Chassis, Custom Pumpers, Custom Aerials, Custom Quints, or Wildland Fire Apparatuses. *Id.* The CACs also omit multiple defendants named in the Non-Class Actions, including most notably the BME Defendants.[8]

The only claims in IPPs' CAC are two federal antitrust claims for violation of Sherman Act *Section 1* and its state-law equivalents. IPP CAC ¶¶ 226-305; *see* 15 U.S.C. § 1. This has been the case since Interim Lead IPP Class Counsel filed their first complaint, in August 2025; their pleading has always omitted a Clayton Act Section 7 claim and Sherman Act Section 2 claim. *See* La Crosse Complaint ¶¶ 131-157. Indeed, as recently as May 13, Interim Lead IPP Class Counsel Steve Berman stated: "[W]e're not bringing a [Clayton Act Section 7] claim . . . . We researched it and don't agree with it. . . . [W]e have to have the authority to decide what claims we should be bringing." Tr. of Tel. Conf. at 16-17 (May 13, 2026) (Simonsen Decl. ¶ 7 & ECF No. 68-1).[9]  The IPP CAC also omits Pierce replacement-parts claims.

As for Interim Lead DPP Class Counsel, their original complaint filed in October 2025, like IPPs', alleged only violations of Sherman Act Section 1, related to their alleged horizontal

---

[8] As discussed, on May 22, 2026, DPPs filed a first amended CAC in which they added the BME Defendants to new Sherman Act Section 2 claims (but not to the preexisting Clayton Act Section 7 claim) and purported to add "submarkets" for "fire apparatus chassis" and wildland fire apparatuses. *See* Simonsen Decl. Ex. A ¶¶ 90-96. DPPs' "fire apparatus chassis" market—which includes all custom *and commercial* chassis—is entirely distinct from NCAPs' alleged highly concentrated Custom Chassis market. *See* NCAP CAC ¶ 143.

[9] While Interim Lead IPP Class Counsel appears to have had a change of heart—recently announcing in their May 22 leadership motion that they now intend to add a Clayton Act Section 7 claim, *see* ECF No. 63 at 7—this intent does not change the fact that for the entire period of Lead NCAP Counsel's client outreach at issue here, the operative IPP class complaint has never included a mergers-and-acquisitions claim.

conspiracy. *See* Augusta Complaint ¶¶ 132-150. In March 2026, they filed an amended complaint in which they again asserted their Sherman Act Section 1 "Restraint of Trade" claim and, curiously, added another "Restraint of Trade" claim, allegedly a violation of Clayton Act Section 7 (which governs not restraints of trade but mergers and acquisitions). *See* DPP CAC ¶¶ 242-264. DPPs never asserted a Sherman Act Section 2 claim until their May 22 amendment.[10] Nor have they ever alleged anything related to Pierce's conduct in replacement parts markets.

As discussed, DPPs include a claim styled "Clayton Act" "Section 7." However, this claim appears to be an attempt to repackage a conspiracy claim as a violation of Section 7. Among other gaps, DPPs' Clayton Act Section 7 claim does not cover the Custom Chassis, Custom Pumpers, Custom Aerials, and Custom Quints markets and omits the BME Defendants. *See* ECF No. 59 at 81. DPPs also omit multiple theories of Clayton Act Section 7 liability on which NCAPs' claims are based, including violations of vertical merger law, potential competition, elimination of head-to-head competition, and entrenchment.[11]

The class cases also differ substantially from the Non-Class Actions in that they appear to seek to recover damages only for price increases.[12] But as discussed, another significant source

---

[10] DPPs' May 22 amended pleading still does not allege the same Sherman Act Section 2 claims alleged by NCAPs. DPPs allege attempted monopolization only of the markets for "Fire Apparatus and Fire Apparatus Chassis." *See* ECF No. 59 ¶¶ 299, 302, 305. By contrast, NCAPs allege Sherman Act Section 2 claims affecting relevant markets for *Custom* Chassis (a completely different market from all fire apparatus chassis), Custom Pumpers, Custom Aerials, Custom Quints, and Wildland Fire Apparatuses. *See* NCAP CAC ¶¶ 182-231, 649-679.

[11] *See e.g.*, *Illumina, Inc. v. FTC*, 88 F. 4th 1036 (5th Cir. 2023) (affirming condemnation of vertical merger); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) (describing potential competition law); *FTC v. Edwards Lifesciences Corp.*, 2026 U.S. Dist. LEXIS 19409, at *80-81 (D.D.C. Jan. 9, 2026) (enjoining proposed merger due to the elimination of head-to-head competition); *FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) (condemning merger due to probability of anticompetitive entrenchment).

[12] *See, e.g.*, DPP CAC ¶¶ 228-30 (alleging only price effects); IPP CAC ¶¶ 215-217 (same).

11

of quantifiable damages to public entities are the *delivery delays* they have been forced to endure. The class cases also do not seek to recover damages for purchases of *non-defendants'* apparatuses in the impacted relevant markets (i.e., umbrella damages),[13] even though this is a recognized category of antitrust damage. *See supra*, pages 7-8. Thus, the only way public entities can recover damages for delivery delays and purchases from non-defendants appears to be through their own action.

Because of these significant unaddressed gaps in each of DPPs' successive pleadings, and because IPPs' pleadings have never included any of NCAPs' claims, Lead NCAP Counsel could not have, did not, and cannot advise their clients that they were or are "covered" by the putative class actions. *Contra* ECF No. 90 at 15-16 n.13 (Class Counsel arguing the "class actions . . . cover the claims of the" Non-Class Actions). Lead NCAP Counsel should not now be ordered to advise their actual and potential clients that they "do not need to sue" in order to recover damages for the injuries they have suffered (ECF No. 90-1 at 1). Lead Class Counsel's pleadings simply do not "encompass[]" (ECF No. 90 at 2) all of NCAPs' claims or claimed damages.

### C. The Class Actions Fail to Assert Federal or State-Law Claims on Behalf of Their Putative Class Members

Between the two class cases, Interim Lead Class Counsel claims they represent all purchasers of fire apparatuses. IPPs claim to represent entities that "purchased Fire Apparatus made by any of the Manufacturer Defendants *from a retailer, dealer* or other method that does not include direct purchases from the manufacturers." IPP CAC ¶ 1 (emphasis added). In contrast, DPPs seek to represent "[a]ll direct purchasers." DPP CAC ¶ 232. Lead NCAP Counsel

---

[13] *See* DPP CAC ¶ 1 (DPPs represent "direct purchasers" of "Fire Apparatus *from any Manufacturer Defendant(s)*"); IPP CAC ¶ 1 (same, with respect to "indirect purchasers").

accordingly understands that if a dealer was involved in a public entity's purchase, that public entity will be claimed by the IPPs and will not be covered by the DPPs' CAC.

A dealer was involved in many public entities' purchases. To be clear, this does not render NCAPs "indirect purchasers" for purposes of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the controversial U.S. Supreme Court decision that "held that, in general, a downstream plaintiff cannot sue an alleged monopolist or cartel member on a theory that a middleman passed an anticompetitive overcharge on to her." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 838 (7th Cir. 2020). For example, the majority of NCAPs entered into a purchase-and-sale agreement directly with a defendant manufacturer, via a master contract negotiated by a cooperative purchasing organization like Sourcewell or HGAC.[14] Those contracts provide that the public entity may still purchase the apparatus from a dealer, but the dealer must honor the price and other terms negotiated between the cooperative purchasing organization (in whose shoes the public entity stands) and the manufacturer. *See, e.g.*, NCAP CAC ¶¶ 156, 166. Indeed, some dealers, recognizing that dealers do not themselves incur Defendants' overcharges, enter into assignment agreements, which explicitly state that the dealer and the city:

> recognize that in actual economic practice, overcharges by the [dealer's] suppliers [e.g., Defendant manufacturers] resulting from violations of state or federal antitrust laws are in fact borne by the City. Therefore, the [dealer] assigns to the City any and all causes of action both now and in the future that it may have against any party under all state and federal antitrust laws for the products or services that are the subject of this Contract.[15]

---

[14] *See, e.g.*, NCAP CAC ¶¶ 155-57, 164-71, 175-75 (alleging details of cooperative purchasing contracts); *id.* ¶¶ 387, 398 (Los Angeles County Plaintiffs used Sourcewell contract with manufacturer); *id.* ¶ 407 (City of San Diego used Sourcewell); *id.* ¶ 418 (Ebbetts Pass Fire Protection District used HGAC); etc.

[15] NCAP CAC ¶ 176; *see* Complaint, *Mayor & City Council of Baltimore v. REV Group, Inc., et al.*, Case No. 26-cv-02202-ABA (D. Md. June 2, 2026), ECF No. 1 at ¶ 320.

13

Thus, while such public entities may technically have "purchased . . . from a . . . dealer"—i.e., fit the IPP class definition—they are direct purchasers for purposes of *Illinois Brick*.

This issue of the status of public entities as "direct" or "indirect" purchasers—and therefore whether they are included in either the putative DPP or IPP class—raises two issues relevant to Class Counsel's Motion. First, most public entities appear to belong to the putative IPP class, and not the DPP class, because a dealer was involved in their purchases. But as discussed, Lead IPP Class Counsel's CAC does not assert *any* of the claims included in the Non-Class Actions. It instead alleges an entirely different theory for the dramatic price increases observed in the market: a conspiracy, rather than mergers and acquisitions. If NCAPs are right— if the explanation for the exorbitantly higher prices and delivery delays is the industry consolidation and not a hypothesized "conspiracy"—then it is *imperative* that these public entities, whose purchases involved a dealer, file their own actions, and that they be informed of the opportunity to do so.

Second, the way that Interim Lead DPP and IPP Counsel appear to have "divided territories"—with IPPs claiming representation of purchasers that used a dealer, and DPPs claiming representation of those that did not—appears to produce substantial gaps in coverage. As for DPPs, they assert only federal-law causes of action. *See* ECF No. 59 at 80-86. They have failed to assert on behalf of "direct purchasers" any state antitrust-law claims. For example, the Wisconsin Antitrust Law provides for a six-year statute of limitations, versus four years under federal law. Wis. Stat. Ann. § 133.18(2). But DPPs have failed to include any Wisconsin Antitrust Law claims in the CAC, which means every single public entity that qualifies as a "direct purchaser" and not an "indirect purchaser" could give up any right to relief it has under that law—potentially *two additional years* of damages, *trebled*—unless it files its own action.

Meanwhile, the IPP CAC omits federal claims for damages and omits claims for damages under all the laws of all the states that have not repealed *Illinois Brick*, despite the fact that many public entities that purchased through a dealer may nevertheless be considered direct purchasers for purposes of *Illinois Brick*—i.e., may not be barred from recovering damages under the Clayton Act and laws of states that follow *Illinois Brick*. *See supra*, pages 13-14. Yet Interim Lead IPP Class Counsel appears to have simply given up trying to recover damages under federal law and state laws that follow *Illinois Brick* for these public entities. For these public entities in *Illinois Brick* states, the avenue for recovering compensation is to file their own action.

Despite all of the differences between the class and non-class claims, and despite the class cases' significant gaps in coverage, Class Counsel has the audacity to assert that "the class actions already cover every recipient of the Solicitation" (ECF No. 90 at 13) and to seek a Court order that every recipient of Lead NCAP Counsel's brochure be sent a "Notice" advising them that "[w]hile the proposed class action is pending, *you do not need to sue* because you may be part of a proposed class" (ECF No. 90-1 at 1) (emphasis added). Nothing could be further from the truth. The "impression" that Class Counsel claims the brochure "gives"—that "the statute of limitations may be running"—is not "false" (ECF No. 90 at 11); it is sound advice.[16]

The impropriety of DPP Class Counsel's Motion is compounded in light of the high degree of variation across public entities in terms of impact from Defendants' conduct. This

---

[16] *See Rochford v. Joyce*, 755 F. Supp. 1423, 1428-29 (N.D. Ill. 1990) ("The statute of limitations will not be tolled for plaintiffs having 'different or peripheral' claims from those in the original class action suit. . . . To ensure fairness, the later action must be similar enough to the earlier action so that the defendants are notified of the substantive claims against them, as well as the number and generic identifies of the potential plaintiffs.") (quoting *Crown v. Parker*, 462 U.S. 345, 354 (1983) (Powell, J., concurring), and *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 562 (1974) (Blackmun, J., concurring)).

variation is highly indicative that the supracompetitive charges levied across the industry reflect Defendants' ability to opportunistically overcharge specific municipal entities—as opposed to imposing a uniform overcharge—requiring specific proof for each victim.[17] For example, in 2020 one NCAP county entered into a five-year purchasing contract directly with Defendant Ferrara, with pre-set price increases at the end of each year. NCAP CAC ¶ 401. Several years later, Ferrara sought to impose the kinds of price increases it was getting away with charging other public entities. *Id.* Nevertheless, the County insisted that Ferrara honor the contract, allowing the County to avoid substantial overcharges. *Id.* ¶ 402. But as the complaint goes on to explain, Ferrara managed to inflict economic harms in other ways—for example, by moving the County to the back of the production line and delivering apparatuses that had to sit out of service for nearly a year while warranty work was performed. *Id.*

Based on these and other fact patterns alleged in NCAPs' complaints, Lead NCAP Counsel believes public entities may be better served filing their own actions, in order to fully develop and prove the full range of their damages.[18] NCAP Counsel's past, current, and potential clients have a First Amendment right to receive these informed assessments and analyses, and the Court should not order that they be contacted by Class Counsel in order to be lulled into inaction by a false sense of security—a "Notice" that misunderstands the crucial differences

---

[17] Crucially, these disparate overcharges greatly undermine alternative or benign, macro-economic explanations such as an influx of federal COVID-19 relief funds or inflation, as the Defendants repeatedly and incorrectly suggest in an attempt to avoid liability for their anticompetitive conduct.

[18] Certainly the fact that 21 public entities and counting have deliberated and decided to file their own individual actions undermines Class Counsel's allegation that "Class Members do not have interest in individually controlling the prosecution of separate actions" and that "absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged." DPP CAC ¶ 240; *see also* IPP CAC ¶ 214.

between the Non-Class Actions and class cases and suggests a world in which public entities "may only need to file a claim form at an appropriate time to get [their] share of any such recovery without taking any other action" (ECF No. 90-1 at 1).

## IV. Lead NCAP Counsel's Accurate Initial Informational Brochure Sent to Attorneys for Sophisticated Public Entities, Resulting in Either No Action or the Start of a Highly Deliberative Process, Misled No One

The differences between the class and non-class actions and the misleading nature of the "Notice" Class Counsel seeks to disseminate should end the inquiry. But Class Counsel's proposed "Notice" and "amend[ments]" to Lead NCAP Counsel's informational brochure are doubly inappropriate in light of the target audience: not laypeople, not recent victims of natural disasters, but practicing lawyers for sophisticated public entities. *See* Fiske Decl. ¶ 9; Young Decl. ¶¶ 4-7.

Lead NCAP Counsel can attest that a public entity that qualifies as a member of one of the putative classes generally follows a robust and deliberative process before pursuing any affirmative litigation. Fisk Decl. ¶¶ 7-8. Indeed, many public entities—such as NCAPs City of Baltimore, County of Los Angeles, and City of Oakland—have entire affirmative litigation departments dedicated to evaluating whether and in what form to file legal actions. *Id.* ¶ 7. The receipt by these public-entity counsel of initial outreach from outside counsel is generally the first step in a long and deliberative process of evaluating the claims, including phone calls and video conferences, the exchange of memos, and closed-session meetings culminating in votes by elected officials. *Id.* ¶¶ 7-8; Young Decl. ¶¶ 4-7. Lead NCAP Counsel can attest that in the course of these communications, every single NCAP was made aware of the existence of the class cases at the time they were evaluating whether to file their own action and considered the costs and benefits of doing so. Fiske Decl. ¶ 10; Young Decl. ¶ 10. Unlike class cases, individual (non-class) actions are not a "sign up here" or "check this box" process. Lead NCAP Counsel's clients

17

treat litigation in their own name with the utmost seriousness. When they decide to file an individual action—often after months of deliberation—it is because they are fully informed. Fiske Decl. ¶¶ 7-8.

Class Counsel's other feigned concerns for "confusion" on the part of absent class members are similarly not credible. Class Counsel takes issue with the informational brochure's reference to the "nationwide" scope of NCAPs' actions. But NCAPs allege national markets and seek nationwide relief—the unwinding of Defendants' unlawful acquisitions and the restoration to victims nationwide of monies unlawfully taken from them by Defendants. *See, e.g.*, NCAP CAC ¶¶ 12, 22-23, 232-44, 385, 1098. Lead NCAP Counsel therefore accurately describes these actions as "nationwide" in scope (ECF No. 91-1 at 4). Class Counsel claims "the only nationwide damage claims are those at issue in the class actions" and that the Non-Class Actions "can only recover for the particularized plaintiff(s) who filed the complaint." ECF No. 90 at 12-13. They are incorrect on two levels. Individual plaintiffs can recover nationwide injunctive relief that benefits all, and regardless, the non-class claims include *representative* claims for restitution in the name of the People of the State of California on behalf of all victims nationwide. *See* NCAP CAC ¶¶ 23, 1065-1079, 1098(d).

In short, the only relevant evidence in the record is that Lead NCAP Counsel's brochure is truthful and accurate and that NCAPs made informed and considered decisions to file their non-class actions after a long and deliberative process. No one has been misled.[19]

---

[19] Class Counsel points to isolated examples of Young & Partners contacting an in-house or outside attorney for the City of Philadelphia after it had filed suit. ECF No. 90 at 6 & Joint Decl. ¶ 9. This was inadvertent, *see* Young Decl. ¶¶ 7-9, and is irrelevant to the Motion, which relates to Lead NCAP Counsel's informational brochure.

**V. The Order Class Counsel Asks the Court to Enter Would Violate the First Amendment's Prohibition on Undue Restraints on Speech and Compelled Speech**

In the context of attorney advertising, it is "well established that lawyer advertising is commercial speech and, as such, is accorded a measure of First Amendment protection." *Fla. Bar v. Went for It*, 515 U.S. 618, 622-24 (1995) (collecting cases). Indeed, "the Supreme Court . . . has commented on the importance of ensuring that class members make an informed decision whether to remain in a prospective class" or bring their own action, and truthful and accurate solicitations from informed counsel can help enable that informed decision. *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 313 (3d Cir. 2005) (citing *Am. Pipe*, 414 U.S. at 549). Because Lead NCAP Counsel's brochure is truthful, accurate, and informative, it is protected speech under the First Amendment, and the Court cannot order Class Counsel's requested relief without violating that sacred right.

The U.S. Supreme Court has warned that "[w]hen the government polices the content of professional speech," as Class Counsel asks the Court to do here, "it can fail to '"preserve an uninhibited marketplace of ideas in which truth will ultimately prevail."'" *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 772 (2018) (quoting *McCullen v. Coakley*, 573 U. S. 464, 476 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984))). This is the animating principle behind the First Amendment's protections of free speech and expression, which includes not only the "right to advertise," but also the "reciprocal right to receive the advertising." *Va. State Bd. of Pharmacy*, 425 U.S. at 757 n.15.

The Supreme Court has explained why we recognize First Amendment protections for commercial speech. "As to the particular consumer's interest in the free flow of commercial information"—here, information about potential legal redress for injuries resulting from monopolistic practices—"that interest may be as keen, if not keener by far, than his interest in

19

the day's most urgent political debate." *Id.* at 763. Indeed, here, information about potentially stronger paths to relief than those being pursued by Interim Lead Class Counsel could mean the difference between the status quo of skyrocketing prices and delivery delays for lifesaving fire apparatuses into perpetuity, and a strong court order requiring the breakup of Defendants' massive corporations and meaningful monetary compensation.

With respect to attorney solicitations, courts "engage in 'intermediate' scrutiny of restrictions on commercial speech" such as Class Counsel seeks here, analyzing them under the *Central Hudson* framework. *Fla. Bar*, 515 U.S. at 623 (1995) (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557 (1980)). "Under *Central Hudson*, the government may freely regulate commercial speech that concerns unlawful activity or is misleading. . . . Commercial speech that falls into neither of those categories . . . may be regulated if the government satisfies a test consisting of three related prongs: First, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction on commercial speech directly and materially advances that interest; and third, the regulation must be 'narrowly drawn.'" *Id.* at 623-24.

### A. The Informational Brochure Is Truthful and Not Misleading, and Therefore Any Interference with That Speech Must Satisfy Intermediate Scrutiny

As discussed above, nothing about the informational brochure is abusive or misleading. It is an initial informational document sent to highly sophisticated attorneys representing public entities that provides truthful information about the potential claims and paths to relief they may pursue—including claims and relief that the Class Actions filed by Interim Lead Class Counsel have *not* pursued. Accordingly, government regulation of that speech—including the court-ordered "Notice" Class Counsel seeks here—must satisfy intermediate scrutiny.

### B. Class Counsel Has Failed to Demonstrate Any Harm Caused by the Informational Brochure or That Their Proposed "Notice" Will Do Anything

20

Class Counsel satisfies none of the required prongs of the *Central Hudson* test. *See Fla. Bar*, 515 U.S. at 623-24. As to the first prong, Class Counsel asserts that the interest supposedly served by the statements they seek to have this Court *mandate* be disseminated is "to protect and reinforce the salutary goals of the Rule 23 class action process from the dissemination and use of incomplete, confusing and potentially misleading advertising and marketing materials" (ECF No. 90 at 1). But as discussed, Class Counsel has failed to establish that there is anything incomplete, confusing, or misleading about Lead NCAP Counsel's informational brochure.

Class Counsel's proposed court-mandated "corrective" communications also fail the second prong of the *Central Hudson* test. Far from directly and materially advancing any governmental interest, Class Counsel's proposed court-mandated statements are themselves misleading. As discussed *supra*, Class Counsel seeks a court order allowing them—and compelling Lead NCAP Counsel against their professional judgment—to tell public entities that "[w]hile the proposed class action is pending, you do not need to sue" (ECF No. 90-1 at 1). The opposite is true. In other words, Class Counsel's proposed regulation of speech would undermine, rather than promote, the governmental interest in the dissemination of truthful information and informed decisionmaking.

Third, Class Counsel's proposed "Notice" is not narrowly drawn. Perplexingly, Class Counsel seeks to send the proposed "Notice" to every public-entity attorney who received the informational brochure and has *not* filed their own action. But by definition, this subset of recipients cannot possibly have made the supposed miscalculation that Class Counsel would seek to "cure"—they remain merely passive members of a putative class. Meanwhile, the public-entity attorneys who received the brochure and whose clients *have* filed an action went through a highly deliberative and informed process; they do not need a "Notice" from DPP Counsel that

21

condescendingly informs them of the basic distinctions between class and non-class actions. They do not need to be told that "you have the right to hire your own attorneys and pay them yourself to file an individual lawsuit, if you believe that is in your best interest" (ECF No. 90-1 at 1). These public entities' attorneys have already determined a individual action is in their best interest, and they haven't had to "pay" their lawyers anything. Blasting a deliberately misleading "Notice" out to anyone who received an initial piece of information about potential non-class claims, effectively discouraging them from pursuing them, is anything but narrowly tailored.

### C. Class Counsel Seeks to Have the Court Compel Lead NCAP Counsel's Speech Against Their Informed Judgment

While Class Counsel claims that "[t]he requested ['notice'] is not meant as an injunction against solicitation efforts generally" (ECF No. 90 at 15 n.13), that is exactly what it is. Were the Court to find that the initial outreach efforts to public-entity attorneys in which Lead NCAP Counsel engaged—outreach efforts that are so common that even Interim Lead DPP Class Counsel engages in them[20]—are misleading and require a "curative" notice, the ramifications would be extreme. If lawyers cannot send accurate informational brochures about potential legal action to other lawyers, inviting them to do nothing other than contact them to learn more, then they cannot—and will not—engage in attorney advertising at all. Yet the U.S. Supreme Court has repeatedly emphasized that "commercial speech . . . performs an indispensable role in the

---

[20] Interim Lead DPP Class Counsel Preti, Flaherty, Beliveau & Pachios, LLP ("Preti") engages in the same outreach efforts to putative class members after interim lead class counsel has been appointed that they complain of here. Specifically, after the court in *In re Insulin Pricing Litigation* appointed lead counsel for the class and non-class tracks of that litigation, a Preti attorney working with Young & Partners—the public-entity law firm identified in Class Counsel's Motion that has been retained by clients to file Non-Class Actions with Lead NCAP Counsel in this litigation—contacted multiple public entities seeking to recruit them to file their own non-class. *See* Young Decl. ¶¶ 8, 11.

22

allocation of resources in a free enterprise system. . . . [S]uch speech serves individual and societal interests in assuring informed and reliable decisionmaking." *Bates v. State Bar of Ariz.*, 433 U.S. 350, 363-64 (1977). The Motion seeks an effective injunction on free speech.

In fact, it is worse. Class Counsel seeks not just a court-ordered "curative communication." They seek a *mandatory injunction* requiring Lead NCAP Counsel to "amend[]" their informational brochure to include false and misleading statements with which Lead NCAP Counsel, in their professional judgment and experience and based on their deep familiarity with the Non-Class Actions, strongly disagrees. In other words, they seek to compel Lead NCAP Counsel's speech, a frontal "offen[se]" to the fundamental First Amendment principle that "the government may not compel a person to . . . include other ideas with his own speech that he would prefer not to include." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586-87 (2023). If Class Counsel believes public entities are better off remaining absent members of the putative classes and not filing their own actions, the answer under binding U.S. Supreme Court precedent is for them to speak—not to stop or compel Lead NCAP Counsel's speech. They are free to convene meetings with public entities to discuss their "conspiracy" claims and to provide *accurate* information about the pros and cons of filing an individual action. Indeed, Lead NCAP Counsel is confident that Lead Class Counsel has been doing precisely this. That these outreach efforts do not appear to be working—that public entities are increasingly deciding they are best served by filing their own actions—does not allow Class Counsel to shut down other lawyers' efforts to provide the best legal representation and strongest possible claims to public entities.

## VI. No Facts Establish the "Clear Record" or Permit the "Specific Findings" of a "Serious Threat to the Fairness" of this Proceeding to Justify Class Counsel's Requested Infringement of First Amendment Rights

Orders under Fed. R. Civ. P. 23(d) "regulating communications between litigants . . . pose a grave threat to first amendment freedom of speech" and "must be exercised within the bounds

of the first amendment." *Calobrace v. Am. Nat'l Can Co.*, 1995 U.S. Dist. LEXIS 1348, at *12 (N.D. Ill. Feb. 2, 1995) (alterations omitted) (citing *Gulf Oil*, 452 U.S. at 100, 101 n.2). Consistent with the First Amendment principles discussed above, a court order that "interfere[s] with [counsel's] efforts to inform potential class members of the existence of [a potential] lawsuit" by "limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil*, 452 U.S. at 101; *see Williams v. Chartwell Fin. Servs.*, 204 F.3d 748, 759 (7th Cir. 2000) ("The Supreme Court was clear . . . that order should be based on a clear record and specific findings."). Indeed, as the Manual for Complex Litigation provides, "[m]ost judges are reluctant to restrict communications between the parties or their counsel and potential class members, except when necessary to prevent serious misconduct," as regulation of such communications "could implicate the First Amendment." Manual for Complex Litigation (Fourth) § 21.12 (2004).

The court's authority to restrict communications with class members is particularly limited before a class is certified, even if interim lead class counsel has been appointed. That is because "[b]efore class certification, there is no class and no class counsel." *Lukis v. Whitepages Inc.*, 549 F. Supp. 3d 798, 808 (N.D. Ill. 2021). "While lead counsel owes a generalized duty to unnamed class members, the existence of such a fiduciary duty does not create an inviolate attorney-client relationship with" absent class members. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1239, 1245 (N.D. Cal. 2000).

Thus, "[p]rior to class certification, Plaintiffs' counsel may solicit absent class members in compliance with all applicable ethics rules." Joshua P. Davis & Candice L. Enders, *The ABA's Ethical Codes*, in Class Actions and Other Complex Litigation: Ethics § 1.03 (LexisNexis 2023);

24

*Stanich v. Travelers Indem. Co.*, 259 F.R.D. 294, 316 (N.D. Ohio 2009) ("Courts generally hold that there is nothing wrong with soliciting class members by advertisement."). As the Sixth Circuit explained in a case cited by Class Counsel, "[t]here is nothing inherently abusive about engaging clients who later end up members of a class" once it is certified. *Fox v. Saginaw County*, 35 F.4th 1042, 1050 (6th Cir. 2022). "In fact, it makes sense that lawyers might engage clients who could later become class members—they are people with viable legal claims. And often potential plaintiffs are not even aware of their rights." *Id.* Thus, a "determination that a communication between outside counsel and an absent class member would be a violation of an attorney's ethical duty would essentially eviscerate th[e][] right" for absent class members to retain their own counsel. *Cmty. Bank*, 418 F.3d at 313.

The only record facts here are that Lead NCAP Counsel sent a truthful and accurate initial informational brochure to attorneys for sophisticated public-entity members of uncertified classes, welcoming them to contact Lead NCAP Counsel to learn more about potential claims. On these facts, there is no "clear record" and there can be no "specific findings" that Lead NCAP Counsel's communications are "abusive in that [they] threaten[] the proper functioning of the litigation," such that the Court could entertain Class Counsel's requested relief. *Kay Co., LLC v. Equitable Prod. Co.*, 246 F.R.D. 260, 262 (S.D. W. Va. 2007).[21] Class Counsel's attempt to liken

---

[21] *See, e.g.*, *Calobrace*, 1995 U.S. Dist. LEXIS 1348, at *13-14 (approving defendants' communication to putative class members because it "does not pose a serious threat to the fairness of representation or the administration of justice," "is not abusive or coercive in any respect," and "in no way interferes with the potential rights of potential class members," and therefore would invade "defendants' First Amendment rights"); *Thomas v. Trs. of Ind. Univ.*, 2018 U.S. Dist. LEXIS 198454, at *12-17 (S.D. Ind. Nov. 21, 2018) (declining to order the "extraordinary restraint sought by Plaintiffs" limiting defendants' communications with class members "at this very early stage of the litigation" where "[t]he Court is hard-pressed to find any

25

Lead NCAP Counsel's informational brochure to the abusive and misleading conduct at issue in the cases cited by Class Counsel "fails to pass the straight-face test." *Burrow v. Sybaris Clubs Int'l, Inc.*, 2014 U.S. Dist. LEXIS 148576, at \*13-14 (N.D. Ill. Oct. 17, 2014). As in *Burrow*, the informational brochure "could not be further from the abusive [communications]" at issue in those cases. *Id.*

Class Counsel appears to believe that *McKesson* is most on-point. But in *McKesson*, the "Notice" that two law firms sent to non-lawyer class members requested that the recipients, by an "arbitrary" date, "retain[] separate counsel . . . [by] pressing a 'Click Here' button on a web page" and authorize that counsel to opt the recipient out of the class action. 126 F. Supp. 2d at 1241-44. The court was particularly concerned with "use of the word 'notice'" and use of "the usual distribution channels for official court notices in securities class actions," which "suggested that the notices were somehow required (or at least authorized) by the court." *Id.* at 1243; *see id.* at 1244 ("[T]he word 'notice,' particularly in the class-action context, has an official meaning. Attorneys have a special obligation not to disguise their advertisements as official-sounding notices."). Moreover, the court rationally inferred that "[a]ny client who retained [the law firms] on the basis of these materials did so without the benefit of adequate information," because they "clicked" to sign up and opt out within days of receiving the misleading "notice." *Id.* at 1245.[22]

---

inaccurate, misleading, coercive, confusing, or abusive communications made by Defendant to the Plaintiffs"); *Kay*, 246 F.R.D. at 263 (refusing to "limit the defendants' discussions with putative class members" pre-certification where "[t]here are no allegations that the defendants have distributed false, misleading, or confusing statements" and no "evidence which indicates that the defendants have attempted to coerce putative members into excluding themselves from the class or undermined cooperation with or confidence in the plaintiffs' counsel").

[22] *McKesson* is also distinguishable in that it concerned a securities class action and therefore implicated the public policy of the Private Securities Litigation Reform Act of "discourag[ing] attorney-driven litigation." 126 F. Supp. 2d at 1242-43.

26

The facts of *McKesson* bear no resemblance to Lead NCAP Counsel's outreach here. Lead NCAP Counsel sent an initial informational brochure, conspicuously labeled "ADVERTISEMENT," to sophisticated attorneys for public entities, inviting them to "contact us to learn more about your legal options" (ECF No. 91-1 at 8), and commencing the beginning of a deliberative and informed process for deciding whether to obtain counsel and initiate litigation. *See* Fiske Decl. ¶¶ 7-8. Every single NCAP remains a silent member of the IPP or DPP class to the extent it fits the class definition. No one has been pressured to opt out, and no one has opted out, of anything. Critically—and unlike in *McKesson*—Class Counsel has not shown and cannot show that the public-entity attorneys who received the informational brochure and elected to file their own action "did so without the benefit of adequate information." *Id.* at 1245. The only evidence is to the contrary—Lead NCAP Counsel's sworn declaration that NCAPs made an informed decision to file their actions. *See* Fiske Decl. ¶¶ 7-10.

Lead NCAP Counsel's remaining cases are equally distinguishable. In *Masonek v. Wells Fargo Bank*, 2009 U.S. Dist. LEXIS 136738 (C.D. Cal. Dec. 21, 2009), the court found the solicitation misleading because it encouraged individual class members to opt out without discussing the process and misled them to believe they must pay an upfront fee in order to participate in the litigation either as an opt-out or as a member of the class. *Id.* at *11. The solicitation in *Matson v. NIBCO Inc.*, 2021 U.S. Dist. LEXIS 108683 (W.D. Tex. June 10, 2021), which similarly induced laypeople to opt out—this time *after* a class was certified—was problematic not because it omitted information about the pending class action but because it

contained numerous affirmative misstatements that precluded informed consent. *Id.* at *16.[23]

Class Counsel cites *Fox v. County of Saginaw*, 2021 U.S. Dist. LEXIS 192576 (E.D. Mich. Oct. 5, 2021), for the proposition that solicitations to class members are misleading when they do not mention the class action, even when no class has been certified. But they fail to advise the Court that the Sixth Circuit *vacated* the district court's order for curative communications to class members who had retained the soliciting firm *before* class certification. *See Fox,* 35 F.4th at 1050-51 ("[T]he court went a step too far by lumping together those who ARI had engaged pre-certification with those it engaged post-certification."). The Sixth Circuit made clear that "we will not penalize the company for engaging clients *before they were class members.*" *Id.* at 1051(emphasis added). The court affirmed the district court's curative communication order only with respect to the class members whom the soliciting firm had induced—with "various factual distortions"—to file their own claims *after* a class had been certified. *Fox*, 2021 U.S. Dist. LEXIS 192576, at *13; *see Fox,* 35 F.4th at 1050-51.

*McWilliams v. Advanced Recovery Systems*, 176 F. Supp. 3d 635 (S.D. Miss. 2016), involved a situation where the class had already been certified at the time of the misleading

---

[23] *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation* is even further off-point. There, a third-party claims filing company, after certification of a settlement class, "made misleading solicitations" to "small and relatively unsophisticated merchants," soliciting them to "needlessly ced[e] a significant portion of their future claims." 2014 U.S. Dist. LEXIS 142213, at *1-3 (E.D.N.Y. Oct. 3, 2014). In the later-dated decision in the same MDL cited by Class Counsel, a different third-party claims filing company, again after certification of a settlement class, "provided class members with misleading or false information about the settlement." 2026 U.S. Dist. LEXIS 101635, at *106 (E.D.N.Y. May 7, 2026). Similarly, in *In re Lupron Marketing and Sales Practices Litigation*, 2004 U.S. Dist. LEXIS 26461 (D. Mass. 2004), the court ordered counsel for intervenors to remove website content found to be "blatantly misleading and deliberately intended to deceive potential plaintiffs into believing that the websites are either court-sanctioned or sponsored by the MDL plaintiffs" and to provide corrective notice. *Id.* at *5.

solicitation—which falsely represented the soliciting lawyer's relationship to the class action—after counsel had already been admonished for this conduct. *Id.* at 641. The court expressly limited its prohibition on further contact to communications with class members who entered into representation agreements with the lawyer *after* the class was certified. *Id.* at 644.

Meanwhile, *County of Santa Clara v. Astra USA, Inc.*, 2010 U.S. Dist. LEXIS 78312 (N.D. Cal. July 8, 2010), did not involve solicitation of clients to bring claims at all. Rather, it addressed a defendant trying to settle with putative class members by sending them checks and letters without a copy of the complaint or information about the case status. *Id.* at *16. Similarly, *Jones v. Jeld-Wen*, 250 F.R.D. 554 (S.D. Fla. 2008), and *Slamon v. Carrizo (Marcellus) LLC*, 2018 U.S. Dist. LEXIS 126157 (M.D. Pa. July 27, 2018), addressed the scope of permissible settlement communications between defendants and putative class members, not solicitation by plaintiffs' counsel, and there the communications were problematic because they affirmatively misled laypeople. *Mitchell v. CoreLogic, Inc.*, 2019 U.S. Dist. LEXIS 221927 (C.D. Cal. July 19, 2019), similarly involved a settlement offer by defendants to laypeople—individuals who had just lost their jobs—this time in violation of a stipulated injunction ordered by the court to forebear from terminating or threatening to terminate employees participating in the lawsuit or from communicating with potential class members during the opt-in period (or with any class members during or after the opt-in period) without court permission.[24]

---

[24] Class Counsel also cites three more inapposite cases involving *defendants* contacting class members seeking settlement or opt-out, two post-certification. *See Braswell v. Bow Plumbing Grp., Inc.*, 2024 U.S. Dist. LEXIS 92478, at *3 (M.D. Ala. May 23, 2024) (class had already been certified, for settlement purposes, at the time of the solicitation, which sought class members—individual homeowners—to opt out of the class settlement.); *Camp v. Alexander*, 300 F.R.D. 617, 624 (N.D. Cal. 2014) (defendants sent a letter to their employees, describing the

29

## VII.    Conclusion

Interim Lead Class Counsel has continuously demonstrated their intent to sideline Lead NCAP Counsel and prejudice the prosecution of the Non-Class Actions. Class Counsel's Motion is just the latest tactic in an ongoing crusade that began even before this Court appointed Lead NCAP Counsel. Class Counsel provides no authority for the extreme abridgement of First Amendment rights they seek in the Motion. Lead NCAP Counsel respectfully requests that the Court deny the Motion.

Dated June 8, 2026                              Respectfully Submitted,

By: /s/ Catherine S. Simonsen
Catherine S. Simonsen (CA SBN 307325)
Thomas G. Mattes (CA SBN 355010)
**SIMONSEN SUSSMAN LLP**
418 Bamboo Lane, Suite C-18
Los Angeles, CA 90012
Tel: (917) 747-5196
Fax: (646) 357-8447
Email: catherine@simonsensussman.com
E-mail: thomas.mattes@simonsensussman.com

Shaoul Sussman (NY SBN 5820782)
Nico Gurian (NY SBN 5590591)
Braden Fain (NY SBN 6198287)
**SIMONSEN SUSSMAN LLP**
307 West 38th Street, 16th Floor
New York, NY 10018
Tel: (646) 693-3929
Fax: (646) 357-8447
Email: shaoul@simonsensussman.com
Email: nico.gurian@simonsensussman.com
Email: braden.fain@simonsensussman.com

---

negative impact of the litigation and asking them to opt out of the case); *Riley v. Flowers Baking Co. of Jamestown, LLC*, 2015 U.S. Dist. LEXIS 90597, at *2 (W.D.N.C. July 13, 2015) (defendants solicited class members to release their claims and ultimately agreed to send a curative notice to class members who signed releases after the class had been certified).

30

Nicolas A. Stebinger (DC SBN 984080)
Victoria R. Sims (DC SBN 1006974)
**SIMONSEN SUSSMAN LLP**
1629 K Street NW, Suite 300
Washington, DC 20006
Tel: (202) 384-3130
Fax: (646) 357-8447
Email: nicolas@simonsensussman.com
Email: victoria.sims@simonsensussman.com

John P. Fiske (CA SBN 249256)
Lindsay R. Stevens (CA SBN 256811)
Jason J. Julius (CA SBN 249036)
**BARON & BUDD, P.C.**
11440 West Bernardo Court, Suite 265
San Diego, CA 92127
Tel: (858) 251-7424
Fax: (214) 523-6600
Email: jfiske@baronbudd.com
Email: lstevens@baronbudd.com
Email: jjulius@baronbudd.com

*Lead Counsel for Non-Class Action Plaintiffs People of the State of California, acting by and through the Los Angeles County Counsel, County of Los Angeles, and Consolidated Fire Protection District of Los Angeles County; People of the State of California, acting by and through the Office of County Counsel, County of San Diego, County of San Diego, and San Diego County Fire Protection District; People of the State of California, acting by and through the San Diego City Attorney's Office, and City of San Diego; Ebbetts Pass Fire Protection District; City of Santa Barbara; County of Butte; County of Shasta; City of Oakland; City of Santa Clara; Unified Fire Authority; City of Hartford; City of Portland, Oregon; City of Allentown; City of Portsmouth; City of Green Bay; City of Yonkers; City of Tucson; City of Albuquerque; City of Emeryville; City of Tempe; City of Baltimore*

31